1

2

3

4

5

6

7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
8
## AT SEATTLE

9  STATE OF WASHINGTON, STATE OF          NO.
   MINNESOTA, STATE OF OREGON,
10 PHYSICIAN 1, PHYSICIAN 2, and          COMPLAINT FOR DECLARATORY
   PHYSICIAN 3,                           AND INJUNCTIVE RELIEF
11
                           Plaintiffs,
12
        v.
13
   DONALD J. TRUMP, in his official
14 capacity as President of the United States;
   U.S. DEPARTMENT OF JUSTICE; PAM
15 BONDI, in her official capacity as the
   United States Attorney General;
16 U.S. DEPARTMENT OF HEALTH AND
   HUMAN SERVICES; DOROTHY FINK,
17 in her official capacity as Acting Secretary
   of the U.S. Department of Health and
18 Human Services; U.S. DEPARTMENT OF
   AGRICULTURE; GARY WASHINGTON,
19 in his official capacity as Acting Secretary
   of the U.S. Department of Agriculture;
20 U.S. DEPARTMENT OF COMMERCE;
   JEREMY PELTER, in his official capacity
21 as Acting Secretary of the Department of
   Commerce; U.S. DEPARTMENT OF
22 DEFENSE; PETE HEGSETH, in his official
   capacity of Secretary of Defense;
23 U.S. DEPARTMENT OF EDUCATION;
   DENISE L. CARTER, in her official
24 capacity as the Acting Secretary of
   Education; U.S. DEPARTMENT OF
25 ENERGY; INGRID KOLB, in her official
   capacity as Acting Secretary of the U.S.
26 Department of Energy;

COMPLAINT FOR DECLARATORY                    1
AND INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  U.S. DEPARTMENT OF VETERANS
   AFFAIRS; TODD B. HUNTER, in his
2  official capacity as Acting Secretary of the
   U.S. Department of Veterans Affairs;
3  NATIONAL AERONAUTICS AND
   SPACE ADMINISTRATION; JANET
4  PETRO, in her official capacity as the acting
   administrator of the National Aeronautics
5  and Space Administration; NATIONAL
   SCIENCE FOUNDATION;
6  SETHURAMAN PANCHANATHAN, in
   his official capacity as Director of the
7  National Science Foundation; OFFICE OF
   THE DIRECTOR OF NATIONAL
8  INTELLIGENCE; LORA SHIAO, in her
   official capacity as Director of National
9  Intelligence; and the UNITED STATES OF
   AMERICA,
10
                    Defendants.
11

12                    **I.    INTRODUCTION**

13        1.      On January 28, 2025, President Trump issued a sweeping Executive Order that

14  targets transgender and gender-diverse youth and their medical providers by trying to cut off

15  access to necessary, often life-saving, health care. The Order attempts to dictate medical care by

16  executive fiat.

17        2.      The Order is a cruel and baseless broadside against transgender youth, their

18  families, and the doctors and medical institutions that provide them this critical care. It is an

19  official statement of bigotry from the President that directs agencies to openly discriminate

20  against vulnerable youth on the basis of their transgender status and sex. It is also a blatant abuse

21  of power. The Order usurps spending and legislative powers belonging exclusively to Congress,

22  and seizes the States' historic police powers to regulate the practice of medicine in violation of

23  the Tenth Amendment.

24        3.      It cannot stand.

25

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    2            ATTORNEY GENERAL OF WASHINGTON
                                                          Complex Litigation Division
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA  98104
                                                          (206) 464-7744

4.      The Order, Executive Order 14,187, is titled "Protecting Children from Chemical and Surgical Mutilation," but that title is false and repugnant. This Complaint will refer to it simply as "the Order."

5.      Relevant to this lawsuit, Section 4 of the Order directs agencies to "immediately" cut off federal research and education grants to medical institutions, including hospitals and medical schools, that provide gender-affirming care. Exec. Order No. 14,187, § 4, 90 C.F.R. 8771 § 4. Absent an injunction, the Order will terminate over one billion dollars of federal funding to the Plaintiff States' medical schools and hospitals that is used to research and treat hundreds of conditions having nothing to do with gender-affirming care, including cancer, AIDS, diabetes, substance use disorder, mental health conditions, autism, aging, cardiovascular diseases, maternal health, and so much more.

6.      The same Order, through Section 8(a), threatens baseless criminal prosecutions against providers by weaponizing a statute prohibiting female genital mutilation of minors, despite the fact that transgender minors do not receive gender-affirming genital surgery, and despite the statute's exclusive application to "non-medical" procedures and express exceptions for medical care provided by a licensed practitioner. *Id.* §§ 8(a)–(b). The Executive Order attempts to redefine non-surgical treatments for minors as "mutilation," but this is frivolous. The statute has no possible bearing on gender-affirming care. Rather, the Order invokes it solely to sow fear among providers and bully them out of providing gender-affirming care at all.

7.      Plaintiff State of Washington, through its instrumentality University of Washington (UW), operates a world class medical school that is part of the integrated health system (UW Medicine). UW Medicine is comprised of multiple separate entities sharing a common mission to improve the health of the public. Physicians who are UW School of Medicine faculty provide gender-affirming medical care to adolescents and adults. UW School of Medicine receives approximately half a billion dollars in federal research and education

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
3
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    grants, as well as other federal funding. The State of Washington operates the State's Medicaid

2    and public health programs covering approximately 1.9 million people.

3        8.    Plaintiff State of Minnesota's residents include people who seek medically-

4    necessary gender-affirming health care for themselves or on behalf of their minor children, as

5    well as providers of such care. In addition, the State of Minnesota regulates the practice of

6    medicine within its state, as well as operates the State's Medicaid and public health programs

7    providing health care coverage for approximately 1.3 million people. The State of Minnesota

8    has a strong interest in protecting the rights and abilities of its residents in seeking and providing

9    medically-necessary care, in preserving its ability to regulate the provision of medical care and

10   the practice of medicine within its border, and in ensuring the operation of its state health

11   insurance and Medicaid programs with coverage for medically-necessary health care services

12   and in accordance with its state laws.

13       9.    Plaintiff State of Oregon oversees and regulates state-created public corporations

14   providing education and health care service functions on behalf of the State of Oregon, as

15   instrumentalities of the State. Within Oregon, the Oregon Health & Science University (OHSU),

16   Oregon State University (OSU), and other state entities and instrumentalities provide gender-

17   affirming care and receive federal grants and federal funding.

18       10.   The Order is immediately effective according to its terms, and it has already been

19   relied on by the Trump Administration to command Plaintiffs to cease performing gender-

20   affirming care and halt research. E.O. 14,187 § 4.

21       11.   The Order also threatens the Physician Plaintiffs and other providers in the

22   Plaintiff States with baseless criminal prosecutions for providing medically appropriate and

23   necessary health care to transgender and gender-diverse patients that is lawful in the Plaintiff

24   States, supported by the overwhelming consensus of medical professionals, and plainly not

25   covered by statute at issue. The Order by itself constitutes a credible threat of criminal

26   enforcement; there is no other way to read it. Further, given the context of President Trump's

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

repeated promises on the campaign trail, and the actions he's already taken in his first 19 days in office, the President's intent to use the Department of Justice to terrorize and criminalize providers of gender-affirming care and families of youth who receive such care cannot be denied.

