1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

STATE OF WASHINGTON, et al.,

NO. 2:25-cv-00244

10

Plaintiffs,

PLAINTIFFS' EMERGENCY MOTION
FOR TEMPORARY RESTRAINING
ORDER

11

v.

12

DONALD J. TRUMP, in his official
capacity as President of the United States, et
al.,

NOTE ON MOTION CALENDAR:
February 7, 2025

13

ORAL ARGUMENT REQUESTED

14

Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 2

      A.   Gender-Affirming Care Is Life-Saving Medical Treatment
           Overwhelmingly Supported by Medical Professionals and Protected by
           Plaintiff States ....................................................................................................... 2

      B.   The Order Unilaterally Defunds Medical Institutions and Threatens
           Criminal Prosecution for Providers and Families .................................................. 5

III.  ARGUMENT .......................................................................................................... 6

      A.   Legal Standard ....................................................................................................... 6

      B.   Plaintiffs Have Standing to Challenge the Order .................................................. 6

      C.   Plaintiffs Are Likely to Succeed on the Merits ..................................................... 9

           1.   The Order discriminates against transgender children ................................. 9

                a.   The Order is subject to heightened scrutiny because it
                     discriminates based on transgender status and sex ............................... 10

                b.   The Order fails heightened equal protection scrutiny ......................... 11

                c.   The Order fails any level of review ...................................................... 14

           2.   Defunding medical schools, providers, and hospitals for providing
                gender-affirming care violates the separation of powers ........................... 15

           3.   The Order's criminalization of gender-affirming care violates the
                Tenth Amendment ....................................................................................... 18

      D.   Plaintiffs Will Suffer Immediate and Irreparable Harm if the Order Is Not
           Blocked ................................................................................................................. 20

      E.   The Balance of Equities Weigh in Plaintiffs' Favor, and a Temporary
           Restraining Order Is in the Public Interest ........................................................... 24

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# I.     INTRODUCTION

With the stroke of a pen, the President unlawfully intruded into the personal medical decisions of transgender youth, their families, and their doctors. His Executive Order targets vulnerable transgender youths by directing federal agencies to "immediately" defund medical institutions that provide necessary and often life-saving gender-affirming care, and weaponizes a criminal statute to threaten providers and parents for providing care. Lest there be any doubt about the President's intent, the White House bragged the Order "is already having its intended effect" with "hospitals around the country taking action to downsize or eliminate" gender-affirming care programs.

The Order has unleashed unbridled fear and irreparable harms. It forces State medical institutions and providers into an impossible choice between following their ethical obligations to provide necessary care or risk immediately losing hundreds of millions of dollars in federal funding. Doctors and families must now risk criminal prosecution or watch their young patients and children suffer. And for transgender youth singled out by the President's Order, pausing treatment can cause irreversible impacts to their bodies that dramatically increase their risk of depression, anxiety, self-harm, and suicide. Simply put, if the Order stands, transgender children will die.

The Order is unconstitutional several times over. It violates the constitutional guarantee of equal protection because it discriminates against transgender youth on the basis of their transgender status and sex. It violates the constitutional separation of powers because the President has seized Congress' spending and lawmaking power by rewriting the law to defund medical institutions. And it violates the Tenth Amendment because it robs states of their core police power to regulate medicine by dictating what constitutes medically necessary care.

The Court must immediately restrain this flagrant and discriminatory abuse of power.[1]

---

[1] Plaintiffs provided notice of this motion to Defendants' counsel under Federal Rule of Civil Procedure 65(b) and Local Civil Rule 65(b). *See* McGinty ¶3.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

## II.    STATEMENT OF FACTS

### A.    Gender-Affirming Care Is Life-Saving Medical Treatment Overwhelmingly Supported by Medical Professionals and Protected by Plaintiff States

Gender dysphoria is a serious medical condition marked by a persistent mismatch between a person's assigned sex and gender identity, causing severe distress or impairment. Shumer ¶39. Left untreated, it can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and, far too often, suicide. *Id.* ¶46. Fortunately, it is treatable.

Gender-affirming care is overwhelmingly supported by the evidence and broadly endorsed by the medical community, including the American Academy of Pediatrics, American Medical Association, American Psychological Association, American Psychiatric Association, and American Academy of Family Physicians. *Id.* ¶¶40-58. It is governed by (1) Standards of Care published by the World Professional Association for Transgender Health (WPATH), a non-profit professional and educational organization devoted to transgender health, (2) guidelines published by the Endocrine Society, an organization representing endocrinologists, and (3) the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5). *Id.* ¶¶38, 40, 50-58. Gender-affirming care covers a spectrum of treatments, including talk therapy, social transition, puberty-blocking medications, hormone replacement therapy, and other care, based on individual need. *Id.* ¶¶59-60, 62-79.

Transgender children and their parents do not make the decision to start gender-affirming care lightly. Z.C.L. ¶¶14-15; O'Brien ¶9. Children often endure extended and debilitating periods of depression, self-hatred, hopelessness, anxiety, self-harm, and suicidality before families seek gender-affirming care.[2] L.L., a Seattle-area teen, would, for years, "rot in [] bed" all day, with no friends, struggling even to shower in a body he "hated." L.L. ¶9. S.F., a teen in southwest Washington, spent days "curled up in the fetal position on the floor," with his mother feeling helpless to do anything but sit and share his pain. S.F. ¶6. Some adolescents showered in

---

[2] N.M. ¶¶5, 7, 11; S.B. ¶¶7, 9-11; A.Johnson ¶8; Seaton ¶¶7-9; E.C. ¶5; Ullom ¶6; K.S. ¶5; K.C.C. ¶6; K.D. ¶20; L.L. ¶¶8, 9; M.B. ¶5; R.D. ¶6; S.S. ¶¶6, 9; Parent S.O. ¶7; S.F. ¶6; S.N. ¶¶4-6; V.S. ¶¶4-5; A.J. ¶5; Provider B.M. ¶¶6, 12; K.H. ¶¶6-7, 11; Kaefer ¶¶6-8; M.F. ¶¶14, 19, 40; R.T. ¶¶10, 13,18.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

a bathing suit or in the dark so they didn't have to see their own body. Buckley ¶6, Seaton ¶8. Others engaged in self-harm, "cutting" or "burning" themselves or developing eating disorders so they could "feel in control of their body." Dunham ¶13.

