**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF PHYSICIAN PLAINTIFF 2, MD |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, Physician Plaintiff 2, declare as follows:

1. I am a Plaintiff in this action. I bring my claims on behalf of myself and my patients. I offer this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order. I have personal knowledge of the facts set forth in this declaration and could testify competently to those facts if called as a witness.

2. I am a physician licensed by the Washington Medical Commission and am certified by the American Board of Pediatrics in general pediatrics and pediatric endocrinology.

3. I am an Assistant Professor in the Department of Pediatrics at the University of Washington (UW) School of Medicine, and I have taught on a variety of subjects at the UW School of Medicine.

4. I am an attending physician at a Seattle hospital where I work as a pediatric endocrinologist. I practice medicine in a clinic where I provide gender-affirming medical care to adolescent patients alongside other UW School of Medicine faculty members. In addition, I also provide general pediatric endocrine care, including treatment of diabetes, thyroid disease, and puberty disorders, which remains a significant portion of my practice, and oversee UW School of Medicine fellows and residents.

5. I have conducted research on the health of transgender youth, including serving as the primary investigator on grant-funded research, and am also a member of the World Professional Association for Transgender Health (WPATH). I have been an author on numerous peer-reviewed publications, including those on gender-affirming medical care for transgender youth.

6. Through my training and practice, I am deeply familiar with the prevailing medical standards and protocols for gender-affirming medical care, including the standards promulgated by WPATH.

7. As discussed more below, I am filing this declaration under pseudonym due to fear for my own safety, and the safety of my family, colleagues, and patients.

DECLARATION OF PHYSICIAN PLAINTIFF 2, MD

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

8. In my clinical practice, I see transgender and gender-diverse adolescent patients and, where medically indicated, provide gender-affirming medical care. This means that I prescribe medications to treat gender dysphoria, which refers to the psychological distress that results from an incongruence between one's sex assigned at birth and one's gender identity. The medications I prescribe for this condition include puberty-delaying medications and hormone replacement therapy. Over the course of my clinical practice, I have prescribed these medications for hundreds of patients.

9. Many times, by the time I meet with a patient and their family, the youth has already undergone social transitioning. This often means that they have changed their name, clothes, hair, or other aspects of their identity to affirm their gender identity. Patients also undergo an extensive mental health assessment as part of the clinic's intake process before I meet with them for their medical visit.

10. In my experience, the main reason that patients and their families decide to seek gender-affirming medical care is because even after social transitioning, some kids still feel distressed because of the incongruence between their gender identity and their body. This often leads to patients struggling with their mental health when I first meet them. Many are experiencing anxiety, depression, and withdrawal. Often their parents are very worried.

11. During a patient's first visit, we spend time discussing what things are causing the patient distress. I listen to what the patient tells me, and I also ask what the parents have observed. I then counsel the patient and their parents about different options for addressing their concerns. For instance, if I am treating a patient who identifies as male but was assigned female at birth, and that patient is distressed by the high-pitched sound of their voice, I would counsel them that a medical option to lower the pitch of their voice is testosterone, and that a non-medical option is voice therapy. I would explain the risks and benefits of both options. An example for a patient who identifies as female but was assigned male at birth might be distressed at developing facial hair. I would counsel that patient that hormone therapy can decrease facial hair, but that

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

laser hair removal or electrolysis are non-medical options that are also available. As another example, many transgender boys will try chest binding before considering top surgery as both can help to create a flat chest appearance.

12. When providing gender-affirming medical care, I spend a significant amount of time with the families of my patients discussing treatment options and explaining their risks and benefits, just as I discuss options and risk with the families of other minor patients experiencing other medical conditions. I review a patient's medical history and complete a baseline laboratory evaluation in the process of evaluating the pros and cons of particular care options. There is no single path or treatment plan for gender-affirming care. Every patient is unique, with their own experiences, concerns, and goals.

13. While I make sure that patients and their families are aware of all the medical and non-medical options to treat a patient's causes of distress, ultimately the reason that many patients choose to start puberty-delaying medications or hormone replacement therapy is when those medications are the best options to help a patient meet their goals. For instance, puberty-delaying medications can help to prevent permanent changes of puberty, such as chest development in someone assigned female at birth, or voice deepening and facial hair in someone assigned male at birth, which could be very distressing changes to occur when these changes do not match one's gender identity. In addition, testosterone therapy can help a patient who identifies as male but was assigned female at birth to develop facial hair, have a deeper voice, and gain more muscle mass, and estrogen can help a patient who identifies as female but was assigned male at birth to develop breasts and a feminine body shape. These can help a transgender youth go through puberty in a way that matches their gender identity, at around the same time their peers are also experiencing puberty, which can lead to reduced gender dysphoria and significantly improved mental health.

