# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF PHYSICIAN PLAINTIFF 3 |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATION OF
PHYSICIAN PLAINTIFF 3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, Physician Plaintiff 3, declare as follows:

1. I am a Plaintiff in this action. I bring my claims on behalf of myself and my patients. I offer this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order. I have personal knowledge of the facts set forth in this declaration and could testify competently to those facts if called as a witness.

2. I am a physician licensed by the Washington Medical Commission and am certified by the American Board of Pediatrics in general pediatrics and pediatric endocrinology.

3. I am an Assistant Professor in the Department of Pediatrics at the University of Washington (UW) and I am an attending physician at a Seattle hospital where I work as a pediatric endocrinologist.

4. Through my training and practice, I am deeply familiar with the prevailing medical standards and protocols for gender-affirming medical care, including the standards promulgated by the World Professional Association for Transgender Health (WPATH). I am also familiar with the clinical practice guidelines of the Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, on the treatment of gender dysphoria.

5. As discussed more below, I am filing this declaration under pseudonym due to fear for my own safety, and the safety of my family, colleagues, and patients.

6. In my clinical practice I work as a pediatric endocrinologist, which means that I specialize in how hormones regulate the body. This includes normal and abnormal puberty, growth, thyroid, and diabetes. I have a diverse patient practice and divide my clinical time between treating transgender and gender-diverse adolescent patients, providing general pediatric endocrine care, and providing diabetes care to pediatric patients.

7. I decided to go to medical school and become a pediatric endocrinologist because I grew up with diabetes as a child. Diabetes is a relentless, every-minute-of-every-day type of disease. It requires constant monitoring and frequent follow-up care with pediatric

DECLARATION OF
PHYSICIAN PLAINTIFF 3

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

endocrinology. I knew from a young age that I wanted to help other kids medically manage it so they had a doctor with real world knowledge of living with diabetes. Throughout my time in college and medical school I developed a passion for working with underserved populations. I tutored and assisted high school students in applying to college, trade-school, and jobs. I served a year in AmeriCorps supporting kindergarten classrooms with reading and literacy development.

8. I learned more about gender-affirming care as part of pediatric endocrinology when I was a pediatric resident. My residency was my first time working with a gender-diverse population and my first exposure to gender-affirming medical care. I loved it. It was fun working with the adolescent patients, especially adolescents who were engaged and excited about their medical care. I enjoyed helping marginalized transgender patients access equitable and supportive care. During my residency, I remember that my transgender and gender-diverse patients were so grateful for the gender-affirming medical care that I provided them.

9. When it was time for me to pursue a medical fellowship, I intentionally chose a fellowship at the University of Washington in order to obtain specialized clinical training in gender-affirming care. Being able to provide gender-affirming medical care was also an important factor for me when I applied to jobs after my fellowship.

10. I am currently practicing medicine in a clinic where I provide gender-affirming medical care to adolescent patients alongside other UW School of Medicine pediatric faculty physicians. In that part of my practice, I treat patients with gender dysphoria, which is defined in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, fifth edition (DSM) as "a marked incongruence between one's experienced/expressed gender and their assigned gender" which is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."

11. Gender dysphoria is treated with gender-affirming care. This includes mental health support and treatment, social transition (such as changing name, pronouns, clothing style,

DECLARATION OF
PHYSICIAN PLAINTIFF 3

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

hair style), gender-affirming medication, and gender-affirming surgery. As a pediatric endocrinologist, I prescribe medications to treat gender dysphoria, which may include puberty-blocking medications and hormone replacement therapy.

12. Puberty-blocking medications are generally prescribed to transgender or gender-diverse adolescents at the onset of puberty to delay puberty. These medications prevent the development of permanent physical characteristics that conflict with the adolescent's gender identity.

13. Gender-affirming hormone replacement therapy involves the administration of hormones such as estrogen or testosterone to transgender or gender-diverse individuals to align their physical characteristics with their gender identity.

