1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

STATE OF WASHINGTON, et al.,

NO.

10

               Plaintiffs,

DECLARATION OF B.M.

11

   v.

12
13

DONALD J. TRUMP, in his official
capacity as President of the United States of
America, et al.,

14

               Defendants.

15
16
17
18
19
20
21
22
23
24
25
26

DECLARATION OF B.M.

I, B.M. declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.       I live in Redmond, Washington with my wife. We've been married since 1998. We have three kids, ages 19, 23, and 25 years old.

3.      I am a software engineer and my wife is a fourth grade teacher at a local private school. I received my bachelor's degree in computer science from Weber State University in 1999. My wife received her master's degree in secondary education from Western Governors University in 2020.

4.      Our youngest son, Child A, is transgender and uses he/him pronouns. I have chosen to refer to him in this declaration as Child A because I am fearful for his safety and privacy in the current political climate. Child A is awesome. He is 19 years old and currently attends college at the University of Washington. He loves to rock climb and ride bikes. He is interested in environmental sustainability, botany, gardening, and has recently taken up woodworking. This summer he will work as a camp counselor at the summer camp for transgender and gender expansive youth that he attended when he was younger. When he was born, he was assigned female at birth, but his gender identity is male.

5.      My wife and I originally started raising our family in Kaysville, Utah. We both come from conservative Utah Mormon families and were active members of the Mormon church for many years.

6.      Child A started telling us he was a boy when he was 3 years old, and he has consistently maintained that self-awareness and identity for the last 16 years. As a young boy he would tell me that he wanted to shop on my side of the store and would consistently dress in masculine clothing. Because of our religion, it was really upsetting for my wife and I and we struggled to accept his identity at first. We would try to convince him to dress in feminine clothing for church and only wear masculine clothing at home. It was hard for our son at this

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1   time too. He used to cry and ask why God made him a girl, when he knew he was truly a boy.

2        7.      But as time went on, our love for our child led us to accept his identity, and to

3   start questioning our religion. It was not long before we started getting comments that turned

4   into harassment at church and at the grocery store. I remember being approached at church and

5   told "you have a really weird child." The harassment and hostility got to the point where I

6   questioned my ability to protect my son and be the parent he needed. We ultimately decided to

7   move to Washington because we had friends there and we felt it would be a safer place to raise

8   him.

9        8.      At the time we decided to move, Child A was 5 years old and had just finished

10  preschool. Soon after moving, I found out about the Gender Diversity non-profit organization.

11  We joined one of their family support groups, which helped us identify resources and learn how

12  to better support our son's journey.

13       9.      When Child A was part way through kindergarten, my wife and I spoke with the

14  teachers and school counselors about our son being transgender and outlined the support we

15  expected from them. The teachers were supportive, but we had some issues with which bathroom

16  Child A was to use. He would try to use the boy's bathroom and if kids were in there they would

17  tell him to leave and if he went to the girl's bathroom the same thing happened. Because of this,

18  Child A started holding his bladder to avoid using the bathroom at school. We reached out to the

19  principal, and after that, Child A was allowed to use the nurse's bathroom but eventually was

20  able to use the boy's bathroom at school.

21       10.     When Child A was 6 years old he started seeing a mental health provider to help

22  support him. It was during this process that Child A got a diagnosis of gender dysphoria. After

23  a few months, Child A told us he did not want to keep going to the counselor. He did not want

24  to keep talking about it. He just wanted to be a kid.

25       11.     During this time, my wife and I were very fearful. It was thirteen years ago, and

26  people were still largely in the dark about the experience of transgender and gender expansive

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   young people. Coming from a very conservative community we had heard of parents having

2   Child Protective Services (CPS) called on them for supporting their trans child or not receiving

3   appropriate care in the emergency room when their child had an injury. Consequently, my wife

4   and I felt it necessary to put together a "safety folder" with letters from friends and our son's

5   psychiatrist attesting to the fact that Child A was a transgender boy, and we were not crazy or

6   harming him in any way by supporting who he is.

7       12.     When Child A was about 8 years old he started having a sort of existential crisis.

8   He would disassociate especially when he felt social anxiety. It was heartbreaking. We asked for

9   help at our support group to get help navigating how he was feeling. We were advised that it

10  could be helpful to find a mentor for Child A, someone who had experienced similar things and

11  who he could connect with. We were fortunate to find someone and it helped a great deal. His

12  mentor was also transgender and working with him helped Child A see himself and his future

13  more clearly.

14      13.     When Child A started middle school, he decided he wanted to start seeing a

15  therapist again. It was a difficult time. Even though he had socially transitioned and had been

16  presenting as male and using he/him pronouns since first grade, some of the kids remembered

17  Child A from kindergarten with a different name and pronouns. One of those kids outed him to

18  others in middle school who were unaware he was transgender. We found a great therapist for

19  Child A with experience working with transgender youth. We noticed a significant change in

20  Child A after getting this support. He worked through his anxiety and stopped isolating himself

21  as much. He started going out and being with friends more. We noticed that he was more

22  confident being his authentic self. Working with a gender-affirming therapist helped normalize

23  Child A's experience and sense of who he is. It allowed for a more typical childhood

24  development and allowed him to participate in his life more fully.

