**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF J.M. |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATION OF J.M.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

I, J.M., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am a clinical social worker and the parent of A., who is 13 years old. We live with A.'s siblings and my spouse in Shoreline, Washington. Although I have professional experience as a social worker and therapist for members of the LGBTQ community, I write this declaration in my capacity as a parent.

3. I am choosing to use my initials rather than my full name in this declaration out of fear for the safety of myself and my family.

4. A. is a transgender boy, which means his gender identity is male, although he was assigned a female gender at birth. I'm choosing to refer to my child by his initial, A., in this declaration because I fear for his safety and privacy in his community, including at school, where he has already been bullied for being transgender.

5. A. came out as transgender in 2019, at the end of the 3rd grade. My son knows that I am accepting and supportive where issues of gender and sexuality are concerned. When A. informed me that he believed he is transgender, I encouraged him to experiment with male clothing expression. By the end of that summer, A. confirmed that he wanted to use male pronouns. He cut his hair short and prepared to socially transition to his male gender identity in the 4th grade.

6. Though A.'s school counselor reintroduced him to his school as a boy at the beginning of the 4th school year, the school community was not accepting. As a social worker, I am aware that the 4th grade is a pivotal developmental period when children individualize and differentiate, and this differentiation often involves conflict. Still, the steady stream of bullying that A. experienced was more than I ever personally experienced or witnessed as a child.

7. When socially transitioning, A. was told "you're not a boy" by other students. He was physically bullied as well. When the students were not able to bully A. in-person because

of remote learning during COVID, the bullying moved online. In one instance, a bully sent A. a message telling him to kill himself. This was an especially dangerous and painful message to receive because my late husband died by suicide when A. was five years old. A. went from being a socially engaged kid to withdrawn and isolated. His grades plummeted.

8. In the 6th grade, when A. returned to in-person schooling, the bullying resumed, and became physical. A. was bullied on the school bus, and in the school locker room. I am aware that such antisocial behavior is prevalent at this age, and tends to peak around middle school and high school. But I was concerned about A.'s safety. I did not want my son to come home with a concussion.

9. For the 7th grade, I moved A. to an alternative school. That environment made a dramatic improvement for A. The bullying immediately stopped, but A. had to start fresh and had no friends. A.'s mental health continued to suffer during this time.

10. Currently, A. is in the 8th grade back at the mainstream public school. The bullying has resumed. However, at this point we are more savvy—for example, A. obtained a waiver from gym class, so that he can avoid bullying in the locker room. Though I want to protect A., this does represent a loss. Physical education is a rite of passage for a young person, and my son is forced to miss out because our society and the federal government encourage transphobia in young people. Because of such discrimination and hostility, A. is behind socially and academically. A. will require summer school. However, it is essential that my son be allowed to live as himself.

11. A. used puberty blockers for three years, beginning at approximately age 10. Before seeking puberty blockers for A., our family proceeded carefully and sought education on the risks and benefits. Puberty blockers help buy time, allowing young transgender people to grow into a body that better matches their gender identity. Though some sources highlight contraindications and dangers associated with puberty blockers, generally this is misinformation. I've learned from my own research and from our medical providers that puberty blockers may

present significant risk for children with true precocious puberty—presenting at age three or four—but they are perfectly safe for an adolescent such as A.

12. This past fall, A. went off puberty blockers. Though his gender identity is male, and A. hopes for a flat chest, he can accept other developmental changes that would come from puberty. At some point, he may want top (chest) surgery. For A., living a full life in his gender identity requires discerning and addressing his unique desires and needs. In gender-affirming care, one size does not fit all.

13. A.'s gender affirming care has been his choice, and the opportunity to make that choice is crucial to his physical, mental, and emotional health. For transgender people there is no "club." Transgender people are simply people. But if there were such a club, no one would want to join it. And given everything I know and have seen, I can say firmly that no parent, no teacher, would ever coerce a young person into falsely assuming a transgender identity or seeking gender-affirming care. The hazards of navigating life as a transgender individual, the threats to one's safety, the constant pressure to code switch and suppress one's true identity—no person would choose these experiences needlessly, for themselves or for their child.

14. I understand that the President of the United States has issued an Executive Order affecting and preventing gender-affirming care for people under age 19. The Executive Order does not impact only minor children. It undermines, and I believe is intended to undermine, the bodily autonomy of adults, today and in the future. For A., the Federal Government's policy will have a variety of impacts, including preventing him from seeking gender-affirming care such as top surgery.

15. I believe that children who are able to connect with and explore who they are, including through receiving gender-affirming care, are more confident and can live authentically. This has certainly been true for A. A.'s interests include video games, drawing, ceramics and clay art. My son is also a coxswain on a rowing team. A. is a curious, attuned, empathetic young man. He is able to easily relate to and connect to people with different experiences—for example,

different socioeconomic backgrounds, heritage, or culture. A. sometimes reports that he has few friends; however, if you observe him, like when I drop him off at school, you will note that he is a child that other kids are drawn to, and say hello to. I believe that the chance to explore who A. is and live in his gender identity helps him connect with others. I fear what may happen if A. can no longer receive gender-affirming care, or is prevented from doing so in the future.

16. My family will support A. and his gender identity no matter what. It takes resources to support a transgender child. I am generally able to navigate these challenges. For example, I have found supportive doctors for A., transported him to appointments, and reduced my employment when needed to care for my son. But other families may not have the same flexibility and resources, and the Executive Order threatens these families. I want all families, and all transgender people, protected.

17. I have more resources than others, including education and time. But I do not have much money. What little I have I would like to spend on my son's education, not on suing the Federal Government to challenge the Executive Order. Additionally, I observe the President of the United States using this and other recent Executive Orders to destroy the professional and personal lives of those who stand in his way. It is extremely intimidating to stand in front of that power. However, our democracy provides ways for us to stand together and not have to challenge unjust policies alone. This is the reason I provide this declaration and support Plaintiffs' case challenging the Executive Order. I have my son's full support in this.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 3rd day of February 2025 at Shoreline, Washington.



J.M.
Parent of A.

DECLARATION OF J.M.   4   ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744