1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF P.R. |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATION OF P.R.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

I, P.R., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I live in Seattle, Washington with my husband and two children.

3. My oldest child is transgender. When she was born, she was designated male on her birth certificate, but her gender identity is female. She is currently nine and a half years old and is in the 3rd grade. I have chosen to refer to her in this declaration as "Minor A" because I am fearful for her and our family's safety and privacy in the current political climate.

4. My husband and I always endeavor to provide our daughter with a broad education, so we regularly read children's books with her about inclusivity of all bodies, genders, races, etc. and we talk openly to her about these topics. She plays with toys that are both traditionally male and traditionally female. We give her dolls and trucks alike. Before she transitioned, we dressed her in traditional boy clothes and kept her hair short.

5. When Minor A was three years old, there were subtle signs that she was beginning to explore her gender identity, gravitating toward female characters, animals, and toys. For example, when watching nature shows about animals, Minor A would always say that the animal was female. She wanted an "Elsa" from the movie "Frozen" nightgown. My husband and I began to do research about gender identity and consulted a family friend who had their own transgender child who had been through gender-affirming care.

6. My daughter's gender identity developed gradually but at age five, she began to assert that she was female. She asked to grow her hair long and expressed dreams of being a mom and having children of her own one day. Through our network of family friends, my husband and I found a reputable pediatrician with over 20 years of experience working in gender-affirming care, as well as a gender-affirming therapist for Minor A. My husband and I had many conversations with our daughter to make sure she understood that there are many different options, and to affirm what she was experiencing and feeling.

7. Even though Minor A had started asserting that she was a girl, she still wanted to use he/him pronouns at the start of kindergarten. However, within six weeks, Minor A told her teacher that "on the binary, I like she/her" and asked to add sharing her words with her class to the class meeting agenda. From then on, my daughter used she/her pronouns exclusively in all settings. She told us that we could tell all our family and friends. Minor A's social transition occurred organically with no apparent distress. She continued to use her birth name.

8. Our daughter had been growing up in the time of COVID and quarantine, so she had very little socialization and often experienced anxiety. She worried about natural disasters, had difficulty sleeping, and had separation anxiety. We got her connected to a therapist early on because of her anxiety, but simultaneously chose a provider who specialized in gender-affirming therapy.

9. Since kindergarten, Minor A has been seeing her therapist consistently. We observed her anxiety gradually lessen with therapy. In therapy, they played a lot of games that give Minor A an opportunity to explore her gender identity in a safe environment. They played games where she always assigned herself a female character, named herself Mary, and pretended to have babies.

10. When she was eight years old, Minor A had her first meeting with the pediatrician recommended by the parent of another transgender child regarding gender-affirming care. The pediatrician wanted to make sure to let our daughter steer the ship in decision-making. He talked to her about changes in her body that will happen and told her to be on the lookout for pubic hair He told my husband and I about finding affirming books and ways to talk about biology and puberty. The pediatrician explained the different types of gender-affirming medical interventions that are (or were) available and informed Minor A of how her body might change with the use of hormones or puberty blockers. Minor A asked if she could begin taking hormones immediately, excited for her body to follow the same pace as her peers. She was excited about the possibility of having breasts. The pediatrician explained the multi-step process, including

1  blockers first and then progressing to hormones later. However, she became distressed when she
2  learned of how her body would change without gender-affirming care and of the changes her
3  body would go through due to testosterone and puberty. Minor A was fearful of growing a beard
4  and her voice getting deeper. She reiterated that she just wants to be a girl and have her body
5  change like other girls.

6  11.     Last summer, Minor A went to a week-long summer camp. When my husband
7  and I went to pick her up, her friends were calling her by a new name and she seemed so happy
8  being called by her chosen name. On her first day of 3rd grade, Minor A told the kids at school
9  her new chosen name. She was so happy, relieved, and ecstatic. In December 2024, we legally
10 changed Minor A's name to her new chosen name. Since the legal name change, Minor A has
11 felt more comfortable and confident in herself.

12 12.     It would just be devastating for Minor A and our family if she were unable to
13 access the gender-affirming medical care that she so desperately looks forward to. She has never
14 had to imagine that she would not be able to help her body reflect who she is. She already gets
15 annoyed when she sees old pictures where she looks like a boy and does not want those photos
16 displayed. If her body starts betraying her and starts developing male traits, it would be a huge
17 struggle for Minor A. Her mental health would suffer, she would develop depression, and her
18 anxiety would increase. I do not think she would feel safe and would struggle to participate in
19 public settings like school.

20 13.     Protecting my daughter's joy and ability to exist in her body is paramount. We
21 have researched DIY methods to get the gender-affirming medication that she would need if we
22 were unable to get it because of the Executive Order.

23 14.     If we could not safely find this care for my daughter in the United States, we
24 would mostly likely have to move our family to another country where we could get her the
25 necessary care. Washingtons state is our home. My husband and I love living and working and
26 raising a family here. And our two children have lived here their entire lives. We bought our

home planning to raise our kids in a supportive community and are actively involved in their schools and our local neighborhood. Moving to another country would mean losing our entire support network of family, friends, and medical providers. We do not otherwise want to leave the United States, but if we are at risk of losing necessary medical care for our daughter, or risk losing our custody or parental rights for supporting her, then we would have no choice but to leave to protect our family.

15. My husband and I are not in a position to challenge the President's Executive Order in court ourselves. Not only is it not financially feasible, but we fear the publicity of exposing our privacy. It would risk my children's safety, which is too great a risk to take.

16. I am using my initials instead of my full name to protect my identity and the identity of my husband and children. I want to protect the privacy interests of my minor children. I do not want to put my children at risk. I fear we will be targeted for harassment or violence or retaliation.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this _____ day of February 2025 at _____, Washington.

_____
P.R.
Parent of Minor A

home planning to raise our kids in a supportive community and are actively involved in their schools and our local neighborhood. Moving to another country would mean losing our entire support network of family, friends, and medical providers. We do not otherwise want to leave the United States, but if we are at risk of losing necessary medical care for our daughter, or risk losing our custody or parental rights for supporting her, then we would have no choice but to leave to protect our family.

15. My husband and I are not in a position to challenge the President's Executive Order in court ourselves. Not only is it not financially feasible, but we fear the publicity of exposing our privacy. It would risk my children's safety, which is too great a risk to take.

16. I am using my initials instead of my full name to protect my identity and the identity of my husband and children. I want to protect the privacy interests of my minor children. I do not want to put my children at risk. I fear we will be targeted for harassment or violence or retaliation.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 3 day of February 2025 at ___N|A___, Washington.

_P.R_
P.R.
Parent of Minor A