**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF G.M., MD |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATION OF G.M., MD

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, G.M., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am a Washington State licensed physician. I work in a medical facility in Seattle. I am a general pediatrician by training, providing primary care to patients from birth to age 21. I am certified in General Pediatrics by the American Board of Pediatrics. I received a bachelor's degree in biology and completed my medical residency at prestigious institutions with respected training programs. I am board certified by the American Board of Pediatrics. I have received research awards from the American Pediatric Society and taught in pediatric training programs around the country.

3. I am choosing to use a pseudonym rather than my legal name in this declaration out of fear for the safety of myself, my family, my patients, and the facility where I work.

4. I am affiliated with my facility's pediatrics department. Though some of my patients are from outside Seattle, they generally come from the Seattle area.

5. Three years ago, I began providing gender-affirming care for patients who are already in my facility's system. Clinicians in the system who need support in providing gender-affirming care can make referrals to me. I can also consult with another area facilities to help with those facility's patients if needed. I see patients in person and through telehealth appointments. The only requirement is that my patients must be located in Washington State.

6. I have always felt passionate about serving underserved communities. During my medical residency and in my practice, being able to give back to the LGBTQ+ population by caring for them as a physician has been important to me. I'm part of that community. Gender-affirming care has been an important part of my practice over the last few years. I have seen patients in crisis over not being able to access gender-affirming care. I have seen the positive impact of gender-affirming care on youths' lives. Simply being able to discuss and consider

options with patients and parents can be beneficial to patients and their families. Over the years my practice in this area has grown to meet this need.

7. In the last three years I have provided gender-affirming care at some level to approximately 60-80 patients. A smaller subset of that number are patients actively managed with gender-affirming medication.

8. When patients decide to obtain gender-affirming care with parental consent, the services I am trained to provide and do provide fall into three general categories.

9. First, I help optimize social support for transgender and gender-diverse patients. This includes consultations with parents and family to seek support for the patient's preferred name and pronouns, as well as hair and clothing changes that are in line with their gender.

10. Second, I help with supporting the patient's mental health. Gender dysphoria, a condition involving a persistent mismatch between a patient's physical presentation and their subjective experience of gender, is accompanied by a range of comorbid mental health challenges. Depression and anxiety are typically the most common. Suicidal ideation, suicide attempts, and completed suicides are also a considerable risk.

11. Finally, I provide care for gender affirming medical interventions. For example, puberty blocking medication is an option to pause developmental changes in a patient in the early stages of puberty, giving them the time and space to decide which outward gender characteristics are most aligned with their gender identity—i.e., which characteristics they would like to avoid, and which to affirm permanently. Puberty blockers are considered reversable and a short-term treatment, typically for one to three years. Hormone replacement therapy, including use of testosterone, estrogen, or androgen blockers, produce changes that are considered to be permanent. Much of my gender-affirming care practice consists of managing this latter option. Surgical gender-affirming care, which requires patients to be aged 18 and older, is less relevant to my practice. In rare cases I have made referrals with parental consent for gender-affirming

1  surgery consultations for patients aged 16-17, and that has always been to learn about surgical
2  options to remove breast tissue that is not consistent with my patient's gender identity.

3  12. A large part of my gender-affirming care practice consists of conversations with
4  a patient and their parents or legal caregivers. Typically, I will also have a confidential
5  consultation with the patient, during which their parents leave the room, so that I can hear from
6  them about anything they are not comfortable sharing with a physician in front of their parents.
7  Then we wrap up the visit by bringing the parents back in. My gender-affirming care practice
8  requires parental consent for any medical gender-affirming intervention for minors; any parent
9  with legal decision-making authority is required to sign a consent form which includes
10 information about expected benefits, risks and side effects of any medication. Mental health
11 evaluation is also required before starting any gender affirming medications for patients under
12 the age of 18. If appropriate, a licensed mental health professional is required to provide a
13 diagnosis of gender dysphoria utilizing DSM-V criteria prior to starting gender affirming
14 medications for patients under the age of 18. Additionally, we discuss early and often the
15 potential effects of hormone replacement therapy on future fertility which may be impacted when
16 taking these medications. I encourage conversations with patients and families about this
17 potential impact and connect them to fertility preservation centers if they wish to pursue this
18 prior to starting hormone therapy.

19 13. I have experienced a wide spectrum of parental support for gender-affirming care,
20 in particular support for pursuing medication such as puberty blockers and hormones. Some
21 parents are fully on board, supportive, and happy to be part of the process. I hear this from the
22 patient sometimes—that they have, and are grateful to have, the support of their parents. Other
23 times parents are not supportive and have difficulty even discussing gender-affirming care. The
24 vast majority of cases fall somewhere in the middle. Most parents are supportive but cautious;
25 they want to carefully explore the risks and benefits of medical gender-affirming care. My role
26 is to provide information to enable parents and young patients to provide informed consent.

14. I have often experienced situations where gender-affirming care made a significant positive difference in the life of a young patient struggling with mental health challenges.

15. For example, two years ago I began caring for a 16-year-old transgender male in my practice. The patient had a significant complex mental health history. He experienced difficulty in getting established with a primary care physician for many months and finding support for his gender identity and his general health needs. The patient came to me in mental health crisis, lacking needed medication and not able to maintain therapy appointments. The patient's main concern was having a body that didn't align with his gender identity. This gender dysphoria caused him significant distress, to the point when only weeks before he had been hospitalized with a suicide attempt. After having extensive conversations with the patient and his parents, we identified that having a deeper voice would be especially important for him. He hoped to make that happen with testosterone therapy. After the patient had been evaluated by a mental health professional who made a diagnosis of gender dysphoria and after both of the patient's parents consented, we were able to start him on testosterone therapy. Within two months we saw a dramatic improvement in his mental health as the patient's comfort with his body significantly improved. As his mental health stabilized, we were able to get him set up with a consistent mental health treatment plan and he continued to improve. I saw this patient recently. He is still using testosterone, and his voice has continued to deepen. He is still connected with a regular therapy regimen. The patient's health showed a 180-degree improvement because of access to gender-affirming care. I had been concerned that with no access to gender-affirming care, the patient would make another suicide attempt. Being able to provide that care to him was certainly medically necessary, in my professional opinion. That care made a significant positive impact on the patient's health.

