UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., <br><br> Defendants. | NO. <br><br> DECLARATION OF KELSEY LEONARDSMITH, MD, FAAFP |

DECLARATION OF KELSEY
LEONARDSMITH, MD, FAAFP

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

## DECLARATION OF KELSEY LEONARDSMITH, MD, FAAFP

I, Kelsey Leonardsmith, hereby declare:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am a family medicine physician providing primary care and gender affirming care for all ages. I graduated from Harvard Medical School in 2013 and did my residency at Allina Health – United Hospital from 2013 to 2016. In July 2016, started working at the Family Tree Clinic as part of a yearlong fellowship and trained under Dr. Eric Meininger, who was the medical adviser for the Gender Care program at Family Tree Clinic. In 2018, I became Director of Gender Care at Family Tree Clinic and became the interim medical director in 2022 and now I serve as the Director of Midwest Trans Health Education Network (MTHEN). I now work one afternoon per week at Family Tree Clinic. In this capacity I also train medical providers across the Midwest region in Gender Care for youth and adults.

3. In January 2024 I started practicing at the Phalen Village Clinic in St. Paul, which is part of MHealth, four days a week providing family primary care and gender affirming care. I am also an assistant professor at the University of Minnesota in the department of family medicine and community health.

4. In my career, I have provided gender-affirming healthcare to over 1,000 patients. I currently provide gender-affirming healthcare for approximately 100 patients, half of whom are under age 19.

5. At Phalen Village clinic, I provide primary care and gender care in addition to teaching Family Medicine Residents and Medical Students four days a week. I also provide primary care for my transgender and gender diverse patients because these patients tend to be more

1

comfortable with me providing their care rather than a doctor who does not provide gender-affirming treatments.

6. In fact, patients who receive gender affirming care traditionally do not seek treatment for common medical conditions from "typical" providers because they are uncomfortable seeing a practitioner who will not also provide gender affirming healthcare, so I not only do their hormone management, but also other healthcare treatment and management, such as for diabetes, blood pressure, or heart issues. Sometimes I meet minors who are seeking gender-affirming care because they had a primary care appointment with me, and they felt comfortable sharing this information when they are alone with a caring physician. Survey data shows that nearly half of transgender patients have had negative experiences related to gender in healthcare settings.

7. At Family Tree Clinic, I only provide gender care, sexual healthcare, birth control, STI testing and treatment, and pregnancy testing. The care I provide at Family Tree Clinic includes supportive counseling, puberty suppression, gender-affirming hormone treatment, and birth control.

8. I follow the World Professional Association for Transgender Health (WPATH) Standards of Care as a guideline for my gender affirming healthcare treatments at both clinics. WPATH is the leading organization for gender affirming healthcare—it provides training and education for psychologists, physicians, and advance practice providers. These guidelines have gone through rigorous research and testing over the years, including which gender patients get the best outcomes and how providers can replicate that treatment. I have completed WPATH training courses in advanced pediatric gender care and pediatric endocrinology.

9. Based on WPATH's Standards of Care Version 8, when I first meet with a patient seeking gender-affirming healthcare, I do a minimum one-hour intake, in which I have an in-depth

discussion with the patient about their background, family dynamics, and medical history in order to initiate a comprehensive biopsychosocial assessment of the patient. Medications are not the correct treatment for every person experiencing gender dysphoria. As a gender care provider, I need to do a full assessment so I can tailor my medical recommendations to each patient individually. We have a thorough discussion about their experience with gender and/or gender dysphoria, including what about their external body makes them uncomfortable and their gender embodiment goals.

10. We also discuss their process of self-realization of their gender identity, what their gender identity means to them, if they have come out, and their sources of information on gender identity. If the patient is a minor, they also complete multiple questionnaires.

11. For many patients, gender care is non-medical and may include interventions like supportive counseling, and changes to their name, manner of dress, or grooming. Prior to initiating medical interventions, we have additional appointments where I go through an in-depth counseling process with both the patient and the patient's family. Prior to starting hormone treatments, the patient must demonstrate developmental maturity and decision-making capacity, and their guardian must give consent. Once the patient starts taking hormones, we have follow-up appointments to assess how their treatment. Hormones are started at low doses to ensure adequate time for patients to confirm the impact of the treatment is beneficial. Prior to these appointments, all patients fill out a series of documents to assist us in their treatment.

12. My patients who want to use puberty blockers do not begin puberty suppression until they the second stage of puberty, generally measured by certain hormone levels and standardized physical exam. I complete additional comprehensive assessments for minors who wish to start a puberty blocker. Part of the reason I wait until patients reach a certain stage of

puberty prior to prescribing puberty blockers is because waiting minimizes the impact on fertility and side effects. All patients and their guardians receive counseling on potential for fertility impacts and options for fertility preservation. Puberty suppression medications are completely reversible and safe.

13. I meet with my patients on puberty blockers every six months for updates and assessment and ensure that this continues to be the appropriate treatment for them.

14. I make sure to use a variety of communication methods with each patient, including verbal and non-verbal communication, to ensure the patient has a clear understanding of what medication therapy entails. Counseling includes thorough review, including written educational materials, of the effects, side effects, known, and theoretical risks of the puberty blocking or hormonal medication.

15. I understand that the President of the United States has issued an Executive Order "Protecting Children from Chemical and Surgical Mutilation," which directs the Office of Management and Budget and each executive department or agency that provides research or education grants to medical institutions, including medical schools and hospitals, to immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end gender affirming care for individuals under 19 years old (Sec. 4). The Executive Order further directs the Department of Justice to enforce laws against "female genital mutilation" against persons providing or facilitating such care to individuals under 19 years old (Sec. 8). Since the President of United States has issued this Executive Order, we have seen and are experiencing an uptick in reports among our patients of gender phobia and trans phobia.

17. I am very concerned about the ramifications of this Executive Order. My patients are experiencing fear, anxiety, and suicidal ideation. We already know that the rates of attempted suicide are higher in states which have enacted anti-trans legislation.

18. Not only is this Executive Order distressing for youth, but it also affecting my minor patients' parents. I have been getting frequent calls from parents worried about how this Executive Order will harm their children, and seeking resources for what they can do to protect their child, such as stockpiling hormones or seeking more-aggressive medical care that they normally would not have pursued at this time as a way to ensure that their child does the ability to get that care in the future.

19. I also have concerns that patients will seek hormones through illicit sources, which would mean not being certain what ingredients are in the hormones they would take and no longer having access to proper monitoring to ensure their health and safety.

20. Denying gender-affirming healthcare is playing with people's lives for no reason other than advancing a non-evidence based political agenda. All major medical associations, including the American Academy of Pediatrics and American Academy of Family Physicians, support gender-affirming healthcare for minors.

21. Furthermore, the Executive Order intrudes on parents' ability to make medical decisions for their children.

22. If minors lose access to gender-affirming medication and healthcare, they will experience irreversible physical changes that could cause they a lifetime of distress. Not providing gender-affirming health care is not a valid medical practice—as a medical provider, I know denying a person this care will cause serious harm to my patients. This order asks me to violate my oath as a physician.

I declare under penalty or perjury under the laws of the State of Minnesota and the United States of American that the foregoing is true and correct.

DATED and SIGNED this 5th day of February 2025 at St. Paul, Minnesota.

*Kelsey Leonardsmith, M.D.*