

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATION OF MARIA KAEFER, M.D. |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATION OF MARIA KAEFER, M.D.

# DECLARATION OF MARIA KAEFER, M.D.

I, Maria Kaefer, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.      I am a medical doctor licensed by the State of Minnesota (License Number 45239). I received my medical doctorate in 1999 from Southern Illinois University School of Medicine and have been in practice for more than 20 years.

3.      I have nearly ten years of experience working within transgender and nonbinary patients.  First, in 2015, I became the medical director of Family Tree Clinic in Minneapolis, Minnesota, where I was among a group of staff members to help create Family Tree's first specialty clinic focusing on gender-affirming care.  Besides acting as medical director at Family Tree, I also provided care there to transgender and nonbinary patients and support to their families.

4.      Our transgender and nonbinary patients at Family Tree Clinic came from all over Minnesota, plus Wisconsin and Iowa and other additional states.  The clinic's patients were of all ages, while I primarily saw patients from 18 to 60.  Concurrent to my position with Family Tree, I continued to work in a staff position at Hennepin Healthcare, serving patients 18 and up. In 2020, I left Family Tree and focused on my practice at Hennepin Healthcare, where I treat transgender and nonbinary patients 18 and up, among other patients.

5.      At both Family Tree and Hennepin Healthcare, I have provided patients with gender-affirming care and comprehensive support. I have prescribed hormones such as estrogen and testosterone, and other medications known as cross-gender hormones. I make referrals to medical providers for surgery, and referrals that supported our patients in their transition and gender confirmation, such as for voice training, mental-health care, legal assistance, emotional support, and peer support.  I have written letters for patients in support of changing their pronouns on legal documents.

6.     At both Family Tree and Hennepin Healthcare, I have become aware that young adult patients, including 18-year-olds, would come in having been unable to receive gender-affirming care earlier, when they were going through or about to go through puberty. Because these patients could not receive such care before going through puberty, it added to the extent of suffering that they later had to go through, including surgeries.

7.     I am aware of studies that have established an increase in mental-health issues among persons who were unable to obtain gender-affirming care, including depression and suicide at much higher rates than the general population.

8.     I am aware that when patients are unable to access gender-affirming care before undergoing puberty, it forces those patients to experience physical characteristics that cause them major distress. Those characteristics are easier to prevent by medications than reverse by surgery.

9.     Surgeries are not only burdensome to patients seeking gender-affirming care, but surgeries are much riskier as a general matter than preventative care and medications including hormones and puberty blockers.

10.     One of the philosophies of my medical practice is that patients (along with the parents of minor patients) are the agents of their own health care. It is obvious to me that we should provide this autonomy to transgender and nonbinary patients who desire and need gender-affirming care, and to their parents when the patients are minors – just as we would for any other patients for any other care.

11.     To assess whether cross-gender hormones are an option for my transgender and non-binary youth patients, I follow the process described in the rigorous, peer-reviewed, and evidence-based World Professional Association for Transgender Health ("WPATH") Standards of Care. The WPATH standards help me determine whether candidates for gender-affirming medical care meet the criteria for a diagnosis of gender dysphoria in the DSM-5. Following

1   WPATH Standards of Care helps ensure that an individual patient's care matches the unique
2   medical needs of that patient and provides the healthiest outcome.

3       12.     I have *never* worked with a transgender or non-binary patient under 19 years old
4   —or any patient otherwise—who has elected to stop receiving gender-affirming medical care or
5   who has regretted undergoing such care. I have cared for at least 100 such patients.

6       13.     I am familiar with studies examining the patients' "frequency of regret" of having
7   received gender-affirming medical care, where the frequency was extremely low. For example,
8   in one such study published in 2021, involving 7,928 transgender patients who underwent any
9   type of gender-affirmation surgery, the prevalence of regret afterward was 1%.

10      14.     My professional opinion is that it is generally inappropriate for medical providers
11  to try to persuade transgender or non-binary patients *not* to receive gender-affirming medical
12  care, including surgery to ensure their bodies match their gender identity. I work with such
13  patients (and their parents when appropriate) to be a nonjudgmental medical provider and
14  provide resources that will address and relieve patients' suffering.

15      15.     I understand that the President of the United States has issued an Executive Order
16  "Protecting Children from Chemical and Surgical Mutilation," which directs the Office of
17  Management and Budget and each federal executive department or agency that provides research
18  or education grants to medical institutions, including medical schools and hospitals, to
19  immediately take steps to ensure that institutions receiving federal research or education grants
20  end gender-affirming care for individuals under 19 years old (Sec. 4).

21      16.     In my professional opinion, the Executive Order is full of mistruths about gender-
22  affirming care and would put transgender and non-binary patients, including my patients, at
23  significant risk. For example, particularly as the Executive Order pertains to patients under 19
24  years old, based on the medical literature and this population's need for gender-affirming care,
25  there is reason to believe the Executive Order would increase risk of suicide among transgender
26  and non-gender-conforming patients. This Executive Order will undoubtedly prevent parents

1   from responding to their children's healthcare needs as they see fit, undermining parents'

2   authority and ability to take care of their children's healthcare needs.  These effects are contrary

3   to my responsibility to do no harm.

4       17.    I am speaking from my own experience as a medical provider, and not for

5   Hennepin Healthcare as a healthcare system.

6

7       I declare under penalty of perjury under the laws of the State of Minnesota and the United

8   States of America that the foregoing is true and correct.

9       DATED and SIGNED this 4th day of February 2025 at Minneapolis, Minnesota.

10

11       MARIA KAEFER, M.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26