1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. |
| Plaintiffs, | DECLARATIONS OF |
| v. | DR. A. DOE, MD AND DR. B. DOE, MD |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

We, Drs. A. Doe and B. Doe, MD, declare as follows:

1.      We are over the age of 18, competent to testify as to the matters herein, and make this declaration based on our personal knowledge. We are filing this declaration under pseudonym due to fear for our own safety, and the safety of our family, colleagues, and patients.

2.      We are physicians in the Department of Surgery at the University of Washington School of Medicine (UW). We treat transgender and gender-diverse adults (18 and over) and adolescent patients (under 18) and, where medically indicated and consistent with the World Professional Association for Transgender Health (WPATH), we provide those patients gender-affirming surgical care.

3.      The WPATH is an international organization comprised of over 3000 multidisciplinary medicolegal professionals dedicated to transgender health care, research, policy, and advocacy. In their founding year of 1979, WPATH developed the first evidence-based clinical guidelines promoting uniform, high-quality health care for transgender and gender-diverse patients, known as the Standards of Care (SOC). Seven additional versions of the SOC have since been published, reflecting evolving scientific literature and medical practices—most recently in September 2022 with the SOC-8.[1]

4.      Through our training and practice, we are familiar with the prevailing medical standards of care and protocols for gender-affirming care, including the standards promulgated by the WPATH. As UW physicians, we follow the WPATH SOC-8 and standards of care in Washington State.

5.      Gender-affirming surgery broadly refers to a broad range of surgical care that supports and affirms a person's gender identity. It generally refers to surgery for a transgender, nonbinary, or gender-diverse person to address gender dysphoria.

---

[1] WPATH SOC8, https://www.tandfonline.com/doi/pdf 10.1080/26895269.2022.2100644; Standards of Care History and Purpose. World Professional Association for Transgender Health, available at: https://www.wpath.org/soc8/history (last accessed Feb. 6, 2025).

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

6. Gender dysphoria is clinically significant distress or impairment due to an incongruence between a patient's gender identity and their assigned sex at birth. This distress can manifest itself in different ways, but often these patients experience significant anxiety and depression. It is also common for patients with untreated gender dysphoria to engage in self-harm, experience suicidal ideation, and to attempt suicide.

7. Surgical care for transgender and gender-diverse patients is often broken into the following broad categories: "facial surgery," "top or chest surgery" and "bottom or genital surgery." Facial surgeries include techniques that alter the facial bones, soft tissue, and skin, such as hairline advancement, forehead contouring, rhinoplasty, and/or jaw contouring. Top or chest surgery refers to a set of procedures that reshape the chest by removing, reducing, or augmenting breast tissue, such as with mastectomy, chest reduction or breast augmentation. Finally, bottom or genital surgery refers to a range of surgical procedures that modify a person's genitalia to align with the person's gender identity, and include vaginoplasty, metoidioplasty, and phalloplasty. Facial surgery, top or chest surgery, and bottom or genital surgery may be "masculinizing" or "feminizing," depending on the individual's gender identity. The goal of any gender-affirming procedure is to align a patient's physical appearance with their gender identity, thus alleviating or improving their gender dysphoria and optimizing personal safety and comfort in social settings.

8. In our clinical practice, we have, collectively, performed more than one thousand gender-affirming surgeries. On average, our patients (adolescent and adult) have been living for five years in the gender they seek to affirm through surgery and, when medically indicated, have maintained a stable dose of hormone therapy for several years prior to surgical consultation. Sustained hormone therapy often promotes positive and affirming changes of patients' inherent sexual characteristics, such as mild breast growth for transfeminine individuals or facial and bodily hair growth for transmasculine individuals. However, residual sexual characteristics, such as excess breast tissue in transmasculine individuals, may remain and trigger ongoing dysphoria.

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Additionally, some patients, such as those who identify as non-binary, may not desire hormone treatment. In these scenarios, gender-affirming facial, top or chest, or bottom or genital surgery *may* be desired by the patient as a means of treating their gender incongruence.

