1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11     STATE OF WASHINGTON et al.,                 CASE NO. 2:25-cv-00244-LK

                        Plaintiffs,              MEMORANDUM OPINION

12          v.

13     DONALD J. TRUMP et al.,

14                      Defendants.

15

16          The United States Constitution endows the three branches of the federal government with

17     separate but overlapping powers. Article III of the Constitution assigns to the judicial branch the

18     responsibility and power to adjudicate "Cases" and "Controversies"—that is, concrete disputes

19     with consequences for the parties involved. The Framers "envisioned that the final 'interpretation

20     of the laws' would be 'the proper and peculiar province of the courts,'" independent of influence

21     from the political branches. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024)

22     (quoting The Federalist No. 78, pp. 522, 525 (J. Cooke ed. 1961) (A. Hamilton)). And since its

23     earliest days, the Supreme Court has embraced this vision, holding that "[i]t is emphatically the

24     province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch

137, 177 (1803). This includes the power to reject the President's interpretation of the Constitution, *see id.* at 172–73; otherwise, "judicial judgment would not be independent at all." *Loper Bright*, 603 U.S. at 386.

The United States Constitution exclusively grants the power of the purse to Congress, not the President, and "the President does not have unilateral authority to refuse to spend the funds" Congress appropriates. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231–32 (9th Cir. 2018) (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). Indeed, it is well established that the President's power is at its "lowest ebb" when he contravenes the express will of Congress, "for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–638 (1952) (Jackson, J., concurring).

Here, Congress appropriated money for research and education grants to medical institutions across the country. These appropriations fund, among other things, research relating to Alzheimer's disease, cancer, diabetes, autism and other neurodevelopmental disorders, asthma, cardiovascular disease, opioid use disorder, pediatric oncology and blood disorders, and kidney disease. Instead of "tak[ing] Care that [such] Laws be faithfully executed," U.S. Const. art. II, § 3, President Trump issued an Executive Order making the funding contingent on whether grant recipients provide certain medical care to individuals 18 and under. This oversteps the President's authority under the separation of powers.

To the extent the Executive Order purports to expand the scope of criminalized conduct in another federal statute—18 U.S.C. § 116—this too trespasses beyond the President's powers under the Constitution.

These are not the only ways the Executive Order is unconstitutional. The Fifth Amendment's Equal Protection Clause prohibits the federal government from treating people differently based on sex or transgender status unless such differential treatment (1) serves

important governmental objectives and (2) is substantially related to the achievement of those objectives. *Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1079–80 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019).

Although the Executive Order's stated purpose is to protect "children" from regret associated with adults "chang[ing] a child's sex through a series of irreversible medical interventions," the Order is not limited to children, or to irreversible treatments, nor does it target any similar medical interventions performed on cisgender youth. And critically, the Executive Order prevents transgender youth from obtaining necessary medical treatments that are completely unrelated to their gender identity. For example, a cisgender teen could obtain puberty blockers from a federally funded medical provider as a component of cancer treatment, but a transgender teen with the same cancer care plan could not.

When it comes to surgery, the Executive Order sweeps far more broadly than its stated purpose of protecting "children" from medical treatment decisions made by adults. For example, the Order forbids federal funding to providers who offer surgeries "to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." This would prevent such a provider not only from performing gender-affirming surgery on an 18-year-old transgender individual, but also from performing, for example, a vasectomy on a married cisgender 18-year-old man who desires the surgery because he has Huntington's disease and does not want to pass it to his children.

Because the sex-based distinctions drawn by the Executive Order are not substantially related to achieving the Order's purpose, the Order does not survive constitutional scrutiny.

Plaintiffs seek to halt enforcement of Sections 4 and 8(a) of the Executive Order as unconstitutional. The Court granted their motion on February 14, 2025. Dkt. No. 158. This opinion further explains the Court's reasoning.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order" or "Order"). Dkt. No. 17-1. This Order is one of many new initiatives by the Trump Administration aimed at transgender individuals, including executive orders halting the standard processing of their passport applications; ordering the transfer of incarcerated transgender women to men's prisons; initiating a ban on military service by transgender individuals; ending federal recognition of gender identities other than male and female; and barring female transgender student athletes from competing with or against cisgender women and girls. Dkt. Nos. 17-2, 17-3, 17-15.

The Executive Order at issue in this case defines a number of treatments for gender dysphoria as "chemical and surgical mutilation." Dkt. No. 17-1 at 2. The treatments included under this umbrella term (together, the "Listed Services") are as follows:

- "[T]he use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex";

- "[T]he use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex";

- "[S]urgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex"; and

- "[S]urgical procedures . . . that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." *Id.*

As pertinent here, Section 4 of the Executive Order "defund[s]" the Listed Services by ordering the head of every relevant federal agency to "immediately . . . ensure that [medical] institutions

receiving Federal research or education grants end" the Listed Services for individuals ages 18 and younger. *Id.* at 3. Section 8(a) of the Order, in turn, directs the Attorney General to prioritize "enforcement of protections against female genital mutilation" under 18 U.S.C. § 116. *Id.*

On February 7, 2025, the States of Washington, Oregon, and Minnesota (together, "Plaintiff States") and Physicians 1, 2, and 3 (together, "Plaintiff Physicians") filed a lawsuit on their own behalf and/or on behalf of the patients whom they treat. They allege that Section 4 of the Executive Order violates the Constitution's separation of powers and Fifth Amendment equal protection guarantees, and that Section 8(a) of the Order violates the Tenth Amendment. Dkt. No. 1 at 32–34. On the same day they filed their Complaint, Plaintiffs filed a motion for a temporary restraining order seeking to enjoin all Defendants except President Trump from enforcing or implementing Sections 4 and 8(a) of the Order. Dkt. No. 11; Dkt. No. 148 at 14 n.11. Defendants oppose the motion. Dkt. No. 136.[1]

## II.    DISCUSSION

### A.    Standing

Article III's "case or controversy" requirement obligates federal courts to determine, as a preliminary matter, whether plaintiffs have standing to bring suit. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). A plaintiff establishes standing by showing: (1) that it suffered an injury in fact, meaning a concrete and particularized harm that is actual or imminent, rather than hypothetical; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The second and third standing requirements—causation and redressability—are often 'flip sides of the

---

[1] Amicus briefs were submitted by the State of Alabama and the Service Employees International Union. Dkt. No. 133; Dkt. No. 140 at 6–17.

same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. When a claimed injury has not yet occurred, a plaintiff must show that the potential harm is sufficiently imminent to qualify as an injury in fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). In this Circuit, a threatened "loss of funds promised under federal law satisfies Article III's standing requirement." *City and Cnty. of San Francisco*, 897 F.3d at 1236.

