The Honorable Lauren King

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

STATE OF WASHINGTON; STATE OF
MINNESOTA; STATE OF OREGON;
STATE OF COLORADO;
PHYSICIAN PLAINTIFF 1;
PHYSICIAN PLAINTIFF 2; and
PHYSICIAN PLAINTIFF 3,

Plaintiffs,

v.

DONALD J. TRUMP, in his official
capacity as the President of the United
States; U.S. DEPARTMENT OF JUSTICE;
PAM BONDI, in her official capacity as the
United States Attorney General;
U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F.
KENNEDY, JR., in his official capacity as
the Secretary of Health and Human
Services; U.S. DEPARTMENT OF
AGRICULTURE; BROOKE ROLLINS, in
her official capacity as the Secretary of
Agriculture; U.S. DEPARTMENT OF
COMMERCE; HOWARD LUTNICK, in
his official capacity as the Secretary of
Commerce; U.S. DEPARTMENT OF
DEFENSE; PETE HEGSETH, in his official
capacity of the Secretary of Defense;
U.S. DEPARTMENT OF EDUCATION;
DENISE L. CARTER, in her official
capacity as the Acting Secretary of
Education; U.S. DEPARTMENT OF
ENERGY; CHRIS WRIGHT, in his official
capacity as the Secretary of Energy;

NO. 2:25-cv-00244-LK

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  U.S. DEPARTMENT OF VETERANS
   AFFAIRS; DOUGLAS A. COLLINS, in his
2  official capacity as the Secretary of Veterans
   Affairs; NATIONAL AERONAUTICS
3  AND SPACE ADMINISTRATION;
   JANET PETRO, in her official capacity as
4  the Acting Administrator of the National
   Aeronautics and Space Administration;
5  NATIONAL SCIENCE FOUNDATION;
   SETHURAMAN PANCHANATHAN, in
6  his official capacity as the Director of the
   National Science Foundation; OFFICE OF
7  THE DIRECTOR OF NATIONAL
   INTELLIGENCE; TULSI GABBARD, in
8  her official capacity as the Director of
   National Intelligence; U.S. AGENCY FOR
9  INTERNATIONAL DEVELOPMENT;
   MARCO RUBIO, in his official capacity as
10 Acting Administrator for the U.S. Agency
   for International Development; U.S.
11 DEPARTMENT OF THE TREASURY;
   SCOTT BESSENT, in his official capacity
12 as the Secretary of the Treasury; U.S.
   DEPARTMENT OF TRANSPORTATION;
13 SEAN DUFFY, in his official capacity as
   the Secretary of Transportation; U.S.
14 SMALL BUSINESS ADMINISTRATION;
   EVERETT WOODEL, JR., in his official
15 capacity as the Acting Administrator for the
   U.S. Small Business Administration; and the
16 UNITED STATES OF AMERICA,

17                      Defendants.[1]

## I.    INTRODUCTION

19         1.      On January 28, 2025, President Trump issued a sweeping Executive Order that

targets transgender and gender-diverse youth and their medical providers by trying to cut off

access to necessary, often life-saving, health care. The Executive Order attempts to dictate

medical care by executive fiat.

           2.      The Executive Order is a cruel and baseless broadside against transgender people

under age 19, their families, and the doctors and medical institutions that provide them this

critical care. It is an official statement of bigotry from the President that directs agencies to

---

[1] Several Defendants have been substituted pursuant to Fed. R. Civ. P. 25(d).

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

2

openly discriminate against vulnerable youth on the basis of their transgender status and sex. It is also a blatant abuse of power. The Executive Order usurps spending and legislative powers belonging exclusively to Congress, and seizes the States' historic police powers to regulate the practice of medicine in violation of the Tenth Amendment.

3. It cannot stand.

4. Executive Order 14,187, is titled "Protecting Children from Chemical and Surgical Mutilation," but that title is false and repugnant. This Complaint will refer to it as "the Denial-of-Care Order."

5. Relevant to this lawsuit, Section 4 of the Denial-of-Care Order directs agencies to "immediately" cut off federal research and education grants to medical institutions, including hospitals and medical schools, that provide gender-affirming care. Exec. Order No. 14,187 § 4; 90 C.F.R. § 8771 (cited as E.O. 14,187). Absent an injunction, the Denial-of-Care Order will terminate over one billion dollars of federal funding to the Plaintiff States' medical schools and hospitals that is used to research and treat hundreds of conditions having nothing to do with gender-affirming care, including cancer, AIDS, diabetes, substance use disorder, mental health conditions, autism, aging, cardiovascular diseases, maternal health, and so much more.

6. The same Executive Order, through Section 8(a), threatens baseless criminal prosecutions against providers by weaponizing a statute prohibiting female genital mutilation of minors, despite the fact that transgender minors do not receive gender-affirming genital surgery, and despite the statute's exclusive application to "non-medical" procedures and express exceptions for medical care provided by a licensed practitioner. *See* E.O. 14,187 § 8(a)–(b); 18 U.S.C. § 116. The Denial-of-Care Order attempts to redefine non-surgical treatments for minors as "mutilation," but this is frivolous. The statute has no possible bearing on gender-affirming care. Rather, the Denial-of-Care Order invokes it solely to sow fear among providers and bully them out of providing gender-affirming care at all.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

7.      The Denial-of-Care Order followed on the heels of Executive Order 14,168, issued on January 20, 2025, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender-Ideology Order). The purpose and effect of the Gender-Ideology Order is to deny the existence of transgender individuals. The Gender-Ideology Order establishes a federal policy of recognizing only two sexes, male and female. It defines "sex" to mean "an individual's immutable biological classification as either male or female," which is "not a synonym for and does not include the concept of 'gender identity.'" Exec. Order No. 14,168 § 2(a); 90 C.F.R. § 8615 (cited as E.O. 14,168). The Order declares that gender identity is a "false" idea and seeks to eradicate "gender ideology," which it characterizes as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id*. § 2(f). To achieve this objective, among other things, Section 3(g) of the Gender-Ideology Order commands that federal funds "shall not be used to promote gender ideology." The Gender-Ideology Order directs all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology" and "take all necessary steps" to "end the Federal funding of gender ideology." *Id.* §§ 3(e), (g).

8.      Plaintiff State of Washington, through its instrumentality University of Washington (UW), operates a world-class medical school that is part of the integrated health system (UW Medicine). UW Medicine is comprised of multiple separate entities sharing a common mission to improve the health of the public. Physicians who are UW School of Medicine faculty provide gender-affirming medical care to adolescents and adults. UW School of Medicine receives approximately half a billion dollars in federal research and education grants, as well as other federal funding. The State of Washington operates the State's Medicaid and public health programs covering approximately 1.9 million people.

9.      Plaintiff State of Minnesota's residents include people who seek medically-necessary gender-affirming health care for themselves or on behalf of their minor children, as

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

well as providers of such care. Some of those providers are also recipients of federal research or education grants at risk as a result of the Denial-of-Care Order. In addition, the State of Minnesota regulates the practice of medicine within its state, as well as operates the State's Medicaid and public health programs providing health care coverage for approximately 1.3 million people. The State of Minnesota has a strong interest in protecting the rights and abilities of its residents in seeking and providing medically-necessary care, in preserving its ability to regulate the provision of medical care and the practice of medicine within its border, and in ensuring the operation of its state health insurance and Medicaid programs with coverage for medically-necessary health care services and in accordance with its state laws.

10.     Plaintiff State of Oregon oversees and regulates state-created public corporations providing education and health care service functions on behalf of the State of Oregon, as instrumentalities of the State. Within Oregon, the Oregon Health & Science University (OHSU), Oregon State University (OSU), and other state entities and instrumentalities provide gender-affirming care and receive federal grants and federal funding.

11.     Plaintiff State of Colorado oversees and regulates state-created public corporations providing education and health care service functions on behalf of the State of Colorado, as instrumentalities of the State. Within Colorado, the University of Anschutz Medical Campus (AMC) faculty provide gender-affirming medical care to patients under the age of 19.

12.     The Denial-of-Care and Gender-Ideology Orders are immediately effective according to their terms and have already been relied on by the Trump Administration to command Plaintiffs to cease performing gender-affirming care and halt research. E.O. 14,187 § 4; E.O. 14,168 §§ 3(e), (g).

13.     The Denial-of-Care Order also threatens the Physician Plaintiffs and other providers in the Plaintiff States with baseless criminal prosecutions for providing medically appropriate and necessary health care to transgender and gender-diverse patients that is lawful in the Plaintiff States, supported by the overwhelming consensus of medical professionals, and

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    plainly not covered by the statute at issue. The Denial-of-Care Order by itself constitutes a
2    credible threat of criminal enforcement; there is no other way to read it. Further, given the context
3    of President Trump's repeated promises on the campaign trail, and the actions he's already taken
4    in his first 31 days in office, the President's intent to use the Department of Justice to terrorize
5    and criminalize providers of gender-affirming care and families of youth who receive such care
6    cannot be denied.

7         14.    The effect of the Denial-of-Care Order on providers of gender-affirming care,
8    transgender and gender-diverse people, and their families has been immediate and severe.
9    Providers fear for their physical and legal safety. And they are afraid to provide medical care
10   that they know is evidence based, lawful where they practice, and can save their patients' lives.
11   Indeed, some have already stopped providing care, feeling compelled to cancel scheduled
12   appointments for fear of federal law enforcement harassment or loss of medical research and
13   education grants.

