The Honorable Lauren King

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:25-cv-00244-LK |
| Plaintiffs, | PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | NOTE ON MOTION CALENDAR: February 28, 2025, at 2:00 p.m. |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | ORAL ARGUMENT REQUESTED |
| Defendants. | |

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................... 2

        A.      Gender-Affirming Care Is Life-Saving Medical Treatment Overwhelmingly
                Supported by Medical Professionals and Protected by Plaintiff States ................... 2

        B.      The Orders Unilaterally Defund Medical Institutions and Threaten Criminal
                Prosecution for Providers and Families ................................................................... 5

        C.      This Court Granted Plaintiffs' Motion for Temporary Restraining Order ............... 7

III.    ARGUMENT ............................................................................................................... 7

        A.      Legal Standard .......................................................................................................... 7

        B.      Plaintiffs Have Standing to Challenge the Orders ................................................... 8

        C.      Plaintiffs Are Likely to Succeed on the Merits ....................................................... 8

                1.      The Orders discriminate against transgender children ..................................... 8

                        a.      The Orders are subject to heightened scrutiny because they
                                discriminate based on transgender status and sex ................................ 8

                        b.      The Orders fail heightened equal protection scrutiny ........................... 10

                        c.      The Orders fail any level of review ...................................................... 13

                2.      Defunding medical schools, providers, and hospitals for providing
                        gender-affirming care and recognizing transgender identity violates the
                        separation of powers ....................................................................................... 14

                3.      The Denial-of-Care Order's criminalization of gender-affirming care
                        violates the Tenth Amendment and separation of powers ............................... 17

                4.      The Orders are unconstitutionally vague .......................................................... 20

        D.      Plaintiffs Will Suffer Irreparable Harm if the Orders Are Not Enjoined ............... 20

        E.      The Balance of Equities Weigh in Plaintiffs' Favor, and a Preliminary
                Injunction Is in the Public Interest ......................................................................... 24

# I.    INTRODUCTION

With two Executive Orders, the President unlawfully intruded into the personal medical decisions of transgender youth, their families, and their doctors. The Orders target vulnerable transgender youths by directing federal agencies to "immediately" defund programs that recognize the existence of transgender and gender-diverse people and medical institutions that provide necessary and often life-saving gender-affirming care. The President also weaponized a criminal statute to threaten providers and parents for providing care. Lest there be any doubt about the President's intent, the White House bragged that his action is "already having its intended effect" with "hospitals around the country . . . taking action to downsize or eliminate" gender-affirming care programs.

These Orders have unleashed unbridled fear and irreparable harms. They force State medical institutions and providers into an impossible choice between following their ethical obligations to provide necessary care or risk immediately losing hundreds of millions of dollars in federal funding. Doctors and families must now risk criminal prosecution or watch their young patients and children suffer. And for transgender youth singled out by the President's Orders, pausing treatment can cause irreversible impacts to their bodies that dramatically increase their risk of depression, anxiety, self-harm, and suicide. Simply put, if the Orders stand, transgender children will die.

The Orders are unconstitutional several times over. They violate the constitutional guarantee of equal protection because they discriminate against transgender youth on the basis of their transgender status and sex. They violate the constitutional separation of powers because the President has seized Congress' spending and lawmaking power by rewriting the law to defund medical institutions. They violate the Tenth Amendment and separation of powers because they rob states of their core police power to regulate medicine by dictating what constitutes medically necessary care, conflict with Congress's decision not to regulate the practice of medicine, and contravene Congress's direction not to discriminate in the provision of

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

medical care. Finally, they are impermissibly vague because their nonsensical definitions of "sex", "male," and "female" provide no way to determine a person's sex, a necessary first step in attempting to apply them.

The Court must enjoin these flagrant and discriminatory abuses of power.

## II.    STATEMENT OF FACTS

**A.    Gender-Affirming Care is Life-Saving Medical Treatment Overwhelmingly Supported by Medical Professionals and Protected by Plaintiff States**

Gender dysphoria is a serious medical condition marked by a persistent mismatch between a person's assigned sex and gender identity, causing severe distress or impairment. Dkt. #19 ¶39. Left untreated, it can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and, far too often, suicide. *Id*. ¶46. Fortunately, it is treatable.

Gender-affirming care is overwhelmingly supported by the evidence and broadly endorsed by the medical community, including the American Academy of Pediatrics, American Medical Association, American Psychological Association, American Psychiatric Association, and American Academy of Family Physicians. *Id*. ¶¶50-58. It is governed by (1) Standards of Care published by the World Professional Association for Transgender Health (WPATH), a non-profit professional and educational organization devoted to transgender health, (2) guidelines published by the Endocrine Society, an organization representing endocrinologists, and (3) the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5). *Id*. ¶¶, 40, 50-58. Gender-affirming care covers a spectrum of treatments, including talk therapy, social transition, puberty-blocking medications, hormone replacement therapy, and other care, based on individual need. *Id*. ¶¶59-60, 62, 64-79.

Transgender children and their parents do not make the decision to start gender-affirming care lightly. Dkt. #111 ¶¶14-15; Dkt. #93 ¶9; E.L. ¶9. Children often endure extended and debilitating periods of depression, self-hatred, hopelessness, anxiety, self-harm, and suicidality before families seek gender-affirming care. *See* Dkt. #11 p.4 n.2 (citing declarations); *see also*

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Dkt. #47 ¶4; C.F. ¶7; E.L. ¶11; S.T. ¶4; L.D. ¶¶7-8; M.M. ¶12; Mischo ¶9; Dkt. #89 ¶6. L.L., a Seattle-area teen, would, for years, "rot in [] bed" all day, with no friends, struggling even to shower in a body he "hated." Dkt. #21 ¶9. S.F., a teen in southwest Washington, spent days "curled up in the fetal position on the floor," with his mother feeling helpless to do anything but sit and share his pain. Dkt. #68 ¶6. Some adolescents showered in a bathing suit or in the dark so they didn't have to see their own body. Dkt. #102 ¶6; Dkt. #34 ¶8. Others engaged in self-harm, "cutting" or "burning" themselves or developing eating disorders so they could "feel in control of their body." Dkt. #99 ¶13.

Meanwhile, parents experience profound "grief" seeing their children's pain, while fearing others will "harm their child." Dkt. #91 ¶16; C.D. ¶15. Those with resources often seek extensive therapy before engaging in gender-affirming hormonal treatment. Dkt. #83 ¶¶8-9. To qualify for gender-affirming care, adolescents must "consistently, persistently, and insistently express their desire for a body that reflects a non-binary gender or a gender different than the sex they were assigned at birth." *Id.* ¶9; *see also* Dkt. #19 ¶63.

