The Honorable Lauren King

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:25-cv-00244-LK |
| Plaintiffs, | DECLARATION OF G.K.L. |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

DECLARATION OF G.K.L.
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, G.K.L., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I have chosen to submit this declaration using only my initials, and to identify my children as Child A and Child B, because I am fearful that the government could retaliate against me or my children. I also am fearful that individuals emboldened by recent actions of the Federal Government would target my family for speaking out.

3. I am married and the parent of three children, two of whom are transgender. Child A, a 23-year-old, is transgender and non-binary. Child B, a minor aged 14-years-old, is a transgender girl.

4. Child A was assigned female at birth but is non-binary and uses they/them pronouns. Child A is in their mid-20's, is starting their education career, and happily lives with their boyfriend. Child A came out when they were 18, during the COVID lockdown. Since Child A came out when they were in college and legally an adult, the family was less able to support them, with things like paperwork and updating critical documents. They had varying and difficult experiences with professors, and they lost friends after coming out. This transition was marked with great emotion. As part of their transition, Child A had gender-affirming "top" surgery. Despite this earlier tumult, Child A is happy now that they live authentically as themselves and engages in positive, supportive, and uplifting experiences now.

5. My youngest child, Child B, is a transgender girl, which means her gender identity is female, although she was assigned a male gender at birth.

6. Although we didn't have the language for it at the time, the first indication that Child B's gender identity was not consistent with her sex assigned at birth occurred in approximately 2014, when she was around three years old. We noticed immediately that Child B was different than her siblings. For example, Child B would wear pajama bottoms on her head like a wig. When questioned, she would either admit to that she was pretending she had a long

DECLARATION OF G.K.L.
NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

head of hair, or claim that the pants were merely a "head warmer." She continued wearing pajama pants on her head even into the summer months. She also seemed hyperaware of societal expectations about what boys did and what girls did. If guests came over while Child B was dressed up in a "girly" costume, she would run and hide. Screaming and crying were common during these times. Child B's feeling that she had to meet societal expectations about gender caused her significant distress. There really is no adequate way to describe what those years were like and how different her development really was from the expected norm. Until you live through it, these facts seem not too different from any other childhood "theatrics." They are far from it.

7. Over the course of three years, my husband and I conducted significant research on gender identity and sought guidance from medical providers, the trans community, and my Christian religious community. Indeed, it was a pastor with whom our family is close that put us into contact with members of the LGBTQ community who helped us learn about how important it was that we support Child B. Ultimately, the medical information convinced us that it was necessary that we support Child B in being who she is.

8. Child B socially transitioned at six years old. Child B was ecstatic when my husband and I supported her transition, a joy she promptly demonstrated by marching out the front door and loudly pronouncing herself to the world. Shortly after she came out, Child B's friends invited her to their house, where they gave her a large bag of hand-me-down clothing; she was tremendously grateful and validated by this gesture. In fact, Child B did not lose a single friend.

9. Child B socially transitioned shortly before beginning the first grade. She attended the same elementary school as both of her older siblings, which was helpful because we had a positive relationship with that school's principal. My husband and I spoke with the principal in August before school began and informed him of Child B's transition, to which he was totally supportive. We discussed accommodations for Child B's restroom needs and asked

DECLARATION OF G.K.L.
NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

that he keep her transition a secret, which he did. Child B had no issues using the restroom. While it was not widely known she was transgender, there were classmates and families who did know her from before her transition at the same school. On one occasion during recess in Child B's first grade year, she deemed the principal was trustworthy enough to run up and hug. Although her principal was surprised by this, his continuous support proved to Child B that she was safe. I recall the principal noting that his observations of Child B from before her transition were of a quiet and reserved child. He was surprised to see her transformed into this outgoing, boisterous, and happy child playing with her friends on the playground.

10. Although Child B's elementary school experience was undeniably positive, we were aware when she moved onto sixth grade, that the middle school's principal was more conservative and less accommodating of trans students, which gave reason for her to lay low throughout junior high. Now in ninth grade, her high school has been supportive to date, though Child B is "stealth" at school. Child B still has the same friends from her early childhood who know she is transgender and who are protective of her. She also has newer friends who seemingly do not know and accept her for who she truly is. We know how lucky Child B has been to have a mostly supportive and uneventful experience with school.

11. When we first started researching and speaking with Child B's doctors, we were informed that one of the criteria is that a child must be consistent, persistent, and insistent to begin gender-affirming treatment. Child B checked each of these boxes going into treatment and has showed no signs of wavering. It is an extensive process. No one ever wants to misdiagnosis a child with any condition. A day I consider a turning point in my relationship with Child B occurred shortly after her social transition. We were sitting together, and in discussing her transition, I told her that if she felt this way when older, there were things doctors could do to help her to look and feel like a girl. She was immediately hopeful and asked if we could do those things then.

