The Honorable Lauren King

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:25-cv-00244-LK |
| Plaintiffs, | DECLARATION OF J.V. AND P.V. |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

DECLARATION OF J.V. AND P.V.
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

We, J.V. and P.V., declare as follows:

1. We are both over the age of 18, competent to testify as to the matters herein, and make this declaration based on our personal knowledge.

2. We have chosen to submit this declaration using only our initials, and to identify our child as "Child A," because we are concerned that individuals emboldened by recent actions of the federal government would target our family for speaking out.

3. We are the parents of Child A, who is 18 years old and an only child. Our family lives in Vancouver, Washington.

4. Child A is a transgender woman, which means her gender identity is female, although she was assigned a male gender at birth.

5. The first hint of differences in Child A's gender identity came in approximately August 2020, when she told us that she was bisexual. Two months later, in late October or early November 2020, she reported that she believed she might be transgender. At that point, her feelings appeared tentative; she seemed to be engaged in a process of discernment. We understood that we were the first people Child A told about these feelings, after her best friend. We were grateful for her trust, but we still felt worried and afraid.

6. At the time we knew very little about what it meant to be transgender. Much of what we knew, or believed we knew, was negative. Our heads were filled with stereotypes and terrible images of the fate we thought awaited transgender people: a life of drug use, homelessness, sex work, and even violent death. That's what we expected and worried about, and it was not what we wanted for Child A. These thoughts were very difficult for us, of course.

7. Privately, we wondered if our daughter's feelings were just a phase. We were also highly resistant to the idea of a medical gender transition. As we became educated on gender dysphoria and the validity of gender-affirming care, our opinions about this changed. But on the day in the fall of 2020 when Child A first talked to us about her gender identity, our sole focus

DECLARATION OF J.V. AND P.V.
NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

was on assuring our daughter that she was loved and accepted and would always have a place in our home and our hearts.

8. Later, Child A said that when she was young, she wanted Minnie Mouse ears, not Mickey, but that she never mentioned this to us. We also recall that Child A always sat to urinate. It's possible that these were signs our daughter didn't identify with the gender assigned to her at birth, but we can't be sure. In hindsight, the main sign that Child A was suffering was the aggression and disrespect she displayed to us. For years, right up to the point at age 14 when she came out as transgender, Child A would push and hit her mother, and act in a terribly disrespectful way towards her father. She didn't act this way at school; she saved it for home. Child A received counseling to help address her aggression, but it created a continual strain on our family. She acted out most days of the week. We now think it is likely our daughter was struggling with gender dysphoria, a condition involving a mismatch between her physical presentation and her private experience of gender.

9. Child A's aggression lifted almost the day she came out to us as transgender. What followed was a long, careful process of social transitioning. Though she first talked to us about her gender identity in the fall of 2020, it wasn't until April or May of 2021 that Child A asked us to use female pronouns, or to call her by a different name. She even asked us to delay any public acknowledgement of her transition until after a family wedding that spring, because she didn't want to steal the focus from the bride. Of the many things about our daughter that make us proud, one is the way she handled her gender transition. We have heard anecdotes about young people being rushed into gender transitions, but this has not been our experience. Our daughter proceeded thoughtfully and carefully through her transition. We feel that she could write a book on how to go through a gender transition successfully.

10. One of the first steps we took after Child A talked to us about her gender identity was to schedule an appointment with a general practitioner in a gender clinic. We didn't understand then that we were skipping several steps; after consulting with our family therapist,

DECLARATION OF J.V. AND P.V.  
NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
(206) 464-7744

we cancelled the appointment with the doctor and started at the beginning. Within weeks of coming out to us, Child A started weekly therapy sessions at a Vancouver-area therapy and social work practice. We attended some of these sessions with her.

11. After only two therapy sessions I, Child A's dad, understood that gender dysphoria is real. This is something I would not have believed before. If more people had our family's experience they would know, as I now know, that gender identity is not something a person chooses, something to be turned on or off. I believe that transgender people have existed since the beginning of time. If our daughter was born 50 years earlier, she might be closeted, but she would be transgender. Her transgender identity, and her female gender identity, are real.

