The Honorable Lauren King

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:25-cv-00244-LK |
| Plaintiffs, | DECLARATION OF S.T. |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

DECLARATION OF S.T.
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, S.T., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I live in Seattle, Washington with my wife and two daughters.

3. I work in the legal department of a tech company and my wife is a small business owner. Our daughters are nine and eleven years old. We have lived in Washington for over 16 years.

4. My 11-year-old daughter is transgender. She is also neurodiverse. She is autistic and has struggled with anxiety and depression. At school, she is considered "twice exceptional," which means that she is gifted in some learning modalities and struggles with learning disabilities in others.

5. I have chosen to refer to her as "Minor A" because I am fearful that the government could retaliate against me or my child, or individuals emboldened by recent actions of the federal government would target my family for speaking out. This is also why I have chosen to submit this declaration using only initials.

6. Minor A is a bright, social, inquisitive and spatially gifted child. She loves to build things and play boardgames with friends. Minor A is also an athlete, playing competitive ice hockey and gymnastics.

7. When Minor A was two years old, she was obsessed with the movie Frozen and told us that she wanted a "Frozen" dress. My wife and I are supportive of both of our children's creativity and expression, so we bought her a "Frozen" dress, which she wore every day. It was not long before she wanted more dresses.

8. At this time, Minor A was still going by her birth name and was wearing her hair short. Early on it was not a big deal with other kids, but by the time Minor A went to pre-school, her classmates started to ask questions about whether she was a girl or a boy. We talked about it

DECLARATION OF S.T.  
NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
(206) 464-7744

with her and she said that she was a "sparkly" boy and wanted to continue using her birth name and he/him pronouns. She also continued to wear dresses and her favorite colors, pink and purple.

9. When Minor A was in kindergarten, we noticed that she went through a dramatic "boy phase." She stopped wearing dresses and started wearing more traditional boy clothes. We also noticed that she did not seem as happy and outgoing. She was acting out and was not herself. We learned that Minor A was being bullied at school and that the boys in her class would not let her play with them because "boys do not wear dresses." We also learned about an incident at school where a group of boys Minor A was trying to play with pushed her off a play structure. This incident was very upsetting to Minor A. After this incident, Minor A was not happy at school, she was withdrawn and her depression increased, so we started looking for a gender-affirming therapist for Minor A. Fortunately, we were able to find one and it was very helpful. Her distress lessened and she was not acting out as much. During this time, Minor A was still wearing traditional "boy" clothes to school and when we went out as a family, but at home she wore her dresses.

10. Soon after, the COVID pandemic started, and school became fully remote. All the peer pressure and bullying went away since we were at home. A few weeks into remote learning, Minor A seemed to relax a bit, and she became comfortable wearing dresses again. I remember an occasion during this time when Minor A was out with my wife, and she had to use a public restroom. My wife asked if she wanted to come into the women's bathroom with her or use the men's bathroom. Minor A said she wanted to use the women's bathroom and told her mom that she wanted to try using a more feminine version of her birthname. We started using that name and asked her how it felt. She was very clear that it "felt good."

11. As a family we supported Minor A and used her preferred name. We also told her that if she wanted to pick an entirely new name, not associated with her birth name, we would support her. Ultimately, Minor A chose a new name and shared confidently that she was a girl and wanted to use she/her pronouns. She grew her hair out and consistently started wearing more

DECLARATION OF S.T.
NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

"girlie" clothes. Minor A's birthday was around the corner, so we introduced her to the rest of the family and friends by her new name and gender pronouns at her seventh birthday. She has used this name and she/her pronouns ever since.

12. Fortunately, Minor A's social transition has been mostly smooth. Although it took her grandparents a little bit of time to come around, our family and her circle of friends are supportive.

13. Once Minor A was comfortable living as her authentic self, we noticed a difference in her demeanor. She was a happier and more content child. She had a supportive social circle and was doing well in school.

14. In 2023 Minor A was diagnosed with autism. Last year was a difficult year for Minor A. She was depressed and did not want to go to school and started socially isolating herself. Because she was struggling, we tried to shield her as best we could from the political climate and specifically all the hateful rhetoric targeting transgender and gender expansive people. The level of attention to transgender issues during the presidential campaign was very concerning to me and my wife and I started to worry about how it might impact our daughter. It has made us feel unwelcome in our own country.

15. In addition to seeing a gender-affirming therapist, we were able to find a doctor for Minor A at The Poly Clinic who provides gender-affirming care. Minor A's doctor is regularly monitoring her hormone levels and has discussed the puberty process with us and Minor A. It is not time yet, but we anticipate that it will be soon and when it is, we want our daughter to have the option of starting puberty blockers if she wants to. If she did not have access to this care, we are deeply concerned about how it would impact both her mental and physical health.

16. Minor A has been able to build a social circle that is supportive of her authentic self. There are other trans kids on her ice hockey team, and she has recently gotten involved with

DECLARATION OF S.T.
NO. 2:25-cv-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   the Lambert House, a community center for LGBTQ+, transgender and gender expansive youth
2   in Seattle.

3   17.  We were able to get the gender markers on Minor A's birth certificate and passport changed, but not her social security card. However, there is language in recent Executive Orders (EOs) that concerns us about how the government will treat our daughter at a border. My daughter has ice hockey tournaments in Canada, and we have an upcoming family trip to Mexico. I am fearful that Minor A could be detained at the border for having" fraudulent" documents, since her gender markers do not match her sex. If she were detained or questioned at the border it would be incredibly traumatizing for her. I can't believe that we do not feel safe traveling as a family.

18.  I am also aware of the EO putting conditions on gender-affirming care for youth. I am very concerned that the restrictions in it will limit access to gender-affirming care in Washington. I am terrified to think about the possibility of having to tell our daughter that she can't have the care she needs. If she does not have access to the care she needs, when she needs it, it will be detrimental to her and our family. Minor A already navigates anxiety and depression and works really hard to stay regulated. Losing access to gender-affirming care would dis-regulate her and I fear that she will become suicidal.

19.  I am also deeply worried for other transgender young people and their families. There is so much dangerous rhetoric out there targeting transgender kids, it is scary and makes us not feel welcome in our own country.

20.  If we lose access to gender-affirming care for our daughter in the United States, we have talked about moving to another country in order for her to get the care she needs. Washington is our home. Both me and my wife work here and have communities that we are part of and that mean a great deal to us. We do not otherwise want to leave the United States.

21. We are not in a position to sue the Federal Government ourselves, as it would impact us financially as well as increase the risk to our family's safety. We have two kids to protect and increasing that risk is not an option.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 18 day of February 2025.

_____
S.T.
Parent of Minor A