The Honorable Lauren King

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

STATE OF WASHINGTON, et al.,

    Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

    Defendants.

NO. 2:25-cv-00244-LK

DECLARATION OF E.L., LSWAIC

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, E.L., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am a social worker in a therapy practice in Southwest Washington State. I have an associate license in independent clinical social work, which means that I provide mental health counseling in a clinical setting under the supervision of a fully licensed social worker. I expect to become fully licensed in the coming year. I have a master's degree in social work. My undergraduate education focused on psychology and gender and sexuality studies.

3. I have chosen to submit this declaration using only initials because I am fearful that the government could retaliate against me, my therapy practice, my colleagues, or clients for providing gender-affirming care to minors or for the views I express here. Also, individuals emboldened by the anti-trans rhetoric and recent actions of the Federal Government could target me for speaking out in this litigation or for providing gender-affirming care.

4. My area of specialty is gender-affirming care for all ages, but predominantly adolescents and young adults. In the six years of my practice, I have worked with approximately 60 gender-diverse youth in various capacities. This includes groups, camp, community events, an individual therapy (either observing or conducting myself). Working in specific, individual therapeutic capacity, I have worked individually with approximately 25 individuals under the age of 18. I currently have 23 people on my caseload, some of whom are gender-diverse individuals.

5. I have known since the age of 15 that I wanted to be a therapist. As a patient, therapy changed my life. I connected with the discipline, and felt that I could do the work. Originally, I wanted to work with menopausal women because the existing body of work revealed gaps in services I wanted to help address. Then in 2015 I saw a survey that reported that 75% of Americans believe that they have never met a transgender person. I was surprised by that finding. In the area where I lived, I found that nearly all of my friends were members of

the LGBTQ+ community, and there were several trans and/or gender-diverse individuals among them.

6. Meeting and living amongst transgender people in the community was impactful for me. That population is also underserved in therapy care. There are not enough providers, particularly ones who know what they are doing and are financially accessible. In Vancouver I had friends seeking and receiving gender-affirming care. I knew that most gender-affirming care is received not by transgender people, but by cisgendered people (i.e. people who identify with the gender assigned to them at birth). I observed that gender-nonconforming people are expected to be experts in gender-affirming care as soon as they come out, and that this expectation is never forced on cisgendered people. Talking to my friends who were on hormone replacement therapy or who received top surgery, I learned how involved the decision and the process for obtaining care was. I learned that cisgender people sought and received the same procedures, but only transgender and gender-diverse people were persecuted for seeking that care.

7. I am a cisgendered woman. I decided that for reasons of equity I would focus my social work practice on gender non-conforming clients, in order to serve as a bridge and represent transgender and gender-diverse people to the wider community. Often, cisgendered people are subjected to misinformation and operate under profound misunderstandings concerning transgender people. I wanted to use my privilege as a cisgender woman to change this.

8. Today the percentage of Americans who report that they have never met a transgender person has declined slightly, to 70%. However, many more Americans than that have opinions—often really strong opinions—about transgender and gender-diverse people, the healthcare they receive, the sports they can play, the bathrooms they can use, whether they can serve their country, and their overall place in society. Misinformation has taken hold because many Americans do not know, or do not believe they know, transgender people. As a result, there is increased support for anti-transgender legislation in states and anti-trans policy at the federal level.

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

9. One misconception is that gender-affirming care is easy to access and provided to patients without due care. The reality is that obtaining gender-affirming care is a long, drawn-out process with many hoops to jump through. The process is neither easy nor quick. A minor patient's primary care provider must sign off on gender-affirming hormone replacement therapy (HRT). For adult patients in Washington, no letter of approval is required for HRT, but is required for other medical procedures such as top surgery, bottom surgery, and facial feminization surgery. Depending on the medical intervention and the state in which the person seeking care resides, at least one therapist, and in some cases two, are required to sign off after at least 4-5 appointments (in my practice, a minimum of five sessions is required). In the sessions I lead, I assess whether the gender-affirming medical intervention being sought is in the client's best interest at this time. We discuss the potential risks, benefits, and changes associated with the medical intervention so that the client can provide informed consent. We also discuss the client's mental health history, which can include meeting with a client's previous (or current primary) mental health provider(s) to further assess how the medical intervention will impact their mental health. The patient must meet with other doctors, including an endocrinologist. In most cases, a minimum of one parent is required to be on board if the individual seeking the gender-affirming medical intervention is a minor. Depending on where the services are being accessed (or the state in which they are being accessed in), both parent's participation is required. Hormone replacement therapy requires blood work to determine whether receiving hormones will exacerbate any pre-existing conditions. Bloodwork is ordered on an ongoing basis while an individual takes hormones, to ensure the safety of the intervention.

