The Honorable Lauren King

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:25-cv-00244-LK |
| Plaintiffs, | DECLARATION OF STACEY PRINCE, PH.D |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

DECLARATION OF STACEY PRINCE
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, STACEY PRINCE, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am a licensed clinical psychologist. I received my Ph. D. in clinical psychology from the University of Washington in 1999. I went into private practice in 2001. I began working with queer and trans adults almost immediately after beginning my private practice career. At that time, I worked with a practitioner who was one of the only people in Seattle who provided services for trans adults. My colleague began mentoring and supervising me in working with these clients.

3. As part of my current practice, I provide both transition and non-transition related psychotherapy services to trans and queer adult clients, as well as the parents of trans and queer children and to couples where one partner is transitioning. Working with these clients makes up about one-third of my practice. In addition to providing individual and couples therapy, I also provide consultation services for healthcare entities and supervision of people working towards licensure.

4. I practice in Seattle, which I see as a more progressive and accepting place for transgender people. However, my trans clients come to me having experienced gender dysphoria, bullying, family rejection, underemployment, and fear of being discovered as transgender. In addition to these experiences, many of my clients come to therapy with experiences of depression, anxiety, and post-traumatic stress disorder. As a practitioner, I see these experiences as stemming largely from external sources of transphobia rather than as an internal distress with one's gender identity. Access to gender-affirming mental health care and medical care makes an enormous difference in the lives of my trans clients. It's hard to even summarize how significant of a difference it makes.

5. One experience in particular highlights the need for trans people to have access to gender-affirming mental and medical health care. I once had a client who started coming to

DECLARATION OF STACEY PRINCE
NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

me for therapy when she was around 19 years old. She was a transgender woman, which means she was assigned a male sex at birth, but her gender identity was female; she was also a woman of color. She had not received any gender-affirming medical care like hormones or surgery, and so was constantly trying to "pass" as a woman and fearful of being discovered. When I started seeing this client, health insurance did not cover gender-affirming surgeries. Any procedure would have to be paid for out of pocket, and such procedures could cost up to $30,000.

6. Although my client's mother was generally supportive of their child, her father was only slowly coming to terms with his child's identity. My client had also experienced significant bullying and cyberbullying at school. My client was also constantly afraid of being discovered. She was chronically suicidal because of these experiences. Her suicidality was heightened because of her experiences in in-patient psychiatric wards. Because of her suicidal ideation, my client was hospitalized several times. If my client revealed to hospital staff that she was transgender, she would be placed on a ward that did not align with her gender identity. If she didn't disclose this information and was allowed to be on a ward that did identify with her gender identity, and was then discovered to be transgender, she was accused of lying or even engaging in predatory or harassing behavior. This sometimes resulted in my client being placed in isolation—not because of her behavior, but purely because of her gender identity. This only exacerbated her despair and suicidal ideation.

7. My client had two "rehearsals" of suicide attempts. Bystanders and emergency responders were able to talk her down those times. But, on her third attempt, my client completed her suicide attempt and died at a nearby hospital. This is not a unique story. A year after my client completed suicide, UW started offering insurance for students that would have covered gender-affirming care. Sadly, it was too late for my client. I believe if my client had access to gender-affirming care, she might still be alive today. Although this occurred nearly 15 years ago, I still get emotional when thinking about this client.

DECLARATION OF STACEY PRINCE
NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

8. In working with transgender adults, I have worked with people who had access to gender-affirming care as minors as well as those who are transitioning in adulthood. Having access to gender-affirming care in childhood 100% helps with adjustment to adult life. Among my clients who had access to gender-affirming care as children, those clients report increased happiness, decreased gender dysphoria, and increased access to education, employment, dating, and exercise. By contrast, some of my trans clients who did not have access to gender-affirming care in childhood struggle more with transphobia in the workplace and in their families, and have more difficulty accessing mental health and medical care as adults.

9. As part of my practice, I often provide letters of support for adults seeking gender-affirming surgeries. The WPATH standard of care for receiving gender-affirming surgeries requires two letters from two mental health professionals, one of whom is the person's therapist. The intent behind this standard is to ensure that a patient is ready for surgery, that they can handle the emotional and physical demands of recovery, and that they have social support. I try to make this process as easy as possible for people whether or not they are my client. If a person seeking a support letter is not my client, we usually meet once or twice before I write a letter. The only times I've refused to provide a support letter for an adult seeking gender-affirming surgery is if someone is in active psychosis or has severe substance abuse problems that need to be stabilized before surgery. If the person seeking the letter is my client, we've almost certainly discussed gender-affirming care and surgery in the regular course of our therapeutic relationship. In these situations, I will write a support letter and refer the client out for their secondary letter.

10. Therapists are put in a gatekeeping role that often puts us in a Catch-22. As discussed above, the WPATH standard of care asks us to consider whether a person seeking gender-affirming surgery is mentally prepared for surgery. People seeking this care often experience anxiety, depression, and suicidality that could be seen as a sign that someone is not prepared for surgery. But frequently these same issues are resolved by receiving gender-

affirming surgery. Often such feelings are the result of transphobia rather than being reflective of internal issues that should be stabilized before and prolong access to surgery.

11. In my 24 years of private practice, I have never had a client regret their decision to transition. As a practitioner, I know that rates of "de-transitioning" are extremely low. The closest I had was a client who, because of the transphobia they experienced as a person who transitioned later in life, sometimes expressed feelings that she thought her life might have been easier if she decided not to transition. But none of my clients have ever expressed internal regret about deciding to live as who they are.

12. I also work with the parents of transgender children. In working with parents, I direct them towards resources and social support so that they can best support their child in exploring their gender identity. My approach is to hold space for parents to wrap their heads around their child's gender identity, whether their child is a toddler or a legal adult. I do not push parents to take any particular steps or choices with regards to their children. Rather, I encourage them to listen to their child about what they need to be happy and well.

13. I am aware of the Executive Order putting conditions on gender-affirming care for youth. Seeing hospitals, even here in Washington State, pause or stop providing gender-affirming care for youth has been extremely distressing to me as a provider. I understand that the Executive Order purports to apply to minors, but my 18-year-old clients are affected by the Executive Order even though they are legal adults. I worry that these clients will immediately lose access to gender-affirming medical care like hormones, puberty blockers, and surgery.

14. I also see the Executive Order profoundly effecting my adult clients. Since the Executive Order came down, I've seen increased suicidality, despair, and anger among my trans clients and the transgender community as a whole. There has already been news of increased suicides and murders of transgender people. I worry that this will only continue as people who are already hateful are emboldened by the rhetoric embodied by the Executive Order.

DECLARATION OF STACEY PRINCE
NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

15. The parents I see are also affected by the Executive Order. Parents of trans children are deeply afraid that their children might not be able to access the medical care they need now or in the future, and what may happen if puberty blockers or hormones are no longer available.

16. Because I am in private practice and do not receive federal funding, I am not immediately concerned about being targeted by the federal government for the care that I provide transgender adults. But I fear that this is only a first step in the federal government also targeting gender-affirming care for adults like my clients. Even beyond this Order, the current political climate is so full of hate towards transgender individuals. I see this in the form of attacks on the use of X gender markers on federal identification and the larger increase in harassment of transgender individuals and those who hold opinions contrary to the federal government. I fear what may happen to me, my business, and my clients if policies like the Executive Order are not stopped.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 17th day of February 2025.

*Stacey*

STACEY PRINCE, PH.D.