12.    The effect of the Order on providers of gender-affirming care, transgender and gender-diverse people, and their families has been immediate and severe. Providers fear for their physical and legal safety. And they are afraid to provide medical care that they know is evidence based, lawful where they practice, and can save their patients' lives. Indeed, some have already stopped providing care, feeling compelled to cancel scheduled appointments for fear of federal law enforcement harassment or loss of medical research and education grants.

13.    The Order purports to "protect" youth, but the Order *harms* them. The Order has already, and will continue, to limit physicians' ability to treat patients' gender dysphoria, as well as the unavoidable, grave harm to the health and wellbeing of transgender youth if they are prohibited from receiving necessary medical care, including debilitating anxiety, severe depression, self-harm, and suicide that can accompany untreated dysphoria.

14.    The Order is blatantly unconstitutional. It violates the right to Equal Protection guaranteed by the Fifth Amendment to the United States Constitution because it singles out one vulnerable group for mistreatment. It singles out for restriction and criminalization medical treatments that affirm a patient's gender if inconsistent with that patient's sex. It is an act of malice against transgender and gender-diverse people, is not supported by an exceedingly persuasive justification (let alone any legitimate government interest), and this Court should declare it unlawful and enjoin Defendants from implementing and enforcing it.

15.    The Order also violates constitutional Separation of Powers by usurping Congress's legislative powers and exclusive power of the purse. None of the federal funding that medical institutions, including UW School of Medicine, OHSU, OSU, and other similarly situated entities receive is conditioned on a promise by the institutions that they would deny

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

gender-affirming care to their patients under 19 years of age. Congress has never imposed such a condition, and it is unconstitutional for the President to do so via executive fiat.

16.    And finally, the Order violates the Tenth Amendment. Regulation of the medical profession is a core, traditional exercise of the States' police powers. The President cannot unilaterally, and without any Congressional authorization whatsoever, interfere with the States' prerogatives by criminalizing the provision of safe, effective, and necessary medical care.

## II.    JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

18.    Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because this is an action against an officer, employee, and/or agency of the United States, the Defendants are residents of the Western District of Washington, and a substantial part of the events or omissions giving rise to this action have occurred in the Western District of Washington.

## III.    PARTIES

**A.    Plaintiffs**

19.    Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. As an operator of medical facilities that provides gender-affirming medical care and as a recipient of federal research and education grants, Washington is directly subject to the Order through its instrumentality UW and has standing to vindicate its proprietary interests in delivering high-quality, evidence-based patient care and cutting-edge medical research. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

20.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota's Attorney General, Keith Ellison, is the chief law enforcement officer of Minnesota

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    and is authorized under Minnesota Statutes Chapter 8 and has common law authority to bring

2    this action on behalf of the State and its residents, to vindicate the State's sovereign and quasi-

3    sovereign interests, and to remediate all harm arising out of—and provide full relief for—

4    violations of the law.

5          21.     Plaintiff State of Oregon, represented by and through its Attorney General, is a

6    sovereign state of the United States of America. Attorney General Dan Rayfield is Oregon's

7    chief law enforcement officer. The State of Oregon created OHSU to provide education and

8    health care service functions on behalf of the state. OHSU is a public corporation and

9    instrumentality of the state, and is Oregon's comprehensive public academic health center.

10   Along with Oregon's other public universities, OHSU provides gender-affirming medical care

11   and receives federal research and education grants. Oregon is thus subject to the Order through

12   its state universities and instrumentalities and has standing to vindicate its proprietary interest in

13   ensuring its residents receive high-quality, life-saving patient care, medical research, and

14   education.

15         22.     Together, the States of Washington, Minnesota, and Oregon are referred to as the

16   Plaintiff States.

17         23.     Physician Plaintiff 1 is a UW School of Medicine faculty member licensed by the

18   Washington Medical Commission and board certified by the American Board of Pediatrics in

19   Pediatrics and Adolescent Medicine. Physician Plaintiff 1 is an Assistant Professor in the UW

20   School of Medicine, Department of Pediatrics and is an attending physician at a Seattle hospital

21   where they provide gender-affirming medical care to adolescent patients.

22         24.     Physician Plaintiff 2 is a medical doctor licensed by the Washington Board of

23   Medical Examiners and certified by the American Board of Pediatrics in Pediatrics and

24   Endocrinology. Physician Plaintiff 2 is an Assistant Professor in the UW School of Medicine,

25   Department of Pediatrics and is an attending physician at a Seattle hospital where they provide

26   gender-affirming medical care to adolescent patients.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

25.     Physician Plaintiff 3 is a medical doctor licensed by the Washington Board of Medical Examiners and certified by the American Board of Pediatrics in Pediatrics and Endocrinology. Physician Plaintiff 3 is an Assistant Professor in the UW School of Medicine, Department of Pediatrics and is an attending physician at a Seattle hospital where they provide gender-affirming medical care to adolescent patients.

26.     Together, Physicians 1, 2, and 3 are referred to as the Physician Plaintiffs.

27.     The Plaintiff States and the Physician Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the President's Executive Order, which targets federal funding received by the Plaintiff States' medical institutions pursuant to congressional appropriations and purports to condition that funding on the University's denying gender-affirming care to people under the age of 19 threatens critical aspects of the States' institutions' functions and mission. For example, the UW School of Medicine receives $494 million in research and education grants, of which $417 million were received from the United States Department of Health and Human Services. For another example, OHSU received more than $413 million in federal research grants and contracts in 2023, of which National Institutes of Health (NIH) grants and contracts made up $297 million. Under the terms of the Order, at minimum, more than one billion dollars in federal funding is now illegally conditioned on state institutions' and instrumentalities' denial of gender-affirming care.

28.     The Plaintiff States are also aggrieved in their sovereign capacity. The Order usurps both Congress's exclusive spending and legislative powers, and the States' historic police powers to regulate the practice of medicine reserved to States under the Tenth Amendment. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (recognizing the state's powers to regulate medical professions from "time immemorial").

29.     The Physician Plaintiffs are also aggrieved and have standing because the Order directs the Department of Justice to "prioritize" bad-faith criminal prosecutions based on their provision of necessary medical care that is lawful in the Plaintiff States. Among other things, it

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

purports to redefine non-surgical hormonal treatment as genital mutilation based on a frivolous reading of a federal statute and threatens providers with criminal sanctions. The Order thus constitutes a credible and imminent threat of criminal prosecution against UW School of Medicine faculty who provide gender-affirming care. By defunding and threatening to prosecute gender-affirming care, the Order also forces the Physician Plaintiffs into an impossible choice between complying with the Order or violating their ethical obligations to their patients to provide them medically necessary and appropriate care consistent with the standard of care, which is often gender-affirming care. It also harms the Plaintiff States through their instrumentalities, including the UW School of Medicine and OHSU, which have faculty physicians and surgeons that provide gender-affirming medical care. It impedes these instrumentalities' public-health mission by threatening prosecution for providing medically necessary health care. It also impedes their ability to effectively train their medical and surgical fellows and residents in providing this care.