Meanwhile, parents experience profound "grief" seeing their children's pain, while fearing others will "harm their child." H.L. ¶16. Those with resources often seek extensive therapy before engaging in gender-affirming hormonal treatment. Stanfield ¶8. To qualify for gender-affirming care, adolescents must "consistently, persistently, and insistently express their desire for a body that reflects a non-binary gender or a gender different than the sex they were assigned at birth." *Id*. ¶9; *see also* Shumer ¶63.

When families seek gender-affirming care, clinicians follow settled guidelines to ensure accurate diagnoses and that patients understand their options. Physician Plaintiff 1 ¶¶8-16; Physician Plaintiff 2 ¶¶6, 11-13; Physician Plaintiff 3 ¶¶14-17; Stanfield ¶9; Kaefer ¶11; Oyster ¶8. Physician Plaintiffs, for example, do not see patients until after a thorough mental screening confirming the dysphoria diagnosis. Physician Plaintiff 1 ¶¶10-11; Physician Plaintiff 2 ¶9; Physician Plaintiff 3 ¶17. Clinicians independently confirm the diagnosis and spend extensive time with families discussing the adolescent's experiences, goals and expectations, the risks and benefits of different options, and obtaining informed consent from the patient and parent. Physician Plaintiff 1 ¶¶10-15; Physician Plaintiff 2 ¶¶11-15; Physician Plaintiff 3 ¶¶14-17. Clinicians generally start with gradual, readily reversible treatments that mimic natural puberty processes. Physician Plaintiff 1 ¶16; Physician Plaintiff 3 ¶¶19-21. They provide regular follow-up care to adjust treatment as needed and monitor the patient's mental and physical health. Physician Plaintiff 1 ¶16; Physician Plaintiff 2 ¶20; Oyster ¶¶14-15.

The evidence supporting gender-affirming care for adolescents is as robust as the evidence supporting other pediatric treatments. Antommaria ¶¶43-45; Shumer ¶¶79-102. Clinicians have used puberty blockers for decades to treat gender dysphoria. *Id*. ¶66. Patients receiving gender-affirming care have high rates of satisfaction and extremely low incidence of

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

regret. Shumer ¶101; Physician Plaintiff 1 ¶19; Dunham ¶17. Studies show rates of regret for gender-affirming care are exceptionally low, between about 0.3 and 1.1 percent—much lower than, for example, knee replacements (10%), tattoos (16%), or having children (7%). Antommaria ¶70; Drs. Doe ¶22. Most providers have never had a patient regret gender-affirming care. Physician Plaintiff 3 ¶26; E.K. ¶22, H.L. ¶14, Stanfield ¶10, C.L. ¶10, Marie Doe ¶12; Z.C.L. ¶12; Kaefer ¶¶12-13; Oyster ¶16. If anything, patients regret not starting earlier. Z.C.L. ¶12; Piper ¶13; Jansen ¶7. Beyond the extremely low incidence of regret, the risks to fertility are likewise mischaracterized. Puberty blockers do not permanently impair fertility. Children experiencing medically precocious puberty are routinely treated with puberty blockers and have typical fertility in adulthood, and such medications are used to preserve fertility in patients with cancer and treat other pediatric conditions. Physician Plaintiff 2 ¶22; A.P. ¶14; Antommaria ¶60. Moreover, the current treatment paradigm is consistent with general ethical principles and the informed consent practices for other pediatric medical care. Antommaria ¶56. For example, UW Medicine requires consent from a parent or guardian for a minor patient to receive gender-affirming medical care. Dellit ¶16.

And it works. Transgender youths who receive gender-affirming care see their rates of anxiety and depression dramatically improve to mirror those of their cisgender peers.[3] Parents report similarly transformative changes, with kids experiencing "a profound sense of relief" when their "outsides" finally "match their insides," making them feel like "their true and authentic selves" for the first time in their young lives. Parent B.M. ¶13; Parent A.M. ¶10; E.C. ¶10. Children report their world transforming from "scales of gray" into "color." Beal ¶13.

Nothing reveals the profundity of this transition better than kids' and parents' own words. Youth receiving treatment "blossom[ed] in every way," and experience newfound confidence that helps them "flourish," and live "joyful," lives. S.F. ¶7; H.E. ¶8; H.B. ¶6; Beal ¶13. They "go

---

[3] A.M.M. ¶10; Parent B.M. ¶13; H.L. ¶¶13,14; H.R. ¶6; A.P. ¶11; McGuire ¶¶10-14; E.K. ¶¶12-15; W.J. ¶8; Dunham ¶¶14-16; Marie Doe ¶13; R.C. ¶¶12-13; Barnett-Kern ¶¶7, 12; Z.C.L. ¶12; R.R. ¶¶8-9; W.J. ¶¶6-7; M.E.S. ¶15; Bertram ¶9; Grande ¶¶6-7; Riddle ¶¶5-6; Khan ¶7; Voelker ¶5; Buckley ¶¶7-9.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

from socially isolating themselves, engaging in negative internal dialogue, not going to school" and avoiding people, to joining clubs, playing sports, and seeking out community. A.M.M. ¶11; Bertram ¶9; T.O. ¶12. Treatment makes youth feel "like something inside of them is lighter" when "they no longer hate themselves." A.P. ¶11. They feel "happier" and "more confident." Hillinger ¶9. And it brings "a sense of security in identity without which [they] would not have survived." Crone-Barón ¶8. Parents describe the transformation "like flipping a light switch," with their kids having increased energy and a renewed sense of self that reveals just "how much their child must have been suffering." E.K. ¶¶13-16. When children are "relieved of the need to mask, hide, or compensate," they stop self-harming. J.B. ¶9. "Passing" or "being seen as the gender they identify" often "makes life worth living." Stanfield ¶7. It allows them to "walk through the world without being discriminated against or harassed." *Id*. Not spending "every moment of their day" thinking about "how their body looks and how it does not align with their identity" gives children the freedom to "learn better at school and proactively engage and prepare for their future careers and lives." Dunham ¶16. The benefits of gender-affirming care are literally "life-giving." Provider B.M. ¶12.