14. In my clinical practice, we require parental consent from all parents with medical decision-making rights before treating minors with puberty-delaying medications or hormone

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  replacement therapy. Both the patient and their parent(s) must sign a medication consent form, which I sign too, before I will prescribe puberty-delaying medications or hormone replacement therapy. This ensures that the patient and parents have had full information about the benefits and potential side-effects of any treatment they are pursuing, and that the patient and parents are in agreement on the course of treatment.

15. In my clinical practice, parents are involved every step of the way. I find that while they often have many questions and concerns, they ask thoughtful questions about both short-term and long-term outcomes as well as potential risks. Parents are deeply concerned about their child's mental and physical health and want them to receive the medical care they need. The parents of my patients do not want their children to suffer. They love their children, and want their children to be safe and happy, and to have the opportunity to thrive.

16. The most consistent observation that I have made in providing gender-affirming medical care is that there is a drastic improvement in the mental health of my transgender and gender-diverse patients after beginning hormone replacement therapy or puberty-delaying medications. Indeed, one of the reasons that I became interested in providing gender-affirming medical care is because I was able to witness the incredible improvement in the physical and mental well-being of my patients when receiving the care itself. Often, when patients are first seeking care from our clinic, their parents report that they often don't want to leave their room or their house because they don't feel comfortable in their bodies. They may avoid school and going out in public. But after experiencing the desired changes from gender-affirming medical care, they are like a new person—so much happier and engaged in life. As one parent recently remarked to me about her daughter who has been receiving hormone replacement therapy, "She's like a different kid now, just so much happier." Watching this transformation happen, and sharing it with my patients and their families, is one of my main motivations to do this work.

17. As one example, I inherited a patient who was 17, but who had been seen by another physician in the clinic for 2-3 years prior. I met the patient and her mother. The mother

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

told me during the initial meeting, "You are meeting her at her finest moment. She is a different kid than she was 3 years ago. She is so much happier." At the start of gender-affirming care, the girl had debilitating anxiety and depression. By age 17, she was involved in many school activities and was getting ready for college.

18. Another patient I have followed for several years, who has been taking testosterone and recently had top surgery, said "I just don't really think about gender anymore." Before starting medical care, he had significant anxiety and constantly worried about being misgendered in public and at school. Now that his body better matches his gender identity, he can focus his energy on school and on his life. He has graduated high school and is spending some time travelling the world before starting college next year.

19. One patient, who had known she was a girl since she was a toddler despite being assigned male at birth, was so well supported by her family that she did not experience much distress from gender dysphoria for several years. However, as she got closer to the age of puberty and began to see her peers have changes from puberty, she became terrified that she would develop changes of voice deepening and facial hair that she knew she would never want. We met several times to discuss options of puberty-delaying medications with her and her family and monitored closely for puberty. She was able to start puberty-delaying medications early in puberty, before permanent voice deepening developed, and felt so relieved knowing that she would not have to experience that change.

20. I have frequent follow-up visits with my patients who are receiving puberty-delaying medications or hormone replacement therapy. We generally meet every three months. During these visits I always ask the same three questions: (1) What changes have you noticed? (2) Are there changes you still want that haven't happened yet? (3) Are there any changes that have been unwanted? Based on the answers to those questions, I discuss with patients and families options to modify their course of treatment, which can include adjusting the care plan, modifying dosages, managing side effects, and tracking changes. I also solicit input from parents

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

during the check-ins to get their perspective and address any concerns. I work hard to have close relationships with my patients and their families. I learn about the patient's families, school environment, social relationship and friendships. They trust me with highly personal information that people don't often share with most clinicians, or even their family and friends. Treatment is most successful when there is a deep level of trust and when I understand the details of my patients, their lives, and how particular treatment options fit in. I treat them for years, know them very well as people as well as patients. Our goodbyes are sometimes emotional, especially for my patients. The clinic and I have been a significant part of their lives, and play a big role in their having become strong and capable young adults.

21. Over the course of my clinical practice, I have treated hundreds of transgender patients with puberty-delaying medications or hormone replacement therapy. The vast majority of those patients were very happy with their decision to pursue that care and the outcomes they have achieved. I can only recall a few patients who started hormone therapy and then stopped because they were unhappy with the effects or no longer wanted the changes to occur. I believe this is a very rare occurrence because there is a significant amount of mental health screening and discussion that takes place before a patient is prescribed puberty-delaying medications or hormone replacement therapy. In addition, patients explore their gender identity for a significant amount of time prior to starting gender-affirming medical care and feel confident with this decision when it is made.

22. Based on my clinical experience, gender-affirming medical care is as necessary, and as effective, as countless other treatments that I provide to my patients who are not transgender or gender-diverse. For example, a cisgender minor with central precocious puberty, which is where puberty begins earlier than expected, is often treated with puberty-delaying medications. When I compare the use of puberty-delaying medications to youth who are transgender and those who are cisgender, there have been more benefits shown for youth who are transgender, whereas the risks are similar. Another example is when a cisgender minor with

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

constitutional delay in puberty, which is when puberty has not started when expected, can be treated with hormone replacement therapy to "jumpstart" puberty. Again, there have been more benefits shown for youth who are transgender in receiving hormone replacement therapy, whereas the risks are similar. It is frustrating as a physician whose training and experience is grounded in science to see the social stigma associated with prescribing puberty-delaying medications or hormone replacement therapy for transgender youth, when none of those same stigmas are associated with prescribing the exact same medications to cisgender minors, even though the effects, benefits, and risks are similar.