14. In my clinical practice, parental or legal-guardian consent is always required for a minor patient to receive gender-affirming puberty-blocking medications or gender-affirming hormone replacement therapy. If parents or guardians with legal decision-making authority do not agree to medical treatment, then the adolescent patient must wait until they are 18 years old to be able to consent to gender-affirming medications without parental consent. My appointments in gender clinic include assessment of mental health, medical history, surgical history, and family dynamics. A visit to discuss and obtain consent for gender-affirming medications often lasts 1 hour or longer.

15. I will note that this consent procedure is markedly different than in the general pediatric endocrinology setting. When I practice in general pediatric endocrine clinic, I treat kids who are unhappy with their bodies because puberty is happening too early (precocious puberty) as well as kids who are unhappy with their bodies because puberty is happening too late (delayed puberty). The medications I use to treat my cisgender adolescent patients are the same medications that I use to treat my transgender and gender-diverse adolescent patients. The use of these medications carry similar risks for both sets of patients. Yet when I prescribe those medications to cisgender kids, I don't have to obtain formal, written parental consent. Instead, I

DECLARATION OF
PHYSICIAN PLAINTIFF 3

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

discuss and document the risks, benefits, side effects, and long-term impacts of treatment with the parent who attends the clinic visit, which is the case for all medications that I prescribe. I'm not aware of any other medications for minors where parents must provide written consent before the medication can be prescribed. The appointments for my cisgender are also not as long as appointments for my transgender and gender-diverse patients, in part because there is less focus on the mental-health impacts of a trans-phobic society.

16. Parents overwhelming agree that gender-affirming medical care is the right course of treatment for the vast majority of patients I treat. The parents of my patients want what is best for their child and they want their child to thrive.

17. Before I meet with a patient in the clinic, I review their mental health assessment, which is generally conducted over a series of visits before I ever meet with the patient. This means that I generally have a good deal of information about the patient before I ever meet them. When I meet with a patient and their family for the first time, I ask about their gender identity, how they feel about their body, and what their goals are for puberty and their body. While most adolescents are generally reserved about discussing puberty and their bodies, I find that my transgender and gender-diverse adolescent patients are generally much more attune to their bodies, identity, and goals. They can generally describe in detail what they have been experiencing, how it is making them feel, and their hopes for how gender-affirming care could impact them.

18. I have a close and personal relationship with my patients and their families. Typically, I see patients and their parents for follow up visits every 3 months. Helping parents understand their adolescent is part of my job. In order to create a treatment plan for an adolescent, I need to have an open conversation with my patient and their parents about their goals and concerns. A main part of my job is helping families navigate their health care journey together, and to create a shared plan through conversation and open communication. I follow the

DECLARATION OF
PHYSICAN PLAINTIFF 3

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

adolescent and family's lead, because that is the best way to support them, develop a personalized treatment plan, and achieve the best outcomes for my patients.

19. For example, I recall one patient who physically presented as a girl, although she was male assigned at birth. She had a supportive family and had already socially transitioned when I first met with her in her early teens—she wore classically thought of girls' clothes, had long hair, and often dressed in pink. She and her family she explained that she was incredibly anxious about beginning puberty. She explained that she was scared that her body was going to start changing in ways that she didn't want it to. She was very clear that she did not want her genitals to grow; she did not want male hair growth; she did not want her voice to deepen. She was clear that when she grew up, she wanted to look like a girl—like her mom. It was obvious that she was in extreme mental distress at the prospect of her body changing in ways that she didn't want it to, and her parents were very worried about her mental health. I counseled the patient and her family on the risks and benefits of puberty-blocking medications. The family agreed that their daughter needed the medication. In the follow-up appointments with the family after the patient began take the puberty-blocking medication, the family reported her being much more at ease and happier in her body. The patient was thriving in school and with friends due to decreased anxiety. A couple of years later, the family decided their daughter was ready to begin taking estrogen. That patient has made incredible strides since I first met her and feels so much more comfortable in her body.