25      14.     One of the things Child A was most afraid of growing up was puberty. He was

26  terrified and had very high levels of anxiety about what was going to happen to his body and

DECLARATION OF B.M.                           3                    ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104
                                                                            (206) 464-7744

1   how he was going to feel about it. We were able to find a great doctor for Child A who ran tests

2   to determine where Child A's hormone levels were. The doctor discussed the puberty process

3   with Child A, treating him with respect and answering his questions. He explained it was not

4   time yet, but to come back periodically for tests until he was in the initial stages of puberty.

5       15.     When Child A was about 11 years old, the doctor gave him the option to start

6   puberty blockers, if he wanted to. The doctor explained all the risks and possible outcomes and

7   Child A still wanted to move forward with the care. When Child A was about 12 years old, he

8   became eligible for additional treatment. Again, the doctor spoke directly to Child A and

9   discussed the process and potential risks. Child A started a low dose topical testosterone cream

10  and at 14 years old started receiving a stronger dose by injection.

11      16.     The impact on our son once he started receiving gender-affirming care was

12  significant. It was a major relief for him. His anxiety levels went down significantly, and he said

13  he felt so much better. Child A shared that he felt more like himself and fit in with his friends

14  better. It was such a relief to see my son feel better about himself and to start having a better

15  relationship with his body. It has allowed him to live as his authentic self.

16      17.     When Child A turned 18 he got a hysterectomy because it was something he felt

17  would further aid in feeling comfortable in his body. The surgeon was supportive, caring, and

18  sensitive to his anxieties and questions. I was so glad to see him treated with such respect and

19  care and I was also glad to see the positive effect the surgery had on his well-being and

20  confidence.

21      18.     Our oldest child, Child B, is 25 years old. I have chosen to refer to them in this

22  declaration as Child B because, as I stated above, I am fearful for their safety and privacy in the

23  current political climate. When they were born, they were assigned female at birth but came out

24  as non-binary in 2020. Child B has also received gender-affirming care, both surgical and

25  hormonal.

26

DECLARATION OF B.M.                          4                    ATTORNEY GENERAL OF WASHINGTON
                                                                          Complex Litigation Division
                                                                         800 Fifth Avenue, Suite 2000
                                                                            Seattle, WA 98104
                                                                               (206) 464-7744

19.    Child B's distress also lessened when they started receiving gender-affirming care. Their anxiety diminished and they have been able to participate in their lives more fully and authentically. Because they are non-binary, their gender presentation varies based on how they feel. Because of the recent change in the political climate, I am very concerned for their physical safety. It breaks my heart that they do not feel safe traveling to visit my family in Utah, for example.

20.    The recent executive order (EO) restricting gender-affirming care for transgender youth is incredibly upsetting to our family. I am terrified to think about the possibility that the care my kids receive could be interrupted or discontinued. I am very concerned that health insurance companies will stop covering this type of care. Child A's doctor recently had a conversation with him about this, indicating that healthcare providers are deeply concerned as well and are working to figure out a way to maintain continuity of care for their patients. Losing access to this care is Child A's worst nightmare. Child A is terrified about how his body would start to change if his treatment was interrupted and what that would do to his mental and physical health. He just started his college career. The loss of access to gender-affirming care would significantly impact his future and ability to plan for his future. Child B is also very concerned about the impact on their mental, physical, and emotional health they would experience if they no longer had access to gender-affirming care.

21.    Prior to the EO going into effect, Child A was able to get his gender markers changed on his passport, driver's license and social security card, but not his birth certificate. Child B was able to have their gender marker changed on their passport and driver's license to X, but in the current political climate is afraid to travel with their documents. They fear that they may be harassed or detained. It is unconscionable that people who live in this country who happen to be transgender or gender non-conforming are afraid to travel.

22.    I am also worried about Child A and Child B being the targets of increased harassment because of these EOs. Both of them have experienced harassment at work and if

DECLARATION OF B.M.                          5                  ATTORNEY GENERAL OF WASHINGTON
                                                                Complex Litigation Division
                                                                800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104
                                                                (206) 464-7744

1    Child A's testosterone treatments were interrupted, his outward appearance would change and

2    potentially subject him to harassment or violence.

3        23.    As a family we have already had to move to a different state and leave the church

4    we grew up in to protect our family. We are not in a position to sue the Federal Government

5    ourselves, as it would impact us financially as well as increase the risk to our family's safety.

6    We have three kids to protect and increasing that risk is not an option.

7        I declare under penalty of perjury under the laws of the State of Washington and the

8    United States of America that the foregoing is true and correct.

9        DATED and SIGNED this  4th  day of February 2025 at  -------------- , Washington.

10

11    B.M.
     Parent of Child A and Child B

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744