16. Another patient, an 18-year-old transgender female, was facing academic challenges. She was failing classes, and it was clear she wouldn't graduate on time. When I met

her, she had given up on completing her education. I got to know her over several months and through the course of our visits, was able to identify that aspects of her body didn't align her experience of her gender. It had been on her mind for a while, but it took her time to articulate. After consultation with a mental health professional, a diagnosis of gender dysphoria was made. After they provided informed consent, I was able to treat the patient with estrogen to help achieve her gender goals. Within a couple of months, the patient was able to get back on track academically. She graduated high school and enrolled in community college. She became involved in theater and is now considering a career in theater production. It made me proud to see the turnaround she experienced, and to now be pursuing a career that interests her. I attribute her successful health outcome to access to gender-affirming care.

17. In my practice, the age range for gender-affirming care is approximately seven to 21 years old. I don't have a cutoff on the lower end of that range, though the care provided in the earliest years consists mostly of conversations with the patient and their parents, and providing support with any social transitions the patient is choosing to make.

18. The use of puberty blockers and hormone replacement therapy depends on a patient's individual circumstances and their goals for what they are trying to achieve. There is a common misconception that every gender-affirming care patient follows the same path, for example using the same medication regimen of blockers and hormones. In fact, in my experience each patient's care is individualized. For some patients, gender-affirming care may only involve only social and emotional support.

19. Even a patient or family's simple awareness of the availability of gender-affirming care tends to produce positive health outcomes. This is not a form of health care that some clinicians are comfortable providing, and transgender and gender-diverse people face significant stigma in even raising the topic of gender in a health care setting. When transgender youth come out to their family, sometimes I receive feedback from the family that they don't know what to do or who to turn to. Sometimes a pediatrician is the first person the family

1  interacts with to discuss gender affirming care. This is especially true for families who previously
2  lived states and locations where there are restrictions on gender-affirming care. It's very helpful
3  for families to be able to talk to a pediatrician who is trained in gender-affirming care. It's helpful
4  for the patient, family, and doctor to come to these important health care decisions together. For
5  those families, knowing what options exist for gender-affirming care is helpful and reassuring.

6  20. I understand that the President of the United States has issued an Executive Order
7  impacting the provision of gender affirming care. The Federal Government's policy will have a
8  variety of harmful impacts on my work, and on the patients I serve.

9  21. What stands out for me first in the Executive Order are the language and the
10 specific terms used to describe what I believe to be important and essential forms of health care
11 for transgender patients. For example, describing medication for gender transition as "chemical
12 mutilation." I am appalled and alarmed by this language, which I believe to be profoundly anti-
13 science, and disconnected from the realities of public health and the responsible practice of
14 medicine.

15 22. I am also concerned that the Executive Order could result in restrictions on
16 Medicaid funding. In my practice I provide primary care and gender-affirming care to Medicaid
17 patients. The Executive Order makes me concerned that I will no longer be able to provide this
18 care—not only gender-affirming care, but also to patients in need of primary care. That I might
19 have to tell patients I can't care for them would be devastating for the well-being of patients to
20 cease treatments that they actually benefit from. For patients receiving gender-affirming care,
21 this would very likely lead to worsening mental health outcomes, including a significant increase
22 in suicide attempts and completed suicide. That would be the result if Medicaid funding were
23 cut off, and patients could no longer obtain gender-affirming care.

24 23. The Executive Order also scares me personally. The idea of potential litigation
25 against clinicians is frightening. Not only as a physician who provides gender-affirming care,
26 but also primary care. The Executive Order forces me to ask myself: Can I even continue to be

a doctor in this country? I believe it harms public health to have qualified, trained clinicians everywhere struggling with these questions.

24. My patients also report fear and uncertainty caused by the Executive Order. Just yesterday, a patient told me that they were afraid. Patients send messages to me, asking whether their gender-affirming care will continue, or if it will be forced to stop. Patients are scared, not knowing where to go or what to do. Prominent and major medical associations including the American Academy of Pediatrics support giving transgender patients access to the health care that they need. Because I believe in the efficacy of gender-affirming care, I have told these patients that their gender affirming care will proceed.

25. The Executive Order creates ethical concerns for me as a medical professional. It is concerning to not be allowed to provide necessary health care to a patient, in the exercise of my professional judgment, drawing from all my training and experience. As doctors we aim to tailor care to patients. We make decisions in consultation with the patient and their family. We use the best evidence-based care that is available to help inform our decisions. For the federal government to say that a doctor can't provide medically necessary health care is a terrible overreach.

26. I would like the court to understand that gender-affirming care is essential for the patients who need it. Gender-affirming care improves health outcomes, it improves the functioning and livelihood of patients. Gender-affirming care decreases suicidal ideation and helps prevent completed suicides. It is a form of health care that is decided, and should be decided, between a patient, the patient's family, and their health care team. It should not be attacked this way by the federal government.

1  I declare under penalty of perjury under the laws of the State of Washington and the
2  United States of America that the foregoing is true and correct.
3  DATED this __6__ day of February 2025 at __Seattle__, Washington.

_____
G.M., MD