9. The gender affirming surgery process is long and rigorous for *all* patients and even more so for adolescents. In the hospitals where we practice, patients often wait for **over one year** for initial surgical consultation and an **additional nine to 12 months** thereafter for surgery. It is important to note that within our practice we offer only reductive "top or chest surgery" (e.g. mastectomy or chest/breast reduction) to adolescent transgender and gender-diverse patients, generally to 16 or 17 years old, and only if certain criteria are met. All other procedures, including facial surgery, breast augmentation, and bottom or genital surgery, are deferred until *at least* 18 years of age.

10. Under the WPATH SOC-8 criteria, gender mastectomy or chest reduction are only offered to adolescent patients when all of the following criteria are met: (1) the adolescent has persistent and well-documented gender dysphoria over time; (2) the adolescent demonstrates the emotional and cognitive maturity required to provide informed assent and consent for treatment under the supervision of their legal guardian(s); and (3) the adolescent has well-controlled comorbid medical or mental health issues.[2] Both parents, if legal guardians, must also consent to the procedure. If both parents do not support the patient's desired surgery, then the patient must wait until they are *at least* 18 to have the surgery.

11. In addition, a patient has to provide: (1) a mental assessment letter from a licensed mental health clinician as well as; (2) a letter of support from a primary care physician, endocrinologist, or treating physician. Letter writers must explicitly confirm the patient's diagnosis of gender dysphoria (ICD-10 F64.1), indicate that the patient's gender dysphoria

---

[2] WPATH SOC 8: https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 (last accessed Feb. 5, 2025).

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

causes clinically significant distress or impairment, and attest to the medical necessity of surgical interventions. Further, both clinicians must also affirm that co-existing conditions are stable, well controlled, and will not contribute to undue surgical risk. Qualified mental health professionals include psychiatrists (MD, DO), psychologists (MA, PhD, PsyD), psychiatric nurse practitioners (ARNP, PMHNP), licensed marriage and family therapists, licensed independent clinical social workers, and mental health counselors. In contrast, the medical clearance letter is typically from a medically focused professional, such as a primary care physician or advanced practice professional.

12. Unless all these conditions are met, a patient cannot even be considered for gender-affirming surgery.

13. Once a patient has met these prerequisites with appropriate referral documentation, they can schedule an appointment for a surgical consultation. Again, the wait time for a surgical consultation for gender-affirming care often exceeds one year.

14. In advance of a patient's first consultation, we review the patient's referral documents and their medical history provided in the referral paperwork. At the first consultation, we ask the patient about their gender identity, including the length of time living in their current gender identity, as well as their goals for themselves and their body. If "top or chest surgery" is being considered, we discuss the patient's history of breast binding to achieve a more flat, masculine contour in public and private settings. However, many patients experience negative side effects of binding, such as skin irritation, pain, and difficulty breathing, and are unable to tolerate binding for extended periods – if at all.

15. We also ask the patient about their personal medical history, their family medical history, their surgical history, social history, use of nicotine, and any medications they are taking regularly – including puberty blockers and hormones. We also discuss their support system and plans for recovery. For adolescent patients who are under the legal age of majority, we make sure that *both* parents are supportive of the surgery. We then perform a physical examination

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

under the supervision of a chaperone (e.g. a nurse, trainee physician, or medical assistant). All of this information determines whether the patient is a candidate for surgery.

16. If the patient is a candidate for surgery, we then discuss their surgical options, the risks of surgery, what outcomes they could expect from the surgery, and what pre-operative and post-operative care would be required. We also discuss the potential for decisional regret or dissatisfaction related to the surgery. We do not shy away from the topic of decisional regret with our patients. We firmly believe that it is crucial for patients to understand that the regret rate for *any* surgery is never zero, regardless of procedure type. We are also very clear with our patients about what parts of their surgery are permanent and what parts could potentially be reversed. Further, if they ever have any regrets or unhappiness with their surgical procedure, they are always welcome to return to our clinic to discuss their concerns further with us. We take the time to have this discussion both because we think it is important that the patient understand the serious consequences of surgery, and also because we believe it is critical to building trust in the doctor-patient relationship.

17. For adolescent patients, we give time for both the patient and the parents to ask questions. When the consultation is complete, we provide the patient and their parents with various informational handouts related to surgery. The patient then meets with our clinic's mental health coordinator and treatment coordinator. Some patients and their parents immediately decide to proceed with requesting insurance prior authorization for surgery and others will call and book a return appointment later.