Plaintiff States argue that they have standing because (1) the Executive Order expressly and immediately conditions federal research and education grants on denying gender-affirming care to individuals under age 19, risking the loss of "hundreds of millions of dollars, if not more, awarded to Plaintiff States' medical institutions"; (2) the Executive Order infringes their "sovereign authority to regulate the practice of medicine free of intrusion by the President"; and (3) the Defendants have caused these injuries such that an injunction and declaratory relief "will prevent Defendants from enforcing the Order." Dkt. No. 11 at 8–11. Plaintiff Physicians assert that they have standing because (1) the Executive Order prevents them "from delivering appropriate and necessary [gender-affirming] care under threat of criminal prosecution, forcing them to violate their ethical obligations to their patients"; (2) their patients are "injured by the Order's discriminatory treatment and coercion designed to stop gender-affirming care"; and (3) the Defendants have caused these injuries such that an injunction and declaratory relief will redress the harm. *Id.* at 9–11. Defendants respond that Plaintiffs' claim is unripe because the agencies subject to the Executive Order's directive "have not taken action to revoke, or threaten to revoke, any funding at issue in the [Executive Order]." Dkt. 136 at 8. Defendants also argue that Plaintiffs' claim regarding Section 8(a) is speculative because the Executive Order "does not require any

particular interpretation of the criminal statute or any prosecutions, but only directs 'review' and prioritization." Dkt. No. 136 at 25.

The Court finds that Plaintiffs have standing. Plaintiffs have shown that Sections 4 and 8(a) of the Executive Order threaten to cause them imminent concrete injury in a personal and individual way. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Section 4 of the Executive Order directs "[t]he head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals," to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" the Listed Services. Dkt. No. 17-1 at 3. Meanwhile, Section 8(a) purports to expand the scope of conduct criminalized in 18 U.S.C. § 116 to include the Listed Services, and to direct the Attorney General to prioritize prosecution of such conduct. *Id.* Plaintiff States (via their medical institutions) and Plaintiff Physicians provide—and intend to continue to provide—the Listed Services when they believe such Services are medically appropriate, including to certain patients ages 18 and under.[2] Therefore, Plaintiffs have shown that they intend to engage in a course of conduct in conflict with the Executive Order. *See City & Cnty. of San Francisco*, 897 F.3d at 1237.

---

[2] *See, e.g.*, Dkt. No. 13 at 5 (Physician 1, a physician at the Department of Pediatrics at the University of Washington, averring that, "[i]f both the patient and the parent or caregiver with medical decision-making authority express a desire to proceed with gender-affirming medical care, and it is medically indicated and consistent with the standards of care, then we proceed with treatment," which can include puberty-delaying medications and gender-affirming hormones); Dkt. No. 14 at 3 (Physician 2, a physician at a Seattle hospital, stating that, "where medically indicated . . . I prescribe medications to treat gender dysphoria," including "puberty-delaying medications and hormone replacement therapy"); Dkt. No. 15 at 4 (Physician 3, a pediatric endocrinologist at a Seattle hospital, stating that "I prescribe medications to treat gender dysphoria, which may include puberty-blocking medications and hormone replacement therapy," after obtaining consent from patients' guardians); Dkt. No. 16 at 5 (UW Medicine "provides gender-affirming medical care coordinated across a range of clinicians in the UW Medicine system to its adult patients," including but not limited to surgical care, "[w]hen medically indicated and consistent with practice guidelines and standards of care," and the UW School of Medicine Department of Pediatrics faculty physicians also "provide primary and specialty pediatric care, including gender-affirming medical care, to minor patients when medically indicated and necessary to serve the patients' health needs"); Dkt. No. 79 at 3 (University of Minnesota medical institutions provide gender-affirming care, including puberty-suppressing medications, when medically appropriate); Dkt. No. 97 at 2 (Oregon State University provides gender-affirming care to students through its Student Health Services, including hormone therapy, mental health support, and surgical referrals); Dkt. No. 107 at 8 (Oregon Health and Science University provides gender-affirming care, including hormone therapy and puberty suppression medications, "when appropriate, after additional comprehensive mental health involvement[.]").

1    The fact that the loss of funds may have not yet materialized or that enforcement of the

2    Order has not yet occurred does not mean that there is no imminent injury or that Plaintiffs lack

3    standing on this ground. *Id.* In any event, and contrary to Defendants' claims that no threats of

4    grant revocation have been made, Dkt. No. 136 at 4, on January 31, 2025, the Health Resources &

5    Services Administration ("HRSA") sent an email to "HRSA Award Recipients" (including

6    personnel at public medical institutions in Plaintiff States) advising that, "[e]ffective immediately,

7    HRSA grant funds may not be used for activities that do not align with Executive Orders (E.O.)

8    entitled . . . Protecting Children from Chemical and Surgical Mutilation[] and Defending Women

9    from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

10   (Defending Women)," and that "[a]ny vestige, remnant, or re-named piece of any programs in

11   conflict with these E.O.s are terminated in whole or in part." Dkt. No. 16 at 7; Dkt. No. 16-1 at 2;

12   *see also* Dkt. No. 13 at 10; Dkt. No. 107 at 13. The email further warned that "[y]ou may not incur

13   any additional costs that support any programs, personnel, or activities in conflict with these

14   E.O.s." Dkt. No. 16 at 7; Dkt. No. 16-1 at 2. Although the email was rescinded without explanation

15   roughly a week later, Dkt. No. 16-2 at 2, this concrete step taken by a federal agency in response

16   to the Order demonstrates the imminency of enforcement of the Executive Order. *PFLAG, Inc. v.*

17   *Trump*, No. 1:25-cv-00337-BAH, Dkt. No. 62 at 15 (D. Md. Feb. 14, 2025) ("[I]t is clear that the

18   rescission of the HRSA notice does not render the issue moot."). If that weren't enough, the White

19   House issued a press release on February 3, 2025 declaring that the Executive Order was "having

20   its intended effect" as demonstrated by specific examples of "[h]ospitals around the country . . .