14        15.    The Denial-of-Care and Gender-Ideology Orders purport to "protect" youth and
15   women, but the Orders *harm* them. The Orders have already, and will continue, to limit
16   physicians' ability to treat patients' gender dysphoria, as well as the unavoidable, grave harm to
17   the health and wellbeing of transgender youth if they are prohibited from receiving necessary
18   medical care, including debilitating anxiety, severe depression, self-harm, and suicide that can
19   accompany untreated dysphoria.

20        16.    The Denial-of-Care and Gender-Ideology Orders are blatantly unconstitutional.
21   They violate the right to Equal Protection guaranteed by the Fifth Amendment to the United
22   States Constitution because they single out one vulnerable group for mistreatment. The Denial-
23   of-Care Order singles out for restriction and criminalization medical treatments that affirm a
24   patient's gender if inconsistent with that patient's sex. The Gender-Ideology Order likewise
25   restricts grants used to support medical treatments that affirm a patient's gender if inconsistent
26   with that patient's sex. The Denial-of-Care and Gender-Ideology Orders are acts of malice

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK                                6                ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA  98104
                                                                        (206) 464-7744

1    against transgender and gender-diverse people, are not supported by an exceedingly persuasive

2    justification (let alone any legitimate government interest), and this Court should declare the

3    Orders unlawful as applied to the Plaintiffs and enjoin Defendants from implementing and

4    enforcing them.

5        17.    The Denial-of-Care and Gender-Ideology Orders also violate constitutional

6    separation of powers by usurping Congress's legislative powers and exclusive power of the

7    purse. None of the federal funding that medical institutions, including UW School of Medicine,

8    OHSU, OSU, and other similarly situated entities receive is conditioned on a promise by the

9    institutions that they would deny gender-affirming care to their patients under 19 years of age.

10   Congress has never imposed such a condition, and it is unconstitutional for the President to do

11   so via executive fiat.

12       18.    And finally, the Denial-of-Care Order violates the Tenth Amendment and

13   separation of powers. Regulation of the medical profession is a core, traditional exercise of the

14   States' police powers. Congress itself has not criminalized gender-affirming care and has

15   explicitly carved out the practice of medicine from federal regulation. The President cannot

16   unilaterally, and without any Congressional authorization whatsoever, interfere with the States'

17   prerogatives by criminalizing the provision of safe, effective, and necessary medical care.

18                        **II.    JURISDICTION AND VENUE**

19       19.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

20   This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C.

21   §§ 2201(a) and 2202.

22       20.    Venue is proper in the Western District of Washington under 28 U.S.C.

23   §§ 1391(b)(2) and (e)(1) because this is an action against an officer, employee, and/or agency of

24   the United States, the Defendants are residents of the Western District of Washington, and a

25   substantial part of the events or omissions giving rise to this action have occurred in the Western

26   District of Washington.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

III.    PARTIES

A.    Plaintiffs

21.    Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. As an operator of medical facilities that provides gender-affirming medical care and as a recipient of federal research and education grants, Washington is directly subject to the Denial-of-Care and Gender-Ideology Orders through its instrumentality UW and has standing to vindicate its proprietary interests in delivering high-quality, evidence-based patient care and cutting-edge medical research. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

22.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota's Attorney General, Keith Ellison, is the chief law enforcement officer of Minnesota and is authorized under Minnesota Statutes Chapter 8 and has common law authority to bring this action on behalf of the State and its residents, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of—and provide full relief for—violations of the law.

23.    Plaintiff State of Oregon, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Dan Rayfield is Oregon's chief law enforcement officer. The State of Oregon created OHSU to provide education and health care service functions on behalf of the state. OHSU is a public corporation and instrumentality of the state, and is Oregon's comprehensive public academic health center. Along with Oregon's other public universities, OHSU provides gender-affirming medical care and receives federal research and education grants. Oregon is thus subject to the Denial-of-Care and Gender-Ideology Orders through its state universities and instrumentalities and has standing to vindicate its proprietary interest in ensuring its residents receive high-quality, life-saving patient care, medical research, and education.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

24.    Plaintiff State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign state of the United States of America. The Attorney General acts as the chief legal representative of the state, and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

25.    Together, the States of Washington, Minnesota, Oregon, and Colorado are referred to as the Plaintiff States.

26.    Physician Plaintiff 1 is a UW School of Medicine faculty member licensed by the Washington Medical Commission and board certified by the American Board of Pediatrics in Pediatrics and Adolescent Medicine. Physician Plaintiff 1 is an Assistant Professor in the UW School of Medicine, Department of Pediatrics and is an attending physician at a Seattle hospital where they provide gender-affirming medical care to adolescent patients. Physician Plaintiff 1 receives federal research grant funding at the medical institution where they provide gender-affirming medical care.

27.    Physician Plaintiff 2 is a medical doctor licensed by the Washington Medical Commission and certified by the American Board of Pediatrics in Pediatrics and Endocrinology. Physician Plaintiff 2 is an Assistant Professor in the UW School of Medicine, Department of Pediatrics and is an attending physician at a Seattle hospital where they provide gender-affirming medical care to adolescent patients.

28.    Physician Plaintiff 3 is a medical doctor licensed by the Washington Medical Commission and certified by the American Board of Pediatrics in Pediatrics and Endocrinology. Physician Plaintiff 3 is an Assistant Professor in the UW School of Medicine, Department of Pediatrics and is an attending physician at a Seattle hospital where they provide gender-affirming medical care to adolescent patients.

29.    Together, Physician Plaintiffs 1, 2, and 3 are referred to as the Physician Plaintiffs.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

30. The Plaintiff States and the Physician Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the President's Executive Orders, which target federal funding received by the Plaintiff States' medical institutions pursuant to congressional appropriations and purport to condition that funding on the state institutions' denying gender-affirming care to people under the age of 19 threatens critical aspects of the States' institutions' functions and mission. For example, the UW School of Medicine receives $494 million in research and education grants, of which $417 million were received from the United States Department of Health and Human Services. For another example, OHSU received more than $413 million in federal research grants and contracts in 2023, of which National Institutes of Health (NIH) grants and contracts made up $297 million. Under the terms of the Denial-of-Care and Gender-Ideology Orders, at minimum, more than one billion dollars in federal funding is now illegally conditioned on state institutions' and instrumentalities' denial of gender-affirming care.

31. The Plaintiff States are also aggrieved in their sovereign capacity. The Denial-of-Care and Gender-Ideology Orders usurp both Congress's exclusive spending and legislative powers, and the Denial-of-Care Order usurps the States' historic police powers to regulate the practice of medicine reserved to States under the Tenth Amendment. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (recognizing the state's powers to regulate medical professions from "time immemorial").

32. The Physician Plaintiffs are also aggrieved and have standing because the Denial-of-Care Order directs the Department of Justice to "prioritize" bad-faith criminal prosecutions based on their provision of necessary medical care that is lawful in the Plaintiff States. Among other things, it purports to redefine non-surgical hormonal treatment as genital mutilation based on a frivolous reading of a federal statute and threatens providers with criminal sanctions. The Denial-of-Care Order thus constitutes a credible and imminent threat of criminal prosecution against the Physician Plaintiffs who provide gender-affirming care. By defunding and

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   threatening to prosecute gender-affirming care, the Denial-of-Care Order also forces the

2   Physician Plaintiffs into an impossible choice between complying with the Denial-of-Care Order

3   or violating their ethical obligations to their patients to provide them medically necessary, non-

4   discriminatory, and appropriate care consistent with the standard of care, which is often gender-

5   affirming care. It also harms the Plaintiff States through their instrumentalities, including the

6   UW School of Medicine and OHSU, which have faculty physicians who provide gender-

7   affirming medical care. It impedes these instrumentalities' public-health mission by threatening

8   prosecution for providing medically necessary health care. It also impedes their ability to

9   effectively train their medical fellows and residents in providing this care.

10  **B.    Defendants**

11         33.    Defendant Donald J. Trump is the President of the United States and is sued in

12  his official capacity. President Trump oversees the Executive Office of the President, which

13  includes but is not limited to components such as the Office of National Drug Control Policy.

14         34.    The Executive Office of the President, through the Office of National Drug

15  Control Policy, provides federal research or education grants through direct contracts or

16  subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and

17  is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by

18  issuing regulations, policies, and guidance consistent with the Orders.

19         35.    The Department of Justice (DOJ) is a federal cabinet agency of the United States

20  and is responsible for investigating and prosecuting alleged violations of United States criminal

21  law. DOJ has been directed by the Denial-of-Care Order to investigate and prosecute physicians

22  who provide medically appropriate and necessary gender-affirming care, under a statute that

23  clearly has no application. DOJ includes subagencies and components, which include but are not

24  limited to the Federal Bureau of Investigation and U.S. Attorneys' Offices.

25         36.    Defendant Pam Bondi is the Attorney General of the United States and is sued in

26  her official capacity.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

37.    Defendant U.S. Department of Health and Human Services (HHS) is a federal cabinet agency that provides federal research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine and OHSU, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders. HHS includes subagencies and components, which include but are not limited to the Health Resources and Services Administration; National Institutes of Health; National Institute on Drug Abuse; National Center for Advancing Translational Sciences; National Eye Institute; National Heart, Lung, and Blood Institute; National Institute on Aging; Centers for Disease Control and Prevention; Center for Medicare & Medicaid Services; and Substance Abuse and Mental Health Services Administration.

38.    Defendant Robert F. Kennedy, Jr. is the Secretary of Health and Human Services and is sued in his official capacity. He oversees the research and education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine and OHSU, through HHS.

39.    Defendant U.S. Department of Agriculture (USDA) is a federal cabinet agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders. USDA includes subagencies and components, which includes but is not limited to the National Institute of Food and Agriculture.

40.    Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity. She oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through USDA.