When families seek gender-affirming care, clinicians follow settled guidelines to ensure accurate diagnoses and that patients understand their options. *E.g.*, Dkt. #13 ¶¶8-16; Dkt. #14 ¶¶6, 11-13; Dkt. #15 ¶¶14-17; Nelsen-Barbosa ¶¶6-7. Physician Plaintiffs, for example, do not see patients until after a thorough mental screening confirming the dysphoria diagnosis. Dkt. #13 ¶¶10-11; Dkt. #14 ¶9; Dkt. #15 ¶17. Clinicians independently confirm the diagnosis and spend extensive time with families discussing the adolescent's experiences, goals and expectations, the risks and benefits of different options, and obtaining informed consent from the patient and parent. Dkt. #13 ¶¶10-15; Dkt. #14 ¶¶11-15; Dkt. #15 ¶¶14-18. Clinicians generally start with gradual, readily reversible treatments that mimic natural puberty processes. Dkt. #13 ¶16; Dkt. #14 ¶¶19-21. They provide regular follow-up care to adjust treatment as needed and monitor the patient's mental and physical health. Dkt. #13 ¶16; Dkt. #14 ¶20; Dkt. #95 ¶¶14-15.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  The evidence supporting gender-affirming care for adolescents is as robust as the

2  evidence supporting other pediatric treatments. Dkt. #18 ¶¶43-45; Dkt. #19 ¶¶78-102. Clinicians

3  have used puberty blockers for decades to treat gender dysphoria. *Id*. ¶66. Patients receiving

4  gender-affirming care have high rates of satisfaction and extremely low incidence of regret. *E.g.*,

5  *Id.* ¶101; Dkt. #13 ¶¶19-22. Studies show rates of regret for gender-affirming care are

6  exceptionally low, between about 0.3 and 1.1 percent—much lower than, for example, knee

7  replacements (10%), tattoos (16%), or having children (7%). Dkt. #18 ¶71; Dkt. #112 ¶22. Most

8  providers have never had a patient regret gender-affirming care. *E.g.*, Dkt. #15 ¶26; *see also*

9  Dkt. #11 p.6 (citing declarations); Leggett ¶¶18-19. If anything, patients regret not starting

10 earlier. *Id.;* Dkt. #111 ¶12; Dkt. #81 ¶13; Dkt. #27 ¶7. Beyond the extremely low incidence of

11 regret, the risks to fertility are likewise mischaracterized. Puberty blockers do not permanently

12 impair fertility. Children experiencing medically precocious puberty are routinely treated with

13 puberty blockers and have typical fertility in adulthood, and such medications are used to

14 preserve fertility in patients with cancer and treat other pediatric conditions. Dkt. #14 ¶22;

15 Dkt. #76 ¶14; Dkt. #18 ¶60. Moreover, the current treatment paradigm is consistent with general

16 ethical principles and the informed consent practices for other pediatric medical care. *Id.* ¶56.

17 For example, UW Medicine requires consent from a parent or guardian for a minor patient to

18 receive gender-affirming medical care. Dkt. #16 ¶16.

19 And it works. Transgender youths who receive gender-affirming care see their rates of

20 anxiety and depression dramatically improve to mirror those of their cisgender peers. *See*

21 Dkt. #11 p.4 n.2 (citing declarations); *see also* Dkt. #90 ¶¶15-16; A.D. ¶8; C.S. ¶9; J.K. ¶11; J.V.

22 & P.V. ¶13; K.B. ¶17; M.S. ¶¶15-17; S.W. ¶7; B.P. ¶12. Parents report similarly transformative

23 changes, with kids experiencing "a profound sense of relief" when their "outsides" finally

24 "match their insides," making them feel like "their true and authentic selves" for the first time in

25 their young lives. Dkt. #29 ¶13; Dkt. #28 ¶10; Dkt. #33 ¶10; Dkt. #17 ¶11.

26

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Nothing reveals the profundity of this transition better than kids' and parents' own words. Youth receiving treatment "blossom[ed] in every way," and experience newfound confidence that helps them "flourish," and live "joyful," lives. Dkt. #68 ¶7; Dkt. #38 ¶8; Dkt. #39 ¶6; Dkt. #82 ¶13; C.D. ¶10; C.F. ¶9. They "go from socially isolating themselves, engaging in negative internal dialogue, not going to school" and avoiding people, to joining clubs, playing sports, and seeking out community. Dkt. #74 ¶11; Dkt. #30 ¶9; Dkt. #72 ¶12. Treatment makes youth feel "like something inside of them is lighter" when "they no longer hate themselves." Dkt. #76 ¶11. They feel "happier" and "more confident." Dkt. #129 ¶9; J.T. ¶8; S.T. ¶13. And it brings "a sense of security in identity without which [they] would not have survived." Dkt. #23 ¶8. Parents describe the transformation "like flipping a light switch," with their kids having increased energy and a renewed sense of self that reveals just "how much their child must have been suffering." Dkt. #85 ¶¶13-16. When children are "relieved of the need to mask, hide, or cover who she was," they stop self-harming. Dkt. #44 ¶8. "Passing" or "being seen as the gender they identify" often "makes life worth living." Dkt. #83 ¶7. It allows them to "walk through the world without being discriminated against or harassed." *Id*. Not spending "every moment of their day" thinking about "how their body looks and how it does not align with their identity" gives children the freedom to "learn better at school and proactively engage and prepare for their future careers and lives." Dkt. #99 ¶16. The benefits of gender-affirming care are literally "life-giving." Dkt. #77 ¶12.

## B.    The Orders Unilaterally Defund Medical Institutions and Threaten Criminal Prosecution for Providers and Families

On January 20, 2025, President Trump issued Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender-Ideology Order); 90 C.F.R. §8615 (cited as E.O. 14,168). And on January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation" (Denial-of-Care Order); 90 C.F.R. §8771 (cited as E.O.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

14,187). These Orders follow a decade of President Trump scapegoating transgender people and threatening to criminalize their medical care. In the first three weeks of this presidential term, President Trump has targeted all aspects of transgender lives, halting their passport applications, ordering transfer of incarcerated transgender women to men's prisons, initiating a ban on transgender military service claiming transgender soldiers are not "honorable, truthful, or disciplined," erasing references to "gender" from federal websites and forms, barring female transgender student-athletes from "compet[ing] with or against" other women and girls, and making the denial of transgender existence a cornerstone of executive policy. Dkt. ## 17-1, 17-2, 17-3, 17-15; *see also* McGinty Decl. ISO Mot. for Prelim. Inj. Decl. Ex. 4 (E.O. 14,190).

The Orders continue this ruthless persecution. The Gender-Ideology Order strictly defines "sex," "female," and "male" in non-scientific and nonsensical ways and strips federal funding from any program that supposedly "promote[s] gender ideology" by accepting that transgender people exist. E.O. 14,168 §§2(a), (d), (e), (f), 3(e), (g). The Centers for Disease Control and Prevention (CDC), for instance, directed grant recipients at the UW School of Medicine and the Washington State Department of Health to "terminate, to the maximum extent" all activities "inculcating gender ideology at every level." Dellit Supp. ¶3; Fehrenbach-Marosfalvy ¶6. The administration has likewise terminated grants to medical clinics for purportedly violating the Gender-Ideology Order. *See* Dkt. #149-1.