DECLARATION OF G.K.L.
NO. 2:25-cv-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

12. Child B started taking puberty blockers shortly after puberty began, and soon after began taking estrogen; she has only truly experienced female puberty. To even start puberty blockers, Child B was thoroughly evaluated and, as a family, we were thoroughly informed of the implications of her treatment before it started. The vetting process and the information provided was thorough in a way myself or my husband has not ever received for any other medical condition or treatment. One commonly overlooked component of gender-affirming care, particularly puberty blockers and hormone therapy, is that bodily changes are closely tracked through quarterly blood exams that analyze the body's hormone levels, including testosterone. Child B is closely and consistently monitored by her medical providers, and her testosterone levels are at the bare minimum, indicative of successful treatment.

13. One of the things important to Child B's gender identity was her height; both her father and one of her siblings are over six feet tall, and she worried a lot about being that tall. There are also taller women in our family. She would talk about how she wanted to be taller than Child A, but shorter than me. After speaking with Child B's medical providers, we learned that her height can somewhat be influenced both by the timing of her estrogen treatment and how quickly her estrogen levels increase over time. It is important to note that her treatment is still within the boundaries of typical range of puberty for cisgender girls. Child B's doctor was confident that she, without medical intervention, would also grow to over six feet tall. However, by starting estrogen treatment at the outset of puberty, and increasing her estrogen levels a bit more quickly over time, Child B's height has slowed and has grown to around five and a half feet tall. Because one aspect of height can be influenced by the timing and amount of estrogen treatment, Child B is asked at each doctor's appointment whether they are happy with their growth, and she and her doctor talk about whether and how her levels need to be adjusted. It is just one example of the level of care Child B receives. Due to these regular and detailed visits for Child B, I have learned a great deal more not about just Child B's body, but about the human body in general and, as a result, my own body too.

DECLARATION OF G.K.L.  
NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
(206) 464-7744

14. Child B has thrived since she transitioned and began receiving gender-affirming care. Child B is the same as any other child her age. She loves gaming, often playing with her friends online, and spends a lot of time in-person with friends too. Recently, she attended her first homecoming dance, at which she was made to feel welcome and accepted by a large group of friends. Child B also loves volleyball. She is a good player, but by no means is she a top competitor with a competitive advantage. She's just like any other member of the team. This year, she chose not to try out for the high school team.

15. I am aware of the Executive Order putting conditions on gender-affirming care for youth. Although I understand that executive orders are not law, I also understand that he is directing agencies to withhold funding from hospitals and programs that provide gender-affirming care.

16. Our family has worked hard to insulate Child B from divisive political rhetoric aimed at the transgender community. For example, after Child B came out, I had to cut off contact with my family because they were unaccepting, and we had to limit contact with my husband's family too. We did this to protect Child B. Regardless, in the past month, we've had several conversations about the political climate. Among other things, we've talked with Child B about why we think it's important that she keep the fact that she's transgender private. Although we're not worried about what her friends might think, we're worried about what adults in their lives might say or do. Child B also has a planned out of state school trip. We've made plans about how and when to change her estrogen patches, so that we don't have to risk flying with them in our luggage, even though we have a valid prescription for them. We've debated whether we should even go on the trip, given the current climate.

17. As of now, Child B's gender-affirming medical care has not been disrupted. Her care is covered under my husband's work-sponsored health insurance, which explicitly covers gender-affirming care. However, we worry what may happen if Child B's access to puberty blockers and estrogen is cut off. We have made contingency plans to ensure that Child B can

DECLARATION OF G.K.L.
NO. 2:25-cv-00244-LK

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

continue to receive the medical care that she needs, and have also discussed leaving Washington, or even the United States, to get Child B the care she needs. But we don't want to leave.

18. We feel hunted in the current political climate. Although I was previously a person who kept up with the news, for my own health, I have had to stop doing that as political rhetoric has shifted. My husband and I deleted our social media accounts to avoid seeing anti-trans posts as well. We now only use end-to-end encrypted platforms for maintaining connections with other families with transgender children. We've become extremely security-cautious out of fear that we could be identified and targeted by the Federal Government or transphobic individuals.

19. We know that Child A and Child B have been very privileged to be born into a family that loves and accepts them for exactly who they are and have the resources to obtain the care they need. But not every transgender child is so lucky. I look forward to the day that a child identifying their gender will be treated like any other childhood developmental milestone.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this __18th__ day of February 2025.

_____
G.K.L.
Parent of Child A and Child B

DECLARATION OF G.K.L.
NO. 2:25-cv-00244-LK

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744