12. Child A went through at least six months of therapy before seeking any medical intervention to affirm her gender. She obtained a letter from the therapy and social work practice, recommending gender-affirming care to address gender dysphoria. Though we had a referral to a gender clinic, it took months to get an appointment. In the first appointment, the doctor discussed the options, risks and other details of gender-affirming care with us. We discussed puberty blockers and hormones, and learned it was too late for puberty blockers since Child A had already entered puberty. We discussed the option of fertility preservation, to give Child A the option of conceiving a biological child later in life. The doctor talked to our daughter privately about her gender identity and her desire for gender-affirming care. They sent us home with paperwork and information to read. We made no decisions in that first appointment. Our plans for gender-affirming care for Child A came together over the multiple appointments that followed. It was a thoughtful, painstaking process.

13. Child A obtained a prescription for estrogen and began hormone replacement therapy in September of 2021. This was eleven months after she first told us she believed she might be transgender. Telling us about her gender identity and taking steps towards social and medical transitioning had a powerful effect on Child A. The relief she felt was obvious. She grew her hair out and began wearing slightly more feminine clothing—a modest change that suited

DECLARATION OF J.V. AND P.V.  
NO. 2:25-cv-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
(206) 464-7744

her perfectly. Today she is happier, and more confident. She is a pro wrestling fan, and a huge fan of the Raiders NFL Team. She loves debating politics with her dad. She enjoys life.

14. Child A previously suffered from depression and suicidal ideation, and engaged in self-harm and cutting. This behavior straddled the time when she came out to us as transgender at age 14. Through continued therapy the risk of self-harm risk has lessened, and we don't worry nearly as much as we once did. This is a tremendous relief to us. We believe that talk therapy is gender-affirming care just as much as hormone therapy is. Both are essential tools to keep our daughter healthy and safe.

15. When she was as young as 16 years old, Child A expressed a desire for surgical gender-affirming care. Together, the three of us consulted with her therapist and came to the decision that a surgical transition wouldn't be appropriate for her until she was at least 18. She currently has no specific plan to seek surgical gender-affirming care, but she may seek that care in the future.

16. I am aware of the federal government's Executive Order restricting and preventing gender-affirming care for individuals under age 19.

17. I would be very concerned if the restrictions in the Executive Order were to affect medical providers in Washington.

18. Hormone replacement therapy and talk therapy are both essential forms of gender-affirming care for Child A. Without gender-affirming care, including estrogen therapy, we are convinced that our daughter would not survive. The risk of suicide is too great. Similarly, if her therapist were prevented from discussing her gender identity, or even using her correct pronouns, the efficacy of the therapy would be severely undermined. It would be pointless for our daughter to continue with that therapy, and she would not continue. This creates a terrible and entirely needless risk to our daughter's mental health and her safety.

19. Our daughter is 18 years old, a legal adult. If the Executive Order is implemented and gender-affirming care is prohibited for patients under age 19, hopefully our daughter could

DECLARATION OF J.V. AND P.V.  
NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
(206) 464-7744

wait until she aged out of the affected population. However, this assumes the continued viability of gender-affirming care for adults in the U.S., including those aged 19 and older. In any event, it is essential for our daughter to have continued gender-affirming care. We do not know the seriousness of the suicide risk for other transgender and gender-diverse individuals, but the risk is terribly real for our family. The federal government's attempt to withdraw all gender-affirming care from patients under age 19, on a blanket basis and without exception, is a dangerous mistake. Every patient with gender dysphoria has unique needs for gender support and gender-affirming care. The federal government should not attempt to dictate the experiences of families, or the medical needs of patients.

20. Being transgender and suffering from gender dysphoria are conditions that transcend politics. The first family we knew with a transgender child were deeply religious. They were also conservative politically, as our family is (mom somewhat less than dad). Before Child A came out to us as transgender, we had many wildly inaccurate ideas about what it meant to be transgender. We now know the truth: that transgender people are simply people. Anyone who knows a transgender person understands the same. Unfortunately, the federal government's packaging of its Executive Order, and the rhetoric and language used to describe transgender people, all perpetuate the worst stereotypes and misconceptions about what it means to be transgender.

21. If Washington State were not suing to block the implementation of the Executive Order, it is unlikely that our family would take legal action on our own to challenge the government. We would be motivated to do so, to support not only our own daughter but also other affected families. But the financial cost of a private legal action would be too much for us to shoulder.

DECLARATION OF J.V. AND P.V.  
NO. 2:25-cv-00244-LK

5

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
(206) 464-7744

We declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 16 day of February 2025.

_____
J.V.

_____
P.V.

Parents of Child A

DECLARATION OF J.V. AND P.V.
NO. 2:25-cv-00244-LK

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744