10. Gender-affirming care prior to medical intervention(s) looks like social transition support; things like name, pronouns, haircut/style, clothing, etc. are all examples of this. Medical gender-affirming care generally does not begin until patients start developing pubic hair (a development known as Tanner Stage 2). At the earliest, Tanner Stage 2 starts around age nine, but is more typically entered at age ten or eleven. The medical intervention at this stage is

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

puberty blockers, not estrogen or testosterone. Puberty blockers are especially important for transgender girls who would otherwise begin to see marked signs of masculinization from puberty. Such changes are harder to undo than to prevent. The ability to pause puberty for one to three years is incredibly impactful for young transgender and gender-diverse patients. It gives them time to work toward a gender expression that matches their gender identity. Puberty blockers are completely reversible, and puberty can commence on track once blockers are no longer being administered. Timely provision of gender-affirming care can effectively mitigate the effects of gender dysphoria, a condition in which an individual experiences a persistent mismatch between their physical presentation and the gender with which they identify. I have observed through my work with trans and gender diverse youth—and current research supports—that this gender-affirming care lowers suicide rates and keeps kids alive.

11. When clients come to see me, they are often experiencing depression and anxiety. They share these conditions with cisgendered people. However, in a transgender individual, these conditions can be exacerbated by gender dysphoria. Untreated gender dysphoria is dangerous, as it is associated with significant risk of suicidal ideation, and attempted and completed suicides.

12. However, it is not a young person's trans identity itself that causes higher rates of anxiety, depression, and suicidal ideation. Overwhelmingly, research supports that negative treatment from others (at individual, community, and societal levels) in response to their trans identity as the primary reason we see elevated levels of mental health problems in this population. This is supported further by the evidence we have that shows reduced rates of anxiety, depression, and suicidal ideation/attempts when a trans young person is in an affirming environment and receiving the medical care (if any) they need to support and affirm their identity. In my therapy practice, we are trying to provide healthcare that saves lives.

13. Some parents have difficulty supporting a child who is gender-nonconforming. They may pull their child out of therapy simply because a therapist correctly genders the child

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

using their preferred pronouns. In such cases, I work with parents to help them accept and support their child. However, I have never once had the opposite experience, where a young client comes to my practice because their parents were trying to convince the client that they are transgender, or pushing some sort of gender ideology. The idea that this occurs is a misconception.

14. Other than those who reach me through a clinical referral, young clients and their parents tend to come to me because the youth or adolescent has come out as transgender, their parents are scrambling, and don't know what to do. Parents' worry is especially acute in the current political climate of anti-LGBTQ+ legislation in states and anti-transgender policy from the Federal Government. It is frightening for parents to think that their child will be subjected to that hostility. Parents come to my practice asking for help, empathy, support, and coping skills. They often express, "I can't do this by myself. Give me resources."

15. I understand that the President of the United States has issued an Executive Order on January 28, 2025, titled, "Protecting Children from Chemical and Surgical Mutilation." This Executive Order will cause a variety of harms to my practice, my profession, and the clients I serve.

16. Gender-affirming care saves lives. There is ample documented evidence to support this. The impact of the Executive Order will be that every transgender person I know will be grieving a future that looks much bleaker than before. There are young clients on my caseload who want to leave the country as soon as possible, something that was not remotely on their agenda prior to November 2024. There are families in my practice who are terrified about how the Executive Order will impact their children. This Executive Order and other policies from the current president will empower people to harass transgender youth. The Federal Government is giving people with anti-transgender bias the green light to harass children, all based on a profound misunderstanding of what it means to be transgender or gender-diverse.

17. The rhetoric being used against transgender people now is just a repackaging of rhetoric against gay people in the 1980s. Today we look back at that time and are shocked at the

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

lack of care demonstrated for gay people and other communities affected by the AIDS crisis. Why didn't people care when human lives were being devastated? The reality is we are witnessing the same phenomenon today with transgender people, and it is exemplified by the anti-transgender Executive Orders.

18. I am bound by the National Association of Social Workers Code of Ethics (https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English). The six pillars of this code are Service, Social Justice, the Dignity and Worth of the Person, the Importance of Human Relationships, Integrity, and Competence. The Executive Order interferes with each part of this code.

19. Service is impacted, because the Executive Order prevents service providers in the field of social work from performing their work. The Executive Order affects social justice because it takes lifesaving services away from the tiny minority of people who are transgender, less than 1% of the population, all based on pseudoscience. It uses transgender people as pawns in a political effort. The Executive Order undermines the dignity and worth of the person in many ways, only one of which is that it specifically denies the existence of people with a non-binary gender identity. The Executive Order infringes on the importance of human relationships because it prohibits youth from getting the healthcare they need to fully engage with their loved ones, build relationships with other human beings, and live authentically. The Executive Order impacts the integrity of social work as a profession, because it asks social workers to accept easy answers that do not address the realities of our clients' lives. My work is important. It is not fast or easy, but it is the right thing to do. Finally, the Executive Order undermines a social worker's competence. The Federal Government is asking social workers to be incompetent—to fail to provide the care that science and medical understanding dictate is needed for our clients. Gender-affirming care is the best practice for many transgender youth and adolescents. The Executive Order interferes with this best practice. This creates a severe ethical conflict for me.

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  I declare under penalty of perjury under the laws of the State of Washington and the
2  United States of America that the foregoing is true and correct.
3  DATED this ____ day of February 2025.

5  E.L., LSWAIC

DECLARATION OF E.L., LSWAIC
NO. 2:25-cv-00244-LK

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 18 day of February 2025.

*E.L.*

E.L., LSWAIC