**B.    Defendants**

30.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

31.    The Department of Justice (DOJ) is an agency of the United States and is responsible for investigating and prosecuting alleged violations of United States criminal law. DOJ has been directed by the Order to investigate and prosecute physicians who provide medically appropriate and necessary gender-affirming care, under a statute that clearly has no application.

32.    Defendant Pam Bondi is the Attorney General of the United States and is sued in her official capacity.

33.    Defendant U.S. Department of Health and Human Services (HHS) is a federal cabinet agency that provides federal research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine and OHSU, and is responsible for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order. HHS includes subagencies the Health Resources and Services Administration and the National Institutes of Health.

34.     Defendant Dorothy Fink is the Acting Secretary of HHS. She oversees the research and education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine and OHSU, through HHS.

35.     Defendant U.S. Department of Agriculture (USDA) is a federal cabinet agency that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

36.     Defendant Gary Washington is the Acting Secretary of USDA. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through USDA.

37.     Defendant U.S. Department of Commerce (DOC) is a federal cabinet agency that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

38.     Defendant Jeremy Pelter is the Acting Secretary of DOC. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through DOC.

39.     Defendant U.S. Department of Defense (DoD) is a federal cabinet agency that that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

40.     Defendant Pete Hegseth is the Secretary of Defense. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through DoD.

41.     Defendant U.S. Department of Energy (DOE) is a federal cabinet agency that that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

42.     Defendant Ingrid Kolb is the Acting Secretary of DOE. She oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through DOE.

43.     Defendant U.S. Department of Veterans Affairs (VA) is a federal cabinet agency that that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

44.     Defendant Todd B. Hunter is the acting Secretary of the VA. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through the VA.

45.     Defendant National Aeronautics and Space Administration (NASA) is a federal agency that that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

46.     Defendant Janet Petro is the Acting Administrator of NASA. She oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through NASA.

47.     Defendant National Science Foundation (NSF) is a federal agency that that provides research or education grants to Plaintiff States' medical institutions, including to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

48.     Defendant Sethuraman Panchanathan is the Director of NSF. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through NHTSA.

49.     Defendant Office of the Director of National Intelligence (ODNI) is a federal agency that that provides research or education grants to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Order, including by issuing regulations, policies, and guidance consistent with the Order.

50.     Defendant Lora Shiao is the Acting Director of ODNI. She oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through ODNI.

51.     Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Order.

## IV.     FACTUAL ALLEGATIONS

**A.     Gender-Affirming Care is Medically Appropriate and Necessary Health Care**

52.     Gender-affirming care is health care explicitly protected by laws in the Plaintiff States and is supported by overwhelming medical consensus, including the American Academy of Family Physicians, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, the American Medical Association, the American Psychological Association, and the Pediatric Endocrine Society, among others. Gender-affirming care supports the health of transgender and gender-diverse people by helping them to live consistently with their gender identity.[1] Such care is multidimensional and can include

---

[1] Plaintiffs use the term "transgender and gender-diverse" to refer inclusively to the population of youth targeted by the Order, understanding that the Order impacts youth who are nonbinary, two-spirit, intersex, genderqueer, and genderfluid, among others.

1  medication, psychiatric and psychological support, and surgical procedures provided by a range

2  of medical professionals.

3      53.    "Gender identity" is the medical term for a person's internal, innate sense of

4  belonging to a particular sex. Everyone has a gender identity. A person's gender identity has a

5  strong biological basis, but the precise causal mechanism is unknown. Several different factors

6  including prenatal hormonal exposure, genetic factors, and brain structure may all contribute to

7  a person's gender identity. A person's gender identity cannot be changed by medical or

8  psychological intervention.

9      54.    Generally, when a child is born, a health care provider or someone else assigns

10  the child a sex. Usually, the sex assigned at birth is consistent, or congruent, with that person's

11  gender identity. Other times the sex assigned at birth turns out to be different from, or

12  incongruent with, the person's innate gender identity. Such individuals are commonly referred

13  to as transgender or gender diverse, but individual people vary in the words they use to express

14  the incongruence between the sex they were assigned at birth and their innate gender identity.

15      55.    If a person's sex assigned at birth is incongruent with their innate gender identity,

16  this can cause varying degrees of gender dysphoria, a serious medical condition. Gender

17  dysphoria is a medical diagnosis contained in the American Psychiatric Association's *Diagnostic*

18  *and Statistical Manual of Mental Disorders*, fifth edition (DSM). The DSM defines gender

19  dysphoria as "a marked incongruence between one's experienced/expressed gender and their

20  assigned gender" which is "associated with clinically significant distress or impairment in social,

21  occupational, or other important areas of functioning."

22      56.    Gender dysphoria is readily treated with gender-affirming care. Gender-affirming

23  care for minors is well-established as the standard of care for treating gender dysphoria. The

24  level of evidence supporting clinical practice guidelines and recommendations regarding gender-

25  affirming care for adolescents is comparable to the level of evidence supporting many other

26

COMPLAINT FOR DECLARATORY       13       ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                 Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  pediatric medical treatments, including treatments for pediatric obesity, congenital adrenal
2  hyperplasia, and central precocious puberty.

3       57.    The Endocrine Society, an international medical organization of over 18,000
4  endocrinology researchers and clinicians, has published a clinical practice guideline for the
5  treatment of gender dysphoria. These include puberty-blocking medications and gender-
6  affirming hormone therapy.

7       58.    Gender-affirming care is also the recommended treatment for gender dysphoria
8  by the World Professional Association for Transgender Health's (WPATH's) Standards of Care
9  for the Health of Transgender and Gender Diverse People which is currently in its 8th version
10 (SOC-8).

11      59.    Puberty-blocking medications may be prescribed to transgender or gender-
12 diverse adolescents at the onset of puberty to delay puberty. These help to prevent the
13 development of physical characteristics that conflict with the adolescent's gender identity.

14      60.    Gender-affirming hormone therapy is the prescription of gender-affirming
15 hormones. The result of this therapy is that a transgender boy or man typically has the same
16 levels of circulating testosterone as other boys or men. Similarly, a transgender girl or woman
17 will typically have the same levels of circulating estrogen and testosterone as other girls or
18 women.

19      61.    Research and clinical experience both show that treating gender dysphoria in
20 adolescents with gender-affirming care is safe and effective. Patients receiving gender-affirming
21 care have high rates of satisfaction and low incidence of regret. Available studies report that
22 rates of regret for gender-affirming care is exceptionally low, between about 0.3 and 1.1
23 percent—much lower than, for example, knee replacements (10%), tattoos (16%), or having
24 children (7%). Based on longitudinal data and clinical experience, when transgender adolescents
25 are provided with gender-affirming care and have parental and social support, they are more
26 likely to thrive and grow into healthy adults.