## B.    The Order Unilaterally Defunds Medical Institutions and Threatens Criminal Prosecution for Providers and Families

On January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation" (Order). The Order follows a decade of President Trump scapegoating transgender people and threatening to criminalize their medical care. In the first three weeks of this presidential term, President Trump has targeted all aspects of transgender lives, halting their passport applications, ordering transfer of incarcerated transgender women to men's prisons, initiating a ban on transgender military service claiming transgender soldiers are not "honorable, truthful, or disciplined," erasing references to "gender" from federal websites and forms, barring female transgender student-athletes from "compet[ing] with or against" other women and girls, and making the denial of transgender existence a cornerstone of executive policy. McGinty, Exs. 1-3.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

The Order continues this ruthless persecution. In cruel and dehumanizing terms, the Order redefines all gender-affirming care—including the use of medications like puberty blockers—as "chemical and surgical mutilation" and a "stain" on the Nation's history. Exec. Order No. 14,187, 90 C.F.R. 8771 (cited as E.O. 14,187) §1. Among other directives, Section 4 of the Order requires "[d]efunding" gender-affirming care by ordering each executive department or agency providing research or education grants to medical institutions to "*immediately* . . . ensure that institutions receiving Federal research or education grants end" gender-affirming care for youths. E.O. 14,187 §4 (emphasis added). Section 8(a) of the Order, in turn, directs the Attorney General to prioritize "enforcement of protections against female genital mutilation" under 18 U.S.C. § 116, which the Order equates with gender-affirming care. E.O. 14,187 §§ 8, 1. These provisions are already causing immediate, irreparable harm to the Plaintiffs.

### III.    ARGUMENT

#### A.    Legal Standard

A temporary restraining order is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65(c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). All of these factors strongly favor the Plaintiffs.

#### B.    Plaintiffs Have Standing to Challenge the Order

The Plaintiffs face imminent, direct injuries as a result of the Order. To establish standing, Plaintiffs must show they have suffered or will suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

"[L]os[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (counties had standing to bring

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

separation of powers claim based on loss of federal funds). The Order expressly and "immediately" conditions federal research and education grants on denying gender-affirming care to individuals under age 19. E.O. 14,187 §§2, 4. Providing such care risks hundreds of millions of dollars, if not more, awarded to Plaintiff States' medical institutions. For example, UW Medicine provides such care and receives nearly $500 million in federal grant funding each year. Dellit ¶7. The teaching and research missions of the University, and the individual grant receipts of Physician Plaintiffs, are also undeniably harmed by the loss of federal grant funding. Dellit ¶18; Physician Plaintiff 2 ¶27; Physician Plaintiff 1 ¶30.[4] The Order places public medical institutions in an impossible bind: to provide "lawful healthcare services, consistent with the standards of care, to underserved populations," or "risk losing hundreds of millions of dollars in federal research grants." Dellit ¶20; Tumer ¶¶9-15; Hower ¶¶8-15; Goldfarb ¶¶46-47.[5]

The Plaintiff States also have standing to protect their sovereign authority to regulate the practice of medicine free of intrusion by the President. *See Ariz. v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022) (an offense to state sovereignty gave rise to a cognizable injury in fact). And they have standing to vindicate their proprietary interests in delivery of high-quality care. *See Washington v. Trump*, 847 F.3d 1151, 1159-61 (9th Cir. 2017) (per curiam) (states have standing where challenged law harmed proprietary work of public universities). The Order limits the treatment available to patients in the Plaintiff States and prevents providers from delivering appropriate and necessary care under threat of criminal prosecution, forcing them to violate their ethical obligations to their patients. Physician Plaintiff 1 ¶33; Physician Plaintiff 3 ¶39;

---

[4] Plaintiffs contend that any action to cease federal funding based on the Order would violate the temporary restraining order entered in *New York v. Trump*, No. 1:25-cv-00039-JJM-PAS (D.R.I.), but Defendants disagree. *See* Dkt. 51 (attached as McGinty Ex. 5). Even after that order was entered, the Department of Health and Human Services commanded State healthcare providers to cease all "activities that do not align with Executive Orders," including explicit citation to the Order challenged here, only to then cursorily rescind the notice on February 5. Dellit, Exs. 1-2. The TRO in Rhode Island does not eliminate the irreparable financial harms threatened here, much less address the other irreparable harms at issue, and the federal government's abrupt notices have further sowed chaos and fear on what the government will do next. Dellit ¶22.

[5] Other medical institutions within the Plaintiff States face grave financial harms too. For example, Seattle Children's received nearly $185 million in federal research grants in 2024; it would face "an existential threat" if defunded for providing gender-affirming care. Ojemann ¶¶8,14.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Drs. Doe ¶38; Beal ¶14; A.P. ¶15; Stanfield ¶15; Marie Doe ¶17; *see also* Dellit ¶20; Sandoe ¶¶12-15.

The Physician Plaintiffs also have pre-enforcement standing to challenge the Order's threat of criminal prosecutions. Pre-enforcement standing exists where (1) the plaintiff intends to engage in "conduct arguably affected with a constitutional interest," (2) the conduct is "proscribed by a statute," and (3) "a credible threat of prosecution" exists. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-65 (2014); *Isaacson v. Mayes*, 84 F.4th 1089, 1098 (9th Cir. 2023). In evaluating the threat of prosecution, the courts consider: "(1) whether the plaintiff has a "concrete plan" to violate the law, (2) whether enforcement authorities have "communicated a specific warning or threat to initiate proceedings," and (3) whether there is a "history of past prosecution or enforcement." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). Courts interpret "the government's failure to disavow enforcement of the law as weighing in favor of standing." *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022). And the government's history of enforcement has little weight where, as here, the law or its interpretation is new. *Id*.

These factors are clearly met. The Physician Plaintiffs have provided, and continue to provide, gender-affirming care to youth. Physician Plaintiff 1 ¶6; Physician Plaintiff 2 ¶4; Physician Plaintiff 3 ¶6. And, as detailed below, the Order directs DOJ to pursue and "prioritize" criminal charges under 18 U.S.C. §116(a), governing female genital mutilation, which the Order conflates with all forms of gender-affirming care, including the use of puberty blockers and hormone replacement therapy. E.O. 14,187 §§ 1, 8(a). The Order specifically attempts to redefine the use of puberty blockers and hormone replacement therapy as "chemical mutilation" in a bad-faith attempt to shoehorn them within the criminal statute. The Order, coupled with DOJ's failure to disavow enforcement of 18 U.S.C. § 116, presents a credible and imminent threat of prosecution.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

The Physician Plaintiffs also have third-party standing to assert the rights of their minor patients. A litigant may assert the rights of another by demonstrating, in addition to their own injury, a close relationship with the person whose rights are asserted and a "hindrance" to that person's ability to protect their own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *McCollum v. Cal. Dep't of Corr. and Rehab.*, 647 F.3d 870, 879 (9th Cir. 2011). The Physician Plaintiffs have this close and personal relationship with patients, developed over treatment lasting months or years. Physician Plaintiff 1 ¶¶19-23; Physician Plaintiff 2 ¶¶11-20; Physician Plaintiff 3 ¶¶18-22. And Physician Plaintiffs' minor patients are hindered from protecting their own interests because they lack capacity or financial resources to sue and credibly fear retaliation from the federal government.[6] The Physician Plaintiffs may bring this litigation to vindicate their own rights and the rights of their patients, who are injured by the Order's discriminatory treatment and coercion designed to stop gender-affirming care. *See Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972).