23. I was scared, frustrated, and angry when I learned about the Executive Order directed at transgender youth, their parents, and clinicians. I was shocked by how it was written and by references to medically indicated care as "mutilation." This language is inaccurate and harmful, particularly because it is coming from people in power.

24. I was almost immediately bombarded with frantic calls and messages from my patients and their families. They are all terrified that their care will be taken away from them.

25. The fear of my patients related to the Executive Order has come up with nearly every patient I have spoken to since it was released. I have one patient whose family recently moved to Seattle so that she could receive gender-affirming medical care, because the care is banned in the state where the family used to live. That family shared that they are now thinking about moving to another country even though gender-affirming medical care is still lawful in Washington.

26. I have witnessed some youth being forced to discontinue puberty-delaying medications or gender-affirming hormones in the past and the harms caused by this. I have seen patients forced to undergo permanent puberty changes that did not align with their gender identity after losing access to puberty-delaying medications, which caused significant anxiety and depression and will likely require surgery in the future to reverse the changes that occurred. I have seen adolescents resort to ordering gender-affirming hormones online, which is dangerous

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

as the medications sold in this way are not regulated and may contain inaccurate amounts of hormones or other substances. I worry that many more patients will be in this situation if the changes detailed in the Executive Order go into effect.

27. I am also worried about my colleagues. Some of them have federal funding that support their careers, and their career trajectories will be significantly harmed without that funding.

28. Although I do not provide surgical care, I make referrals for gender-affirming surgery when it is medically indicated and consistent with the patient's goals of care. This can include surgery to remove breast tissue (often referred to as "top surgery") as well as genital surgery (often referred to as "bottom surgery"). In my Seattle clinic's practice, genital surgery is reserved for individuals who are 18 years old or older. The Executive Order is threatening my ability to refer for this care.

29. As an assistant professor and training physician, the Executive Order also threatens the ability to teach medical students about gender-affirming care. It is important for all physicians to learn about gender diversity and gender affirming care no matter what they end up specializing in. Every kind of physician, regardless of their specialty, will see gender-diverse patients in their practice. It is important to understand these patients, and the health care issues specific to them, in order to practice medicine well and care for patients fully.

30. I am scared for my patients and their families. I have been treating many of my patients for years and have helped them get to happy, stable places in their lives. I worry that if they lose their puberty-blocking medications or hormone therapy, they will lose hope. I expect preventable depression, anxiety, and suicidal ideation to rapidly increase among transgender youth.

31. One of the reasons that I am such a strong proponent of gender-affirming medical care is because when I was a pediatric resident, I lost a 14-year-old transgender patient to suicide. I believe that access to gender-affirming medical care could have saved his life. I never want any

child—let alone one of my patients—to suffer or die an avoidable death. The fact that this Executive Order may be intentionally trying to prevent people from getting care that could save their lives is devastating to me.

32. Providing gender-affirming medical care to transgender youth can be life-saving medical care. It would be wholly at odds with my ethical obligations as a medical doctor if I had to withhold life-saving medical care to transgender youth. Two of the main principles of medical ethics are autonomy, which is a patients' right to make decisions about their own healthcare, and beneficence, which is doing what is in the best interest of the patient. I have seen countless patients benefit from this care and knowing that there are medical options that can treat someone's gender dysphoria but having to withhold that care would clearly violate both of these ethical obligations.

33. The Executive Order also makes me scared for myself and other clinicians who are providing gender-affirming medical care even though it is lawful in Washington State. I am worried that the United States Department of Justice will start prosecuting clinicians for providing lawful, medically indicated gender-affirming care. This terrifies us as clinicians, and our families.

34. I am also scared that the hyperbolic language of the Executive Order is going to incite violence towards the institutions and providers who provide gender-affirming medical care. We have already had protestors outside of my practice. I am scared that it is only going to get worse. I am fearful for the safety of myself, my family, my colleagues, and my patients.

35. Since the Executive Order came out, I have been deeply worried for my patients. The first time I felt hopeful for them since then was after hearing that a lawsuit could be filed to prevent this from going into effect. I am hoping that a court will understand that my patients and their parents are real people, good people, with dignity. They just want to live happy and full lives. I want to be able to provide them the healthcare they need.

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this __4__ day of February 2025 at _____Seattle_____, Washington.

*[signature]*
PHYSICIAN PLAINTIFF 2, MD

DECLARATION OF
PHYSICIAN PLAINTIFF 2, MD

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744