20. That doesn't mean that every patient I meet with for gender-affirming care decides to proceed with gender-affirming medications. I would say that in cases where I determine medication would be appropriate and consistent with the standard of care, approximately 85% of patients and their families choose to have their child begin gender-affirming medications. This number is higher than the percentage of adolescents in the general population who choose to pursue gender-affirming medical care because the families who see me in clinic have spent time discussing their goals as a family, invested effort into talking with

DECLARATION OF
PHYSICIAN PLAINTIFF 3

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

their primary care physician and pursuing a referral, in addition to completing their mental health assessment appointments. Of the families that I see, there are two main reasons why families don't have their child begin gender-affirming medications; either because one or more parents are unwilling to provide consent, or because after the family learns more about gender-affirming medications they decide it's not the right decision for their child.

21. For example, I recently saw a nonbinary patient, who was assigned female at birth. They and their family came to see me because the adolescent was uncomfortable with their breast growth, wanted a more androgynous appearance, and was considering taking testosterone. They explained that they wanted a boxier, more masculine body, did not want to have periods, and wanted a square jaw line. However, they were not interested in facial hair or more hair on their body, and they were a singer and did not want their voice to change. After I explained that testosterone would cause a deeper voice, increased hair on the body, and facial hair, they decided that it was not a good option for them. Instead, I counseled them on a different medication that would stop menstruation but not cause any other physical changes, and they decided to take that instead. Carefully reviewing the various treatment options with patients and their families and figuring out the best way to address a patient's concerns is one of the best parts of my job. Families and adolescents generally feel excited and happy with gender-affirming medical care when they help create a treatment plan that is unique to them. There is generally a huge sense of relief from everyone once we are able to put a treatment plan in place.

22. I have consistently observed a sense of relief and joy from my patients who choose to begin puberty-delaying medications or hormone replacement therapy and their families. Many of my patients express relief and affirmation as soon as I send the prescription off to the pharmacy. There is a lot of happiness for my patients in making puberty happen the way they want it to happen with their bodies. And I find that parents are generally happy when their kids are happy and thriving in school and their social lives.

DECLARATION OF
PHYSICAN PLAINTIFF 3

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

23. One example is a male patient who was assigned female at birth. He has identified as a boy since he could ever remember. He first came to see me around the age of 9 when puberty was expected to begin. He was feeling anxious and worried about growing breasts and developing curvy hips. He had begun to withdraw from his friends and was struggling to enjoy his normal activities, including Jui-Jitsu and basketball. I monitored for signs of puberty starting, and when his body was in the earliest phase of puberty both him and his parents were eager to use puberty-blocking medications to prevent irreversible breast growth. Within months of starting puberty-blocking medication, he felt more secure in his body "like it's doing what it is supposed to." His anxiety about his body decreased and parents noted he was back to hanging out with his friends and enjoying sports like he used to. I continue to see him and his family regularly to assess how the puberty-blocking medications are working, support his mental health, and eventually determine with the family when the right time will be for him to start testosterone.

24. Another patient who comes to mind is a male patient who was assigned female at birth. He came to the clinic with his family about midway through puberty. He had started his period and was growing larger breasts. He was ashamed of his body and incredibly depressed. He had a diagnosis of anorexia, and was trying to limit his eating and decrease his weight in order to stop his body from developing, which is not uncommon. When I first saw him, he was depressed, anxious, reserved, and restricting his food with a very low weight. His parents were distraught and very engaged in his care but were finding it challenging to help him on their own. After discussing the risks and benefits with him and his family, they agreed that we should start him on testosterone therapy and a medication to stop his periods. After he began the medication regimen, things slowly started to turn around. His period stopped and his breasts stopped growing. And then his voice started deepening and he started to gain more muscle. As his mental health improved, he was able to complete an anorexia program. He became proud of his new body, worked through his obsessive thoughts around food, and developed a regular exercise routine to gain muscle. As a result, he grew into a confident, mature, and outgoing teenager. He

DECLARATION OF
PHYSICIAN PLAINTIFF 3

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

no longer has disordered eating. He explained to me that now he feels "supported by his body instead of betrayed by it." He is currently applying to Ivy League colleges. I couldn't be prouder of him. Both his family and I agree that his turnaround would not have been possible without gender-affirming medications.