18. Wait times for a surgical appointment for adolescent "top or chest surgery" generally ranges from nine to twelve months, but in some circumstances can take even longer.

19. Around one month before the surgery is scheduled, the patient and their family come in for a pre-operative clinic visit. At this appointment, we generally go over the same topics covered in the first appointment, including surgical risks. We also ask the patient and their parents for an update to determine if anything has changed that might impact their eligibility for

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

surgery. We also affirm the patient's desire to proceed with the surgery. Finally, we address any questions or concerns the patient or their parents may have in advance of their surgery.

20. On the day of surgery, we meet with the patient and their parent(s) again. We again review information regarding surgical technique, risks, and recovery that was provided at initial and pre-operative consultations. Once all parties are satisfied, a written informed consent is obtained from both the patient and their parent(s) or legal guardian(s).

21. Out of the approximately 1000 gender-affirming care surgeries we have collectively provided, we have only had three patients ever express a desire to **reverse** the effects of their gender affirming care through surgery, and two did not have initial care or surgery with us. Notably, none of these patients expressed decisional regret for their gender affirming surgery. Each of the patients had their own reasons for desire for reversal including evolving gender identity, usually to non-binary, or complications with initial surgery.

22. Medical literature reflects that the regret rate for gender-affirming surgery is less than one percent.[3] This is much lower than other types of surgeries.[4] For instance, as plastic surgeons, it is not uncommon to have cisgender women request removal of breast implants due to regret. Regret in this scenario may be related to dissatisfaction with their appearance, physical discomfort, health risks, or the implants not aligning with their self-image, amongst other reasons. We believe that the regret rate is so low for gender-affirming surgeries because patients have generally thought about the decision to have surgery for a very long time and, in many cases, have overcome geographic, financial, administrative, and social barriers to access this care. As stated above, time of referral to time of surgery may exceed **two** years, and surgical

---

[3] Thornton SM, Edalatpour A, Gast KM. A systematic review of patient regret after surgery- A common phenomenon in many specialties but rare within gender-affirmation surgery. *Am J Surg*. 2024;234:68-73; Jedrzejewski BY, Marsiglio MC, Guerriero J, et al. Regret after Gender-Affirming Surgery: A Multidisciplinary Approach to a Multifaceted Patient Experience. *Plast Reconstr Surg*. 2023;152(1):206-214; Bruce L, Khouri AN, Bolze A, Ibarra M, Richards B, Khalatbari S, Blasdel G, Hamill JB, Hsu JJ, Wilkins EG, Morrison SD, Lane M. Long-Term Regret and Satisfaction With Decision Following Gender-Affirming Mastectomy. JAMA Surg. 2023 Oct 1;158(10):1070-1077. doi: 10.1001/jamasurg.2023.3352. PMID: 37556147; PMCID: PMC10413215..

[4] Wilson A, Ronnekleiv-Kelly SM, Pawlik TM. Regret in Surgical Decision Making: A Systematic Review of Patient and Physician Perspectives. *World J Surg*. 2017;41(6):1454-1465.

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  referral is often preceded by several years of social and medical transition. Further, our
2  transgender and gender-diverse patients require two ancillary support letters from mental health
3  and medical professionals to be a surgical candidate – which is not a standard requirement for
4  *any* other procedure for cisgender persons. Simply put, these barriers and requirements translate
5  to gender-affirming surgery being the **most** safeguarded and inaccessible set of surgical
6  procedures that are offered across our entire surgical specialty. While challenging for patients,
7  these additional steps ensure that patients pursuing gender-affirming surgery have consulted with
8  numerous health care professionals and had extensive time to fully consider the risks and benefits
9  of surgery before having the procedure.