21   [already] taking action to downsize or eliminate their so-called 'gender-affirming care' programs."

22   Dkt. No. 17-9 at 2; *see also City & Cnty. of San Francisco*, 897 F.3d at 1236 (injury was

23   sufficiently imminent where the Trump Administration "consistently evinced its intent to enforce

24   the Executive Order, and . . . made clear that the [plaintiffs] are likely targets"); *PFLAG*, No. 1:25-

cv-00337-BAH, Dkt. No. 62 at 14 (the February 3 press release illustrates that "the executive is committed to restricting federal funding based on the denial of gender affirming care").

The record shows that enforcement of Section 4 of the Executive Order will cause one of two concrete harms to Plaintiffs: either (1) be forced to halt the Listed Services, even in circumstances in which Plaintiffs consider such Services to be medically necessary, or (2) lose federal grant money. As Physician 1 describes it, "Forcing me to stop providing care that my training, experience, and medical judgment tell me is in the best interest of my patient would force me to violate the oath I pledged to uphold," but upholding that oath would threaten Physician 1's livelihood because the "grant funding that supports a significant portion of [my] work . . . will be stripped away" under the Executive Order. Dkt. No. 13 at 10.

Much the same is true for Plaintiff States on an institutional level. According to the Chief Executive Officer of UW Medicine and the Dean of the UW School of Medicine, ceasing to provide gender-affirming care, including the Listed Services, "would undermine the UW School of Medicine's mission and its ethical duties to its patients and to the community that it serves." Dkt. No. 15 at 6–7. At the same time, the UW School of Medicine currently has direct research grants from numerous federal agencies, including the Department of Agriculture, Department of Commerce, Department of Defense, Department of Education, Department of Energy, Department of Health and Human Services, Department of Veterans Affairs, National Aeronautics & Space Administration, National Science Foundation, and Office of the Director of National Intelligence. Dkt. No. 16 at 3. Because "[t]hese medical research grants support operational and capital expenses including researchers, labs, and equipment," the school's ability "to achieve its educational, research, and health care mission would be significantly impaired if it were suddenly stripped of federal research or education grants under EO 14187." *Id.* at 6. Moreover, key research endeavors—including on Alzheimer's disease, cancer, diabetes, liver disease, cardiovascular

1    disease, autism and other neurodevelopmental disorders, asthma, opioid use disorder, kidney

2    disease, sleep apnea, Down syndrome, and organ transplantation—"would be left unfinished,

3    putting future medical treatments and breakthroughs at risk of not being developed or discovered."

4    *Id.*

5            Oregon State University faces a similar Sophie's choice. According to its Executive

6    Director, if the school were prevented from providing "medically necessary health care" to

7    transgender students, the students would suffer "increased anxiety, depression, and likelihood of

8    suicide or self-harm, and . . . severe illness or life-threatening conditions," and the University's

9    "ability to fulfill its educational mission" would be impeded. Dkt. No. 97 at 3–4. But like the UW

10   School of Medicine, Oregon State University relies on substantial federal grants to support its

11   work. Dkt. No. 92 at 3–4; Dkt. No. 97 at 3. The Vice President for Research and Innovation at

12   Oregon State avers that "[i]f the federal government were to stop providing research and education

13   grants to Oregon State University, the impacts would be devastating to its operations and disrupt

14   critical research in areas such as integrated health and biotechnology, robotics, agriculture, food

15   and beverages, semiconductors and artificial intelligence." Dkt. No. 92 at 4; *see also* Dkt. No. 97

16   at 3 (Executive Director of Student Health Services attesting to same).

17           Oregon Health and Science University, which "ranks as the top Oregon institution to

18   receive National Institutes of Health (NIH) funding," would experience similarly dire

19   consequences from an immediate federal funding cut: "4,221 grants that are currently underway"

20   would be impacted, disrupting "critical research in areas such as rural health, fetal maternal

21   medicine, cancer, cardiovascular health, Alzheimer's disease, neurology, behavioral health, and

22   many other areas critical to human health," and resulting in the "immediate closure of at least 500

23   research programs" and "the loss of approximately 2000 research staff positions." Dkt. No. 107 at

24   3, 5 (declaration of Executive Vice President and Interim Chief Executive Officer of Oregon

Health and Science University Health). While grants are critical to Oregon Health and Science University, the school also highly values its transgender health programs. It offers curricula in behavioral health, hormone therapy, and surgical care for gender diverse individuals, and is one of only a few international institutions to offer a medical student elective in transgender health and a surgical fellowship exclusively focused on gender-affirming surgeries. *Id.* at 10. "Should gender-affirming care be disallowed at OHSU, all forward workforce training in the various contributing professions and subspecialties related to this care would also cease," and patients unable to access the care that the school considers to be medically appropriate and/or necessary would likely suffer "increase[d] mental health distress" and negative impacts to their "social functioning, emotional wellness, and psychological stability." *Id.* at 9–10.[3]

For the foregoing reasons, Plaintiffs have demonstrated that enforcement of Section 4 of the Executive Order will either (1) result in "a likely 'loss of funds promised under federal law,'" *City & Cnty. of San Francisco*, 897 F.3d at 1236 (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)), or (2) force Plaintiffs to cease "providing medical services they would otherwise provide," *Isaacson v. Mayes*, 84 F.4th 1089, 1096–97 (9th Cir. 2023) (noting that Ninth Circuit precedent "make[s] clear that an Article III injury in fact can arise when plaintiffs are simply prevented from conducting normal business activities"). *See also City & Cnty. of San Francisco*, 897 F.3d at 1236 (Plaintiffs established standing by "demonstrat[ing] that, if their interpretation of the Executive Order is correct, they will be forced to either change