41.    Defendant U.S. Department of Commerce (DOC) is a federal cabinet agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States'

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  medical institutions, including to UW School of Medicine, and is responsible for implementing

2  the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and

3  guidance consistent with the Orders.

4      42.     Defendant Howard Lutnick is the Secretary of Commerce and is sued in his

5  official capacity. He oversees the research or education grants provided to Plaintiff States'

6  medical institutions, including to UW School of Medicine, through DOC.

7      43.     Defendant U.S. Department of Defense (DOD) is a federal cabinet agency that

8  provides research or education grants through direct contracts or subcontracts to Plaintiff States'

9  medical institutions, including to UW School of Medicine, and is responsible for implementing

10  the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and

11  guidance consistent with the Orders. DOD includes subagencies and components, which include

12  but are not limited to the Defense Advance Research Projects Agency and Defense Threat

13  Reduction Agency.

14      44.     Defendant Pete Hegseth is the Secretary of Defense and is sued in his official

15  capacity. He oversees the research or education grants provided to Plaintiff States' medical

16  institutions, including to UW School of Medicine, through DOD.

17      45.     Defendant U.S. Department of Education (ED) is a federal cabinet agency that

18  provides research or education grants through direct contracts or subcontracts to Plaintiff States'

19  medical institutions, including to UW School of Medicine, and is responsible for implementing

20  the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and

21  guidance consistent with the Orders. ED includes subagencies and components, which include

22  but are not limited to the Institute of Education Sciences.

23      46.     Defendant Denise L. Carter is the Acting Secretary of Education and is sued in

24  her official capacity. She oversees the research or education grants provided to Plaintiff States'

25  medical institutions, including to UW School of Medicine, through ED.

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

47.     Defendant U.S. Department of Energy (DOE) is a federal cabinet agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders.

48.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through DOE.

49.     Defendant U.S. Department of Veterans Affairs (VA) is a federal cabinet agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders. The VA includes subagencies and components, which include but are not limited to the VA Puget Sound Health Care System and Veterans Health Administration.

50.     Defendant Douglas A. Collins is the Secretary of Veterans Affairs and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through the VA.

51.     Defendant National Aeronautics and Space Administration (NASA) is a federal agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders.

52.     Defendant Janet Petro is the Acting Administrator of NASA and is sued in her official capacity. She oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through NASA.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

53.     Defendant National Science Foundation (NSF) is a federal agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders.

54.     Defendant Sethuraman Panchanathan is the Director of NSF and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through NSF.

55.     Defendant Office of the Director of National Intelligence (ODNI) is a federal agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders.

56.     Defendant Tulsi Gabbard is the Director of National Intelligence and is sued in her official capacity. She oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through ODNI.

57.     Defendant U.S. Agency for International Development (USAID) is a federal agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders. USAID includes subagencies and components, which include but are not limited to the Agency for Healthcare Research & Quality.

58.     Defendant Marco Rubio is the Acting Administrator for USAID and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through USAID.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

59.     Defendant U.S. Department of the Treasury (Treasury) is a federal cabinet agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders.

60.     Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through the Treasury.

61.     Defendant U.S. Department of Transportation (DOT) is a federal cabinet agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to UW School of Medicine, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders. DOT includes subagencies and components, which includes but is not limited to the National Highway Traffic Safety Administration.

62.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to UW School of Medicine, through DOT.

63.     Defendant U.S. Small Business Administration (SBA) is a federal agency that provides research or education grants through direct contracts or subcontracts to Plaintiff States' medical institutions, including to OHSU, and is responsible for implementing the Denial-of-Care and Gender-Ideology Orders, including by issuing regulations, policies, and guidance consistent with the Orders.

64.     Defendant Everett Woodel, Jr. is the Acting Administrator for SBA and is sued in his official capacity. He oversees the research or education grants provided to Plaintiff States' medical institutions, including to OHSU, through SBA.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

65.    Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Denial-of-Care and Gender-Ideology Orders.

## IV.    FACTUAL ALLEGATIONS

### A.    Gender-Affirming Care Is Medically Appropriate and Necessary Health Care

66.    Gender-affirming care is health care explicitly protected by laws in the Plaintiff States and is supported by overwhelming medical consensus, including the American Academy of Family Physicians, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, the American Medical Association, the American Psychological Association, and the Pediatric Endocrine Society, among others. Gender-affirming care supports the health of transgender and gender-diverse people by helping them to live consistently with their gender identity.[2] Such care is multidimensional and can include social support, medication, psychiatric and psychological support, and surgical procedures provided by a range of medical professionals.

67.    "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex. Everyone has a gender identity. A person's gender identity has a strong biological basis, but the precise causal mechanism is unknown. Several different factors including prenatal hormonal exposure, genetic factors, and brain structure may all contribute to a person's gender identity. A person's gender identity cannot be changed by medical or psychological intervention.

68.    Generally, when a child is born, a health care provider or someone else assigns the child a sex. Usually, the sex assigned at birth is consistent, or congruent, with that person's gender identity. Other times the sex assigned at birth turns out to be different from, or incongruent with, the person's innate gender identity. Such individuals are commonly referred

---

[2] Plaintiffs use the term "transgender and gender-diverse" to refer inclusively to the population of youth targeted by the Denial-of-Care and Gender-Ideology Orders, understanding that the Orders impact people who are nonbinary, two-spirit, intersex, genderqueer, and genderfluid, among others.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    to as transgender or gender diverse, but individual people vary in the words they use to express

2    the incongruence between the sex they were assigned at birth and their innate gender identity.

3        69.    If a person's sex assigned at birth is incongruent with their innate gender identity,

4    this can cause varying degrees of gender dysphoria, a serious medical condition. Gender

5    dysphoria is a medical diagnosis contained in the American Psychiatric Association's *Diagnostic*

6    *and Statistical Manual of Mental Disorders*, fifth edition (DSM). The DSM defines gender

7    dysphoria as "a marked incongruence between one's experienced/expressed gender and their

8    assigned gender" which is "associated with clinically significant distress or impairment in social,

9    occupational, or other important areas of functioning."

10        70.    Gender dysphoria is readily treated with gender-affirming care. Gender-affirming

11    care for minors is well-established as the standard of care for treating gender dysphoria. The

12    level of evidence supporting clinical practice guidelines and recommendations regarding gender-

13    affirming care for adolescents is comparable to the level of evidence supporting many other

14    pediatric medical treatments, including treatments for pediatric obesity, congenital adrenal

15    hyperplasia, and central precocious puberty.

16        71.    The Endocrine Society, an international medical organization of over 18,000

17    endocrinology researchers and clinicians, has published a clinical practice guideline for the

18    treatment of gender dysphoria. These include puberty-blocking medications and gender-

19    affirming hormone therapy.

20        72.    Gender-affirming care is also the recommended treatment for gender dysphoria

21    by the World Professional Association for Transgender Health's (WPATH's) Standards of Care

22    for the Health of Transgender and Gender Diverse People, which is currently in its eighth version

23    (SOC-8).

24        73.    Puberty-blocking medications may be prescribed to transgender or gender-

25    diverse adolescents at the onset of puberty to delay puberty. These help to prevent the

26    development of physical characteristics that conflict with the adolescent's gender identity.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

74.    Gender-affirming hormone therapy is the prescription of gender-affirming hormones. The result of this therapy is that a transgender boy or man typically has the same levels of circulating testosterone as other boys or men. Similarly, a transgender girl or woman will typically have the same levels of circulating estrogen and testosterone as other girls or women.

75.    Research and clinical experience both show that treating gender dysphoria in adolescents with gender-affirming care is safe and effective. Patients receiving gender-affirming care have high rates of satisfaction and low incidence of regret. Available studies report that rates of regret for gender-affirming care is exceptionally low, between about 0.3 and 1.1 percent—much lower than, for example, knee replacements (10%), tattoos (16%), or having children (7%). Based on longitudinal data and clinical experience, when transgender adolescents are provided with gender-affirming care and have parental and social support, they are more likely to thrive and grow into healthy adults.

76.    If left untreated, however, gender dysphoria can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and suicidality. According to one study, a staggering 82% of transgender individuals have considered suicide, and 40% have attempted it. Rates of suicidality are highest among transgender youth who do not receive gender-affirming care and lack community and parental support. In such circumstances, gender-affirming care is life-saving, medically necessary care. When transgender and gender-diverse youth have access to gender-affirming care and supportive communities, however, their rates of suicidality are on par with their cisgender peers. As one Washington healthcare professional puts it, "gender-affirming care is a life-giving treatment."

77.    Patients under consideration for gender-affirming treatment work with providers to ensure that each treatment decision is informed and appropriate. Like any other medical intervention, this process is done thoughtfully and carefully with the patient and family in the best interest of the adolescent. Physicians providing gender-affirming care must be trained and

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  qualified in gender identity concerns and participate in this care out of a desire to improve the

2  health and wellness of transgender and gender-diverse people and prevent negative outcomes

3  such as depression and suicide.

4          78.    Starting puberty-blocking medications in early puberty prevents adolescents with

5  gender dysphoria from developing secondary sex characteristics inconsistent with their gender

6  identity, for so long as the medication is taken. Development of such characteristics, like

7  deepening of the voice, hair growth, muscular changes, and breast development, can be

8  extremely distressing for them. Further, these characteristics may be difficult, if not impossible,

9  to reverse once the characteristics have fully developed. Adolescent patients experiencing

10  significant distress at the onset of puberty routinely have dramatic improvements in mood,

11  school performance, and quality of life with appropriate use of puberty-delaying medication.