The Denial-of-Care Order, in cruel and dehumanizing terms, redefines all gender-affirming care—including the use of medications like puberty blockers—as "chemical and surgical mutilation" and a "stain" on the Nation's history.. Among other directives, Section 4 of the Order requires "[d]efunding" gender-affirming care by ordering each executive department or agency providing research or education grants to medical institutions to "*immediately . . .* ensure that institutions receiving Federal research or education grants end" gender-affirming care for youths. E.O. 14,187 §4 (emphasis added). Section 8(a) of the Denial-of-Care Order, in turn, directs the Attorney General to prioritize "enforcement of protections against female genital

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

mutilation" under 18 U.S.C. §116, which it equates with gender-affirming care. E.O. 14,187 §§1, 8(a). These provisions are already causing immediate, irreparable harm to the Plaintiffs.

## C.    This Court Granted Plaintiffs' Motion for Temporary Restraining Order

After holding a hearing, this Court granted a temporary restraining order, finding that the Denial-of-Care Order was "aimed at erasure of transgender individuals." TRO Hearing Tr. 35:22-23 (Feb. 14, 2025). The Court found that Plaintiffs were likely to succeed on the merits of their equal protection, separation of powers, and Tenth Amendment claims, and that the remaining *Winter* factors favored a TRO. *See generally* Dkt. #161.[1] The Court's Order provided immediate benefits, affording temporary relief to physicians and providers in the Plaintiff States to provide gender-affirming care without risking criminal prosecution or loss of federal grant funds. Dellit Supp. ¶¶4-5; Physician Plaintiff 1 Supp. ¶4 ("After the TRO was issued, I felt like I could finally breathe again."); Physician Plaintiff 2 Supp. ¶4 (Physician Plaintiff 2 was "immediately relieved for [themselves] and [their] patients" after issuance of the TRO); Physician Plaintiff 3 Supp. ¶6 ("I felt immediate relief upon learning about this Court's order"); Ojemann Supp. ¶¶3-6. And it resulted in resumed care for patients: immediately after this Court announced its order, a Seattle teen whose gender-affirming procedure had been cancelled by a Seattle-area hospital in response to the Denial-of-Care Order, received a call notifying him that care had been resumed and rescheduling his procedure. Hillinger, Aumann, & E.H. ¶¶3-5.

## III.    ARGUMENT

### A.    Legal Standard

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public

---

[1] The District of Maryland entered a nationwide TRO restraining federal defendants from conditioning or withholding federal funding based on the fact that a healthcare entity or professional provides gender-affirming medical care to a patient under the age of 19 under Section 3(g) of the Gender-Ideology Order and Section 4 of the Denial-of-Care Order. *PFLAG, Inc. v. Trump*, No. 1:25-cv-00337-BAH, Dkt. #61 (D. Md. Feb. 13, 2025).

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

interest. Fed. R. Civ. P. 65(c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). All four factors strongly favor the Plaintiffs.

**B.      Plaintiffs Have Standing to Challenge the Orders**

As this Court previously determined, Plaintiffs face imminent, direct injuries because of the Denial-of-Care Order. Dkt. #161 pp.7-13. These include the (1) choice between losing federal funds or being forced to stop "providing medical services they would otherwise provide," (2) a "credible and substantial" threat of federal prosecution; (3) third-party standing by Physician Plaintiffs on behalf of their patients; and (4) constitutional injuries from federal officials exceeding their powers. *Id.* Plaintiffs face similar injuries with respect to the Gender-Ideology Order, because it too strips federal funding related to gender-affirming care. E.O. 14,168 §§3(e), (g); Dkt. #149-1. Because these injuries are imminent and would be occurring now but for this Court's TRO, the Plaintiffs have standing and this matter is ripe for review. *See* Dkt. #161 p.12 n.4.

**C.      Plaintiffs Are Likely to Succeed on the Merits**

**1.      The Orders discriminate against transgender children**

Both the Gender-Ideology Order and the Denial-of-Care Order target transgender children and their medical care based on transgender status and sex, triggering heightened equal protection scrutiny. The Orders cannot survive this "exacting" test. *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cited as *VMI*). Given their rejection of the scientific consensus, they couldn't even survive rational basis review.

**a.      The Orders are subject to heightened scrutiny because they discriminate based on transgender status and sex**

Heightened scrutiny applies to classifications based on transgender status and sex. *See Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (applying heightened scrutiny to discrimination based on transgender status); *see also Hecox v. Little*, 104 F.4th 1061, 1080 (9th Cir. 2024) (applying heightened scrutiny to

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    discrimination based on sex and transgender status). Because the Orders discriminate based on

2    transgender status and sex, they are subject to heightened scrutiny.

3         First, the Orders expressly classify based on transgender and gender-diverse status. *See*

4    Dkt. #161 p.17 (holding the Denial-of-Care Order "facially discriminates on the basis of

5    transgender status"). The Gender-Ideology Order defunds any program that supposedly

6    "promote[s] gender ideology," simply by acknowledging the scientific consensus that

7    transgender people exist. E.O. 14,168 §§2(f), 3(e), (g). The Denial-of-Care Order similarly

8    classifies based on transgender and gender-diverse status by penalizing and criminalizing

9    healthcare only when provided to "an individual who does not identify as his or her sex," "to

10   align an individual's physical appearance with an identity that differs from his or her sex," or to

11   "transform an individual's physical appearance to align with an identity that differs from his or

12   her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy

13   their natural biological functions." E.O. 14,187 §2(c).