62.     If left untreated, however, gender dysphoria can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and suicidality. According to one study, a staggering 82% of transgender individuals have considered suicide, and 40% have attempted it. Rates of suicidality are highest among transgender youth who do not receive gender-affirming care and lack community and parental support. In such circumstances, gender-affirming care is life-saving, medically necessary care. When transgender and gender-diverse youth have access to gender-affirming care and supportive communities, however, their rates of suicidality are on par with their cisgender peers. As one Washington healthcare professional puts it, "gender-affirming care is a life-giving treatment."

63.     Patients under consideration for gender-affirming treatment work with providers to ensure that each treatment decision is informed and appropriate. Like any other medical intervention, this process is done thoughtfully and carefully with the patient and family in the best interest of the adolescent. Physicians providing gender-affirming care must be trained and qualified in gender identity concerns and participate in this care out of a desire to improve the health and wellness of transgender and gender-diverse people and prevent negative outcomes such as depression and suicide.

64.     Starting puberty-blocking medications in early puberty prevents adolescents with gender dysphoria from developing secondary sex characteristics inconsistent with their gender identity, for so long as the medication is taken. Development of such characteristics, like deepening of the voice, hair growth, muscular changes, and breast development, can be extremely distressing for them. Further, these characteristics may be difficult, if not impossible, to reverse once the characteristics have fully developed. Adolescent patients experiencing significant distress at the onset of puberty routinely have dramatic improvements in mood, school performance, and quality of life with appropriate use of puberty-delaying medication. One parent said of their child: "The minute the puberty blocker was in place she came back to life. She became happy and had increased energy. She came back to being the person we knew

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  her to be." Side effects are similar to those seen in patients treated with these medications for

2  conditions other than gender dysphoria, such as precocious puberty, and are easily managed.

3      65.    Gender-affirming hormone therapy is highly beneficial for both short-term and

4  long-term psychological functioning of adolescents with gender dysphoria. Gender-affirming

5  hormone therapy is associated with improvement in various mental health parameters including

6  depression, anxiety, self-confidence, body image and self-image, and general psychological

7  functioning. One physician noted that after receiving gender affirming care, her patients "appear

8  to bloom". Another "witness[es] adolescents who come in anxious, avoiding eye contact, and

9  feeling heavy and hopeless, transform into patients feeling like they have hope." One parent said

10 that since beginning hormone therapy their child is "thriving" and has "become so much

11 happier." Another parent said hormone therapy is an "essential part" of her daughter's health

12 and well-being and said "[s]eeing her happy again helped reassure me that my daughter was in

13 less danger of self-harm or suicide."

14     66.    In the adolescent patient population, gender-affirming chest surgery (specifically

15 removal of breast tissue in transgender young men) may be recommended as part of an

16 individualized gender-affirming treatment plan for adolescents. Genital surgeries, however, are

17 reserved for adults (age 18 and older) and much less common.

18     67.    The Physician Plaintiffs see the benefit of gender-affirming in their practices.

19 Physician Plaintiff 1 had a patient who "was experiencing frequent suicidal ideation prior to

20 receiving puberty delaying medications and Testosterone, [and] is now president of his high

21 school class." Physician Plaintiff 2 has patients who, when they begin to seek care, "don't want

22 to leave their room or their house because they don't feel comfortable in their bodies." But with

23 gender-affirming care "they are like a new person—so much happier and engaged in life."

24 Physician Plaintiff 3 describes a patient who was diagnosed with anorexia when they met,

25 because he was trying to "decrease his weight in order to stop his body from developing." After

26 treatment with gender affirming care, he was able to complete an anorexia program and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
16
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    "developed a regular exercise routine to gain muscle." Now applying to college at Ivy League

2    schools, Physician Plaintiff 3 "couldn't be prouder of him."

3        68.    But Physician Plaintiffs have also seen the devastating impact caused by a lack

4    of access to gender-affirming care. Physician Plaintiff 1 has treated patients who had to uproot

5    their lives after the state they lived in banned gender-affirming care. "Many have left their

6    communities and support systems abruptly and arrive in Washington with little support."

7    Physician Plaintiff 2 has "seen patients forced to undergo permanent puberty changes that did

8    not align with their gender identity after losing access to puberty-delaying medications, which

9    caused significant anxiety and depression and will likely require surgery in the future to reverse

10    the changes that occurred."

11        69.    Washington State has an explicit policy to promote the availability of gender-

12    affirming care for those who need it. Wash. Rev. Code § 74.09.675 requires the Washington

13    State Health Care Authority and programs, and providers who offer services through the Health

14    Care Authority, to cover or offer gender-affirming care. Wash. Rev. Code § 48.43.0128 similarly

15    requires privately offered health plans issued or renewed on or after January 1, 2022, to cover

16    gender-affirming care. And the Washington Law Against Discrimination prohibits

17    discrimination in the provision of health-related services on the basis of gender identity or

18    expression. Wash. Rev. Code §§ 49.60.030(1), .040(2), .040(29), .215.

19        70.    Minnesota has similar policies. Coverage for gender-affirming care for its

20    Medicaid and MinnesotaCare programs is required by Minn. Stat. § 256B.0625, subd. 3a.

21    Commercial insurance plans are required to provide the same coverage through Minn. Stat.

22    § 62Q.585. The Minnesota Human Rights Act provides comprehensive protections in the areas

23    of employment, housing, public services, government services, education, provision of credit,

24    and business for Minnesotans and includes protections related to "gender identity," as defined

25    by the Act. *See* Minn. Stat. §§ 363A.03, subd. 50; 363A.01 *et seq*. Minnesota enacted a suite of

26    robust protections through revisions and amendments to various laws in 2023, establishing

               17

Minnesota as a "trans-refuge state," prohibiting enforcement of out-of-state laws interfering in the provision of gender-affirming health care in Minnesota, reflecting the State's policy to allow unrestricted access to medically-necessary health care. *See* Laws of Minnesota, 2023 (Reg. Session), Chap. 29 (Apr. 26, 2023).

71.    Oregon also has an explicit policy to promote the availability of gender-affirming care. For example, Or. Rev. Stat. § 414.769 requires the Oregon Health Authority to cover and not deny medically necessary gender-affirming care. Or. Admin. Rule 836-053-0441 recognizes the World Professional Association for Transgender Health's Standards of Care for the Health of Transgender and Gender Diverse People as the "accepted standards of care" and requires private health benefit plans to cover or offer gender-affirming care. Or. Rev. Stat. § 659.875 also prohibits discrimination in the provision of benefits and health benefit plans delivered in the State of Oregon.

**B.    UW School of Medicine and UW Medicine**

72.    The University of Washington is a world-class research and educational institution located in Seattle, Washington. It is an agency and instrumentality of Washington State. Wash. Rev. Code. ch. 28B.20.

73.    UW includes the UW School of Medicine. The UW School of Medicine is a leader in regional medical education and conducts world-leading research across 31 clinical and biomedical research departments and multiple research institutes and centers with areas of focus including behavioral health, neuroscience and Alzheimer's disease, heart disease and stroke, infectious diseases, cancer, health metrics, genomics and precision medicine, protein design and regenerative medicine.