The Plaintiffs also meet the traceability requirement for standing: the injuries resulting from the Order are logically traced to President Trump and the Defendants directed to implement the Order. These injuries are redressable because injunctive and declaratory relief will prevent Defendants from enforcing the Order. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

**C.    Plaintiffs Are Likely to Succeed on the Merits**

**1.    The Order discriminates against transgender children**

The Order targets transgender children and their medical care based on transgender status and sex, triggering heightened equal protection scrutiny. The Order cannot survive this "exacting" test. *U.S. v. Virginia*, 518 U.S. 515, 533 (1996) (cited as *VMI*). Given its rejection of the scientific consensus, it couldn't even survive rational basis review.

---

[6] L.L. ¶13; T.O. ¶3; K.W. ¶¶10, 18; K.G. ¶¶3, 7-8; N.M. ¶¶10, 13-14; S.B. ¶¶15-16; G.T. ¶27; C.K. ¶12; J.M. ¶¶4-8; K.S. ¶2; Dare ¶2; M.B ¶¶2, 14; 19; Individual S.O. ¶¶6, 13; S.F. ¶¶8-9; S.N. ¶2; Parent B.M. ¶¶4, 7, 12, 19, 23; R.H. ¶4, 16-17; K.H. ¶¶4, 16; L.M. ¶13; F.T. ¶3.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1

2

**a.    The Order is subject to heightened scrutiny because it discriminates based on transgender status and sex**

Heightened scrutiny applies to classifications based on transgender status and sex. *See Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (applying heightened scrutiny to discrimination based on transgender status); *see also Hecox v. Little*, 104 F.4th 1061, 1080 (9th Cir. 2024) (applying heightened scrutiny to discrimination based on sex and transgender status). Because the Order discriminates based on transgender status and sex, it is subject to heightened scrutiny.

First, the Order expressly classifies based on transgender and gender-diverse status by penalizing and criminalizing healthcare only when provided to "an individual who does not identify as his or her sex," "to align an individual's physical appearance with an identity that differs from his or her sex," or to "transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." E.O. 14,187 §2(c). Plainly, individuals targeted by the Order have a gender identity that differs from their sex assigned at birth. Shumer ¶28; *see also Hecox*, 104 F.4th at 1068-69 ("A 'transgender' individual's gender identity does not correspond to their sex assigned at birth[.]").

In restricting medical care that affirms an individual's gender only where it is different from their sex assigned at birth—the defining trait of being transgender—the Order blatantly classifies based on transgender status. *See Poe v. Labrador*, 709 F. Supp. 3d 1169, 1191-92 (D. Idaho 2023) (prohibiting medical care that only transgender people choose to undergo constitutes discrimination against transgender people). Moreover, under the Order, the treatments that are prohibited for transgender adolescents to affirm their gender identity remain available to cisgender adolescents. *See id.*; *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc) (healthcare plans excluding coverage for gender dysphoria treatment discriminated against transgender people).

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    Second, the Order draws a classification based on sex. The purported biological sex of

2    the patient is the basis on which the Order distinguishes between medical interventions restricted

3    and criminalized by the Order and those that are not. *See Bostock v. Clayton Cnty.*, 590 U.S. 644,

4    660 (2020) ("[I]t is impossible to discriminate against a person for being . . . transgender without

5    discriminating against that individual based on sex[.]"). Thus, "discrimination against

6    transgender individuals constitute[s] sex-based discrimination for purposes of the Equal

7    Protection Clause because such policies punish transgender persons for gender non-conformity,

8    thereby relying on sex stereotypes." *Hecox*, 104 F.4th at 1080 (quoting *Grimm v. Gloucester

9    Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020)); *see also Brandt ex rel. Brandt v. Rutledge*,

10   47 F.4th 661, 670-71 & n.4 (8th Cir. 2022) (applying heightened scrutiny to law prohibiting

11   "gender transition procedures" because the law discriminated on the basis of sex).[7]

12       The Order explicitly and coercively enforces gender conformity by targeting medical

13   care when used to affirm a gender that is different from one's birth-assigned sex.

14   E.O. 14,187 §2(c). Thus, the Order would not proscribe a mastectomy for a cisgender boy with

15   gynecomastia (swollen breast tissue) to conform his chest to his male gender. *See* Drs. Doe

16   ¶¶26-28. Nor would it restrict testosterone therapy to a cisgender boy who wants to "jumpstart"

17   puberty. *See* Physician Plaintiff 2 ¶22. By allowing and disallowing care based on sex designated

18   at birth, the Order impermissibly discriminates based on transgender status and sex.

19           **b.    The Order fails heightened equal protection scrutiny**

20       To survive heightened scrutiny, the Order must provide an "exceedingly persuasive

21   justification" for its classifications and a "close means-end fit." *Sessions v. Morales-Santana*,

22   582 U.S. 47, 58, 68 (2017). Neither exists here. The "burden of justification is

23   demanding"—not "deferential"—and "rests entirely on the [federal government]." *VMI*, 518

24   U.S. at 533, 555. Heightened scrutiny is an "extremely fact-bound test," requiring courts to

25   "examine the 'actual purposes'" of the governmental action and "carefully consider the resulting

26   _____

   [7] The "Court's approach to Fifth Amendment equal protection claims has always been precisely the same
   as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2
   (1975).

inequality to ensure our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 483 (9th Cir. 2014).