25. Another example is a nonbinary patient who was assigned male at birth. In addition to being nonbinary, this patient had medical diagnoses including diabetes. When I first met them, they were extremely depressed and, as a result, they were struggling to manage their diabetes. They were starting to enter puberty and they were upset at the changes in their body. After I counseled the patient and their parents about their options, including the risks and benefits of each option, they decided the patient would start taking puberty blockers. Their depressed mood improved, and they were optimistic about starting estrogen and having female puberty in the future. When they were older, they began taking estrogen with their parent's consent. The transformation was incredible. They had improved school attendance and started doing better in school; they became more social; and they also became more invested in taking care of themselves and their diabetes. They recently started a new insulin pump that provides automatic insulin delivery and are very excited their blood glucose levels have been in target range. They are now 18 and feeling confident and affirmed in their body. I see them every 3 months for diabetes care, and while we discuss their gender-affirming hormones, they are no longer distressed by their body or gender identity and the main focus of our visits is on their diabetes.

26. Out of the approximately 200 transgender and gender-diverse patients I have treated, I have never had a patient who regretted pursuing puberty-blocking medications or hormone replacement therapy. Instead, my patients express an overwhelming sense of relief and happiness. When I first see patients, many of them are struggling with mental health issues like depression, anxiety, social isolation, and suicidal thoughts. Usually within six to nine months of beginning gender-affirming medical care, things really begin to start turning around for the

DECLARATION OF
PHYSICIAN PLAINTIFF 3

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

patient. As a patient begins to experience their body changing in ways that are consistent with their gender identity, their self-confidence grows and their mental health improves.

27. One of the major milestone markers for many of my transgender patients is the first time that someone perceives them as a "cisgender boy" or a "cisgender girl" rather than a "trans boy" or a "trans girl." I remember a teenage male patient who was so excited that a stranger called him "sir" at the grocery store. These patients take enormous pride when the outside world finally begins to see them in the way they see themselves. This outward recognition of their gender identity creates positive ripple effects throughout their life. They usually start doing better in school; begin having better relationships with family and friends; and become more social and outgoing.

28. As part of my practice, I am sometimes asked by patients and their families to refer them for gender-affirming surgery. This most often occurs after years of other gender-affirming care, and only when also recommended by a mental health care professional. The most common surgery that my patients want is "top surgery," which is surgery to remove breast tissue. Usually my male patients, who were assigned female at birth, first bind their chests in order to reduce their chest size. But as these patients get older some of them decide that a surgical option is the best decision for them. If the patient and the family are in agreement, I will provide a surgical referral to them. As with gender-affirming medications, parents must provide consent for gender-affirming "top surgery" for adolescents under the age of 18.

29. In my clinical practice and international guidelines, "bottom surgery" or genital surgery is reserved for individuals who are 18 years old or older, so I would only refer adult patients for "bottom surgery." I have had a few requests for referrals for this type of procedure. In my experience, it is most common for patients to begin considering bottom surgery after college. It is usually a very expensive procedure, and it often takes patients many years to save up enough funds.

DECLARATION OF
PHYSICAN PLAINTIFF 3

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

30. When I heard about the Executive Order targeting transgender kids and doctors providing gender-affirming care, I was frustrated and afraid—especially for my patients. Many of my patients have been expressing concern that something like this would happen, but it was still shocking when I read it. Since the Executive Order came down, my patients and their parents uniformly express that they are anxious that they will lose their health care and feel socially isolated. The Executive Order feels like the Federal Government is intentionally bullying transgender adolescents and their families.

31. I feel disappointed and angry that the Executive Order is trying to stop me from providing evidence-based care that my patients desperately need and rely upon. I know a lot of clinicians and health care professionals right now are feeling scared for their personal safety and the safety of their own families. I have heard that gender clinics around the country have already been forced to shut down because of the Executive Order. I worry that could happen here.