23.  We have seen firsthand how gender-affirming surgical care significantly improves the mental health, physical health, and overall well-being of transgender and gender-diverse adolescents by better aligning their physical body with their gender identity. An overwhelming majority of these patients express extreme satisfaction and gratitude at their post-operative follow-up visits at 1 week, 3 months, and 1 year post-operatively. Consider a 16-year-old transgender male who, prior to top surgery, could not try out for his school swim team due to extreme anxiety and discomfort related to the size and weight of his breasts. After undergoing the aforementioned surgical authorization process, he underwent surgery to remove his undesired breast tissue and create a masculinized chest contour. We recall how proud he was of his body post-operatively and how overjoyed he was to be able to swim with his peers without a shirt on.  This anecdote is representative of our clinical experience at large, which echoes a strong body of scientific literature supporting the medical necessity of gender-affirming care for adolescents.

24.  We have also witnessed the extreme detriment of delaying or withholding gender-affirming surgical care, which often occurs as a consequence of both necessary surgical approval processes (e.g. attaining letters of support, insurance pre-approval) and unnecessary administrative barriers (e.g. limited operative time, limited number of surgeons). We have, on

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

multiple occasions, received messages of distress from patients awaiting surgical consultation or scheduling, including reports of increasing depression, anxiety, hopelessness, and suicidal thought or intents. We fear that the frequency and severity of these effects will escalate as gender-affirming care for youth becomes increasingly legislated and difficult to access, ultimately translating to real harm of trans and gender-diverse youth.

25. Stories like these are common. Some patients also report being subjected to bullying or harassment for having visible breasts while presenting otherwise masculine. Patients frequently report the desire to be able to do simple things that their breasts prevent, like take their shirt off at the beach with friends, or wear tight or slim cut shirts without it being obvious that they have breasts. It is difficult to not draw comparisons between the surgeries performed for cisgender adolescents with unwanted breast growth and/or asymmetry, which are technically identical to gender-affirming "top or chest surgery."

26. For example, we perform mastectomies for adolescent cisgender male patients who struggle with "gynecomastia" or persistent, often painful physiologic breast growth without clear hormonal etiology. This may lead to diminished self-esteem and embarrassment in social settings. As such, some adolescents with gynecomastia may choose to have surgery to remove the excess breast tissue with the goal of achieving a more masculine chest contour and improving self-confidence. The technique for this surgery mirrors gender-affirming mastectomy/chest reduction, and yet, there are no requirements for a mental health screening or multiple referral letters, nor is this care prohibited or contested for adolescents in a single U.S. state Consequentially, cisgender male patients can be approved and scheduled for surgery more quickly than transgender or gender-diverse patients seeking similar procedures. These experiences stand in stark contrast, particularly when one considers the mutual goal of affirming one's body with their masculine identity.

27. Another example is breast augmentation/reconstruction surgery for adolescent cisgender female patients who have breast asymmetry. Breast asymmetry generally refers to a

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

difference in size, shape, or positioning of the two breasts. Most commonly, one breast is a different size than the other; typically more than two cup size difference. The surgical correction for this issue is usually to augment the smaller breast while possibly reducing the larger breast. Even though breast augmentation surgery has significant risks involved, including elevated risk of breast implant-associated breast cancer, and guarantees additional surgeries during the patient's lifetime, this is still a socially-accepted medical procedure for an adolescent cisgender female patient to have in order to affirm her gender. By contrast, in our clinical practice breast augmentation is not an approved procedure for transgender or gender diverse adolescent patients due to the risks discussed above.

28. As physicians bound to the code of medical ethics, we find it ethically problematic that the limited surgical options made available to adolescent transgender and gender-diverse youth (i.e., mastectomy or chest reduction surgery only) are so stigmatized, when equally or more risky analogous surgeries for cisgender patients are widely accepted and societally supported.

29. Although we do not provide "bottom or genital surgery" to any minor patient, we do provide bottom or genital surgery to adults, 18 or older, where such a procedure is medically indicated and consistent with the standard of care.

30. While bottom or genital surgery is a much less common procedure for transgender or gender-diverse individuals, we recognize that it can be an incredibly important and life-changing surgery for some patients. One memorable patient was a transgender female in her 70s, assigned male at birth, who chose to have vaginoplasty surgery—notwithstanding the significant risks to having such a major surgery at her age—because she explained that she had lived her life feeling as though she didn't belong in her body and wanted to change it before she died. In fact, she stated on the day of surgery, "[I]f I die during surgery, please complete the surgery so that I can be at peace with my body." While ethically we could not honor this request, hearing the patient express it aloud was profound. While it is an important surgical procedure

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

for a narrow band of adult patients, it is not a surgical procedure that it is available to adolescents in Washington.