---

[3] *See also* Dkt. No. 79 at 3 (University of Minnesota co-medical director of comprehensive gender care stating that "[i]t is very important that we offer gender affirming medical care when it is determined the patient is eligible and it is medically necessary, in order to prevent permanent physical changes that would be damaging to their health and to support positive physical and mental health outcomes"); Dkt. No. 94 at 3–5 (Assistant Commissioner for the Minnesota Department of Human Services averring that "[t]he Executive Order threatens medically-necessary health care for Minnesotans, which our [Medical Assistance] and MinnesotaCare programs are charged with providing for our members"; the Medical Assistance and MinnesotaCare programs are funded by federal dollars); Dkt. No. 98 at 6 (assistant professor at the University of Minnesota attesting that "[n]ot providing gender-affirming health care is not a valid medical practice" and that, "as a medical provider, I know denying a person this care will cause serious harm to my patients. This order asks me to violate my oath as a physician.").

their policies or suffer serious consequences."). Plaintiff Physicians have also demonstrated that enforcement of Section 8(a)—to the extent it purports to amend 18 U.S.C. § 116 to encompass the Listed Services—poses a credible and substantial threat of prosecution to providers of such Services. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 490 (9th Cir. 2024); *see also infra* Section II.B.1.c. Enjoining the enforcement of Sections 4 and 8(a) would remedy this harm. *Food & Drug Admin.*, 602 U.S. at 380–81.[4]

Plaintiff Physicians also have standing to assert their patients' rights. Plaintiffs are permitted to "assert third-party rights in cases where the enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318 (2020) (cleaned up), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Here, as in *June Medical*, the Plaintiff Physicians are providers challenging government action that purports to regulate their conduct where the "threatened imposition of governmental sanctions for noncompliance" (1) "eliminates any risk that their claims are abstract or hypothetical," (2) assures the Court "that the plaintiffs have every incentive to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," and (3) makes Plaintiff Physicians "far better positioned than their patients to address the burdens of compliance." *Id.* at 319 (internal quotation marks omitted). "They are, in other words, 'the least awkward' and most 'obvious' claimants here." *Id.* at 320 (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)). In addition, Plaintiff Physicians have suffered an injury in fact and have close relationships with their patients. *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Specifically, over months and years of

---

[4] Because the Executive Order directs immediate action and threatens Plaintiffs with serious penalties for noncompliance, and because Plaintiffs' claims primarily advance legal questions that require little factual development, this case is prudentially ripe. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 840 (9th Cir. 2024).

treatment, Plaintiff Physicians develop a close and personal relationship with their patients experiencing gender dysphoria. *See, e.g.*, Dkt. No. 13 at 7; Dkt. No. 14 at 7; Dkt. No. 15 at 5. Furthermore, due to the sensitive nature of the subject matter, fear of retaliation from the federal government, and lack of capacity and/or financial resources, Plaintiff Physicians' clients are hindered from protecting their own interests. *Powers*, 499 U.S. at 411; *see, e.g.*, Dkt. No. 21 at 4; Dkt. No. 22 at 4; Dkt. No. 29 at 2, 5–7; Dkt. No. 36 at 2; Dkt. No. 37 at 8; Dkt. No. 45 at 2, 5; Dkt. No. 49 at 2; Dkt. No. 52 at 2, 4; Dkt. No. 54 at 2, 5; Dkt. No. 60 at 5; Dkt. No. 65 at 2, 5; Dkt. No. 67 at 4; Dkt. No. 68 at 5; Dkt. No. 69 at 2; Dkt. No. 70 at 5; Dkt. No. 72 at 2. As such, Plaintiff Physicians may plead their patients' injuries as well as their own.

Finally, and contrary to Defendants' arguments, Dkt. No. 136 at 9, it is well established that plaintiffs may seek equitable relief against federal officials who exceed the scope of their authority or act unconstitutionally. *See West v. Standard Oil Co.*, 278 U.S. 200, 210 (1929); *Noble v. Union River Logging Railroad*, 147 U.S. 165, 171–72 (1893).

**B.      Temporary Restraining Order**

Federal Rule of Civil Procedure 65 empowers the court to issue a temporary restraining order ("TRO"). Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (the standards applicable to TROs and preliminary injunctions are "substantially identical"). The Court will not "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, plaintiffs seeking a TRO must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The mere "possibility" of irreparable harm is insufficient; instead,

1    the moving party must "demonstrate that irreparable injury is likely in the absence of an

2    injunction." *Id.* at 22.

3        For the reasons provided below, the Court finds that Plaintiffs have carried their burden.

4        1.   Plaintiffs Have Demonstrated That They Are Likely to Succeed on the Merits

5             (a) *Plaintiffs' Separation of Powers Claim is Likely to Succeed*

6        Section 4 of the Executive Order imposes a condition on the receipt of federal funds by the

7    Plaintiff States' medical institutions, effective immediately: "[I]nstitutions receiving Federal

8    research or education grants [must] end the" Listed Services. Dkt. No. 17-1 at 3. Plaintiffs argue

9    that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," Section

10   4 "usurps Congress's spending and legislative power." Dkt. No. 11 at 19.

11       "The United States Constitution exclusively grants the power of the purse to Congress, not

12   the President." *City & Cnty. of San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl.

13   7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)). The Constitution

14   provides "a single, finely wrought and exhaustively considered, procedure" through which "the

15   legislative power of the Federal government [may] be exercised": namely, through majority votes

16   of both chambers of Congress and approval by the President. *I.N.S. v. Chadha*, 462 U.S. 919, 951

17   (1983); U.S. Const. art. I § 7. Nothing in the Constitution authorizes the President to unilaterally

18   enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417,

19   438–39 (1998). Indeed, he must instead "take Care that th[os]e Laws be faithfully executed." U.S.

20   Const. art. II, § 3. That duty "refutes the idea that [the President] is to be a lawmaker." *Youngstown*,

21   343 U.S. at 587.