12  One parent said of their child: "The minute the puberty blocker was in place she came back to

13  life. She became happy and had increased energy. She came back to being the person we knew

14  her to be." Side effects are similar to those seen in patients treated with these medications for

15  conditions other than gender dysphoria, such as precocious puberty, and are easily managed.

16          79.    Gender-affirming hormone therapy is highly beneficial for both short-term and

17  long-term psychological functioning of adolescents with gender dysphoria. Gender-affirming

18  hormone therapy is associated with improvement in various mental health parameters including

19  depression, anxiety, self-confidence, body image and self-image, and general psychological

20  functioning. One physician noted that after receiving gender-affirming care, her patients

21  "appear to bloom." Another "witness[ed] adolescents who come in anxious, avoiding eye

22  contact, and feeling heavy and hopeless, transform into patients feeling like they have hope."

23  One parent said that since beginning hormone therapy their child is "thriving" and has "become

24  so much happier." Another parent said hormone therapy is an "essential part" of her daughter's

25  health and well-being and said "[s]eeing her happy again helped reassure me that my daughter

26  was in less danger of self-harm or suicide."

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

80.     In the adolescent patient population, gender-affirming chest surgery (specifically removal of breast tissue in transgender young men) may be recommended as part of an individualized gender-affirming treatment plan for adolescents. Genital surgeries, however, are reserved for adults (age 18 and older) and much less common.

81.     The Physician Plaintiffs see the benefit of gender-affirming in their practices. Physician Plaintiff 1 had a patient who "was experiencing frequent suicidal ideation prior to receiving puberty delaying medications and Testosterone, [and] is now president of his high school class." Physician Plaintiff 2 has patients who, when they begin to seek care, "don't want to leave their room or their house because they don't feel comfortable in their bodies." But with gender-affirming care "they are like a new person—so much happier and engaged in life." Physician Plaintiff 3 describes a patient who was diagnosed with anorexia when they met, because he was trying to "decrease his weight in order to stop his body from developing." After treatment with gender-affirming care, he was able to complete an anorexia program and "developed a regular exercise routine to gain muscle." Now applying to college at Ivy League schools, Physician Plaintiff 3 "couldn't be prouder of him."

82.     But Physician Plaintiffs have also seen the devastating impact caused by a lack of access to gender-affirming care. Physician Plaintiff 1 has treated patients who had to uproot their lives after the state they lived in banned gender-affirming care. "Many have left their communities and support systems behind abruptly and arrive in Washington with little support." Physician Plaintiff 2 has "seen patients forced to undergo permanent puberty changes that did not align with their gender identity after losing access to puberty-delaying medications, which caused significant anxiety and depression and will likely require surgery in the future to reverse the changes that occurred."

83.     Washington State has an explicit policy to promote the availability of gender-affirming care for those who need it. Wash. Rev. Code § 74.09.675 requires the Washington State Health Care Authority and programs, and providers who offer services through the Health

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    Care Authority, to cover or offer gender-affirming care. Wash. Rev. Code § 48.43.0128 similarly

2    requires privately offered health plans issued or renewed on or after January 1, 2022, to cover

3    gender-affirming care. And the Washington Law Against Discrimination prohibits

4    discrimination in the provision of health-related services on the basis of gender identity or

5    expression. Wash. Rev. Code §§ 49.60.030(1), .040(2), .040(29), .215.

6         84.    Minnesota has similar policies. Coverage for gender-affirming care for its

7    Medicaid and MinnesotaCare programs is required by Minn. Stat. § 256B.0625, subd. 3a.

8    Commercial insurance plans are required to provide the same coverage through

9    Minn. Stat. § 62Q.585. The Minnesota Human Rights Act provides comprehensive protections

10   in the areas of employment, housing, public services, government services, education, provision

11   of credit, and business for Minnesotans and includes protections related to "gender identity," as

12   defined by the Act. *See* Minn. Stat. §§ 363A.03, subd. 50; 363A.01 *et seq*. Minnesota enacted a

13   suite of robust protections through revisions and amendments to various laws in 2023,

14   establishing Minnesota as a "trans-refuge state," prohibiting enforcement of out-of-state laws

15   interfering in the provision of gender-affirming health care in Minnesota, reflecting the State's

16   policy to allow unrestricted access to medically-necessary health care. *See* 2023 Minn. Laws

17   Chap. 29 (Apr. 26, 2023).

18        85.    Oregon also has an explicit policy to promote the availability of gender-affirming

19   care. For example, Or. Rev. Stat. § 414.769 requires the Oregon Health Authority to cover and

20   not deny medically necessary gender-affirming care. Or. Admin. R. 836-053-0441 recognizes

21   the World Professional Association for Transgender Health's Standards of Care for the Health

22   of Transgender and Gender Diverse People as the "accepted standards of care" and requires

23   private health benefit plans to cover or offer gender-affirming care. Or. Rev. Stat. § 659.875 also

24   prohibits discrimination in the provision of benefits and health benefit plans delivered in the

25   State of Oregon.

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

86.    Colorado has similar policies. Coverage for gender-affirming care for its Medicaid recipients is required by 10 Code Colo. Regs. § 2505-10-8.735. Individual and small-group insurance plans are also required to provide coverage for gender-affirming care through 3 Code Colo. Regs. 702-4, Regulation 4-2-42, § 5(A)(1)(o).

87.    In 2023, Colorado became the first state in the country to explicitly include gender-affirming care services as essential health benefits through its benchmark health insurance plan. *See* Colorado Department of Regulatory Agencies, Biden Administration Announces Approval of Colorado's Inclusive Health Care Plan to Set Colorado's Essential Health Benefits, https://dora.colorado.gov/press-release/biden-administration-announces-approval-of-colorados-inclusive-health-care-plan-to (published Oct. 12, 2021).

88.    In Senate Bill 23-188, signed into law on April 14, 2023, the Colorado General Assembly determined that gender-affirming health care services are legally protected health care activities. Colo. Rev. Stat. § 12-30-121(2). As such, the Colorado Medical Board, the Colorado State Board of Nursing, and other affected health care regulatory boards may not deny licensure or otherwise impose disciplinary action against a licensee's license based solely on the licensee's provision of such care, so long as that care provided meets generally accepted standards of medical practice in Colorado. Colo. Rev. Stat. § 12-30-121(2)(a). In addition, Colorado law protects those who receive or licensees who provide gender-affirming care from lawsuits and criminal prosecution in other states. *See* Colo. Rev. Stat. §§ 12-30-121, 13-21-133.

**B.    UW School of Medicine and UW Medicine**

89.    The University of Washington is a world-class research and educational institution located in Seattle, Washington. It is an agency and instrumentality of Washington State. Wash. Rev. Code. ch. 28B.20.

90.    UW includes the UW School of Medicine. The UW School of Medicine is a leader in regional medical education and conducts world-leading research across 31 clinical and biomedical research departments and multiple research institutes and centers with areas of focus

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

including behavioral health, neuroscience and Alzheimer's disease, heart disease and stroke, infectious diseases, cancer, health metrics, genomics and precision medicine, protein design and regenerative medicine.

91.    In federal fiscal year 2024, UW School of Medicine received $494 million in federal research grants, of which $388 million were direct awards and $105 million were subcontracts.

92.    UW Medicine is an integrated clinical, research, and learning health system with a single mission to improve the health of the public. UW Medicine is a family of organizations that are operated or managed as part of an integrated health system. These organizations include UW Medical Center (Montlake and Northwest campuses), UW Medicine Primary Care, the UW School of Medicine, UW Physicians, Harborview Medical Center, and Airlift Northwest.

93.    UW Medicine strives to provide patient-centered and inclusive care to all patients, including transgender and gender non-binary patients.

94.    UW Medicine's Transgender and Gender Non-Binary Health Program provides gender-affirming medical care coordinated across a range of clinicians in the UW Medicine system to its adult patients.

95.    The UW School of Medicine Department of Pediatrics trains pediatric-focused clinicians and advances research to improve the health of all children and adolescents. Department faculty physicians provide primary and specialty pediatric care, including gender-affirming medical care, to minor patients when medically indicated and necessary to serve the patients' health needs.

96.    Gender-affirming medical care for patients under age 18 requires consent from a parent or guardian that has medical decision-making rights for that patient, unless the patient is an emancipated minor.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

C.      **Oregon Health & Science University**

97.     The Oregon Health & Science University is a research and educational institution located in Portland, Oregon. OHSU is a state-created public corporation that is an instrumentality of the State of Oregon.

98.     OHSU has a long tradition of leading-edge research, and houses a robust research program with more than 1,415 faculty investigators and 262 postdoctoral scholars, with faculty including members of the National Academy of Science, National Academy of Medicine, and National Academy of Inventors, the American Academy of Arts and Science, and recipients of the Lasker-DeBakey Award for Clinical Medical Research. OHSU has conducted vital research in important areas of modern medicine with the aid of federal funding, including novel imagining of the glymphatic system critical for brain health; identifying a pivotal gene capable of blocking immune responses to important vaccines for disease including HIV, malaria, and certain types of cancer; and identifying whole brain circuit risk factors for the occurrence of ADHD in children, among many other federally funded research projects.

99.     OHSU currently receives 1,209 federally funded grants. The loss of grant funding would impact at least 500 research programs and cause the loss of thousands of research staff positions, and hundreds of graduate students and postdoctoral fellows. OHSU also runs a Graduate Medical Education program that is one of the largest training programs of its kind in the country, training a total of 995 residents and fellows. This program depends upon federal funding and would be at risk of losing the program without such funding, which would have immediate impact upon Oregonians, as well as impact the future healthcare workforce.