14        Second, the Denial-of-Care and Gender-Ideology Orders draw a classification based on

15   sex. *See* Dkt. #161 p.18; *see also PFLAG, Inc., v. Trump*, No. 25-cv-337-BAH, 2025 WL 510050

16   (D. Md. Feb. 14, 2025) ("[T]he Executive Orders discriminate on the basis of transgender

17   identity, and therefore on the basis of sex."). The purported biological sex of the patient is the

18   basis on which the Denial-of-Care Order distinguishes between medical interventions restricted

19   and criminalized versus those that are not. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660

20   (2020) ("[I]t is impossible to discriminate against a person for being . . . transgender without

21   discriminating against that individual based on sex[.]"). Thus, "discrimination against

22   transgender individuals constitute[s] sex-based discrimination for purposes of the Equal

23   Protection Clause because such policies punish transgender persons for gender non-conformity,

24   thereby relying on sex stereotypes." *Hecox*, 104 F.4th at 1080 (quoting *Grimm v. Gloucester

25   Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020)); *see also Brandt ex rel. Brandt v. Rutledge*,

26

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

47 F.4th 661, 670-71 & n.4 (8th Cir. 2022) (applying heightened scrutiny to law prohibiting "gender transition procedures" because the law discriminated on the basis of sex).[2]

The Orders explicitly and coercively enforce gender conformity by targeting medical care when used to affirm a gender that is different from one's sex as defined in the Orders. E.O. 14,168 §§3(e), (g); E.O. 14,187 §2(c). Thus, a mastectomy for a cisgender boy with gynecomastia (swollen breast tissue) to conform his chest to his male gender is not penalized. *See* Dkt. #112 ¶¶26-28. Nor is testosterone therapy to a cisgender boy who wants to "jumpstart" puberty. *See* Dkt. #14 ¶22; *see also* Dkt. #161 pp.17-18 (explaining under the Denial-of-Care Order, federally-funded medical institutions can provide certain treatments to cisgender individuals but not to individuals 'who does not identify as his or her sex'" (quoting Dkt. #17-1 p.2)). By allowing and disallowing care based on sex as defined in the Orders, the Orders facially classify based on transgender status and sex and trigger heightened scrutiny.

### b.    The Orders fail heightened equal protection scrutiny

To survive heightened scrutiny, the Orders must provide an "exceedingly persuasive justification" for their classifications and a "close means-end fit." *Sessions v. Morales-Santana*, 582 U.S. 47, 58, 68 (2017). Neither exists here. The "burden of justification is demanding"— not "deferential"—and "rests entirely on the [federal government]." *VMI*, 518 U.S. at 533, 555. Heightened scrutiny is an "extremely fact-bound test," requiring courts to "examine the 'actual purposes'" of the governmental action and "carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham Corp. v. Abbott Labs*., 740 F.3d 471, 483 (9th Cir. 2014).

The Orders harm adolescents and young adults by restricting their access to the only medically necessary treatments for gender dysphoria. Gender dysphoria is a serious medical condition, and all major medical associations recognize that gender-affirming care is necessary

---

[2] The "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1 to alleviate the significant distress of adolescents facing gender dysphoria. Dkt. #19 ¶¶51, 110.

2 There is no non-discriminatory justification for singling out and criminalizing the medical

3 decisions made by transgender youth, their parents, and their doctors. Untreated gender

4 dysphoria can result in severe anxiety and depression, self-harm, and suicidality. *Id*. ¶46; *see*

5 *also*, *e.g.*, Dkt. #76 ¶13; Dkt. #29 ¶12; Dkt. #86 ¶¶9, 11. Gender-affirming care dramatically

6 improves the health and well-being of adolescent patients, is well-accepted in the medical field,

7 and is supported by substantial clinical and research evidence demonstrating its effectiveness.

8 Dkt. #19 ¶¶45-102; Dkt. #13 ¶7. The quality of evidence supporting this care is comparable to

9 the quality of evidence supporting countless other medical treatments provided to minors.

10 Dkt. #18 ¶¶45-47. And it is supported by decades of clinical experience and research

11 demonstrating the often life-saving results of treatment. *Id*. ¶¶41-42; Dkt. #13 ¶¶19-24; Dkt. #14

12 ¶¶8, 16-22; Dkt. #15 ¶¶17-26. And last but certainly not least, the personal experiences of

13 transgender youths and their families reflect just how such treatment positively transforms the

14 lives of the adolescents who need it. *See supra* 4-5. By penalizing and criminalizing this

15 necessary care, the Orders will harm kids across the country.

16    Gender-affirming care is not uniquely risky. Dkt. #19 ¶¶80-84; Dkt. #18 ¶¶60-63, 67-69;

17 *Poe v. Labrador*, 709 F. Supp. 3d 1169, 1182 (D. Idaho 2023). The same medications and

18 treatments used in gender-affirming medical care—including puberty blockers, testosterone,

19 testosterone suppression, and estrogen—are widely used to treat cisgender adolescents and pose

20 the same potential risks. Dkt. #14 ¶22; Dkt. #112 ¶¶26-28. For example, GnRHa medications

21 are used to treat precocious puberty; testosterone is used to treat cisgender boys with delayed

22 puberty; and estrogen is used to treat cisgender girls for ovarian failure, regulation of

23 menstruation, and contraception. Dkt. #18 ¶¶47, 63, 80. Again, in many cases, this treatment is

24 *also used to affirm* the cisgender adolescent's gender—but the Orders say not a word about it.

25 Dkt. #112 ¶¶26-28.

26

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

The Gender-Ideology Order's stated purpose is rebutted by the evidence. It purports to align national policy with "biological reality," (Section 1) but advances unscientific and false definitions of "sex," "male," and "female." *See generally* Shumer Supp.; *see also* Dkt. #18 ¶¶18-22; Dkt. #19 ¶¶27-37, 103-105. It says that it seeks to defend women from "erasure of sex in language and policy," but the order is grossly overbroad because it defines transgender people out of existence altogether and defunds any program that merely accepts the idea that transgender people exist. E.O. 14,168 §§3(e), (g).

The Denial-of-Care Order's purported concern over potential "sterilization" of youths (Section 1) is similarly unpersuasive. While some types of gender-affirming medical care may impair fertility, this risk is discussed in the informed consent process, as with other medical treatments that can impact fertility. Dkt. #18 ¶¶58, 61-62. And there are ways to adjust treatment to protect fertility if that is important to the patient and family. *Id.* ¶62. And concerns about the low risks of permanent side effects ring hollow when youth denied treatment far too often make permanent decisions with much more tragic consequences. Dkt. #19 ¶107. Given the extensive evidence supporting gender-affirming care, no "exceedingly persuasive justification" exists for treating gender-affirming medical care differently than all other medical treatment for minors. To the contrary, the President's goal in issuing the Order "was not to ban a treatment. It was to ban an outcome that [he] deems undesirable." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021), *aff'd* 47 F.4th 661 (8th Cir. 2022).

"Even assuming . . . that the Executive Order's stated purpose . . . constitutes an important government interest, there is no substantial relationship between this purported goal and Section 4's blunderbuss approach to achieving it." Dkt. #161 pp.19-20; *id.* 21 (Denial-of-Care Order is "insufficiently tailored" to survive heightened scrutiny); *see also Hecox*, 104 F.4th at 1086 (law lacked means-end fit between categorical ban of transgender female athletes and purported interest in athletic equality based on law's broad enforcement mechanism). Although the Denial-of-Care Order suggests in Section 1, without support, that people who receive gender-

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

affirming care will regret that care, the undisputed evidence shows that regret is exceedingly uncommon for transgender youth receiving gender-affirming care. *See* Dkt. #19 ¶¶77, 107; Dkt. #99 ¶17; Dkt. #15 ¶26; Dkt. #112 ¶22. And in any event, the Order doesn't explain why this small risk justifies banning care for all transgender adolescents. Nor does the order weigh the purported risk of regret against the benefits of gender-affirming care—which is particularly troublesome given the consensus of the medical community that this care is medically appropriate and life-saving for certain transgender youth. *Id*. ¶¶22-23. The Denial-of-Care Order discusses fertility risks associated with gender-affirming care, but targets treatments, like puberty blockers, that have no impact on fertility. Dkt. #18 ¶60. And as the Court acknowledged, many patients receiving hormone therapy remain fertile and can be provided with fertility-preserving options. Dkt. #161 pp.21-22; Dkt. #19 ¶¶82-84. And similar or greater risks attend other pediatric treatments, but the Order singles out only gender-affirming care. Dkt. #18 ¶80.