74.    In federal fiscal year 2024, UW School of Medicine received $494 million in federal research grants, of which $388 million were direct awards and $105 million were subcontracts.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

75.     UW Medicine is an integrated clinical, research and learning health system with a single mission to improve the health of the public. UW Medicine is a family of organizations that are operated or managed as part of an integrated health system. These organizations include UW Medical Center (Montlake and Northwest campuses), UW Medicine Primary Care, the UW School of Medicine, UW Physicians, Harborview Medical Center, and Airlift Northwest.

76.     UW Medicine strives to provide patient-centered and inclusive care to all patients, including transgender and gender non-binary patients.

77.     UW Medicine's Transgender and Gender Non-Binary Health Program provides gender-affirming medical care coordinated across a range of clinicians in the UW Medicine system to its adult patients.

78.     The UW School of Medicine Department of Pediatrics trains pediatric-focused clinicians and advances research to improve the health of all children and adolescents. Department faculty physicians provide primary and specialty pediatric care, including gender-affirming medical care, to minor patients when medically indicated and necessary to serve the patients' health needs.

79.     Gender-affirming medical care for patients under age 18 requires consent from a parent or guardian that has medical decision-making rights for that patient, unless the patient is an emancipated minor.

## C.     Oregon Health & Science University

80.     The Oregon Health & Science University is a research and educational institution located in Portland, Oregon. OHSU is a state-created public corporation that is an instrumentality of the State of Oregon.

81.     OHSU has a long tradition of leading-edge research, and houses a robust research program with more than 1,415 faculty investigators and 262 postdoctoral scholars, with faculty including members of the National Academy of Science, National Academy of Medicine, and National Academy of Inventors, the American Academy of Arts and Science, and recipients of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

the Lasker-DeBakey Award for Clinica Medical Research. OHSU has conducted vital research in important areas of modern medicine with the aid of federal funding, including novel imagining of the glymphatic system critical for brain health; identifying a pivotal gene capable of blocking immune responses to important vaccines for disease including HIV, malaria, and certain types of cancer; and identifying whole brain circuit risk factors for the occurrence of ADHD in children, among many other federally funded research projects.

82.    OHSU currently receives 1,209 federally funded grants. The loss of grant funding would impact at least 500 research programs and cause the loss of thousands of research staff positions, and hundreds of graduate students and postdoctoral fellows. OHSU also runs a Graduate Medical Education program that is one of the largest training programs of its kind in the country, training a total of 995 residents and fellows. This program depends upon federal funding and would be at risk of losing the program without such funding, which would have immediate impact upon Oregonians, as well as impact the future healthcare workforce.

**D.    Physician Plaintiffs**

83.    The Physician Plaintiffs provide gender-affirming care to minor patients. In doing so, they spend a significant amount of time with patients and their families, discussing treatment options and explaining their risks and benefits. The provider-patient relationship for gender-affirming care is not transitory, and frequently lasts many years with visits multiple times a year. The Physician Plaintiffs work hard to have close relationships with their patients and families because treatment is most often successful when there is a deep level of trust and when the providers understand the details of their patients' lives, and how particular treatment options will impact them. This constitutes a close personal relationship.

84.    Moreover, that relationship is durable not just with the particular provider treating the patient, but also with the clinic providing the treatment. The Physician Plaintiffs may "inherit" patients who worked with other providers at the same institution. Patients, parents of patients, UW faculty physicians providing gender-affirming care, UW School of Medicine, and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    community mental health therapists all form a close community committed to providing

2    medically appropriate and necessary care for transgender and gender-diverse people.

3        85.    As medical doctors, the Physician Plaintiffs have ethical obligations to offer the

4    highest quality, evidence-based care to their patients. But the Order threatens the Physician

5    Plaintiffs with criminal investigation and prosecution, and their medical institutions with the loss

6    of all research or education grants, if they provide medically indicated gender-affirming care.

7    E.O. 14,187 §§ 4, 8. The Order thus forces the Physician Plaintiffs into an impossible choice

8    between exposing themselves and their colleagues to criminal investigation and prosecution and

9    their employers to losing hundreds of millions in federal research grants, or forsaking their

10   ethical duties to their adolescent transgender and gender diverse patients by withholding access

11   to lawful and needed medical care. The Order further requires the Physician Plaintiffs to violate

12   their ethical obligations by requiring them to withhold medications from their transgender and

13   gender diverse patients but provide them to cisgender patients for similar health care needs.

14   Finally, there are instances where gender-affirming medical care can be life-saving for a patient.

15   It would be wholly at odds with the Physician Plaintiffs' ethical obligations to require them to

16   withhold life-saving medical care from transgender or gender diverse youth.

17       86.    The Order violates the rights of the Physician Plaintiffs' transgender and gender-

18   diverse patients. By restricting medical care that affirms a minor's gender only where it is

19   different from their sex assigned at birth—the defining trait of being transgender—the Order

20   necessarily classifies and discriminates against these patients based on transgender status and

21   sex. *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (applying heightened scrutiny

22   to discrimination based on transgender status); *see also Hecox v. Little*, 104 F.4th 1061, 1080

23   (9th Cir. 2024), *as amended* (June 14, 2024) (applying heightened scrutiny to discrimination

24   based on sex and transgender status). There is no justification for singling out gender-affirming

25   medical care for minors and criminalizing the medical decisions made by youth, their parents,

26   and their doctors.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                              21                    ATTORNEY GENERAL OF WASHINGTON
                                                                         Complex Litigation Division
                                                                         800 Fifth Avenue, Suite 2000
                                                                         Seattle, WA  98104
                                                                         (206) 464-7744

87.     These patients are hindered from protecting their own interests by bringing lawsuits of their own for several reasons. Most are minors who lack capacity or financial resources to hire a lawyer to sue. Others may not be "out" at school or in their neighborhood as transgender or gender diverse, exposing them to privacy and safety risks. But most glaringly, the current targeting of the Physician Plaintiffs' patients and their families by the federal government has created an atmosphere of terror for the vulnerable and comparatively powerless patients of the Physician Plaintiffs. The Order explicitly contemplates unleashing the force of the Department of Justice and felony criminal prosecutions on families for seeking care. E.O. 14,187 § 8. Accordingly, the Physician Plaintiffs bring this litigation to vindicate their own rights as well as the rights of their patients. *See Singleton v. Wulff*, 428 U.S. 106 (1976).

**E.    Plaintiff States Closely Regulate the Medical Profession**

88.     Washington licenses or otherwise establishes qualifications for physicians and other medical professionals. *E.g.*, Wash. Rev. Code ch. 18.71, ch. 18.79. It similarly licenses and regulates hospitals. Wash. Rev. Code ch. 70.41. Medical professionals in Washington are also subject to discipline by the Washington State Department of Health. Wash. Rev. Code § 18.130.040. The provision of, authorization of, recommendation of, aiding in, assistance in, referral for, or other participation in any reproductive health care services or gender-affirming treatment consistent with the standard of care in Washington by a license holder does not constitute unprofessional conduct subject to discipline. Wash. Rev. Code § 18.130.450.