Gender dysphoria is a serious medical condition, and all major medical associations recognize that gender-affirming care is necessary to alleviate the significant distress of adolescents facing gender dysphoria. Shumer ¶¶51, 110. There is no non-discriminatory justification for singling out and criminalizing the medical decisions made by transgender youth, their parents, and their doctors. Untreated gender dysphoria can result in severe anxiety and depression, self-harm, and suicidality. *Id.* ¶46; A.P. ¶13; Parent B.M. ¶11; McGuire ¶¶9, 11; S.N. ¶4; S.F. ¶6. Gender-affirming care dramatically improves the health and well-being of adolescent patients, is well-accepted in the medical field, and is supported by substantial clinical and research evidence demonstrating its effectiveness. Shumer ¶¶45-102; Physician Plaintiff 1 ¶7. The quality of evidence supporting this care is comparable to the quality of evidence supporting countless other medical treatments provided to minors. Antommaria ¶¶45-47. And it is supported by decades of clinical experience and research demonstrating the often life-saving results of treatment. Antommaria ¶¶41-42; Physician Plaintiff 1 ¶¶19-24; Physician Plaintiff 2 ¶¶8, 16-22; Physician Plaintiff 3 ¶¶16-26. And last but certainly not least, the personal experiences of transgender youths and their families reflect just how such treatment positively transforms the lives of the adolescents who need it. By penalizing and criminalizing this necessary care, the Order will harm kids across the country.

Gender-affirming care is not uniquely risky. Shumer ¶¶80-84; Antommaria ¶¶60-63, 67-69; *Poe*, 709 F. Supp. 3d at 1182. The same medications and treatments used in gender-affirming medical care—including puberty blockers, testosterone, testosterone suppression, and estrogen—are widely used to treat cisgender adolescents and pose the same potential risks. Physician Plaintiff 2 ¶22; Drs. Doe ¶¶26-28. For example, GnRHa medications are used to treat precocious puberty; testosterone is used to treat cisgender boys with delayed

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

puberty; and estrogen is used to treat cisgender girls for ovarian failure, regulation of menstruation, and contraception. Antommaria ¶¶47, 63, 80. Again, in many cases, this treatment is *also used to affirm* the cisgender adolescent's gender—but the Order says not a word about it. Drs. Doe ¶¶26-28.

The Order's purported concern over potential "sterilization" of youths is unpersuasive. E.O. 14,187 §1. While some types of gender-affirming medical care may impair fertility, this risk is discussed in the informed consent process, as with other medical treatments that can impact fertility. Antommaria ¶¶58, 61-62. And there are ways to adjust treatment to protect fertility if that is important to the patient and family. *Id.* ¶62. And concerns about the low risks of permanent side effects ring hollow when youth denied treatment far too often make permanent decisions with much more tragic consequences. Shumer ¶107. Given the extensive evidence supporting gender-affirming care, no "exceedingly persuasive justification" exists for treating gender-affirming medical care differently than all other medical treatment for minors. To the contrary, the President's goal in issuing the Order "was not to ban a treatment. It was to ban an outcome that [he] deems undesirable." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *aff'd* 47 F.4th 661 (8th Cir. 2022).

But even if the federal government could show an "exceedingly persuasive justification" to restrict care for some minors (it cannot), the categorical restriction of funding and unilateral revision of federal criminal law to prohibit gender-affirming care would still be an unconstitutionally restrictive means of achieving the interest. *See Hecox*, 104 F.4th at 1086 (law lacked means-end fit between categorical ban of transgender female athletes and purported interest in athletic equality based on law's broad enforcement mechanism).

The Order suggests, without support, that people who receive gender-affirming care will regret that care. E.O. 14,187 §1. But regret is exceedingly uncommon for transgender youth receiving gender-affirming care, and the Order doesn't explain why this small risk justifies banning care for all transgender adolescents. *See* Shumer ¶¶77, 107; Dunham ¶17;

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Physician Plaintiff 3 ¶26; Drs. Doe ¶22. Nor does the Order weigh the purported risk of regret against the benefits of gender-affirming care—which is particularly troublesome given the consensus of the medical community that this care is medically appropriate and life-saving for certain transgender youth. *Id.* ¶¶22-23. The Order discusses fertility risks associated with gender-affirming care, but targets treatments, like puberty blockers, that have no impact on fertility. Antommaria ¶60. Many patients receiving hormone therapy remain fertile and can be provided with fertility-preserving options. Shumer ¶¶82-84. And similar or greater risks attend other pediatric treatments, but the Order singles out only gender-affirming care. Antommaria ¶80.

The Order does not survive heightened scrutiny.

### c.    The Order fails any level of review

Heightened scrutiny should be applied for the reasons described above. But the Order would fail any level of scrutiny because it "is so far removed from" the purported goal of protecting children from regret, "it [is] impossible to credit" it. *Romer v. Evans*, 517 U.S. 620, 635 (1996). There is no rational basis to completely disregard the scientific consensus and conclude that allowing minors with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten [the federal government's] legitimate interests in a way that" allowing other types of medical care "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). There is nothing unique about such care that explains the President's unilateral decision to override youths' and parents' decisions. That the Order seeks to punish medically necessary treatments for adolescents with gender dysphoria, while permitting the same treatments when provided to affirm an adolescent's gender assigned at birth, confirms that the Order fails rational basis review. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) ("The Court's reasoning [in *Cleburne*] was that the city's purported justifications . . . made no sense in light of how the city treated other groups similarly situated in relevant respects."); *Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people).

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Nor is animus a rational basis, *see Romer*, 517 U.S. at 632: "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973). While the Order purports to "protect[]" "vulnerable" youth, the President's actions—indeed, the language of the Order itself—show that its real purpose was to erase transgender people. And even where targeting of a particular group does not rise to the level of malice, an improper motive for the Order can also arise due to "insensitivity caused by simple want of careful, rational reflection or some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring). This is another reason the Order fails any level of review. *Id.* at 377; *see, e.g., Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1220 (N.D. Fla. 2023), *appeal dismissed sub nom. Doe v. Surgeon Gen., Fla.*, No. 23-12159-JJ, 2024 WL 5274658 (11th Cir. July 8, 2024) (concluding "there is no rational basis, let alone a basis that would survive heightened scrutiny," for prohibiting gender-affirming treatment for minors).

### 2.    Defunding medical schools, providers, and hospitals for providing gender-affirming care violates the separation of powers

The Order also violates the separation of powers by unilaterally ordering federal agencies to cut off federal funding to medical institutions that provide gender-affirming care. President Trump should know from his failed efforts to defund States and municipalities during his first term that Congress alone holds the "power of the purse" and that he cannot set conditions on appropriated funds that Congress did not authorize. But he did it again anyway.

*City and County of San Francisco v. Trump* controls. There, the Ninth Circuit struck down an Executive Order from President Trump's first term ordering agencies to broadly defund "sanctuary cities" without congressional authorization. 897 F.3d 1225 (2018). The Court held that, because the United States Constitution "exclusively grants the power of the purse to Congress, not the President," "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* (citing U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)). Rather, given the

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

President's obligation to "take Care that the Laws be faithfully executed," the President is affirmatively obligated to distribute funds appropriated by Congress without adding unauthorized conditions. *Id*. Because Congress had not "authorize[d] withholding of funds" to sanctuary cities, President Trump and the executive branch "violate[d] the constitutional principle of the Separation of Powers" by claiming "for itself Congress's exclusive spending power" and attempting to "coopt Congress's power to legislate." *Id*.