32. I also worry that I or one of my colleagues could be prosecuted for providing medically appropriate care that is legal in Washington. It's scary to think about the Federal Government going after doctors who are providing lawful, evidence-based care in their state.

33. I fear for what would happen if my patients were to suddenly lose access to their medications. I believe that many adolescents would go online to try to buy medication. Buying prescription medications online is extremely dangerous as it is entirely unregulated. Kids could end up buying medications that contain an inaccurate amount of hormones, an unsafe amount of hormones, or hormones mixed with other unknown or unsafe medications or preservatives. Either way, kids could be seriously hurt or even die.

34. There are going to be significant physical side effects for adolescent patients who lose access to gender-affirming medications. For instance, if someone suddenly stops taking puberty-blocking medications, puberty changes would begin to occur within weeks to months of stopping the medication. The physical changes that occur with puberty are generally irreversible unless a patient later has surgery to try to correct the changes. In a patient assigned male at birth,

DECLARATION OF
PHYSICIAN PLAINTIFF 3

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

these irreversible physical changes include genital growth, voice deepening, and facial hair growth. In a patient assigned female at birth, these irreversible changes would include breast growth and body shape changes such as fat distribution to create curvy hips. Any interruption in puberty-blocking medications is an immediate risk for irreversible physical changes, emotional distress and depression.

35. If a male patient assigned female at birth were to suddenly lose access to testosterone, I would expect their muscle mass to decrease and their body fat to begin to redistribute to their hips and breasts, which may result in breast growth, and cause a more feminine body shape. They would have slower hair growth, smoother skin, and their periods would restart. I would expect these changes to begin happening within a month. And if a female patient assigned male at birth were to suddenly lose access to estrogen, I would expect them to have increased hair growth including facial hair, less smooth skin, and more muscle mass resulting in a masculine body shape. If they had not previously completed their male puberty, then they would also experience irreversible genital growth and voice deepening. Again, I would expect these changes to begin happening within a month.

36. For a patient to have their body suddenly begin changing in ways that are inconsistent with their gender identity is deeply distressing. I would expect transgender adolescents to have much higher rates of anxiety, depression, and suicidal ideation. I would expect many of these youth would not want to leave their home as their body starts changing in ways that they find distressing. I anticipate these youth would experience significant social withdrawal, difficulty attending school, and struggle to excel in school. I expect there to be overall mental health crises for the vast majority of transgender and gender-diverse youth.

37. Over the last couple of years, there has been a steady stream of families moving to Washington State after gender-affirming medical care was banned in their home states. I have now heard some of those same families talking about moving to Canada or Europe. Other

DECLARATION OF
PHYSICIAN PLAINTIFF 3

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

families are talking about flying out of the country to get medications. None of my patients or their families want to stop care. Everyone is terrified of what is going to happen next.

38. I am scared for my patients, and I am scared for myself and my family. There are routinely protesters outside of the hospital where I provide gender-affirming care. There are also online social media accounts that are anti-trans and call out our specific clinic in their posts. It feels like public animosity is building towards transgender and gender diverse youth, their families, and their physicians. I am proceeding under a pseudonym because I'm scared that me, my family, or my patients will be targeted.

39. The Executive Order also puts physicians and other health care professionals in an impossible ethical situation. Providing gender-affirming medical care to transgender youth is essential puberty-related medical care. As a pediatric endocrinologist, I also provide very similar puberty-related care to cisgender patients. It would be wholly at odds with my ethical obligations as a medical doctor to withhold medications from my transgender patients but provide them to cisgender patients for similar health care needs.

40. I want to be able to provide my patients access to the medications they need and that their parents want them to have. I have seen my transgender and gender-diverse patients thrive and flourish when they receive gender-affirming medical care alongside counseling and a strong support system. I am scared that the Executive Order is going to prevent me and other doctors in Washington from providing the health care services we know our patients need and deserve.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this __5__ day of February 2025, at __Seattle_____, Washington.

_Physician Plaintiff 3_
PHYSICIAN PLAINTIFF 3, M.D.

DECLARATION OF
PHYSICAN PLAINTIFF 3

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744