31. We are both aware of and outraged by the recent Executive Order restricting gender affirming care for youth. The parameters and implications of the Executive Order will cause direct harm to our patients, from whom medically necessary care will be withheld. Further, the language in the Executive Order, which explicitly labels gender-affirming surgery for adolescents as "mutilation" based on "junk science," is frankly offensive. These terms infer brutality and malintent on the part of physicians, like us, who provide lawful, evidence-based, and medically necessary care.

32. As surgeons who provide gender-affirming care to transgender and gender-diverse individuals, we believe it is disingenuous and unfair for the federal government to target and bully transgender and gender-diverse youth under the guise of "protecting children." Instead of "protecting children," the purpose of the Executive Order appears to be to bully, scare and coerce hospitals and doctors out of providing lawful, medically-appropriate health care.

33. We are aware that some hospitals and clinics across the country are beginning to stop providing all gender-affirming care to transgender and gender-diverse adolescents out of fear of the Executive Order. Others, including in Washington State, are pausing or declining to schedule surgeries while the effects of the Executive Order become clearer.

34. But as physicians who provide gender-affirming care, we know how important this care is to so many adolescents. The vast majority of our adolescent patients have reported that their gender-affirming top or chest surgery improved their gender dysphoria. All patients deserve to feel happy and comfortable in their own bodies, and to not face the risk of bullying and harassment because their body does not match their gender presentation. Gender-affirming surgery provides patients with that option—and it does so with very strict, evidence-based guardrails.

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

35. As explained above, gender-affirming surgery is only available to adolescents as top or chest surgery; when it is approved and supported by both parents; and when it is approved and supported by a mental health care professional and a treating doctor. These guardrails, combined with well-designed physician counseling that addresses issues such as potential regret after surgery, ensure that adolescents and their parents are making fully informed health decisions.

36. We have only had two parents refuse to give consent for gender-affirming surgery, and those surgeries did not go forward. In our clinical practice, the vast majority of parents have been incredibly relieved and appreciative of the medical care we are providing their adolescent. We are often thanked by parents and later told how their child's surgery drastically changed their life for the better. Parents also frequently tell us about the clear change in their child's demeanor and increased confidence after receiving gender-affirming surgery—or even just receiving the news that they were approved for surgery. One parent emphasized that after their son's surgery was the first time she could send him on a trip and not be fearful for his safety.

37. We provide this declaration together and under pseudonym because we fear for the safety of ourselves, our families, and our patients. In recent years, we have witnessed the extreme politicization of gender-affirming care, which has consequentially led to transgender care clinicians being targeted and threatened. We are both aware of surgeons in other cities who have faced significant harassment and physical threats to themselves and their families due to their provision of gender-affirming care. We are also aware of protesters outside of hospitals that provide gender-affirming care in Seattle with signs calling surgeons like us "butchers." We are both concerned that this intimidating and dangerous behavior towards physicians who provide gender-affirming care will only worsen because of the Executive Order. Consequentially, we also fear that being involved in this case may lead to us being targeted by people with prejudice towards transgender people.

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

38. We feel like this Executive Order has forced us into an ethical bind. We feel a responsibility to provide our gender-diverse patients with the highest quality, evidence-based medical care we can. And as surgeons, our job is to provide our patients—and in the case of our adolescent patients, the patient and their parents—the best possible information we can and let them decide the best option for the adolescent's health. This Executive Order now forces us to choose between exposing our families and colleagues to harassment or violence, our employers to losses in federal research funding, and ourselves to potential criminal prosecution, *or* forsake our ethical duty to our adolescent transgender and gender-diverse patients by withholding access to lawful and needed medical care.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 6th day of February 2025 at Seattle, Washington.

*Dr. A. Doe, MD*
DR. A. DOE, MD

*Dr. B Doe, MD*
DR. B. DOE, MD

DECLARATIONS OF
DR. A. DOE, MD AND DR. B. DOE, MD

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744