22       Importantly, Congress's spending power includes the power to "attach conditions on the

23   receipt of federal funds[.]" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987). And "[b]ecause

24   Congress's legislative power is inextricable from its spending power, the President's duty to

enforce the laws necessarily extends to appropriations." *City & Cnty. of San Francisco*, 897 F.3d at 1234. His failure to do so "may be an abdication of the President's constitutional role." *Id.* (citing 2 U.S.C. §§ 681–688 for the proposition that "Congress has affirmatively and authoritatively spoken" with respect to the President's duty to execute appropriations laws).[5]

Here, the record indicates that none of the funds received by the Plaintiff States' medical institutions have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care. Dkt. No. 11 at 18–19; Dkt. No. 16 at 8; Dkt. No. 92 at 4; Dkt. No. 94 at 4–5; Dkt. No. 97 at 4; Dkt. No. 116 at 6. And Defendants have not shown that Congress has delegated authority to the President to condition federal research grants on compliance with his policy agenda. *See PFLAG*, No. 1:25-cv-00337-BAH, Dkt. No. 62 at 126 (Executive Order 14,187 does not "identif[y] a statute authorizing the executive branch to amend or terminate federal grants"). The President's power is thus "at its lowest ebb." *City & Cnty. of San Francisco*, 897 F.3d at 1234 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Despite this, President Trump's Executive Order purports to do something not even Congress is permitted to do: "surprise[] states with post acceptance . . . conditions" on federal funds, and "impose conditions on federal grants that are unrelated to the federal interest in particular national projects or programs." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (cleaned up).

The Executive Order thus amounts to an end-run around the separation of powers. "Not only has the Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco*, 897 F.3d at 1234. To hold that the President has "the power to switch the Constitution on or off at will" would

---

[5] *See also Memorandum Opinion on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, Op. O.L.C. 1, 309 (Dec. 1, 1969) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").

"permit a striking anomaly in our tripartite system of government." *Boumediene v. Bush*, 553 U.S. 723, 765 (2008). But "[o]ur basic charter cannot be contracted away like this." *Id.* As in *City and County of San Francisco*, President Trump "is without authority to thwart congressional will by canceling appropriations passed by Congress" or to "decline to follow a statutory mandate or prohibition simply because of policy objections." 897 F.3d at 1232 (quoting *In re Aiken Cnty.*, 725 F.3d at 261 n.1). Plaintiffs' argument that Section 4 of the Executive Order violates the separation of powers is likely to succeed on the merits.

### (b) Plaintiffs' Fifth Amendment Equal Protection Claim is Likely to Succeed

Even if Section 4 of the Executive Order did not violate the separation of powers (it does), Plaintiffs have shown a likelihood of success on the merits regarding their claim that Section 4 violates the Equal Protection Clause of the Fifth Amendment.

When the federal government employs sex-based line-drawing, it withstands constitutional scrutiny only where the sex-based classifications (1) serve important governmental objectives and (2) are substantially related to the achievement of those objectives. *Craig*, 429 U.S. at 197. Under such heightened scrutiny, "a party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Moreover, the justification provided must be the true purpose underlying the policy or regulation, not merely one hypothesized or devised in order to survive judicial scrutiny. *See id.* at 535–36.

Before the Court addresses the nature of the classifications in the Executive Order, it first reviews key terminology. "'Gender identity' is 'the term used to describe a person's sense of being male, female, neither, or some combination of both.'" *Hecox*, 104 F.4th at 1068 (quoting Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 N. Eng. J. Med. 2451, 2451

(2019)). "A person's 'sex' is typically assigned at birth based on an infant's external genitalia, though 'external genitalia' do not always align with other sex-related characteristics, which include 'internal reproductive organs, gender identity, chromosomes, and secondary sex characteristics.'" *Id.*[6] "A 'transgender' individual's gender identity does not correspond to their sex assigned at birth, while a 'cisgender' individual's gender identity corresponds with the sex assigned to them at birth." *Id.* at 1068–69. "Some individuals are nonbinary, meaning they identify with or express a gender identity that is neither entirely male nor entirely female." *Horne*, 115 F.4th at 1092. In addition, around two percent of people are born "intersex," which is "an umbrella term for people born with unique variations in certain physiological characteristics associated with sex, such as chromosomes, genitals, internal organs like testes or ovaries, secondary sex characteristics, or hormone production or response." *Hecox*, 104 F.4th at 1069 (cleaned up). Transgender individuals often experience "gender dysphoria," which is defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders as a condition in which individuals experience "a marked incongruence between one's experienced/expressed gender and assigned gender, lasting at least 6 months," that is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Dkt. No. 18 at 14 (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 512–13 (5th ed., text rev. 2022)).

Here, the Executive Order facially discriminates on the basis of transgender status. For example, federally funded medical institutions can provide the first Listed Service, "puberty blockers . . . to delay the onset or progression of normally timed puberty," to cisgender individuals, *but not* to an individual 18 or younger "who does not identify as his or her sex." Dkt. No. 17-1 at

---

[6] Another recent Executive Order issued by the Trump Administration defines "sex" differently, as the Court discusses below.

2. Thus, a cisgender teen who needs puberty blockers in the course of cancer treatment[7] could receive them from federally funded institutions, but a transgender teen who needs puberty blockers *due to the same diagnosis*—and not to align with the teen's gender identity—could not.[8] Federally funded institutions likewise are barred from providing the second and third Listed Services, sex hormones and surgical procedures, *only if* those Services are provided to "align" the appearance of an individual 18 or younger "with an identity that differs from his or her sex." *Id.*

The first, second, and third Listed Services also facially discriminate on the basis of sex. Executive Order 14,187 does not define "sex," but the nearly contemporaneously enacted Executive Order 14,168 does. Specifically, "sex" is "an individual's immutable biological classification as either male or female." Dkt. No. 17-2 at 2. ''Female'' means "a person belonging, at conception, to the sex that produces the large reproductive cell" while "male'' means "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.* Applying these definitions here, it is clear that in determining whether a particular treatment involves "an individual who does not identify as his or her sex," Dkt. No. 17-1 at 2, a provider must first determine the sex of the individual to be "male" or "female." And in determining whether a particular treatment "align[s] an individual's physical appearance with an identity that differs from his or her sex," *id.*, the provider must determine not only the sex of the individual but also whether

---

[7] The Court notes that Gonadotrophin-releasing hormone ("GnRH") agonists, which are included as "puberty blockers" in the Executive Order, Dkt. No. 17-1 at 2, are sometimes used to treat prostate cancer. Specifically, because "[p]rostate cancer is hormone-sensitive and testosterone promotes growth of the cancer," one method of treating it "uses a . . . GnRH[] agonist, which binds to receptors in the pituitary gland," eventually "reduc[ing] testosterone to the medical castration level." *Ferring Pharms. Inc. v. Fresenius Kabi USA, LLC*, 645 F. Supp. 3d 335, 344 (D. Del. 2022); *see also Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1258 (N.D. Fla. 2024) ("GnRH agonists are routinely used to treat patients with central precocious puberty . . . as well as, in some circumstances, endometriosis and prostate cancer."); *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1285 (N.D. Fla. 2023) (same).