D.      **The University of Colorado Anschutz Medical Campus**

100.    The University of Colorado Anschutz Medical Campus (AMC) is the largest academic medical center in the Rocky Mountain region and is at the forefront of transformative education, science, medicine and health care. The campus includes the University of Colorado health professional schools, including the University of Colorado School of Medicine (SOM) as

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

well as multiple centers and institutes. Faculty of the SOM as well as the other health professional schools provide nearly 2.6 million patient visits per year at the two nationally ranked independent hospitals located on the AMC, UCHealth University of Colorado Hospital and Children's Hospital Colorado. AMC is an instrumentality of the state of Colorado. Colo. Rev. Stat. § 23-20-101(1)(d); *see also* Colo. Const. art. 8, § 5. The University of Colorado Anschutz Medical Campus receives federal research and education grants and contracts. Faculty of the SOM and the other AMC health professional schools provide gender-affirming medical care to patients under the age of 19. Colorado is thus subject to the Orders through its state university and instrumentalities and has standing to vindicate its proprietary interest in ensuring its residents receive high-quality, life-saving patient care, medical research, and education.

101.    The University of Colorado AMC is a leader in medical/health care education and conducts ground-breaking medical research. The AMC supports more than 1,000 clinical trials with more than 14,000 enrollments in research studies last year in a broad array of investigations across the health spectrum. These clinical trials include new cancer therapies, studies of novel cardiovascular devices, and new approaches for Alzheimer's disease, among many others. Research at AMC is supported by annual awards of $360 million from the federal National Institutes of Health in federal fiscal year 2024.

102.    The loss of grant funding would impact the University of Colorado AMC's research programs and effectively bring the federally funded research and community-based programs to a halt, resulting in the pause or cancellation of clinical trials, and resulting in the loss of thousands of research staff positions, and hundreds of graduate students and postdoctoral fellows.

103.    Clinicians at the AMC health professional schools, including the SOM provide an interdisciplinary, family-centered model of care to support transgender and gender-diverse children and adolescents. This model is a best-practice standard of care grounded in scientific evidence. Research shows that access to behavioral health and supportive care has positive

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

effects on the mental and physical health of transgender and gender-diverse patients and their families. A core tenet of the model of care is that families, in consultation with a trusted healthcare team, know what is best for their child. All families, including those of transgender and gender-diverse children, should have the ability to seek and receive the expert medical care their child needs to thrive.

104.    Before the January 28, 2025 Executive Order, the model of care used by the AMC health care providers of the SOM as well as the other University of Colorado health professional schools, involved behavioral health assessment, connection to ongoing individual, group, and family therapies, puberty delaying medications and gender-affirming hormone therapies.

105.    Because of the threat posed by the Executive Order to University of Colorado AMC's ability to serve its patients who are Medicaid funded and the loss of federal research funds (not just related to gender-affirming care but for medical research spanning the pediatric and adult populations), AMC and it providers made the hard decision to alter the model of care to only provide new patients with behavioral and supportive care without the possibility of receiving puberty delaying medications or gender-affirming hormone therapies. They also are unable to provide these medications to patients who were previously undergoing behavioral and supportive care but had not completed their readiness assessments and approvals. Current patients who have been prescribed puberty delaying medications and gender-affirming hormone therapies have refills that will allow them to continue their treatment for the upcoming months, but they face the possibility that they will be unable to continue their treatment when those refills expire.

106.    By preventing or interrupting the ability of adolescent patients to initiate or continue puberty delaying medications and gender-affirming hormone therapies, the Executive Order causes immense harm to a vulnerable population of already marginalized patients. These patients already face discrimination, harassment, and bullying. Access to these treatments is important to support their wellbeing and sense of self. Denying access to medical interventions

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    that are known to be safe and effective threatens the ability of adolescents and young adults to

2    thrive socially and academically. Their marginalization will exacerbate dysphoria, mood

3    symptoms, and ultimately may cause some previously stable transgender youth to attempt

4    suicide.

5    **E.    Physician Plaintiffs**

6        107.    The Physician Plaintiffs provide gender-affirming care to minor patients. In doing

7    so, they spend a significant amount of time with patients and their families, discussing treatment

8    options and explaining their risks and benefits. The provider-patient relationship for gender-

9    affirming care is not transitory, and frequently lasts many years with visits multiple times a year.

10    The Physician Plaintiffs work hard to have close relationships with their patients and families

11    because treatment is most often successful when there is a deep level of trust and when the

12    providers understand the details of their patients' lives, and how particular treatment options will

13    impact them. This constitutes a close personal relationship.

14        108.    Moreover, that relationship is durable not just with the particular provider treating

15    the patient, but also with the clinic providing the treatment. The Physician Plaintiffs may

16    "inherit" patients who worked with other providers at the same institution. Patients, parents of

17    patients, UW faculty physicians providing gender-affirming care, UW School of Medicine, and

18    community mental health therapists all form a close community committed to providing

19    medically appropriate and necessary care for transgender and gender-diverse people.

20        109.    As medical doctors, the Physician Plaintiffs have ethical obligations to offer the

21    highest quality, evidence-based care to their patients. But the Denial-of-Care Order threatens the

22    Physician Plaintiffs with criminal investigation and prosecution, and threatens their medical

23    institutions with the loss of all research or education grants, if they provide medically indicated

24    gender-affirming care. E.O. 14,187 §§ 4, 8(a). The Denial-of-Care Order thus forces the

25    Physician Plaintiffs into an impossible choice between exposing themselves and their colleagues

26    to criminal investigation and prosecution and their employers to losing hundreds of millions in

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    federal research grants, or forsaking their ethical duties to their adolescent transgender and

2    gender diverse patients by withholding access to lawful and needed medical care. The Denial-

3    of-Care Order further requires the Physician Plaintiffs to violate their ethical obligations by

4    requiring them to withhold medications from their transgender and gender diverse patients but

5    provide them to cisgender patients for similar health care needs. There are instances where

6    gender-affirming medical care can be life-saving for a patient. It would be wholly at odds with

7    the Physician Plaintiffs' ethical obligations to require them to withhold life-saving medical care

8    from transgender or gender diverse youth.

9    110.    The Gender-Ideology Order also orders defunding of any federal grants that

10   "promote gender ideology," which includes federal research grants related to gender-affirming

11   care. E.O. 14,168 §§ 3(e), (g). The Gender-Ideology Order thus strips researchers and their

12   medical institutions of any federal research grants related to gender ideology, including research

13   related to gender-affirming care, depriving them of needed funds to continue ongoing research.

14   111.    The Denial-of-Care and Gender-Ideology Orders violate the rights of the

15   Physician Plaintiffs' transgender and gender-diverse patients. By restricting and criminalizing

16   medical care that affirms a minor's gender only where it is different from their sex assigned at

17   birth—the defining trait of being transgender—the Denial-of-Care and Gender-Ideology Orders

18   necessarily classify and discriminate against these patients based on transgender status and sex.

19   *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (applying heightened scrutiny to

20   discrimination based on transgender status); *see also Hecox v. Little*, 104 F.4th 1061, 1080

21   (9th Cir. 2024), *as amended* (June 14, 2024) (applying heightened scrutiny to discrimination

22   based on sex and transgender status). There is no justification for singling out gender-affirming

23   medical care for minors and criminalizing the medical decisions made by youth, their parents,

24   and their doctors.

25   112.    Transgender and gender-diverse adolescent patients are hindered from protecting

26   their own interests by bringing lawsuits of their own for several reasons. Most are minors who

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  lack capacity or financial resources to hire a lawyer to sue. Others may not be "out" at school or

2  in their neighborhood as transgender or gender diverse, exposing them to privacy and safety

3  risks. But most glaringly, the current targeting of the Physician Plaintiffs' patients and their

4  families by the federal government has created an atmosphere of terror for the vulnerable and

5  comparatively powerless patients of the Physician Plaintiffs. The Denial-of-Care Order

6  explicitly contemplates unleashing the force of the Department of Justice and felony criminal

7  prosecutions on families for seeking care. E.O. 14,187 § 8(a). Accordingly, the Physician

8  Plaintiffs bring this litigation to vindicate their own rights as well as the rights of their patients.

9  *See Singleton v. Wulff*, 428 U.S. 106 (1976).

10  **F.    Plaintiff States Closely Regulate the Medical Profession**

11      113.    Washington licenses or otherwise establishes qualifications for physicians and

12  other medical professionals. *E.g.*, Wash. Rev. Code ch. 18.71, ch. 18.79. It similarly licenses and

13  regulates hospitals. Wash. Rev. Code ch. 70.41. Medical professionals in Washington are subject

14  to discipline by the Washington State Department of Health. Wash. Rev. Code § 18.130.040.

15  The provision of, authorization of, recommendation of, aiding in, assistance in, referral for, or

16  other participation in any reproductive health care services or gender-affirming treatment

17  consistent with the standard of care in Washington by a license holder does not constitute

18  unprofessional conduct subject to discipline. Wash. Rev. Code § 18.130.450.

19      114.    The Washington State Department of Health has, consistent with its statutory

20  authority from the State Legislature, enacted a series of professional standards governing

21  medical professionals. *See generally* Wash. Admin. Code Title 246. Washington actively

22  enforces these standards and regularly brings actions against medical providers who violate

23  Washington's rules. *See*, *e.g.*, *Hiesterman v. Wash. State Dep't of Health*, 524 P.3d 693

24  (Wash. Ct. App. 2022); *Dang v. Wash. State Dep't of Health*, 450 P.3d 1189 (Wash. Ct. App.

25  2019); *Alsager v. Bd. of Osteopathic Med. & Surgery*, 384 P.3d 641 (Wash. Ct. App. 2016).