Neither Order survives heightened scrutiny.

### c.    The Orders fail any level of review

Heightened scrutiny should be applied for the reasons described above. But both Orders would fail any level of scrutiny because they "[are] so far removed from" their purported goals, "it [is] impossible to credit" them. *Romer v. Evans*, 517 U.S. 620, 635 (1996). There is no rational basis to disregard the scientific consensus and conclude that allowing minors with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten [the federal government's] legitimate interests in a way that" allowing other types of medical care "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). *Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people). The Orders' insistence that transgender people do not and cannot exist is simply false as a matter of fact, and there is no legitimate interest in insisting otherwise.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Nor is animus a rational basis, *see Romer*, 517 U.S. at 632: "a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* (cleaned up); *U.S. Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973) (same). While the Orders purport to "protect[]" "vulnerable" youth, the President's actions—indeed, the language of the Orders themselves—show that their real purpose was to erase transgender people. This is another reason the Orders fail any level of review. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring); *see, e.g., Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1220 (N.D. Fla. 2023), *appeal dismissed sub nom. Doe v. Surgeon Gen., Fla.*, No. 23-12159-JJ, 2024 WL 5274658, at *1 (11th Cir. July 8, 2024) (concluding "there is no rational basis, let alone a basis that would survive heightened scrutiny," for prohibiting gender-affirming treatment for minors); *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1293 (N.D. Fla. 2023) ("disapproving transgender status and discouraging individuals from pursuing their honest gender identities" are "plainly illegitimate purposes" demonstrating state law was adopted for "purposeful discrimination" against transgender people).

### 2. Defunding medical schools, providers, and hospitals for providing gender-affirming care and recognizing transgender identity violates the separation of powers

The Orders also violate the separation of powers by unilaterally ordering federal agencies to cut off federal funding to medical institutions that provide gender-affirming care or that recognize transgender identity. *See* Dkt. #161 pp.14-16; *PFLAG*, 2025 WL 510050, at *1 ("The challenged provisions of the Executive Orders place conditions on federal funding that Congress did not prescribe."). President Trump should know from his failed efforts to defund States and municipalities during his first term that Congress alone holds the "power of the purse" and that he cannot set conditions on appropriated funds that Congress did not authorize. But he did it again anyway.

*City and County of San Francisco v. Trump* controls. There, the Ninth Circuit struck down an Executive Order from President Trump's first term ordering agencies to broadly defund

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

"sanctuary cities" without congressional authorization. 897 F.3d 1225 (2018). The Court held that, because the United States Constitution "exclusively grants the power of the purse to Congress, not the President," "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* (citing U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, §8, cl. 1 (Spending Clause)). Rather, given the President's obligation to "take Care that the Laws be faithfully executed," the President is affirmatively obligated to distribute funds appropriated by Congress without adding unauthorized conditions. *Id.* Because Congress had not "authorize[d] withholding of funds" to sanctuary cities, President Trump and the executive branch "violate[d] the constitutional principle of the Separation of Powers" by claiming "for itself Congress's exclusive spending power" and attempting to "coopt Congress's power to legislate." *Id.*

So too here. Section 4 of the Denial-of-Care Order directs every federal agency to "immediately" "ensure that institutions receiving Federal research or education grants end" gender-affirming care. And while Section 4 purports to direct only actions "consistent with applicable law" and "in coordination with the Director of the Office of Management and Budget," similar caveats did not save the order at issue in *San Francisco*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."). The "clear and specific language," *id.* at 1239, of the Denial-of-Care Order is obvious. It directs the "defunding" of medical institutions that provide gender-affirming care. The Gender-Ideology Order similarly directs federal agencies to "end the Federal funding of gender ideology," and to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." E.O. 14,168 §§3(e), (g). Just as in *San Francisco*, President Trump did not even attempt to identify any federal laws conditioning the receipt of federal funds on denying transgender youth gender-affirming care or a refusing to recognize transgender identity. No such law exists, much less in unambiguous terms required for a valid

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

exercise of congressional spending power. The Supreme Court has likened Congress's power to condition federal funds as "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The "legitimacy" of such conditions "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id*. (citations omitted). As such, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*.

Congress did not do so. For example, medical institutions in the Plaintiff States receive federal research grants authorized by Congress under dozens of federal statutes, not one of which conditions receipt of such funds on depriving patients of gender-affirming care or recognizing transgender identity. Dkt. #16 ¶22; Dkt. #116 ¶15; Dkt. #92 ¶16; Dkt. #97 ¶16.[3]

Indeed, Congress has passed numerous laws *prohibiting* federal interference in the practice of medicine and patients' private medical decisions and prohibiting sex-based discrimination in medicine. For example, the Social Security Act (Medicare and Medicaid) forbids federal interference in medical decisions by practitioners and guarantees individuals the right to make their own choices about needed medical care. *See, e.g.*, 42 U.S.C. §1395 ("[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided"); *id.* §1396a(a)(23) (providing individuals freedom of choice to obtain health services from any institution, agency, or person qualified to participate). Similarly, the Affordable Care Act prohibits discrimination on the basis of sex by any health program receiving

---

[3] Indeed, no appropriations bill in the last decade has included a condition requiring denial of gender-affirming care or prohibiting recognition of transgender identity. *See* House Bill 4366, https://www.congress.gov/bill/118th-congress/house-bill/4366/text; House Bill 2617, https://www.congress.gov/bill/117th-congress/house-bill/2617/text; House Bill 2471, https://www.congress.gov/bill/117th-congress/house-bill/2471/text; House Bill 1158, https://www.congress.gov/bill/116th-congress/house-bill/1158/text; House Bill 1625, https://www.congress.gov/bill/115th-congress/house-bill/1625/text; House Bill 1244, https://www.congress.gov/bill/115th-congress/house-bill/244/text; House Bill 2029, https://www.congress.gov/bill/114th-congress/house-bill/2029/text.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

federal assistance. *Id.* §18116; *see Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) (en banc) (state Medicaid plan's categorical exclusion of coverage for gender-affirming care violated the ACA's anti-discrimination requirement).