89.     The Washington State Department of Health has, consistent with its statutory authority from the State Legislature, enacted a series of professional standards governing medical professionals. *See generally* Wash. Admin. Code Title 246. Washington actively enforces these standards and regularly brings actions against medical providers who violate Washington's rules. *See, e.g.*, *Hiesterman v. Wash. State Dep't of Health*, 524 P.3d 693 (Wash. Ct. App. 2022); *Dang v. Wash. State Dep't of Health*, 450 P.3d 1189 (Wash. Ct. App. 2019); *Alsager v. Bd. of Osteopathic Med. & Surgery*, 384 P.3d 641 (Wash. Ct. App. 2016).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

90.     The State of Minnesota similarly regulates the practice of medicine in the state through its Board of Medical Practice. *See* Minn. Stat. ch. 147, 214. The Board is charged with licensing and regulating the practice of medicine, establishing and enforcing qualifications for licensure and standards of practice, and educating practitioners and the public. The Board may discipline licensees for violations of the Minnesota Medical Practice Act. Minn. Stat. §§ 147.001–.381. The Board acts in this capacity as the sole authority on the licensure and regulator of physicians in the practice of medicine in the state. Gender-affirming care, including the provision of such care to individuals under the age of 19, is not prohibited by the Minnesota Medical Practice Act.

91.     Oregon licenses or otherwise establishes qualifications for physicians and other medical professionals operating in the state. *See generally* Or. Rev. Stat. chapter 677; Or. Admin. Rule chapter 847. Oregon similarly licenses and regulates hospitals. *See* Or. Admin. Rule chapter 333. Medical professionals are subject to regulation, oversight and discipline by Oregon. *See e.g.* Or. Rev. Stat. § 675.070; § 675.540; § 675.745; § 677.190. The provision of, authorization of, recommendation of, aiding in, assistance in, referral for, or other participation in any gender-affirming care is consistent with the standard of care in Oregon. Or. Admin. Rule 836-053-0441. Oregon law further protects medical professionals from being disciplined or adverse action by malpractice insurers for providing gender-affirming care, or having their Oregon licensure revoked based upon adverse action taken against them for providing gender-affirming care by other states' licensing bodies. Or. Rev. Stat. § 675.070; § 675.540; § 675.745; § 676.313; § 677.190.

92.     The Oregon Health Authority and Oregon Medical Board, consistent with their state statutory authority, promulgate and enforce rules for professional medical standards in the State of Oregon.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**F.     The Order**

93.     On January 28, 2025, President Trump issued Executive Order 14,187 titled "Protecting Children from Chemical and Surgical Mutilation." By "chemical and surgical mutilation," President Trump referred to medically appropriate and necessary gender-affirming care, including puberty-delaying medication, gender-affirming hormone therapy, and gender-affirming surgical interventions.

94.     The Order's language is gratuitous and abhorrent. It refers to widely accepted, medically appropriate care as "mutilation" and accuses medical providers who provide often life-saving care of "maiming and sterilizing . . . impressionable children." E.O. 14,187 § 1. And worst of all, it directly attacks transgender youth (which it defines as those under 19 years of age) and their families, claiming they are being misled, that their lived experiences of gender dysphoria are "radical and false," and suggests their very existence is "a stain on our Nation's history." *Id.*

95.     Although couched in the language of protecting children, the Order does exactly the opposite. It hurts transgender and gender diverse children and their families.

96.     The Order's dangerous rhetoric is coupled with explicit threats of criminal prosecution for medical providers and parents.

97.     The Order asserts, contrary to all evidence, that gender-affirming care results in adverse medical outcomes and that patients ultimately regret their choice to receive gender-affirming care. *Id*. It asserts in Section 3, again without a shred of evidence, that the medical consensus that gender-affirming care is safe and effective, and that gender identity is an innate trait that may differ from one's sex assigned at birth, is "junk science." *Id.* § 3.

98.     The Order states that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

procedures." *Id.* § 1. By "destructive and life-altering procedures," the Order refers to medically appropriate and necessary gender-affirming care.

99.     In furtherance of this policy, designed explicitly to target transgender and gender-diverse youth and their providers and make it more difficult for them to receive the care they need, Section 4 of the Order directs "[t]he head of each executive department or agency [] that provides research or education grants to medical institutions, including medical schools and hospitals" to "*immediately* take appropriate steps to ensure that institutions receiving Federal research or education grants end "gender-affirming care for children." E.O. 14,187 § 4.

100.     Section 4 of the Order is effective immediately by its terms. *Id*. Moreover, President Trump and his administration proved their willingness to cut federal funding with little or no notice when, on January 27, 2025, the Office of Management and Budget issued a memorandum directing federal agencies to pause all federal funding by the next day. And on January 29, 2025, the Office of Personnel Management instructed all federal agencies to "[r]eview all agency programs, contracts, grants, and terminate any that promote or inculcate gender ideology." This directive was set to go into effect by 5:00 p.m. Eastern Standard Time. The effort was only stopped by an emergency injunction issued by a federal court. *New York v. Trump*, Temporary Restraining Order, Case No. 25-cv-39-JJM-PAS (D.R.I. Jan. 31, 2025).

101.     Indeed, health care providers in the State of Washington and State of Oregon received notices from the Department of Health and Human Services, Health Resources & Services Administration, that stated they must cease to use federal funds in a way that conflicts with the Order. Even after the entry of a Temporary Restraining Order by the U.S. District Court for the District of Rhode Island in *New York v. Trump*, Case No. 1:25-cv-00039-JJM-PAS, the Department of Health and Human Services commanded State health care providers to cease all "activities that do not align with Executive Orders" including explicit citation to the Order challenged here.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

102.    Section 4 of the Order seriously harms the Plaintiff States' medical institutions by conditioning the receipt of all federal funds on the cessation of medically appropriate and necessary medical care. Section 4 of the Order is coercive in its effect on the Plaintiff States and its medical institutions.

103.    This coercion is plainly unlawful. Congress has not conditioned even one dollar of the $494 million in federal research and education grants to the UW School of Medicine or the $413 million to OHSU on the denial of gender-affirming care to youths. Similarly, no such conditions exist for federal research and education grants to Oregon public entities, including Oregon Health & Science University.

104.    Section 8(a) of the Order also immediately threatens providers and families in the Plaintiff States. It directs the Attorney General to "review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation." E.O. 14,187 § 8(a).

105.    18 U.S.C. § 116 makes it a federal crime to perform female genital mutilation on another person or for a parent or guardian to facilitate or consent to female genital mutilation. Conviction under this statute carries a federal prison sentence of up to ten years. 18 U.S.C. § 116(a).

106.    18 U.S.C. § 116 defines female genital mutilation as "any procedure performed for *non-medical reasons* that involves partial or total removal of, or *other injury to*, the external female genitalia." 18 U.S.C. § 116(e) (emphasis added).

107.    To be clear, genital surgery is not performed on transgender minors. But the Order threatens to weaponize this federal statute against puberty blocking medication and hormone therapy, which it defines as "chemical mutilation." In doing so, the Order attempts to redefine these medically necessary treatments as federal crimes.