So too here. Section 4 of the Order, "Defunding Chemical and Surgical Mutilation," directs every federal agency "to ensure that institutions receiving Federal research or education grants end" gender-affirming care. And while Section 4 purports to direct only actions "consistent with applicable law" and "in coordination with the Director of the Office of Management and Budget," similar caveats did not save the order at issue in *San Francisco*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."). The "clear and specific language," *id.* at 1239, of the Order is obvious. It directs the "defunding" of medical institutions that provide gender-affirming care.

Just as in *San Francisco*, President Trump did not even attempt to identify any federal law conditioning the receipt of federal funds on denying transgender youth gender-affirming care. No such law exists, much less in unambiguous terms required for a valid exercise of congressional spending power. The Supreme Court has likened Congress's power to condition federal funds as "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The "legitimacy" of such conditions "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id*. (citations omitted). As such, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    Congress did not do so. For example, medical institutions in the Plaintiff States receive

2    federal research grants authorized by Congress under dozens of federal statutes, not one of which

3    conditions receipt of such funds on depriving patients of gender-affirming care. Dellit ¶22;

4    Ojemann ¶15; Tumer ¶16; Hower ¶16. Indeed, no appropriations bill in the last decade has

5    included a condition requiring denial of gender-affirming care.[8]

6    Indeed, Congress has passed numerous laws *prohibiting* federal interference in the

7    practice of medicine and patients' private medical decisions and prohibiting sex-based

8    discrimination in medicine. For example, the Social Security Act (Medicare and Medicaid)

9    forbids federal interference in medical decisions by practitioners and guarantees individuals the

10   right to make their own choices about needed medical care. *See, e.g.*, 42 U.S.C. § 1395

11   ("[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to

12   exercise any supervision or control over the practice of medicine or the manner in which

13   medical services are provided"); *id.* § 1396a(a)(23) (providing individuals freedom of choice

14   to obtain health services from any institution, agency, or person qualified to participate).

15   Similarly, the Affordable Care Act prohibits discrimination on the basis of sex by any health

16   program receiving federal assistance. *Id.* § 18116; *see Kadel*, 100 F.4th at 164 (state

17   Medicaid plan's categorical exclusion of coverage for gender-affirming care violated the

18   ACA's anti-discrimination requirement).

19   By attaching conditions to federal funding that were not only unauthorized by Congress

20   but that contravene laws prohibiting federal interference and discrimination in the practice of

21   medicine, the Order usurps Congress's spending and legislative power. This Court should enjoin

22   Defendants' implementation and enforcement of the Order.

23

24   [8] *See* HB 4366, https://www.congress.gov/bill/118th-congress/house-bill/4366/text; HB 2617, https://www.congress.gov/bill/117th-congress/house-bill/2617/text;

25   HB 2471, https://www.congress.gov/bill/117th-congress/house-bill/2471/text; HB 1158, https://www.congress.gov/bill/116th-congress/house-bill/1158/text;

26   HB 1625, https://www.congress.gov/bill/115th-congress/house-bill/1625/text; HBl 244, https://www.congress.gov/bill/115th-congress/house-bill/244/text; HB 2029, https://www.congress.gov/bill/114th-congress/house-bill/2029/text.

3.    **The Order's criminalization of gender-affirming care violates the Tenth Amendment**

By attempting to criminalize gender-affirming care, the Order usurps the States' reserved powers to regulate the practice of medicine, in violation of the Tenth Amendment. The Tenth Amendment provides that "[t]he Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." The President has no enumerated power to regulate the practice of medicine or to criminalize medical practices. Nor has he been authorized by Congress to do so. The Order thus encroaches on powers reserved to the States.

It is long-established that the "direct control of medical practice in the states is beyond the power of the federal government." *Linder v. U.S.*, 268 U.S. 5, 18 (1925). States have historically regulated the field of healthcare and set medical standards of care as a quintessential exercise of their police power. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387 (2002); *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (recognizing the state's powers to regulate medical professions from "time immemorial"). Throughout the nation's history, states have exercised such police powers to protect the health and safety of their citizens as primarily "matter[s] of local concern." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *see also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (holding that the Controlled Substance Act did not manifest intent to "regulate the practice of medicine," which has traditionally fallen within core state police powers).

Here, each of the Plaintiff States has exercised their police powers to authorize and protect gender-affirming care, including to transgender youth. Washington, for example, makes clear that the provision of or participation in any gender-affirming treatment consistent with the standard of care in Washington by a license holder does not constitute unprofessional conduct subject to discipline. Wash. Rev. Code § 18.130.450; *see also* Karinen ¶5. It also enacted the Gender Affirming Treatment Act to protect the rights of insured individuals seeking coverage for gender-affirming medical treatment. Wash. Rev. Code § 74.09.675. Washington has also

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

enacted a shield law protecting providers and patients in providing or obtaining gender-affirming treatment. Wash. Rev. Code ch. 7.115. As part of the regulation of practice of medicine, Oregon and Minnesota likewise do not treat the gender-affirming care meeting standards of care as unprofessional conduct. Krishnaswami ¶¶3-7; Chawla ¶9. The Plaintiff States further ensure insurance coverage for gender-affirming care. *See* Fotinos ¶10; Connolly ¶9; Sandoe ¶9.

The President, in contrast, has no enumerated power to regulate the practice of medicine or to criminalize medical care. But this is exactly what the Order does. It broadly redefines gender-affirming care—including non-surgical options like puberty-blocking medications and hormone therapy—as "mutilation," in a bad-faith effort to bring this necessary, life-saving care within the federal prohibition on "female genital mutilation" under 18 U.S.C. § 116. And it directs the Department of Justice to "prioritize" these baseless prosecutions. This is rank bad faith. 18 U.S.C. § 116 simply does not apply to gender-affirming care. Indeed, it specifically applies only to "procedure[s] performed for *non-medical reasons* that involve[] partial or total removal of, or other injury to, the external female genitalia." *Id.* § 116(e) (emphasis added). It has nothing to do whatsoever with non-surgical treatments—which are generally the only treatments minors can receive. And it explicitly excludes any "surgical operation" that is "necessary to the health of the person on whom it is performed and is performed by a person licensed in the place of its performance as a medical practitioner." *Id.* § 116(b). The statute cannot apply to gender-affirming care provided by state medical providers and authorized under the law of Plaintiff States.