[8] Defendants could not offer an alternative interpretation of the Order's text when asked about it at the hearing. Dkt. No. 160 at 24–25.

MEMORANDUM OPINION - 18

1   any resulting change in physical appearance would conform with stereotypical physical attributes

2   of the patient's biological sex.[9]

3       Because the Executive Order makes classifications based on sex and "on its face treats

4   transgender persons differently than other persons," it constitutes sex discrimination; the Court

5   must therefore apply heightened scrutiny. *Hecox*, 104 F.4th at 1079 (quoting *Karnoski*, 926 F.3d

6   at 1201); *see also Horne*, 115 F.4th at 1102 (if a law "discriminates based on transgender status,

7   either purposefully or on its face, heightened scrutiny applies").[10]

8       While the Executive Order need not be so narrowly tailored to the precise governmental

9   purpose here as would be required under strict scrutiny, *see Horne*, 115 F.4th at 1109, there must

10  nevertheless be a substantial relationship between the means (that is, classification on the basis of

11  transgender status and sex) and the ends. Plaintiffs argue that the Executive Order "appears to

12  serve no interest at all save to communicate official, presidentially directed animus against

13  transgender and gender-diverse people, their medical providers, and their families." Dkt. No. 1 at

14  32. Defendants disagree, asserting that the Executive Order "is substantially related to the

15  important governmental purpose of safeguarding children's physical and mental health." Dkt. No.

16  136 at 16.

17      Even assuming without deciding that the Executive Order's stated purpose (i.e., protecting

18  children from regret associated with adults "chang[ing] a child's sex through a series of irreversible

19  medical interventions") constitutes an important government interest, there is no substantial

20

21  [9] Defendants could not offer an alternative interpretation of the Order's text when asked about it at the hearing. Dkt. No. 160 at 27–29.

22  [10] Defendants concede that application of heightened scrutiny to classifications on the basis of transgender status is a foregone conclusion in the Ninth Circuit. Dkt. No. 136 at 17 ("The government recognizes that the Ninth Circuit has held that 'heightened scrutiny applies to laws that discriminate based on transgender status'" (quoting *Horne*, 115

23  F.4th at 1102)); *id.* at 18 ("The government recognizes that the Ninth Circuit has . . . held" that "a classification based on transgender status is necessarily a sex classification" (citing *Hecox*, 104 F.4th at 1080)). They nevertheless argue that "the Ninth Circuit's conclusion is incorrect and should be overruled," *id.* at 17—something this Court is without

24  power to do. In keeping with Ninth Circuit precedent, the Court applies heightened scrutiny.

relationship between this purported goal and Section 4's blunderbuss approach to achieving it. Despite purporting to protect "children" generally, the Order is underinclusive in that it does not encompass any similar medical treatments for *cisgender* youth (for example, breast augmentation surgery in cisgender females), even where those medical treatments pose the same or similar risks.[11] *See Poe by & through Poe v. Labrador*, 709 F. Supp. 3d 1169, 1193 (D. Idaho 2023) (finding the government's asserted objective "pretextual" because it "allows the same treatments for cisgender minors that are deemed unsafe and thus banned for transgender minors"; "rather than targeting the treatments themselves, [the law] allows children to have these treatments—but only so long as they are used for any reason other than as gender-affirming medical care"); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021) ("Defendants' rationale that the Act protects children from experimental treatment and the long-term, irreversible effects of the treatment, is counterintuitive to the fact that it allows the same treatment for cisgender minors as long as the desired results conform with the stereotype of their biological sex."), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).

The Order is overinclusive as well. Despite professing to protect "impressionable children," it is not limited to minors and instead includes 18 year olds. Dkt. No. 17-1 at 2. In all Plaintiff States as well as the vast majority of other states, 18 is the legal age of majority. *See, e.g.*, Minn. Stat. § 645.451 Subds. 3, 6; Or. Rev. Stat. § 109.510; Wash. Rev. Code § 26.28.015(5). At that age, individuals are generally entitled to make their own medical decisions. *See, e.g.*, Minn. Stat. § 645.451 Subds. 3, 6 (defining "adult" and "legal age" as "18 years of age or older"); Or.

---

[11] In their briefing and at the hearing, Defendants did not offer anything to contest Plaintiffs' evidence that the same or similar treatments for cisgender children can be irreversible. Dkt. No. 160 at 21–22; *see generally* Dkt. No. 136; *see also, e.g.*, Dkt. No. 112 at 9–10 (breast augmentation surgery for adolescent cisgender females "has significant risks involved, including elevated risk of breast implant-associated breast cancer, and guarantees additional surgeries during the patient's lifetime").

Rev. Stat. § 109.510 (Generally, "in this state any person shall be deemed to have arrived at majority at the age of 18 years, and thereafter shall: (1) Have control of the person's own actions and business; and (2) Have all the rights and be subject to all the liabilities of a citizen of full age."); Wash. Rev. Code § 26.28.015(5) (Generally, "all persons shall be deemed and taken to be of full age . . . at the age of eighteen years" to "make decisions in regard to their own body . . . to the full extent allowed to any other adult person including but not limited to consent to surgical operations[.]"). But the Order does not permit 18-year-old adults the freedom to obtain the Listed Services from federally funded medical institutions, departing from its purpose to protect "impressionable children" from the decisions of "adults." Dkt. No. 17-1 at 2. Nor is its overbroad application to transgender adults the only collateral damage of this sort. The Executive Order also prohibits federal funding to providers that offer surgeries "to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions," regardless of the individual's gender identity. *Id.* This would prevent a federally funded provider from, for instance, providing a vasectomy to a married cisgender 18-year-old man who desires this surgery because he has Huntington's disease and does not want to pass it to his children.[12]

Furthermore, and importantly, the Executive Order promises serious harm to children even outside the realm of gender care. As discussed above, a cisgender teen who needs puberty blockers in the course of cancer treatment could receive them from federally funded institutions, but a transgender teen who needs puberty blockers *for the same diagnosis*—and not to align with the teen's gender identity—could not.