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

115.    The State of Minnesota similarly regulates the practice of medicine in the state through its Board of Medical Practice. *See* Minn. Stat. ch. 147, 214. The Board is charged with licensing and regulating the practice of medicine, establishing and enforcing qualifications for licensure and standards of practice, and educating practitioners and the public. The Board may discipline licensees for violations of the Minnesota Medical Practice Act. Minn. Stat. §§ 147.001–.381. The Board acts in this capacity as the sole authority on the licensure and regulator of physicians in the practice of medicine in the state. Gender-affirming care, including the provision of such care to individuals under the age of 19, is not prohibited by the Minnesota Medical Practice Act.

116.    Oregon licenses or otherwise establishes qualifications for physicians and other medical professionals operating in the state. *See generally* Or. Rev. Stat. ch. 677; Or. Admin. Rule ch. 847. Oregon similarly licenses and regulates hospitals. *See* Or. Admin. Rule ch. 333. Medical professionals are subject to regulation, oversight and discipline by Oregon. *See, e.g.*, Or. Rev. Stat. §§ 675.070, 675.540, 675.745, 677.190. The provision of, authorization of, recommendation of, aiding in, assistance in, referral for, or other participation in any gender-affirming care is consistent with the standard of care in Oregon. Or. Admin. Rule 836-053-0441. Oregon law further protects medical professionals from being disciplined or adverse action by malpractice insurers for providing gender-affirming care, or having their Oregon licensure revoked based upon adverse action taken against them for providing gender-affirming care by other states' licensing bodies. Or. Rev. Stat. §§ 675.070, 675.540, 675.745, 676.313, 677.190.

117.    The Oregon Health Authority and Oregon Medical Board, consistent with their state statutory authority, promulgate and enforce rules for professional medical standards in the State of Oregon.

118.    Colorado similarly licenses or otherwise establishes qualifications for physicians and other medical professionals. Colo. Rev. Stat. § 12-36-106.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    **G.    The Denial-of-Care Order**

2        119.    On January 28, 2025, President Trump issued Executive Order 14,187 titled

3    "Protecting Children from Chemical and Surgical Mutilation." By "chemical and surgical

4    mutilation," President Trump referred to medically appropriate and necessary gender-affirming

5    care, including puberty-delaying medication, gender-affirming hormone therapy, and gender-

6    affirming surgical interventions.

7        120.    The Denial-of-Care Order's language is gratuitous and abhorrent. It refers to

8    widely accepted, medically appropriate care as "mutilation" and accuses medical providers who

9    provide often life-saving care of "maiming and sterilizing . . . impressionable children."

10    E.O. 14,187 § 1. And worst of all, it directly attacks transgender youth (which it defines as those

11    under 19 years of age) and their families, claiming they are being misled, that their lived

12    experiences of gender dysphoria are "radical and false," and suggests their very existence is "a

13    stain on our Nation's history." *Id.*

14        121.    Although couched in the language of protecting children, the Denial-of-Care

15    Order does exactly the opposite. It hurts transgender and gender diverse children and their

16    families.

17        122.    The Denial-of-Care Order's dangerous rhetoric is coupled with explicit threats of

18    criminal prosecution for medical providers and parents.

19        123.    The Denial-of-Care Order asserts, contrary to all evidence, that gender-affirming

20    care results in adverse medical outcomes and that patients ultimately regret their choice to

21    receive gender-affirming care. *Id.* It asserts in Section 3, again without a shred of evidence, that

22    the medical consensus that gender-affirming care is safe and effective, and that gender identity

23    is an innate trait that may differ from one's sex assigned at birth, is "junk science." *Id.* § 3.

24        124.    The Denial-of-Care Order states that "it is the policy of the United States that it

25    will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one

26    sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1   life-altering procedures." *Id.* § 1. By "destructive and life-altering procedures," the Denial-of-

2   Care Order refers to medically appropriate and necessary gender-affirming care.

3       125.    In furtherance of this policy, designed explicitly to target transgender and gender-

4   diverse youth and their providers and make it more difficult for them to receive the care they

5   need, Section 4 of the Denial-of-Care Order directs "[t]he head of each executive department or

6   agency [] that provides research or education grants to medical institutions, including medical

7   schools and hospitals" to "*immediately* take appropriate steps to ensure that institutions receiving

8   Federal research or education grants end [gender-affirming care for children]." E.O. 14,187 § 4

9   (emphasis added).

10      126.    Section 4 of the Denial-of-Care Order is effective immediately by its terms. *Id*.

11  Moreover, President Trump and his administration proved their willingness to cut federal

12  funding with little or no notice when, on January 27, 2025, the Office of Management and Budget

13  issued a memorandum directing federal agencies to pause all federal funding by the next day.

14  And on January 29, 2025, the Office of Personnel Management instructed all federal agencies to

15  "[r]eview all agency programs, contracts, grants, and terminate any that promote or inculcate

16  gender ideology." This directive was set to go into effect by 5:00 p.m. Eastern Standard Time.

17  The effort was only stopped by an emergency injunction issued by a federal court. *New York v.*

18  *Trump*, Temporary Restraining Order, Case No. 25-cv-39-JJM-PAS (D.R.I. Jan. 31, 2025).

19      127.    Indeed, health care providers in the State of Washington and State of Oregon

20  received notices from the Department of Health and Human Services, Health Resources &

21  Services Administration (HRSA), that stated they must cease to use federal funds in a way that

22  conflicts with the Denial-of-Care and Gender-Ideology Orders. Even after the entry of a

23  Temporary Restraining Order by the U.S. District Court for the District of Rhode Island in

24  *New York v. Trump*, Case No. 1:25-cv-00039-JJM-PAS, the Department of Health and Human

25  Services commanded State health care providers to cease all "activities that do not align with

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

33

1    Executive Orders" including explicit citation to the Denial-of-Care and Gender-Ideology Orders

2    challenged here.

3         128.    Section 4 of the Denial-of-Care Order seriously harms the Plaintiff States'

4    medical institutions by conditioning the receipt of *all* federal research and education grants on

5    the cessation of medically appropriate and necessary medical care. Section 4 of the Denial-of-

6    Care Order is coercive in its effect on the Plaintiff States and its medical institutions.

7         129.    This coercion is plainly unlawful. Congress has not conditioned even one dollar

8    of the $494 million in federal research and education grants to the UW School of Medicine or

9    the $413 million to OHSU on the denial of gender-affirming care to youths. Similarly, no such

10   conditions exist for federal research and education grants to Oregon public entities, including

11   Oregon Health & Science University.

12        130.    Section 8(a) of the Denial-of-Care Order also immediately threatens providers

13   and families in the Plaintiff States. It directs the Attorney General to "review Department of

14   Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of

15   protections against female genital mutilation." E.O. 14,187 § 8(a).

16        131.    18 U.S.C. § 116 makes it a federal crime to perform female genital mutilation on

17   another person or for a parent or guardian to facilitate or consent to female genital mutilation.

18   Conviction under this statute carries a federal prison sentence of up to ten years. 18 U.S.C.

19   § 116(a).

20        132.    18 U.S.C. § 116 defines female genital mutilation as "any procedure performed

21   for *non-medical reasons* that involves partial or total removal of, or *other injury to*, the external

22   female genitalia." 18 U.S.C. § 116(e) (emphasis added).

23        133.    To be clear, genital surgery is not performed on transgender minors. But the

24   Denial-of-Care Order threatens to weaponize this federal statute against puberty blocking

25   medication and hormone therapy, which it defines as "chemical mutilation." In doing so, the

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  Denial-of-Care Order attempts to redefine these medically necessary treatments as federal

2  crimes.

3      134.    Lawful, state-regulated, medically appropriate and necessary gender-affirming

4  care is not female genital mutilation under 18 U.S.C. § 116. Nonetheless, the Denial-of-Care

5  Order directs the U.S. Department of Justice to target families and gender-affirming care

6  providers of transgender and gender-diverse youth with criminal investigations. E.O. 14,187

7  § 8(a).

8      135.    These effects are already being felt—as intended. Despite its facial illegality, the

9  Denial-of-Care Order nonetheless has already coerced providers and medical institutions to halt

10  gender-affirming care. Carla K. Johnson, et. al, *Some hospitals pause gender-affirming care to*

11  *evaluate Trump's executive order*, AP News (Jan. 30, 2025), https://apnews.com/article

12  /transgender-trump-executive-order-hormones-hospitals-8d9e6b94b34d2e6f890c06ebeba0fe1d

13  (reporting on institutions in Virginia, Colorado, and the District of Columbia reducing or

14  stopping care even for existing patients because of the Denial-of-Care Order); *see also* Mira

15  Lazine, *Handful of Hospitals Complying with Trump's Illegal Order to Stop*

16  *Trans Care Under 19 Years Of Age*, Erin in the Morning (Feb. 2, 2025),

17  https://www.erininthemorning.com/p/handful-of-hospitals-complying-with (similar); Emily

18  Alpert Reyes, *Children's Hospital L.A. stops initiating hormonal therapy for transgender*

19  *patients under 19*, L.A. Times (Feb. 4, 2025), https://www.latimes.com/california/story

20  /2025-02-04/childrens-hospital-to-stop-initiating-hormonal-therapy-for-trans-patients-under-19

21  (reporting Children's Hospital of Los Angeles is pausing the initiation of hormonal therapy for

22  gender-affirming care patients under the age of 19 to review the Denial-of-Care Order). President

23  Trump issued a press release listing the cancellation of gender-affirming care by health care

24  providers in New York, Colorado, Virginia, Washington D.C., Illinois, and Pennsylvania

25  claiming that the Denial-of-Care Order was "already having its intended effect."