By attaching conditions to federal funding that were not only unauthorized by Congress but that contravene laws prohibiting federal interference and discrimination in the practice of medicine, the Orders usurp Congress's spending, appropriation, and legislative powers. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). This Court should enjoin Defendants' implementation and enforcement of the Orders.

### 3. The Denial-of-Care Order's criminalization of gender-affirming care violates the Tenth Amendment and separation of powers

By attempting to criminalize gender-affirming care, the Denial-of-Care Order usurps the States' reserved powers to regulate the practice of medicine, in violation of the Tenth Amendment. The Tenth Amendment provides that "[t]he Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." The President has no enumerated power to regulate the practice of medicine or to criminalize medical practices. Nor has he been authorized by Congress to do so. The Order thus encroaches on powers reserved to the States.

It is long-established that the "direct control of medical practice in the states is beyond the power of the federal government." *Linder v. United States*, 268 U.S. 5, 18 (1925). States have historically regulated the field of healthcare and set medical standards of care as a quintessential exercise of their police power. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387 (2002); *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (recognizing the state's powers to regulate medical professions from "time immemorial"). Throughout the nation's history, states have exercised such police powers to protect the health and safety of their citizens as primarily "matter[s] of local concern." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *see also*

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (holding that the Controlled Substance Act did

2   not manifest intent to "regulate the practice of medicine," which has traditionally fallen within

3   core state police powers).

4         Here, each of the Plaintiff States has exercised their police powers to authorize and

5   protect gender-affirming care, including for transgender youth. Washington, for example, makes

6   clear that the provision of or participation in any gender-affirming treatment consistent with the

7   standard of care in Washington by a license holder does not constitute unprofessional conduct

8   subject to discipline. Wash. Rev. Code §18.130.450; *see also* Dkt. #117 ¶5. It also enacted the

9   Gender Affirming Treatment Act to protect the rights of insured individuals seeking coverage

10  for gender-affirming medical treatment. Wash. Rev. Code §74.09.675. Washington has also

11  enacted a shield law protecting providers and patients in providing or obtaining gender-affirming

12  treatment. Wash. Rev. Code §7.115. As part of the regulation of practice of medicine, Oregon,

13  Minnesota, and Colorado likewise do not treat the gender-affirming care meeting standards of

14  care as unprofessional conduct. Dkt. #103 ¶¶5-7; Dkt. #104 ¶9; Colo. Rev. Stat.

15  §12-30-121(2)(a). The Plaintiff States further ensure insurance coverage for gender-affirming

16  care. *See* Dkt. #114 ¶10; Dkt. #94 ¶9; Dkt. #87 ¶9; 3 Code Colo. Regs. 702-4, Regulation 4-2-

17  42, §5(A)(1)(o). And this Court need not determine if Congress would have authority to preempt

18  these laws because Congress has never outlawed gender-affirming care.

19        The President, in contrast, has no enumerated power to regulate the practice of medicine

20  or to criminalize medical care. But this is exactly what the Denial-of-Care Order does. It broadly

21  redefines gender-affirming care—including non-surgical options like puberty-blocking

22  medications and hormone therapy—as "mutilation," in a bad-faith effort to bring this necessary,

23  life-saving care within the federal prohibition on "female genital mutilation" under

24  18 U.S.C. §116. And it directs the Department of Justice to "prioritize" these baseless

25  prosecutions. But 18 U.S.C. §116 applies only to "procedure[s] performed for *non-medical*

26  *reasons* that involve[] partial or total removal of, or other injury to, the external female genitalia."

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    *Id.* §116(e) (emphasis added). It has nothing to do whatsoever with non-surgical treatments—

2    which are generally the only treatments minors can receive. And it explicitly excludes any

3    "surgical operation" that is "necessary to the health of the person on whom it is performed, and

4    is performed by a person licensed in the place of its performance as a medical practitioner[.]"

5    *Id.* §116(b). The statute cannot apply to gender-affirming care provided by state medical

6    providers and authorized under the law of Plaintiff States.

7        Courts will not construe a statute to "alter the federal-state framework by permitting

8    federal encroachment upon a traditional state power," unless "Congress conveys its purpose

9    clearly." *United States v. Bass*, 404 U.S. 336, 349 (1971); *see also Gonzales*, 546 U.S. at 274

10   ("Just as the conventions of expression indicate that Congress is unlikely to alter a statute's

11   obvious scope and division of authority through muffled hints, the background principles of our

12   federal system also belie the notion that Congress would use such an obscure grant of authority

13   to regulate areas traditionally supervised by the States' police power."); *Solid Waste Agency of*

14   *N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (invalidating agency

15   interpretation of federal statute where it "would result in a significant impingement of the States'

16   traditional and primary power over land and water use"). Here, 18 U.S.C. §116 clearly respects

17   the States' historic authority to govern the practice of medicine.

18       Even though 18 U.S.C. §116 clearly does not prohibit gender-affirming care lawfully

19   provided in the Plaintiff States, Defendants have not disavowed weaponizing the statute in

20   exactly this way. Dkt. #136 pp.25-26; TRO Hearing Tr. 18:14-21. The Denial-of-Care Order

21   thus terrorizes medical providers and parents with threats of investigation and prosecution for

22   medical care that is lawful in the Plaintiff States. Physician Plaintiff 1 Supp. ¶¶12-13; Physician

23   Plaintiff 2 Supp. ¶9; Physician Plaintiff 3 Supp. ¶7; Dellit Supp. ¶5. It usurps the Plaintiff States'

24   authority in violation of the Tenth Amendment and subverts 18 U.S.C. §116's specific exclusion

25   of medical care in violation of separation of powers.

26

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1

### 4. The Orders are unconstitutionally vague

2       The Orders are facially vague because they seek to enforce a definition of "sex" that is

3   nonscientific, nonsensical, and cannot apply to anyone.

4       Executive Orders are subject to the same vagueness standards as statutes. *See*

5   *Humanitarian Law Project v. Dept. of Treasury*, 463 F.Supp.2d 1049, 1057-1064 (applying

6   statutory vagueness standard to executive order). "A statute is void for vagueness when it does

7   not sufficiently identify the conduct that is prohibited." *United States v. Wunsch*, 84 F.3d 1110,

8   1119 (9th Cir. 1996). "A law is unconstitutionally vague if it fails to provide a reasonable

9   opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and

10  discriminatory enforcement." *United States v. Mincoff*, 574 F.3d 1186, 1201 (9th Cir. 2009); *see*

11  *also United States v. Williams*, 553 U.S. 285, 304 (2008) (cleaned up).

12      Here, the Gender-Ideology Order in Section 2 provides the definition of "sex," that

13  governs the Denial-of-Care Order as "an individual's immutable biological classification as

14  either male or female." E.O. 14,168 §2(a). The Gender-Ideology Order further defines "Female"

15  as "a person belonging, *at conception*, to the sex that produces the large reproductive cell." *Id.*

16  §(2)(d) (emphasis added). It defines "Male" as "a person belonging, *at conception*, to the sex

17  that produces the small reproductive cell." *Id.* §2(e) (emphasis added).