108.    Lawful, state-regulated, medically appropriate and necessary gender-affirming care is not female genital mutilation under 18 U.S.C. § 116. Nonetheless, the Order directs the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    U.S. Department of Justice to target families and gender-affirming care providers of transgender

2    and gender-diverse youth criminal investigations. E.O. 14,187 § 8.

3        109.    These effects are already being felt—as intended. Despite its facial illegality, the

4    Order nonetheless has already coerced providers and medical institutions to halt gender-

5    affirming care. Carla K. Johnson, et. al, *Some hospitals pause gender-affirming care to evaluate*

6    *Trump's executive order*, AP News (Jan. 30, 2025) (reporting on institutions in Virginia,

7    Colorado, the District of Columbia reducing or stopping care even for existing patients because

8    of the Order)[2]; *see also* Mira Lazine, *Handful of Hospitals Complying with Trump's Illegal*

9    *Order to Stop Trans Care Under 19 Years Of Age*, Erin in the Morning (Feb. 2, 2025) (similar)[3];

10   Emily Alpert Reyes, *Children's Hospital L.A. stops initiating hormonal therapy for transgender*

11   *patients under 19*, L.A. Times (Feb. 4, 2025) (reporting Children's Hospital of Los Angeles is

12   pausing the initiation of hormonal therapy for gender affirming care patients under the age of 19

13   to review the Order).[4] President Trump issued a press release listing the cancellation of gender-

14   affirming care by health care providers in New York, Colorado, Virginia, Washington D.C.,

15   Illinois, and Pennsylvania claiming that the Order was "already having its intended effect."

16       110.    And the effects are also being felt by providers in Washington. Seattle Children's

17   Hospital is a renowned research, training, and clinical hospital in Seattle that was awarded nearly

18   $185 million in federal research grants in 2024 alone. Seattle Children's federally funded

19   research contributes to significantly to improved health outcomes for children across the country,

20   including improving treatment of cystic fibrosis, cancer, and Type I diabetes. As part of its

21   clinical program, Seattle Children's also provides gender-affirming care. The loss of federal

22   grant funding as a result of the Executive Order would be an existential threat to Seattle

23   Children's, threatening both the research and clinical missions of the institution, as well as the

24           [2]    Available at: https://apnews.com/article/transgender-trump-executive-order-hormones-hospitals-
25   8d9e6b94b34d2e6f890c06ebeba0fe1d.
             [3] Available at: https://substack.com/home/post/p-156322780.
26           [4] Available at: https://www.latimes.com/california/story/2025-02-04/childrens-hospital-to-stop-initiating-
     hormonal-therapy-for-trans-patients-under-19.

patients it serves as the top-ranked pediatric hospital in all of Washinton, Alaska, Montana, and Idaho. The Executive Order is creating an emergency situation at Seattle Children's, exerting tremendous pressure on the institution to stop providing gender-affirming care, or risk all of its other research, teaching, and care programs. As a result of the Executive Order, Seattle Children's patients and families are panicking, scared that a loss of care would damage young patients' mental health, physical health, and safety.

111.    And while on Wednesday, February 5, 2025, the Health Resources & Services Administration, a subagency of the Department of Health and Human Services, rescinded a stop work order it issued on Friday, January 31, 2025, that itself had relied on the Order, this only further fuels a climate of chaos and fear in which medical institutions, researchers, and physicians do not know what the federal government is going to do next. In fact, on the very same day the stop work order was rescinded, Children's Hospital Colorado ceased providing all gender-affirming medication, fearing the loss of federal funding. Meg Wingerter, *Children's Hospital Colorado Stops Offering Gender-Affirming Medication Because of Trump Order*, Denver Post (Feb. 5, 2025).

112.    Effects are being felt in Plaintiff States today. For example, a pharmacy in Spokane is refusing to fill AndroGel prescriptions for transgender and gender-diverse patients. Upon information and belief, the Order has caused a medical institution in Washington to pull down information about gender-affirming care—making it difficult for families to access information about such care. This is especially urgent because, as Physician Plaintiff 3 writes, "[a]ny interruption in puberty-blocking medications is an immediate risk for irreversible physical changes, emotional distress and depression."

113.    One Washington provider, going only by their initials to avoid retaliation by the federal government and threats of violence by the President's supporters, has "deep concern that this EO would require [them] to withhold medically-necessary, lifesaving care." Another, also using pseudonyms, is "worried for [their] own safety since the EO targeting gender-affirming

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

care was released[,]" and is "more reticent to diagnose [their] patients with gender dysphoria, even if it is the most accurate diagnosis." Even if providers are willing to risk prosecution by the federal government, patients and their families may not be. According to one provider, "the Executive Order has already caused nearly half of my adult transgender clients to halt or slow their plans to medically or socially transition."

114.    Transgender youth and their parents are similarly terrified of the Order's threats to eliminate life-saving care, as well as prosecute parents and providers. Transgender and gender-diverse youth report fears of their worlds "going dark" if they cannot receive the care they need. And parents of transgender youth are preparing to split their families apart to leave the country rather than letting their children fall back into suicidality experienced before gender-affirming care.

115.    The serious concerns over how the Order will detrimentally impact transgender youth cannot be overstated. One Washingtonian, as her parents describe her, was a bright and gentle soul who loved playing musical instruments, trying new things, and playing Magic the Gathering. She was excited to learn Japanese and the impact of gender-affirming care was immediately clear to her family. Her parents described that "her joy was clear with every new milestone in her transition. She was so happy to get to the next step, to get closer to presenting in a way that was true to herself." But the day before the presidential election, she shared, "[t]omorrow I get to find out if I'm illegal." After the election, she asked her parents if they could move to Canada because she was fearful of new restrictions on transgender youth and worried about losing access to gender-affirming care. In January 2025, she took her life. After the Order issued, her parents expressed that the outlook for transgender futures looks scary and shared fears of what ending gender-affirming care would have meant for their daughter's access to therapy, puberty-delaying medication, hormones, and hope of surgery. Her parents have expressed fear for the many lives who depend on gender-affirming care and that what happened to their daughter does not happen to any other children.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

116.    The Order challenged here is consistent with the President's other executive orders targeting and punishing transgender and gender-diverse people for their gender identities. On January 20, 2025, President Trump signed Executive Order 14,168 titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." That order declares "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." Exec. Order No. 14,168, 90 C.F.R. 8615. It defines "sex" to mean "an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'" *Id.* § 2(a). It further defines "Gender Ideology" as a theory which asserted the "false claim that males can identify as and thus become women and vice versa." *Id.* § 2(f). In so doing, the order attempts to define out of existence transgender and gender-diverse people, whose gender is not the sex they were assigned at birth. These definitions must "govern all Executive interpretation of and application of Federal law and administration policy." *Id.* § 2.