Courts will not construe a statute to "alter the federal-state framework by permitting federal encroachment upon a traditional state power," unless "Congress conveys its purpose clearly." *U.S. v. Bass*, 404 U.S. 336, 349 (1971); *see also Gonzales*, 546 U.S. at 274 ("Just as the conventions of expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

traditionally supervised by the States' police power."); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (invalidating agency interpretation of federal statute where it "would result in a significant impingement of the States' traditional and primary power over land and water use"). Here, 18 U.S.C. § 116 clearly respects the States' historic authority to govern the practice of medicine. But by terrorizing medical providers and parents with threats of prosecution for medical care that is lawful in the Plaintiff States, the Order usurps that authority in violation of the Tenth Amendment.

**D.      Plaintiffs Will Suffer Immediate and Irreparable Harm if the Order Is Not Blocked**

If the Order is not blocked, Plaintiffs will suffer serious and irreparable harm. *See Brandt*, 47 F.4th at 672. As discussed above, the Order violates the constitutional rights of the Plaintiffs and their medical institutions, providers, and adolescent patients, which is, in and of itself, irreparable harm. *See, e.g.*, *Hecox*, 104 F.4th at 1088; *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017).

If it stands, the Order will dramatically reduce if not eliminate the availability of gender-affirming care for transgender adolescents, causing them catastrophic harm. Shumer ¶¶113, 115; Physician Plaintiff 3 ¶¶33-35; Buckley ¶¶9-13; A. Johnson ¶¶9-10; Glenn ¶5. Transgender adolescents are already vulnerable, facing higher risks of suicide, eating disorders, anxiety, and depression. A.P. ¶13; Provider B.M. ¶11; E.M. ¶¶9, 11; S.N. ¶4; S.F. ¶6; Buckley ¶7. With treatment, these youth experience "overwhelming sense of relief"—a type of "gender euphoria" that allows them to "plug into life, "flourish," become "outgoing," and "willing to try new things," even gaining the confidence to become "class presidents." Physician Plaintiff 1 ¶¶20-21; Provider B.M. ¶13; E.M. ¶10; R.C. ¶13; H.B. ¶6. For most adolescents this takes "many months, and often years, of careful medication titration and medical monitoring to get them to that healthy, thriving place." Physician Plaintiff 1 ¶26.

If transgender and gender-diverse youth are unable to access gender-affirming care, even temporarily, they can quickly develop secondary sexual characteristics inconsistent with their gender identity, potentially "causing lifelong gender dysphoria," and "prolonged negative mental

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  health outcomes." E.M. ¶13; Physician Plaintiff 3 ¶¶33-35; Haugland ¶15. Transgender children

2  and their parents are afraid to return to the anguish of gender dysphoria, in which children

3  suffered "severe depression," "suicidal ideation," and felt "trapped" in bodies that "felt foreign."

4  S.N. ¶4. Some "cannot go back to the way they felt before they received gender-affirming

5  care"—"their world would close in and go dark." A.P. ¶15; Khan ¶10. Many transgender

6  adolescents have already experienced trauma from harassment and violence and losing access to

7  care will only expose them to "more violence as their outward appearance changes and they no

8  longer 'pass.'" A.M.M. ¶17; Stanfield ¶13; Brinda ¶¶10-11; Glebe ¶7; T. Johnson ¶6.

9      Legal uncertainty itself is already wreaking havoc. Providers have been "deluged" with

10 "frantic" calls and emails from patients and parents "terrified at the prospect of losing access to

11 this care." Physician Plaintiff 1 ¶25; Physician Plaintiff 2 ¶¶24-25; Ojemann ¶16; A.P. ¶15; E.K.

12 ¶24; Kennedy ¶6; Link ¶4; Van Avery ¶4. After the Order, providers have witnessed increased

13 "anxiety, depression, despair, and suicidal ideation" among their patients, many of whom tie it

14 to their "feeling hopeless about their existence, or their child's existence, as transgender."

15 W.J. ¶10. Providers are worried patients may seek treatment options on the internet or through

16 other illicit sources. Kennedy ¶5; Leonardsmith ¶19. Organizations supporting gender-diverse

17 youth have likewise seen a spike in crisis calls from transgender youth who are suicidal or

18 considering self-harm, and transgender youth have started to crisis plan for access to

19 medications, including through dangerous methods. Wilson ¶¶10-12; Askini ¶15; Gardea ¶6;

20 Cunningham ¶¶4-6. Some children's reaction to the Order was "they should end their life" and

21 should "no longer exist after learning that the 'leader of our country hates them,'" and even

22 young transgender kids now fear being murdered. W.J. ¶11; Physician Plaintiff 1 ¶26; Z.C.L.

23 ¶¶16-17.

24

25

26

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Many parents of transgender youth are considering moving out of the country, with children asking if they can move to Canada, and preparing to split up their families if necessary.[9] They are facing the difficult choice between staying in the home and State they love or keeping their children safe and healthy. H.M. ¶13. Parents have packed "emergency bags" in case they "need to suddenly flee the country." *Id*. Other parents have avoided international travel out of fear their daughter's passport or even their daughter could be taken from them at the border. R.D. ¶15. They "fear even mentioning" their child's "need for gender affirming care." N.M. ¶13. Transgender kids are now scared to go to school and families "feel boxed in from every angle." H.M. ¶13. Parents are struggling to shield their young children from their growing fear about losing access to gender-affirming care.

If this care is lost or even interrupted temporarily, transgender children will predictably suffer severe anxiety, depression, and suicidal ideation, making children's "worst nightmares" a reality. S.N. ¶9; Parent S.O. ¶11; Physician Plaintiff 2 ¶30; Physician Plaintiff 3 ¶¶34, 36; E.K. ¶19. Indeed, numerous doctors have already lost young transgender patients to suicide. Physician Plaintiff 2 ¶31; Provider B.M. ¶11; Dunham ¶21. Shortly after the election, one provider's 18-year-old patient—who had not previously been suicidal—took her own life "rather than continue to live in a country where she was being told she should not exist." *Id*. Another Washington teen, Kai, a "bright and gentle soul" who loved game club, knowledge bowl, and Japanese club, took her own life shortly before President Trump was inaugurated, overwhelmed by the hate directed at transgender people. Billmeyer ¶¶4-12. If gender-affirming care disappears, Washington doctors have no doubt that "transgender adolescents will die." Physicians Plaintiff 1 ¶26. They are "certain" that "there are going to be young people who are going to take their lives if they can no longer receive this care." *Id*.; C.L. ¶12; R.B. ¶18; Z.C.L. ¶16; Kaefer ¶16.