Finally, some of the Listed Services are neither permanent nor irreversible, once again demonstrating that the Order's sex-based classifications are insufficiently tailored to its purpose.

---

[12] Defendants could not offer an alternative interpretation of the Order's text when asked about it at the hearing. Dkt. No. 160 at 25–26.

For example, "[c]hildren with central precocious puberty are routinely treated with GnRH analogs and have typical fertility in adulthood." Dkt. No. 18 at 24.[13] As such, the Executive Order prohibits youth with gender dysphoria from accessing medical services *even if* those services are not in conflict with the Order's stated goal of preventing irreversible medical treatments.

For all of the above reasons, the Court finds it likely that Plaintiffs will succeed on the merits in showing that Section 4 of the Executive Order violates the Fifth Amendment's Equal Protection Clause.

### *(c) Plaintiffs' Tenth Amendment Claim is Likely to Succeed*

Section 8(a) directs the Attorney General to "review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation." Dkt. No. 17-1 at 3. Plaintiffs argue that Section 8(a) trespasses beyond the President's constitutional authority by criminalizing the Listed Services and thereby usurping the Plaintiff States' reserved powers to regulate the practice of medicine under the Tenth Amendment. Dkt. No. 11 at 20. Defendants respond that "Plaintiffs' claim is speculative and misread[s] the E[xecutive] O[rder]." Dkt. No. 136 at 25.

Section 116 makes it a crime to "perform[], attempt[] to perform, or conspire[] to perform female genital mutilation on another person who has not attained the age of 18 years"; to consent, as the "parent, guardian, or caretaker of a person who has not attained the age of 18 years" to female genital mutilation; or to "transport[] a person who has not attained the age of 18 years for the purpose of the performance of female genital mutilation on such person." 18 U.S.C. § 116(a). Defendants dismiss Plaintiffs' concerns that they will be prosecuted under Section 116 for the following reasons:

---

[13] In their briefing and when asked at the hearing, Defendants did not offer anything to counter Plaintiffs' evidence that not all of the Listed Services are irreversible. Dkt. No. 160 at 19–20; *see generally* Dkt. No. 136.

- Section 116 "criminalizes only 'procedure[s]' that 'involve[] partial or total removal of, or other injury to, the external female genitalia,' such as 'a clitoridectomy,' 'the partial or total removal . . . of the labia minora or the labia majora,' or 'pricking, incising, scraping, or cauterizing the genital area.'" Dkt. No. 136 at 25–26 (citing 18 U.S.C. § 116(e)).

- Section 116 applies only to female genital mutilation of individuals under 18 years old, and Plaintiffs "acknowledge that 'non-surgical options . . . are generally the only treatments minors can receive' and they are the only treatments the physician Plaintiffs provide." *Id.* at 26 (citing Dkt. No. 11 at 21; Dkt. No. 13 at 5; Dkt. No. 14 at 3, 9; Dkt. No. 15 at 4).

- Section 116 unequivocally exempts from criminal prosecution any "surgical operation . . . necessary to the health of the person on whom it is performed . . . by a person licensed in the place of its performance as a medical practitioner." 18 U.S.C. § 116(b)(1); *see also* Dkt. No. 136 at 26.

- To obtain a conviction under Section 116, the government must prove that the charged conduct has a sufficient nexus to interstate or foreign commerce. Dkt. No. 136 at 5–6, 22–23; *see also* 18 U.S.C. § 116(d).

But Plaintiffs' challenge is not to Section 116; rather, it is to the Executive Order's purported expansion of that statute. Dkt. No. 148 at 10. Assuming that the conduct proscribed by Section 116 and "chemical and surgical mutilation" are truly apples and oranges, as Defendants suggest but will not concede, Dkt. No. 160 at 18, why does an Executive Order governing apples contain a directive concerning oranges? The text of the Order suggests a clear intent to equate the two. Section 1 states that the United States "will rigorously enforce all laws that prohibit or limit" the transition of a child from one sex to another. Dkt. No. 17-1 at 2. And the only law mentioned

in the "Directives to the Department of Justice" in the Order is 18 U.S.C. § 116. *Id.* at 3–4. Thus, a fair reading of the Order is that it purports to expand Section 116 to include the medical treatments described as "chemical and surgical mutilation" in Section 2(c) of the Executive Order—and thereby places providers offering the Listed Services within the auspices of the Department of Justice's prosecutorial powers.[14]

The President's specific authority with respect to Section 116 is the authority to enforce the law drafted by Congress within the "express or implied" parameters outlined by Congress. *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). As discussed above, the President has no power to unilaterally amend statutes. Here, Congress has not acted to criminalize the Listed Services. Indeed, it has no power to do so to the extent the Listed Services have no nexus to interstate commerce. *Bond v. United States*, 572 U.S. 844, 854 (2014) ("A criminal act committed wholly within a State cannot be made an offence against the United States, unless it ha[s] some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." (cleaned up)). Instead, the Plaintiff States' legislatures have the exclusive power under the Tenth Amendment to criminalize acts committed within those states that lack a federal nexus. *See id.*; *see also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("[T]he structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." (cleaned up)). Plaintiff States have not passed any laws criminalizing the Listed Services. *See, e.g.*, Wash. Rev.

---

[14] To satisfy the injury-in-fact requirement when a claimed injury—such as criminal prosecution—has not yet occurred, a plaintiff must show that "(1) [the plaintiff] ha[s] alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest;' (2) but the conduct is 'proscribed by [the law at issue];' and (3) 'there exists a credible threat of prosecution thereunder.'" *Isaacson*, 84 F.4th at 1098 (quoting *Susan B. Anthony List*, 573 U.S. at 159). Nowhere in their briefing or at oral argument did Defendants explicitly disclaim any intent to prosecute physicians providing the Listed Services under Section 116. Dkt. No. 160 at 18; *see generally* Dkt. No. 136. Their refusal to disavow enforcement, along with the Order's apparent intent to expand the reach of Section 116, establish that Plaintiff Physicians have a reasonable fear of prosecution. *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489–90 (9th Cir. 2024); *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

1    Code §§ 18.130.450, 74.09.675; Wash. Rev. Code ch. 7.115; Dkt. No. 103 at 2–3; Dkt. No. 104 at

2    2–3. To the contrary, the State of Washington has passed a law making clear that the provision of

3    or participation in any gender-affirming treatment consistent with the standard of care in

4    Washington by a license holder does not constitute unprofessional conduct subject to discipline.

5    Wash. Rev. Code § 18.130.450.

6         To the extent that Section 8(a) purports to expand 18 U.S.C. § 116 to encompass Listed

7    Services lacking any tie to interstate commerce, it oversteps the President's authority and invades

8    an arena of lawmaking reserved to the states in violation of the Tenth Amendment.