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

136.    And the effects are also being felt by providers in Washington. Seattle Children's Hospital is a renowned research, training, and clinical hospital in Seattle that was awarded nearly $185 million in federal research grants in 2024 alone. Seattle Children's federally funded research contributes significantly to improved health outcomes for children across the country, including improving treatment of cystic fibrosis, cancer, and Type I diabetes. As part of its clinical program, Seattle Children's also provides gender-affirming care. The loss of federal grant funding as a result of the Denial-of-Care Order would be an existential threat to Seattle Children's, threatening both the research and clinical missions of the institution, as well as the patients it serves as the top-ranked pediatric hospital in all of Washinton, Alaska, Montana, and Idaho. The Denial-of-Care Order is creating an emergency situation at Seattle Children's, exerting tremendous pressure on the institution to stop providing gender-affirming care, or risk all of its other research, teaching, and care programs. As a result of the Denial-of-Care Order, Seattle Children's patients and families are panicking, scared that a loss of care would damage young patients' mental health, physical health, and safety.

137.    And while on Wednesday, February 5, 2025, HRSA rescinded the stop work order it issued on Friday, January 31, 2025, this only further fueled a climate of chaos and fear in which medical institutions, researchers, and physicians do not know what the federal government is going to do next. In fact, on the very same day the stop work order was rescinded, Children's Hospital Colorado ceased providing all gender-affirming medication, fearing the loss of federal funding. Meg Wingerter, *Children's Hospital Colorado Stops Offering Gender-Affirming Medication Because of Trump Order*, Denver Post (Feb. 5, 2025), https://www.denverpost.com/2025/02/05/childrens-hospital-colorado-stops-gender-affirming-care/.

138.    Effects are being felt in the Plaintiff States today. For example, a pharmacy in Spokane is refusing to fill AndroGel prescriptions for transgender and gender-diverse patients. Upon information and belief, the Denial-of-Care Order caused a medical institution in

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Washington to pull down information about gender-affirming care—making it difficult for families to access information about such care. This is especially urgent because, as Physician Plaintiff 3 writes, "[a]ny interruption in puberty-blocking medications is an immediate risk for irreversible physical changes, emotional distress and depression."

139.    One Washington provider, going only by their initials to avoid retaliation by the federal government and threats of violence by the President's supporters, has "deep concern that this EO would require [them] to withhold medically-necessary, lifesaving care." Another, also using pseudonyms, is "worried for [their] own safety since the EO targeting gender-affirming care was released[,]" and is "more reticent to diagnose [their] patients with gender dysphoria, even if it is the most accurate diagnosis." Even if providers are willing to risk prosecution by the federal government, patients and their families may not be. According to one provider, "the Executive Order has already caused nearly half of my adult transgender clients to halt or slow their plans to medically or socially transition."

140.    Transgender youth and their parents are similarly terrified of the Denial-of-Care Order's threats to eliminate life-saving care, as well as prosecute parents and providers. Transgender and gender-diverse youth report fears of their worlds "going dark" if they cannot receive the care they need. And parents of transgender youth are preparing to split their families apart to leave the country rather than letting their children fall back into suicidality experienced before gender-affirming care.

141.    The serious concerns over how the Denial-of-Care Order will detrimentally impact transgender youth cannot be overstated. One Washingtonian, as her parents describe her, was a bright and gentle soul who loved playing musical instruments, trying new things, and playing Magic the Gathering. She was excited to learn Japanese and the impact of gender-affirming care was immediately clear to her family. Her parents described that "her joy was clear with every new milestone in her transition. She was so happy to get to the next step, to get closer to presenting in a way that was true to herself." But the day before the presidential election, she

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    shared, "[t]omorrow I get to find out if I'm illegal." After the election, she asked her parents if

2    they could move to Canada because she was fearful of new restrictions on transgender youth and

3    worried about losing access to gender-affirming care. In January 2025, she took her life. After

4    the Denial-of-Care Order issued, her parents expressed that the outlook for transgender futures

5    looks scary and shared fears of what ending gender-affirming care would have meant for their

6    daughter's access to therapy, puberty-delaying medication, hormones, and hope of surgery. Her

7    parents have expressed fear for the many lives who depend on gender-affirming care and that

8    what happened to their daughter does not happen to any other children.

9    **H.    The Gender-Ideology Order**

10    142.    On January 20, 2025, President Trump issued Executive Order 14,168 titled

11    "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the

12    Federal Government."

13    143.    The Gender-Ideology Order declares "It is the policy of the United States to

14    recognize two sexes, male and female. These sexes are not changeable and are grounded in

15    fundamental and incontrovertible reality." E.O. 14,168 § 2.

16    144.    The Gender-Ideology Order directs that several new definitions in the Order

17    "shall govern all Executive interpretation of and application of Federal law and administration

18    policy." *Id*.

19    145.    Section 2(a) defines "sex" to mean "an individual's immutable biological

20    classification as either male or female," which is "not a synonym for and does not include the

21    concept of 'gender identity.'" Section 2(d) defines "female" as "a person belonging, at

22    conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male"

23    as "a person belonging, at conception, to the sex that produces the small reproductive cell."

24    146.    Section 2(f) claims that "'[g]ender ideology' replaces the biological category of

25    sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that

26    males can identify as and thus become women and vice versa, and requiring all institutions of

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK                    38                    ATTORNEY GENERAL OF WASHINGTON
                                                              Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104
                                                              (206) 464-7744

society to regard this false claim as true." It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."

147.    Section 2(g) states that "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

148.    In order to effectuate the Gender-Ideology Order, Section 3(e) directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) likewise commands that "[f]ederal funds shall not be used to promote gender ideology." Under the Order, "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.*

149.    The Gender-Ideology Order forces agencies to no longer recognize transgender or intersex people by restricting funding that promote "gender ideology."

150.    The administration has already terminated federal funding as a result of the Gender-Ideology Order. For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program. The CDC ended the grant in order to comply with the Gender-Ideology Order. *See* Kristen Hwang, *LA clinics lose funding for transgender health care as Trump executive orders take hold*, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/.

151.    Similar to HRSA, the CDC has also sent grant recipients, including UW School of Medicine and the Washington State Department of Health, notices stating that "[t]o implement the Executive Order entitled *Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government* . . . you must immediately terminate, to

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

39

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award," and that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated."

152.    This defunding order was later rescinded due to temporary relief awarded by a federal district court in other litigation, but these abrupt emails, which appear to be sent indiscriminately and broadly, create a climate of chaos for researchers and grant recipients.

I.    **Other Anti-Transgender Executive Orders**

153.    The Denial-of-Care and Gender-Ideology Orders challenged here are consistent with the President's other executive orders targeting and punishing transgender and gender-diverse people for their gender identities.

154.    For example, on his first day in office, President Trump issued Executive Order 14,148, rescinding several Biden-administration Executive Orders that provided protections for transgender people. Exec. Order No. 14,148; 90 C.F.R. § 8237.

155.    The same day, President Trump also signed Executive Order 14,170, titled "Reforming the Federal Hiring Process and Restoring Merit to Government Service," which forbids government employers from considering gender identity in the hiring process. Exec. Order No. 14,170; 90 C.F.R. § 8621.

156.    On January 27, 2025, the President issued Executive Order 14,183 titled "Prioritizing Military Excellence and Readiness." This order declares "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." Exec. Order No. 14,183; 90 C.F.R. § 8757. It proclaims that being transgender or gender diverse "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle" and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

service member." *Id*. § 1. The order directs the Secretary of Defense to reverse the current accession and retention standards for military service and to adopt instead a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2. The President likewise revoked Executive Order 14,004, which had allowed all qualified persons to serve in the military.

157.    On January 29, 2025, the President signed Executive Order 14,190, titled "Ending Radical Indoctrination in K-12 Schooling." The order directs eliminating federal funding for K-12 schools that "directly or indirectly support" the "instruction, advancement, or promotion" of "gender ideology" in their curricula for students or in training materials for instructors. Exec. Order No. 14,190; 90 C.F.R. § 8853. The order goes beyond the Denial-of-Care Order to prohibit the use of federal funds "to directly or indirectly support or subsidize the social transition of a minor student." "Social transition" is defined as "the process of adopting a 'gender identity' or 'gender marker' that differs from a person's sex."

158.    And on February 5, 2025, the President signed Executive Order 14,201 titled "Keeping Men Out of Women's Sports." The order targets transgender student-athletes by, inter alia, directing the Department of Justice to prioritize enforcement of Title IX against educational institutions that permit transgender athletes to participate in women's sports and athletic events and further directing all agencies to review grants to educational programs to rescind funding from institutions who do not comply with the Executive Order. Exec. Order No. 14,201; 90 C.F.R. § 9279.

159.    As the President boasted at the World Economic Forum three days after being inaugurated, he "made it official — an official policy of the United States that there are only two genders, male and female, and we will have no men participating in women's sports, and transgender operations, which became the rage, will occur very rarely."

160.    In this context, providers of gender-affirming care have no choice but to take President Trump seriously when he threatens to cut off all federal funding and charge them with

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

federal crimes for simply providing medically appropriate and necessary care for their patients. And similarly, parents of transgender and gender-diverse youth must take him at his word when he threatens to charge them for facilitating such care for their children.

## V.    CAUSES OF ACTION

### Count 1: Fifth Amendment Equal Protection

161.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

162.    Transgender and gender-diverse individuals are fully protected by the equal protection guarantee of the Fifth Amendment, and regulations targeting them for discriminatory treatment are subject to heightened scrutiny. *Hecox*, 104 F.4th at 1074.