18      But zygotes do not produce reproductive cells "at conception." Shumer Supp. ¶8; *see*

19  *also* Dkt. #18 ¶¶18-23; Dkt. #19 ¶¶27-37, 103-105. The labels "male" and "female" "cannot be

20  assigned at conception prior to the process of sex differentiation." Shumer Supp. ¶8. These

21  "inaccurate definitions" "make the Order nonsensical." *Id.* ¶22. The Denial-of-Care Order

22  requires determination of an individual's sex. *See* Dkt. #161 pp.18-19. But the Orders define

23  these terms in pure gobbledygook and are unconstitutionally vague.

24  ### D. Plaintiffs Will Suffer Irreparable Harm if the Orders Are Not Enjoined

25      If the Orders are not blocked, Plaintiffs will suffer serious and irreparable harm. *See*

26  *Brandt*, 47 F.4th at 672; *see also* Dkt. #161 pp.26-27. As discussed above, the Orders violate the

---

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

constitutional rights of the Plaintiffs and their medical institutions, providers, and adolescent patients, which is, in and of itself, irreparable harm. *See, e.g.*, *Hecox*, 104 F.4th at 1088; *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017).

If they stand, the Orders will dramatically reduce if not eliminate the availability of gender-affirming care for transgender adolescents, causing them catastrophic harm. Dkt. #19 ¶¶113, 115; Dkt. #15 ¶¶33-35; Dkt. #102 ¶¶9-13; Dkt. #113 ¶¶9-10; Dkt. #119 ¶5. Transgender adolescents are already vulnerable, facing higher risks of suicide, eating disorders, anxiety, and depression. Dkt. #76 ¶13; Dkt. #77 ¶11; Dkt. #86 ¶¶9, 11; Dkt. #69 ¶4; Dkt. #68 ¶6; Dkt. #102 ¶7. With treatment, these youth experience an "overwhelming sense of relief"—a type of "gender euphoria" that allows them to "plug into life, "flourish," become "outgoing," and "willing to try new things," even gaining the confidence to become class president. Dkt. #13 ¶¶20-21; Dkt. #77 ¶13; Dkt. #86 ¶10; Dkt. #106 ¶13; Dkt. #39 ¶6. For most adolescents this takes "many months, and often years, of careful medication titration and medical monitoring to get them to that healthy, thriving place." Dkt. #13 ¶26.

If transgender and gender-diverse youth are unable to access gender-affirming care, even temporarily, they can quickly develop secondary sexual characteristics inconsistent with their gender identity, potentially "causing lifelong gender dysphoria," and "prolonged negative mental health outcomes." Dkt. #86 ¶13; Dkt. #15 ¶¶33-35; Dkt. #88 ¶15; *see also* CEO-MN-1 ¶13 ("Stopping gender-affirming medical for youth with forcibly detransition youth against their wishes."). Transgender children and their parents are afraid to return to the anguish of gender dysphoria, in which children suffered "severe depression," "suicidal ideation," and felt "trapped" in bodies that "felt foreign." Dkt. #69 ¶4. Some "cannot go back to the way they felt before they received gender-affirming care"—"their world would close in and go dark." Dkt. #76 ¶15; Dkt. #43 ¶10. Many transgender adolescents have already experienced trauma from harassment and violence and losing access to care will only expose them to "more violence as their outward

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

appearance changes and they no longer 'pass.'" Dkt. #74 ¶17; Dkt. #83 ¶13; Dkt. #46 ¶¶10-11; Dkt. #121 ¶7; Dkt. #122 ¶6.

Legal uncertainty itself is already wreaking havoc. Providers have been "deluged" with "frantic" calls and emails from patients and parents "terrified at the prospect of losing access to this care." *E.g.*, Dkt. #13 ¶25; Dkt. #14 ¶¶24-25; Dkt. #116 ¶16. After the Order, providers have witnessed increased "anxiety, depression, despair, and suicidal ideation" among their patients, many of whom tie it to their "feeling hopeless about their existence, or their child's existence, as transgender." Dkt. #108 ¶10. Providers are worried patients may seek treatment options on the internet or through other illicit sources. Dkt. #96 ¶5; Dkt. #98 ¶19. Organizations supporting gender-diverse youth have likewise seen a spike in crisis calls from transgender youth who are suicidal or considering self-harm, and transgender youth have started to crisis plan for access to medications, including through dangerous methods. Dkt. #118 ¶¶10-12; Dkt. #115 ¶15; Dkt. #120 ¶6; Dkt. #78 ¶¶4-6. Some children's reaction to the orders was "they should end their life" and should "no longer exist after learning that the 'leader of our country hates them,'" and even young transgender kids now fear being murdered. Dkt. #108 ¶11; Dkt. #13 ¶26; Dkt. #111 ¶¶16-17.

Many parents of transgender youth are considering moving out of the country, with children asking if they can move to Canada, and preparing to split up their families if necessary. *See* Dkt. #11 p.24 n.9 (citing declarations); *see also* Dkt. #32 ¶15; C.C. ¶13; C.D. ¶14; C.S. ¶20; Caitlin P. ¶17; G.K.L. ¶17; J.L. ¶14; J.T. ¶15; Mischo ¶18; S.M. ¶10; S.T. ¶20. They are facing the difficult choice between staying in the home and State they love or keeping their children safe and healthy. Dkt. #41 ¶13. Parents have packed "emergency bags" in case they "need to suddenly flee the country." *Id*. Other parents have avoided international travel out of fear their child's passport or even their child themselves could be taken from them at the border. Dkt. #63 ¶15; S.T. ¶17. They "fear even mentioning" their child's "need for gender affirming care." Dkt. #60 ¶13. Transgender kids are now scared to go to school and families "feel boxed in from

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

every angle." Dkt. #41 ¶13. Parents are struggling to shield their young children from their growing fear about losing access to gender-affirming care.

If this care is lost or even interrupted temporarily, transgender children will predictably suffer severe anxiety, depression, and suicidal ideation, making children's "worst nightmares" a reality. Dkt. #69 ¶9; Dkt. #70 ¶11; Dkt. #14 ¶30; Dkt. #15 ¶¶34, 36; Dkt. #85 ¶19; Leggett ¶21; N.B. ¶12; S.G. ¶14; T.D. ¶11. Indeed, numerous doctors have already lost young transgender patients to suicide. Dkt. #14 ¶31; Dkt. #77 ¶11; Dkt. #99 ¶21; Prince ¶7. Shortly after the election, one provider's 18-year-old patient—who had not previously been suicidal—took her own life "rather than continue to live in a country where she was being told she should not exist." *Id*. Another Washington teen, Kai, a "bright and gentle soul" who loved game club, knowledge bowl, and Japanese club, took her own life shortly before President Trump was inaugurated, overwhelmed by the hate directed at transgender people. Dkt. #55 ¶¶4-12. If gender-affirming care disappears, Washington doctors have no doubt that "transgender adolescents will die." Dkt. #13 ¶26. They are "certain" that "there are going to be young people who are going to take their lives if they can no longer receive this care." *Id*. Dkt. #80 ¶12; Dkt. #111 ¶16; Dkt. #100 ¶16.