117.    And on January 27, 2025 (one day before the Order challenged here was issued), the President issued Executive Order 14,183 titled "Prioritizing Military Excellence and Readiness." This order declares "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." Exec. Order No. 14,183, 90 C.F.R. 8757. It proclaims that being transgender or gender diverse "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle" and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.*, § 1. The order directs the Secretary of Defense to reverse the current accession and retention standards for military service and to adopt instead a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

118.    And just this past Wednesday, on February 5, 2025, the President signed a new Executive Order titled "Keeping Men Out of Women's Sports." The order targets transgender student-athletes by, inter alia, directing the Department of Justice to prioritize enforcement of Title IX against educational institutions that permit transgender athletes to participate in women's sports and athletic events and further directing all agencies to review grants to educational programs to rescind funding from institutions who do not comply with the Executive Order.

119.    In this context, providers of gender-affirming care have no choice but to take President Trump seriously when he threatens to cut off all federal funding and charge them with federal crimes for simply providing medically appropriate and necessary care for their patients. And similarly, parents of transgender and gender-diverse youth must take him at his word when he threatens to charge them for facilitating such care for their children.

## V.    CAUSES OF ACTION

### Count 1: Fifth Amendment Equal Protection

120.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

121.    Transgender and gender-diverse individuals are fully protected by the equal protection guarantee of the Fifth Amendment, and regulations targeting them for discriminatory treatment are subject to heightened scrutiny. *Hecox*, 104 F.4th at 1074.

122.    The Order makes classifications based on transgender status and sex, which triggers heightened scrutiny.

123.    The Order facially discriminates against transgender and gender-diverse people by stigmatizing, defunding, and purporting to criminalize health care that is lawful, state-regulated, medically appropriate and necessary, and specific to their health needs, while the same care is provided to cisgender people for other purposes. The Order discriminates against transgender and gender-diverse people on its face.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    31                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

124.    The Order cannot survive heightened scrutiny. Heightened scrutiny requires "that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Hecox*, 104 F.4th at 1081 (quoting *U.S. v. Virginia*, 518 U.S. 515, 533 (1996)). The federal government's burden of justification is a demanding one.

125.    The Order serves no important government interest. It appears to serve no interest at all save to communicate official, presidentially directed animus against transgender and gender-diverse people, their medical providers, and their families.

126.    In light of its animus, and its total departure from and disregard for the scientific consensus, the Order would not survive even rational basis scrutiny. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

### Count 2: Separation of Powers

127.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

128.    Section 4 of the Order constitutes a condition on the receipt of federal funds by the Plaintiff States' medical institutions which by its terms is effective immediately.

129.    The Constitution vests Congress with the spending power, not the President. U.S. Const. art. I § 8, cl. 1.

130.    The Constitution vests Congress with the authority to condition spending, not the President. U.S. Const. art. I § 8, cl. 1.

131.    The Constitution provides "a single, finely wrought and exhaustively considered, procedure" through which "the legislative power of the Federal government [may] be exercised," *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983), namely, through majority votes of both chambers of Congress and the signature of the President. U.S. Const. art. I § 7.

132.    None of the funds received by the Plaintiff States' medical institutions have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

133.     In fact, federal law *prohibits* the Plaintiff States' medical institutions from discriminating against individuals on the basis of their gender dysphoria for the purposes of participating in the services provided by these institutions and funded with federal financial assistance. 29 U.S.C. § 794.

134.     The President's Executive Order, which conditions the receipt of federal funds by the Plaintiff States' medical institutions on denying patient gender-affirming care, is an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend Congressional appropriations by attaching conditions not contemplated by Congress, and a violation of the separation of powers. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018).

**Count 3: Tenth Amendment**

135.     Plaintiffs re-allege and incorporate the above as if set forth fully herein.

136.     The Tenth Amendment provides that "[t]he Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The President has no enumerated power to regulate the practice of medicine or to criminalize medical practices. Nor has he been authorized by Congress to do so.

137.     The Plaintiff States have the sovereign power to regulate the practice of medicine and establish the standards of care for the practice of medicine in their States. The regulation of the practice of medicine and establishment of the standards of care for the practice of medicine is a core, traditional area of state concern, which the federal government has historically not regulated.

138.     The Order regulates the practice of medicine without congressional authorization. The Order defines gender-affirming care as "chemical and surgical mutilation" and orders the Department of Justice to prosecute cases of gender-affirming care as "female genital mutilation" under 18 U.S.C. § 116.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    139.    Where Congress wishes to intrude on an area of where states have used their

2    police powers to regulate a matter of local concern, such as the regulation of health care, it must

3    do so clearly in unmistakable terms. *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

4    18 U.S.C. § 116 does not in clearly unmistakable terms, or in any terms, regulate or criminalize

5    the practice of medicine in the United States.

6    140.    It is a violation of the Tenth Amendment for Defendants to direct the enforcement

7    of 18 U.S.C. § 116 against medical providers for offering and parents for consenting to medically

8    appropriate and necessary gender-affirming care authorized in the Plaintiff States.

9    ### VI.    PRAYER FOR RELIEF

10    WHEREFORE, the Plaintiffs pray that the Court:

11    a.    Declare that Sections 4 and 8(a) of the Order are contrary to the Constitution and

12    laws of the United States;

13    b.    Temporarily restrain and enjoin Defendants from implementing or enforcing

14    Sections 4 and 8(a) of the Order, pending further orders from this Court;

15    c.    Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing

16    within fourteen (14) days to determine whether this Court should enter a preliminary injunction

17    or the Temporary Restraining Order should be extended;

18    d.    Preliminarily and permanently enjoin Defendants from implementing or

19    enforcing Sections 4 and 8(a) of the Order;

20    e.    Declare Sections 4 and 8(a) of the Order unconstitutional; and

21    f.    Award such additional relief as the interests of justice may require.

22    DATED this 7th day of February 2025.

23                                NICHOLAS W. BROWN
                                  Attorney General of Washington
24
                                  */s/ William McGinty*
25                                WILLIAM MCGINTY, WSBA #41868
                                  CYNTHIA ALEXANDER, WSBA #46019
26                                TERA HEINTZ, WSBA #54921

ANDREW R.W. HUGHES, WSBA #49515
NEAL LUNA, WSBA #34085
CRISTINA SEPE, WSBA #53609
LUCY WOLF, WSBA #59028
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
William.McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Neal.Luna@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Lucy.Wolf@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS, WSBA #53238
COLLEEN MELODY, WSBA #42275
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
Lauryn.Fraas@atg.wa.gov
Colleen.Melody@atg.wa.gov
*Attorneys for Physicians Plaintiffs 1-3*


KEITH ELLISON
Attorney General of Minnesota

*/s/ James W. Canaday*
JAMES W. CANADAY, MSBA #030234X*
Deputy Attorney General
445 Minnesota St., Ste. 600
St. Paul, Minnesota 55101-2130
(651) 757-1421
james.canaday@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DAN RAYFIELD
Attorney General of Oregon

*/s/ Allie M. Boyd*
ALLIE M. BOYD, WSBA #56444
Senior Assistant Attorney General
Trial Attorney
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700
allie.m.boyd@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

\*pro hac vice application forthcoming

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

36