---

[9] Physician Plaintiff 3 ¶37; J.B. ¶10; Brady ¶19; K.W. ¶17; K.G. ¶14; N.M. ¶12; S.B. ¶13; A.F. ¶10; Parent A.M. ¶15; G.T. ¶24; C.K. ¶5; Seaton ¶¶20-21; E.C. ¶17; H.M. ¶13; Ullom ¶15; P.R. ¶14; R.D. ¶16; S.S. ¶11; K.H. ¶15; H.B. ¶10; M.T. & T.T. ¶14; Seaton ¶20; Bertam ¶10; Brinda ¶12; H.E. ¶13; R.H. ¶15.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Moreover, the threat of prosecution and loss of funding has already caused practitioners to stop providing this life-saving care. The White House itself has touted that the Order has forced hospitals around the country to shut down their gender-affirming care programs. McGinty, Ex. 9. Seattle Children's, for example, is "facing immense pressure from the federal government to stop providing gender-affirming care" and is "caught in [an]" emergency caused by the Order. Ojemann ¶16. Immediately after the Order issued, a clinician in Seattle halted all care due to fear of the DOJ, requiring other providers to scramble to cover the providers' appointments. Physician Plaintiff 1 ¶29. Other Washington providers reasonably fear being prosecuted if they continue to provide gender-affirming care. Physician Plaintiff 2 ¶33; Physician Plaintiff 3 ¶32; Drs. Doe ¶38; Stanfield ¶12; W.J. ¶¶13-14; C.L. ¶15. Washington already faces a shortage of providers offering gender-affirming care, with clinicians having months- or years-long wait lists, and patients driving three to four hours to meet with appropriate medical providers. A.P. ¶4; Drs. Doe ¶¶9, 22. Absent an injunction, the Order's funding restrictions will only intensify this shortage, making this necessary, often life-saving care all but impossible to access. T. Johnson ¶8. These injuries are irreparable. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-98 (9th Cir. 2019).

The loss of hundreds of millions of dollars in funding also constitutes irreparable harm. UW School of Medicine alone would lose hundreds of million in research grants annually, putting the University and its providers in the untenable position of either violating the integrity of their medical judgment and ethical obligation to provide evidence-based care for their patients, or risk their and their colleagues' research, practices, and livelihoods. Dellit ¶20; Physician Plaintiff 1 ¶33; Physician Plaintiff 2 ¶32; Physician Plaintiff 3 ¶39; Provider B.M. ¶18; A.P. ¶15; Beal ¶¶14, 16. If enforced, the Order would eliminate all manner of research or treatment, including for cancer, AIDS, diabetes, drug abuse, mental health treatment, autism, aging, cardiovascular diseases, maternal health, and so much more. Dellit ¶9; Ojemann ¶13.

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  These institutions are relied on by their surrounding communities to train doctors, provide

2  medical care, and conduct research into life-saving medications and procedures. *See id.*

3  **E.     The Balance of Equities Weigh in Plaintiffs' Favor, and a Temporary Restraining Order Is in the Public Interest**

4       The equities and public interest, which merge when the government is a party, tip sharply

5  in favor of the Plaintiffs. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The threat of

6  harm to Plaintiffs far outweighs the federal government's interests in immediately enforcing the

7  Order, and preserving Plaintiffs' constitutional rights is in the public interest. *See Melendres v.*

8  *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the

9  violation of a party's constitutional rights" (citation omitted)). The balance of equities decidedly

10  supports a temporary restraining order here, and the Court should preserve the status quo until

11  the case can be decided on the merits.

12       Whatever interest the federal government may have in cutting off treatment to

13  transgender kids during the pendency of this case pales in comparison to Plaintiffs' irreparable

14  harm. In contrast to the personal and irreparable harms faced by the Plaintiffs, a temporary

15  restraining order would not harm the federal government at all, but merely maintain the status

16  quo. Gender-affirming care has been provided safely for many years. And the Order fails to

17  identify any harm to the federal government from the provision of such care. "[B]y establishing

18  a likelihood that [the government's] policy violates the U.S. Constitution," Plaintiffs "have also

19  established that both the public interest and the balance of the equities favor a preliminary

20  injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

21  **VI.     CONCLUSION**

22       The Court should grant the Plaintiffs' TRO Motion and immediately enjoin the

23  implementation and enforcement of Sections 4 and 8(a) of the Executive Order until the Court

24  can further consider Plaintiffs' Motion for Preliminary Injunction.

25

26

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

DATED this 7th day of February 2025.

I certify that this memorandum contains 8,369
words, in compliance with the Local Civil Rules.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
TERA HEINTZ, WSBA #54921
ANDREW R.W. HUGHES, WSBA #49515
NEAL LUNA, WSBA #34085
CRISTINA SEPE, WSBA #53609
LUCY WOLF, WSBA #59028
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
William.McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Neal.Luna@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Lucy.Wolf@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS, WSBA #53238
COLLEEN MELODY, WSBA #42275
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
Lauryn.Fraas@atg.wa.gov
Colleen.Melody@atg.wa.gov
*Attorneys for Physician Plaintiffs 1-3*


KEITH ELLISON
Attorney General of Minnesota

*/s/ James W. Canaday*
JAMES W. CANADAY, MSBA #030234X*
Deputy Attorney General
445 Minnesota St., Ste. 600
St. Paul, Minnesota 55101-2130
(651) 757-1421
james.canaday@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:25-cv-244

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    DAN RAYFIELD
     Attorney General of Oregon

2
     */s/ Allie M. Boyd*
3    ALLIE M. BOYD, WSBA #56444
     Senior Assistant Attorney General
4    Trial Attorney
     1162 Court Street NE
5    Salem, OR 97301-4096
     (503) 947-4700
6    allie.m.boyd@doj.oregon.gov
     *Attorneys for Plaintiff State of Oregon*
7
     *pro hac vice application forthcoming
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' EMERGENCY MOTION FOR          26          ATTORNEY GENERAL OF WASHINGTON
TEMPORARY RESTRAINING ORDER                            Complex Litigation Division
NO. 2:25-cv-244                                        800 Fifth Avenue, Suite 2000
                                                       Seattle, WA  98104
                                                       (206) 464-7744