9         2.   The Savings Clause Does Not Save the Executive Order

10        Defendants effectively argue that the Executive Order is at worst a sheep in wolf's clothing

11   because any illegal directives are neutralized by its savings clause. Dkt. No. 136 at 12–13. That

12   clause states that "[n]othing in this order shall be construed to impair or otherwise affect . . . the

13   authority granted by law to an executive department or agency" and that "[t]his order shall be

14   implemented consistent with applicable law." Dkt. No. 17-1 at 4. As Plaintiffs point out, the Ninth

15   Circuit rejected nearly identical arguments in *City & County of San Francisco v. Trump*.

16        There, the court addressed constitutional challenges to an executive order directing agency

17   heads, "in their discretion and to the extent consistent with law," to ensure that "sanctuary

18   jurisdictions" that did not comply with 8 U.S.C. § 1373 were "not eligible to receive Federal

19   grants." 897 F.3d at 1232–33. As in this case, defendants there argued that the Executive Order

20   was "all bluster and no bite" because the savings clause ensured the government's actions would

21   be "consistent with law." *Id.* at 1238–39. But the Ninth Circuit held that because savings clauses

22   are to be read in their context, they "cannot be given effect when the Court . . . would [need to]

23   override clear and specific language" to rescue the constitutionality of a measure, and "[t]he

24   Executive Order's savings clause does not and cannot override its meaning." *Id.* at 1238–40. So

too here. The Executive Order commands "immediate[]" action from agency heads, Dkt. No. 17-1 at 3—action which, in the case of HRSA, has already materialized, Dkt. No. 16-1 at 2. Although the email was rescinded without explanation roughly a week later, Dkt. No. 16-2 at 2, this federal agency action in response to the Order emphatically demonstrates that "this wolf comes as a wolf." *Morrison v. Olson,* 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). "Because the Executive Order unambiguously commands action, here there is more than a mere possibility that some agency might make a legally suspect decision." *City & Cnty. of San Francisco*, 897 F.3d at 1240 (internal quotation marks omitted). The savings clause cannot salvage the clear meaning of the Executive Order. *PFLAG*, No. 1:25-cv-00337-BAH, Dkt. No. 62 at 30 ("Where, as here, the plain text and stated purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without Congressional authorization, the mere inclusion of the phrase 'consistent with applicable law' cannot insulate these Executive Orders from review.").

> 3. <u>Plaintiffs Have Shown That They are Likely to be Irreparably Harmed</u>

Plaintiffs allege that they and Plaintiff Physicians' patients will face irreparable harm if Sections 4 and 8(a) of the Order are implemented. Dkt. No. 11 at 22–26. In response, Defendants merely recycle the same ripeness argument the Court rejected above, averring that harm is merely "speculative" because the Executive Order "has not been applied to any specific funding or grants." Dkt. No. 136 at 27.

Defendants' argument is disingenuous at best. It ignores the Executive Order's directive for agencies to take immediate action on the Order, Dkt. No. 17-1 at 3, the overt step taken by HRSA to implement the Order, Dkt. No. 16-1 at 2, and the White House's Press Release declaring that the Order was "already having its intended effect," Dkt. No. 17-9 at 2. As the Court discussed above, Plaintiffs have shown that the Executive Order threatens immediate and irreparable injuries. These include, but are not limited to, the constitutional rights violations outlined above, *Melendres*

*v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), the loss of hundreds of millions of dollars in federal funding (as well as its devastating consequences for all manner of medical research and treatment), the threat of criminal prosecution under the false guise of the female genital mutilation statute, and the serious harms caused to transgender youth by depriving them of gender-affirming care. With respect to the latter, as Physician 1 attests, discontinuing puberty-delaying medications or gender-affirming hormones can result in "permanent puberty changes that d[o] not align with [an individual's] gender identity," which "will likely require surgery in the future to reverse"—ultimately increasing the number of medical procedures an individual will have to undergo. Dkt. No. 14 at 8–9. Physician 2 adds that discontinuing such gender-affirming care can cause puberty changes within a month, resulting in "higher rates of anxiety, depression, and suicidal ideation." Dkt. No. 15 at 11–12 ("I would expect many of these youth would not want to leave their home as their body starts changing in ways that they find distressing. I anticipate these youth would experience significant social withdrawal, difficulty attending school, and struggle to excel in school. I expect there to be overall mental health crises for the vast majority of transgender and gender-diverse youth."). In fact, the severity of the impact to transgender youth's mental health from "suddenly hav[ing] their medications ripped away" leaves Physician 1 "certain" that "[t]here are going to be young people who are going to take their lives if they can no longer receive this care." Dkt. No. 13 at 9.

It is clear that, in the absence of the temporary relief Plaintiffs request, serious and irreparable harm will follow.

### 4.  The Balance of Equities and Public Interest Lie in Plaintiffs' Favor

Finally, the Court finds that the balance of equities and the public interest strongly weigh in favor of entering a preliminary injunction. These two factors merge when the federal government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The rule of law is secured by a

strong public interest that the laws "enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (cleaned up). Indeed, "the public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services." *City & Cnty. of San Francisco*, 897 F.3d at 1244. And constitutional violations weigh heavily in favor of an injunction. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024). Any hardship suffered by Defendants pales in comparison to the irreparable harms likely to befall Plaintiffs.[15]

## III.  CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for a Temporary Restraining Order. Dkt. No. 11.

Dated this 16th day of February, 2025.

Lauren King
United States District Judge

---

[15] Because Defendants have shown no evidence of a likelihood of harm, monetary or otherwise, from the TRO, the Court declines to require Plaintiffs to post a bond. Fed. R. Civ. P. 65(c).