163.    The Denial-of-Care Order and Gender-Ideology Order make classifications based on transgender status and sex, which triggers heightened scrutiny.

164.    The Denial-of-Care Order facially discriminates against transgender and gender-diverse people by stigmatizing, defunding, and purporting to criminalize health care that is lawful, state-regulated, medically appropriate and necessary, and specific to their health needs, while the same care is provided to cisgender people for other purposes. The Denial-of-Care Order discriminates against transgender and gender-diverse people on its face.

165.    The Gender-Ideology Order facially discriminates against transgender and gender-diverse people by purporting to erase transgender existence altogether. It facially discriminates against transgender and gender-diverse people by directing agencies to withhold grants from entities that "promote gender ideology," including by providing gender-affirming care.

166.    The Denial-of-Care and Gender-Ideology Orders cannot survive heightened scrutiny. Heightened scrutiny requires "that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Hecox*, 104 F.4th at 1081 (quoting *United States v.*

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    *Virginia*, 518 U.S. 515, 533 (1996)). The federal government's burden of justification is a

2    demanding one.

3        167.    The Denial-of-Care and Gender-Ideology Orders serve no important government

4    interest. They appear to serve no interest at all save to communicate official, presidentially

5    directed animus against transgender and gender-diverse people, their medical providers, and

6    their families.

7        168.    In light of their animus and total departure from and disregard for the scientific

8    consensus, the Denial-of-Care and Gender-Ideology Orders would not survive even rational

9    basis scrutiny. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

10       169.    The Denial-of-Care and Gender-Ideology Orders violate the equal protection

11   rights of transgender people under nineteen under the Fifth Amendment.

12   **<u>Count 2: Separation of Powers</u>**

13       170.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

14       171.    Section 4 of the Denial-of-Care Order constitutes a condition on the receipt of

15   federal funds by the Plaintiff States' medical institutions which by its terms is effective

16   immediately.

17       172.    Likewise, Sections 3(e) and (g) of the Gender-Ideology Order constitute a

18   condition on the federal funds by the Plaintiff States' medical institutions which by their terms

19   is effective immediately.

20       173.    The Constitution vests Congress with the spending power, not the President.

21   U.S. Const. art. I § 8, cl. 1.

22       174.    The Constitution vests Congress with the authority to condition spending, not the

23   President. U.S. Const. art. I § 8, cl. 1.

24       175.    The Constitution vests Congress with the appropriation power, not the President.

25   U.S. Const. art. I § 9, cl. 7.

26

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

176.     The Constitution provides "a single, finely wrought and exhaustively considered, procedure" through which "the legislative power of the Federal government [may] be exercised," *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983), namely, through majority votes of both chambers of Congress and the signature of the President. U.S. Const. art. I § 7.

177.     None of the funds received by the Plaintiff States' medical institutions have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care.

178.     In fact, federal law *prohibits* the Plaintiff States' medical institutions from discriminating against individuals on the basis of their gender dysphoria or sex for the purposes of participating in the services provided by these institutions and funded with federal financial assistance. 29 U.S.C. § 794; 42 U.S.C. § 18116(a).

179.     And no provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including appropriations approved and signed into law. The President cannot directly and unilaterally amend or cancel appropriations Congress has duly enacted, nor can he order federal agencies to do so.

180.     The President's Executive Order, which conditions the receipt of federal funds by the Plaintiff States' medical institutions on denying patient gender-affirming care, is an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend Congressional appropriations by attaching conditions not contemplated by Congress, a nullification of duly enacted federal statutes, and a violation of the separation of powers. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018).

## Count 3: Tenth Amendment and Separation of Powers

181.     Plaintiffs re-allege and incorporate the above as if set forth fully herein.

182.     The Tenth Amendment provides that "[t]he Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The President has no enumerated power

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

44

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    to regulate the practice of medicine or to criminalize medical practices. Nor has he been

2    authorized by Congress to do so.

3    　　　183.    The Plaintiff States have the sovereign power to regulate the practice of medicine

4    and establish the standards of care for the practice of medicine in their States. The regulation of

5    the practice of medicine and establishment of the standards of care for the practice of medicine

6    is a core, traditional area of state concern, which the federal government has historically not

7    regulated.

8    　　　184.    The Denial-of-Care Order regulates the practice of medicine without

9    congressional authorization. The Denial-of-Care Order defines gender-affirming care as

10   "chemical and surgical mutilation" and orders the Department of Justice to prioritize prosecution

11   of gender-affirming care as "female genital mutilation" under 18 U.S.C. § 116.

12   　　　185.    Where Congress wishes to intrude on an area of where states have used their

13   police powers to regulate a matter of local concern, such as the regulation of health care, it must

14   do so clearly in unmistakable terms. *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006). Congress

15   has explicitly chosen not to do so. 18 U.S.C. § 116 does not in clearly unmistakable terms, or in

16   any terms, regulate or criminalize the practice of medicine in the United States. Instead, it

17   explicitly carves out the practice of medicine from the reach of the statute.

18   　　　186.    It is a violation of the Tenth Amendment and a violation of separation of powers

19   for Defendants to direct the enforcement of 18 U.S.C. § 116 against medical providers for

20   offering and parents for consenting to medically appropriate and necessary gender-affirming care

21   authorized in the Plaintiff States.

22   　　　　　　　**Count 4: Fifth Amendment Due Process (Vagueness)**

23   　　　187.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

24   　　　188.    Under the Due Process Clause of the Fifth Amendment, a governmental

25   enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of

26   ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304

2    (2008).

3        189.    The Gender-Ideology Order provides definitions for key terms including "sex,"

4    "female," and "male" that purport to govern all executive interpretation and application of

5    federal law and executive policy. These definitions for sex are based on the production of "large"

6    or "small" reproductive cells "at conception." They fail to consider intersex people and

7    misunderstands embryonic development, including the fact that "at conception" no embryo

8    produces reproductive cells, and that, even at later stages, certain individuals produce no

9    reproductive cells or produce both large and small reproductive cells.

10        190.    The Gender-Ideology Order "fails to provide a person of ordinary intelligence

11    fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously

12    discriminatory enforcement." *Id.*

13        191.    The definitions in the Gender-Ideology Order also lends themselves to subjective

14    interpretation, such that the Gender-Ideology and Denial-of-Care Orders are subject to

15    discriminatory enforcement. Each agency is authorized to exercise unfettered discretion to

16    determine whether a federal grant is used to "promote[] gender ideology" and whether a given

17    instance of gender-affirming care is "chemical and surgical mutilation."

18        192.    The Gender-Ideology and Denial-of-Care Orders are unconstitutionally vague in

19    violation of the Fifth Amendment's Due Process Clause.

20                          **VI.    PRAYER FOR RELIEF**

21        WHEREFORE, the Plaintiffs pray that the Court:

22        a.    Declare that Sections 4 and 8(a) of the Denial-of-Care Order and Sections 3(e)

23    and (g) of the Gender-Ideology Order are contrary to the Constitution and laws of the United

24    States;

25

26

b.    Temporarily restrain and enjoin Defendants from implementing or enforcing Sections 4 and 8(a) of the Denial-of-Care Order and Sections 3(e) and (g) of the Gender-Ideology Order, pending further orders from this Court;

c.    Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing to determine whether this Court should enter a preliminary injunction;

d.    Preliminarily and permanently enjoin Defendants from implementing or enforcing Sections 4 and 8(a) of the Denial-of-Care Order and Sections 3(e) and (g) of the Gender-Ideology Order;

e.    Declare Sections 4 and 8(a) of the Denial-of-Care Order and Sections 3(e) and (g) of the Gender-Ideology Order unconstitutional; and

f.    Award such additional relief as the interests of justice may require.

DATED this 19th day of February 2025.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
TERA HEINTZ, WSBA #54921
ANDREW R.W. HUGHES, WSBA #49515
NEAL LUNA, WSBA #34085
CRISTINA SEPE, WSBA #53609
LUCY WOLF, WSBA #59028
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
William.McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Neal.Luna@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Lucy.Wolf@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS, WSBA #53238
COLLEEN MELODY, WSBA #42275

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    Assistant Attorneys General
     800 Fifth Avenue, Suite 2000
2    Seattle, WA 98104-3188
     (360) 709-6470
3    Lauryn.Fraas@atg.wa.gov
     Colleen.Melody@atg.wa.gov
4    *Attorneys for Physicians Plaintiffs 1-3*

5

6    KEITH ELLISON
     Attorney General of Minnesota

7    */s/ James W. Canaday*
     JAMES W. CANADAY (admitted pro hac vice)
8    Deputy Attorney General
     445 Minnesota St., Ste. 600
9    St. Paul, Minnesota 55101-2130
     (651) 757-1421
10   james.canaday@ag.state.mn.us
     *Attorneys for Plaintiff State of Minnesota*

11

12   DAN RAYFIELD
     Attorney General of Oregon

13   */s/ Allie M. Boyd*
14   ALLIE M. BOYD, WSBA #56444
     Senior Assistant Attorney General
15   Trial Attorney
     1162 Court Street NE
16   Salem, OR 97301-4096
     (503) 947-4700
17   allie.m.boyd@doj.oregon.gov
     *Attorneys for Plaintiff State of Oregon*

18

19   PHIL WEISER
     Attorney General of Colorado

20   */s/ Shannon Stevenson*
21   SHANNON STEVENSON*
     Solicitor General
22   Office of the Colorado Attorney General
     1300 Broadway, #10
23   Denver, CO 80203
     (720) 508-6000
24   shannon.stevenson@coag.gov
     *Attorneys for Plaintiff State of Colorado*

25

26   *pro hac vice application forthcoming

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-CV-00244-LK

48

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744