Moreover, the threat of prosecution and loss of funding has already caused practitioners to stop providing gender-affirming care. *E.g.*, N.V. ¶8; D.Z. & A.Z. ¶11. The White House itself has touted that the Denial-of-Care Order has forced hospitals around the country to shut down their gender-affirming care programs. Dkt. #17-9. Seattle Children's, for example, is "facing immense pressure from the federal government to stop providing gender-affirming care" and is "caught in [an]" emergency caused by the Order. Dkt. #116 ¶16. Immediately after the Order issued, a clinician in Seattle halted all care due to fear of the DOJ, requiring other providers to scramble to cover the providers' appointments. Dkt. #13 ¶29. Other providers in the Plaintiff States reasonably fear being prosecuted if they continue to provide gender-affirming care. Dkt. #14 ¶33; Dkt. #15 ¶32; Dkt. #112 ¶38; Dkt. #33 ¶12; Dkt. #108 ¶¶13-14; Dkt. #80 ¶15;

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

E.L. ¶3; Chun ¶8. Washington already faces a shortage of providers offering gender-affirming care, with clinicians having months- or years-long wait lists, and patients driving three to four hours to meet with appropriate medical providers. Dkt. #76 ¶4; Dkt. #112 ¶¶9, 22. Absent an injunction, the Denial-of-Care and Gender-Ideology Orders' funding restrictions will only intensify this shortage, making this necessary, often life-saving care all but impossible to access. Dkt. #122 ¶8. These injuries are irreparable. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-98 (9th Cir. 2019).

The loss of hundreds of millions of dollars in funding also constitutes irreparable harm. UW School of Medicine alone would lose nearly half a billion dollars in research grants annually, putting the University and its providers in the untenable position of either violating the integrity of their medical judgment and ethical obligation to provide evidence-based care for their patients, or risk their and their colleagues' research, practices, and livelihoods. Dkt. #16 ¶20; Dkt. #13 ¶33; Dkt. #14 ¶32; Dkt. #15 ¶39; Dkt. #77 ¶18; Dkt. #76m¶15; Dkt. #82 ¶¶14, 16; Catherine Doe ¶17. If enforced, the Order would eliminate all manner of research and treatment, including for cancer, AIDS, diabetes, drug abuse, mental health treatment, autism, aging, cardiovascular diseases, maternal health, and so much more. Dkt. #16 ¶9; Dkt. #116 ¶13. These institutions are relied on by their surrounding communities to train doctors, provide medical care, and conduct research into life-saving medications and procedures. *See id.*

### E.    The Balance of Equities Weigh in Plaintiffs' Favor, and a Preliminary Injunction Is in the Public Interest

The equities and public interest, which merge when the government is a party, tip sharply in favor of the Plaintiffs. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024); *see also* Dkt. #161 pp.27-28. The threat of harm to Plaintiffs far outweighs the federal government's interests in immediately enforcing the Orders, and preserving Plaintiffs' constitutional rights is in the public interest. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (citation omitted)).

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1   The balance of equities decidedly supports a preliminary injunction, and the Court should
2   preserve the status quo until the case can be decided on the merits.

3     Whatever interest the federal government may have in cutting off treatment to
4   transgender kids during the pendency of this case pales in comparison to Plaintiffs' irreparable
5   harm. In contrast to the personal and irreparable harms faced by the Plaintiffs, a preliminary
6   injunction would not harm the federal government at all, but merely maintain the status quo.
7   Gender-affirming care has been provided safely for many years. And the Orders fail to identify
8   any harm to the federal government from the provision of such care. "[B]y establishing a
9   likelihood that [the government's] policy violates the U.S. Constitution," Plaintiffs "have also
10  established that both the public interest and the balance of the equities favor a preliminary
11  injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

## VI. CONCLUSION

13    The Court should grant the Plaintiffs' Preliminary Injunction Motion.

14    DATED this 19th day of February 2025.

15             I certify that this memorandum contains 8,377
16             words, in compliance with the Local Civil Rules.

17             NICHOLAS W. BROWN
             Attorney General of Washington

18             */s/ William McGinty*
19             WILLIAM MCGINTY, WSBA #41868
             CYNTHIA ALEXANDER, WSBA #46019
20             TERA HEINTZ, WSBA #54921
             ANDREW R.W. HUGHES, WSBA #49515
21             NEAL LUNA, WSBA #34085
             CRISTINA SEPE, WSBA #53609
22             LUCY WOLF, WSBA #59028
             Assistant Attorneys General
23             800 Fifth Avenue, Suite 2000
             Seattle, WA 98104-3188
24             (360) 709-6470
             William.McGinty@atg.wa.gov
25             Cynthia.Alexander@atg.wa.gov
             Tera.Heintz@atg.wa.gov
26             Andrew.Hughes@atg.wa.gov
             Neal.Luna@atg.wa.gov

PLAINTIFFS' MOTION FOR      25    ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION           Complex Litigation Division
NO. 2:25-cv-00244-LK           800 Fifth Avenue, Suite 2000
                    Seattle, WA  98104
                    (206) 464-7744

Cristina.Sepe@atg.wa.gov
Lucy.Wolf@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS, WSBA #53238
COLLEEN MELODY, WSBA #42275
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(360) 709-6470
Lauryn.Fraas@atg.wa.gov
Colleen.Melody@atg.wa.gov
*Attorneys for Physician Plaintiffs 1-3*


KEITH ELLISON
Attorney General of Minnesota

*/s/ James W. Canaday*
JAMES W. CANADAY (admitted pro hac vice)
Deputy Attorney General
445 Minnesota St., Ste. 600
St. Paul, Minnesota 55101-2130
(651) 757-1421
james.canaday@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*


DAN RAYFIELD
Attorney General of Oregon

*/s/ Allie M. Boyd*
ALLIE M. BOYD, WSBA #56444
Senior Assistant Attorney General
Trial Attorney
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700
allie.m.boyd@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*


PHIL WEISER
Attorney General of Colorado

*/s/ Shannon Stevenson*
SHANNON STEVENSON*
Solicitor General
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:25-cv-00244-LK

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1

(720) 508-6000
shannon.stevenson@coag.gov
2    *Attorneys for Plaintiff State of Colorado*

3    *pro hac vice application pending

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26