1

2

3

4

5

6

7

8

The Honorable Lauren King

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9  | STATE OF WASHINGTON, et al.,

10 |         Plaintiffs,

11 |    v.

12 | DONALD J. TRUMP, in his official capacity
   | as President of the United States, et al.,

13 |

14 |         Defendants.

NO. 2:25-cv-00244-LK

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION

NOTE ON MOTION CALENDAR:
February 28, 2025, at 2:00 p.m.

ORAL ARGUMENT REQUESTED

15

16

17

18

19

20

21

22

23

24

25

26

1

**TABLE OF CONTENTS**

2    I.    INTRODUCTION...................................................................................................... 1

3    II.   ARGUMENT ........................................................................................................... 1

4         A.    Defendants' Threshold Arguments Are Meritless ................................... 1

5         B.    Plaintiffs Are Likely to Succeed on the Merits........................................ 2

6               1.    The Orders violate the separation of powers, and are not the empty
                     gesture Defendants claim ............................................................. 2
7
                8.   2.    The Orders violate equal protection ............................................. 3
8
                           a.    The Orders classify based on transgender status and sex ........................... 4
9
                           b.    The Orders fail heightened scrutiny.................................. 5
10
                3.    Section 8(a) of the Denial-of-Care Order violates the Tenth Amendment
11                     and separation of powers............................................................... 7

12              4.    The Orders are void for vagueness................................................ 9

13        C.    Irreparable Injury and the Balance of Equities Weigh in Plaintiffs' Favor, and
                a Preliminary Injunction Is in the Public Interest ................................. 10
14
          D.    Relief Should Cover All Gender-Affirming Care Provided in Plaintiff States ....... 11
15
          E.    No Bond Requirement or Stay Should Issue .......................................... 12
16
17    III.  CONCLUSION ...................................................................................................... 13

18

19

20

21

22

23

24

25

26

# I.     INTRODUCTION

Defendants resist a preliminary injunction yet submit no evidence whatsoever and primarily argue for the reversal of binding Ninth Circuit precedent. Even though the Orders coerce medical providers to stop providing gender-affirming care, and the President boasts about this loss of care as a "promise[] kept," Defendants say this lawsuit is not ripe. But the Orders unequivocally proclaim their intent to "end" gender-affirming care "immediately," and federal agencies have *already* acted to implement the Orders against the Plaintiff States. Without relief, the Orders' open discrimination and violation of congressional and state prerogatives will go unchecked. Defendants do not rebut the deluge of harms caused by their Orders and established by the Plaintiffs' evidence. This Court should enjoin Defendants from enforcing the Orders.

# II.     ARGUMENT

## A.     Defendants' Threshold Arguments Are Meritless

Defendants make a passing argument that Plaintiffs lack a cause of action. Dkt. #223 (Opp.) pp.9-10. But it is well-established that plaintiffs who have demonstrated Article III standing—which Defendants concede—may obtain declaratory and injunctive relief to prevent unconstitutional federal action. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-35 (9th Cir. 2018) (affirming judgment where Executive Order unconstitutionally violated the separation of powers); *Washington v. Trump*, 847 F.3d 1151, 1164-65 (9th Cir. 2017) (denying motion to stay injunction against Executive Order). Indeed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Washington v. Trump*, ---F.Supp.3d ----, 2025 WL 509617 at *7 (W.D. Wash. Feb. 16, 2025) ("[I]t is well established that plaintiffs may seek equitable relief against federal officials who exceed the scope of their authority or act unconstitutionally.").

PLS.' REPLY ISO MOT. FOR
PRELIM. INJ. – NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1      Defendants also dispute prudential ripeness. Opp. pp.10-11.[1] Under this doctrine, the

2 Court considers "the fitness of the issues for judicial decision and the hardship to the parties of

3 withholding court consideration." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134,

4 1141 (9th Cir. 2000) (en banc). These considerations strongly favor Plaintiffs. *See* Dkt. #161

5 p.12 n.4. The Orders have direct and immediate effects—by subjecting the Plaintiff States'

6 medical institutions and providers to severe financial and criminal threats, the Orders have the

7 status of law which "requires immediate compliance with its terms." *Stormans, Inc. v. Selecky*,

8 586 F.3d 1109, 1126 (9th Cir. 2009). Regarding hardship, the challenged Orders "require[] an

9 immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties

10 attached to noncompliance." *Id.* Indeed, the White House itself has touted that the Denial-of-

11 Care Order is "already having its intended effect" by highlighting hospitals who have been

12 coerced into curtailing or eliminating gender-affirming care. Dkt. #17-9; *see also* Dkt. #129

13 (testimony on eliminated care). Defendants have already enforced the Orders. *See* Dkt. ##16-1,

14 17-7, 174-1. The Orders are in effect and have caused immediate, harmful effects on Plaintiffs.

15 **B.    Plaintiffs Are Likely to Succeed on the Merits**

16      **1.    The Orders violate the separation of powers, and are not the empty gesture
17 Defendants claim**

18      Defendants' lead and only argument on separation of powers is that the Orders cannot

19 violate the law because they include boilerplate language that "require[] agencies to act

20 'consistent with applicable law.'" Opp. p.13 (quoting the Orders). But the Ninth Circuit already

21 rejected this "all bluster and no bite" argument when President Trump made it during his first

22 go-round. *San Francisco*, 897 F.3d at 1238.

23      The Ninth Circuit's reasoning in *San Francisco* controls. "Savings clauses are read in

24 their context, and they cannot be given effect when the Court, by rescuing the constitutionality

---

[1] Defendants do not dispute Plaintiffs' Article III standing. For the same reasons Plaintiffs have standing, Dkt. #169 (Mot.) pp.10-12, this case is constitutionally ripe. *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003).

PLS.' REPLY ISO MOT. FOR
PRELIM. INJ. – NO. 2:25-cv-00244-LK

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    of a measure, would override clear and specific language." *Id.* at 1239. The Court in

2    *San Francisco* distinguished *Allbaugh*, the main authority Defendants cite (Opp. pp.14-16),

3    "[b]ecause the Executive Order unambiguously commands action," and there is "more than a

4    'mere possibility that some agency might make a legally suspect decision.'" *Id.* at 1240 (quoting

5    *Bldg. & Const. Trades Dept. v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002)). "The Executive

6    Order's savings clause does not and cannot override its meaning." *Id.*[2]

7         Contrary to Defendants' protestations, the Orders here are no less directive than the

8    executive order in *San Francisco*. *Contra* Opp. p.14. Section 4 of the Denial-of-Care Order

9    explicitly directs all executive agencies to "immediately take appropriate steps to ensure that

10   institutions receiving Federal research or education grants end" gender-affirming care. Exec.

11   Order No. 14,187, 90 C.F.R. §8771 (cited as E.O. 14,187) §4. The Gender-Ideology Order has

12   similar language. Exec. Order No. 14,168, 90 C.F.R. §8615 (cited as E.O. 14,168) §§3(e), (g).

13   These words command immediate action. As this Court correctly held, "[t]he savings clause

14   cannot salvage the clear meaning of the Executive Order." Dkt. #161 p.26 (citing *PFLAG, Inc.*

15   *v. Trump*, No. 1:25-cv-00337-BAH, 2025 WL 510050 at *15 (D. Md. Feb. 14, 2025)).

16        Defendants' appeal to certain NIH grants (Opp. pp.15-16) gets them nowhere. There is

17   no law, and Defendants cite to none, authorizing the President to cut off federal funding to

18   entities providing gender-affirming care. *See* Mot. p.18 n.3 (citing ten years of appropriations

19   bills). The challenged Orders direct recipients of federal funding to stop providing gender-

20   affirming care today or lose all that funding. E.O. 14,168 §§3(e), (g); E.O. 14,187 §4. As this

21   Court previously held, this violates the separation of powers. Dkt. #161 pp.15-16.

22        **2.      The Orders violate equal protection**

23        The Orders violate equal protection because they explicitly classify based on transgender

24   status and sex and cannot satisfy heightened scrutiny.

25

26        [2] Defendants' argument that *San Francisco* "was wrongly decided" and "should be overruled," Opp. pp.5, 15 n.3, 17 is for an *en banc* Ninth Circuit panel, not this Court.

### a.    The Orders classify based on transgender status and sex

The Denial-of-Care Order discriminates based on transgender status and sex by penalizing medical treatments when provided to an "individual who does not identify as his or her sex;" "to align an individual's physical appearance with an identity that differs from his or her sex;" or "to transform an individual's physical appearance to align with an identity that differs from his or her sex." An adolescent assigned male at birth cannot receive certain medical treatment if they "identify" as a girl. And an adolescent assigned female at birth cannot receive medical treatment enabling them to "align" their physical appearance with their gender identity as a boy. Similarly, the Gender-Ideology Order cuts off federal funding for "gender ideology" meaning the idea that a person's gender identity might be different from the sex they were assigned at birth. E.O. 14,168 §§2(f), 3(e), (g). By definition, this discriminates against transgender and gender-diverse people because they have gender identities that differ from the sex they were assigned at birth. *See*, *e.g.*, Dkt. #19 ¶28. It also discriminates on the basis of sex, because people the Order classifies as "male" are not allowed to have a female gender identity, but people the Order classifies as "female" are (and vice-versa). Both Orders unquestionably classify based on transgender status and sex.

Defendants argue the Denial-of-Care Order classifies "based on their medical purpose" and not transgender status or sex. Opp. p.17. They're flat wrong. Take for example puberty-delaying medication: under the Orders, adolescents assigned male at birth can receive puberty-delaying medication to bring their bodies into alignment with a typical male puberty, but adolescents assigned female cannot. Likewise, adolescents assigned female at birth can receive puberty-delaying medication to bring their bodies into alignment with a typical female puberty, but adolescents assigned male cannot. The fact that both adolescents assigned male at birth and those assigned female receive the same drug to pause puberty, does not make the Orders "evenhanded[]." *Contra* Opp. p.18. The Orders apply only to prevent recipients of federal funds from medically "align[ing]" their appearance differently from their sex assigned at birth. *See*

PLS.' REPLY ISO MOT. FOR
PRELIM. INJ. – NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  *Poe by & through Poe v. Labrador*, 709 F. Supp. 3d 1169, 1191-92 (D. Idaho 2023); *Brandt ex*

2  *rel. Brandt v. Rutledge*, 47 F.4th 661, 670-71, n.4 (8th Cir. 2022).

3       Defendants disagree with binding precedent on the equal protection guarantee for

4  transgender people, labeling it "incorrect" and calling for it to be overruled. Opp. pp.16-19; *but*

5  *see* Mot. pp.10-12 (citing cases). These arguments must be directed to an *en banc* panel of the

6  Ninth Circuit.

7              **b.**      **The Orders fail heightened scrutiny**

8       The Orders cannot satisfy intermediate scrutiny because they do not serve any important

9  government interest. Defendants' contrary arguments are as baseless as the Orders themselves.

10       Defendants argue that gender-affirming care undermines the healthy growth of children,

11  citing to two non-binding legal opinions (one a single-judge concurrence). Opp. p.20 (citing

12  *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J.,

13  concurring), and *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir. 2023),

14  *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024)). But these opinions are

15  not evidence and merely conclude that the evidence in those cases satisfy rational basis review—

16  which does not apply here.[3] Neither opinion explains why the potential of relatively minor side-

17  effects of gender-affirming care justifies the total ban contemplated by the Denial-of-Care Order,

18  particularly when the same treatments are widely used for cisgender youths, and when many,

19  riskier treatments remain widely available. *See* Mot. p.13; *Poe*, 709 F. Supp. 3d at 1193 (finding

20  Idaho's justification for its gender-affirming care ban "pretextual" because the law "allows the

21  same treatments for cisgender minors that are deemed unsafe and thus banned for transgender

22  minors"). Nor do Defendants explain why this Court, in evaluating gender-affirming care, should

23  privilege the opinions of a handful of judges above the overwhelming medical consensus or the

24  100-plus declarations submitted by Plaintiffs that detail the critical, often life-saving, benefits of

25

26      [3] Even if it did, the irrationality motivating the Orders dooms them even under rational basis review. Mot. pp.15-16.

              5

1   gender-affirming care for youth with gender dysphoria. *See* Dkt. #18 ¶¶40-42; Mot. pp.4-7,

2   14-15, 22-26 (discussing evidence). Defendants also simply ignore contrary authority. *See*, *e.g.*

3   *Brandt*, 47 F.4th at 670 (holding that "substantial evidence" demonstrates that Arkansas' ban on

4   gender-affirming care "prohibits medical treatment that conforms with 'the recognized standard

5   of care for adolescent gender dysphoria,' [and] that such treatment 'is supported by medical

6   evidence that has been subject to rigorous study[]'") (quoting district court); *Poe*, 709 F. Supp.

7   3d at 1194 (concluding that Idaho's ban on gender-affirming care failed intermediate scrutiny).

8   In the face of the Plaintiffs' *actual* evidence, Defendants' *ipse dixit* cannot carry their

9   "demanding" burden. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

10          Defendants fare no better with their glancing references to the so-called Cass Review.

11  The Cass Review has been roundly criticized by medical associations and subject matter experts

12  for its author's "negligible prior knowledge or clinical experience of trans and gender diverse

13  youth or indeed transgender medicine and surgery," "its unfounded medical opinion[s]" that fly

14  in the face of the expert medical consensus "ignoring more than three decades of clinical

15  experience in this area as well as existing evidence showing the benefits of hormonal

16  interventions on the mental health and quality of life of gender diverse young people," and its

17  "selective and inconsistent use of evidence." WPATH, *WPATH and USPATH Comment on the*

18  *Cass Review* (May 17, 2024), https://wpath.org/wp-content/uploads/2024/11/17.05.24-

19  Response-Cass-Review-FINAL-with-ed-note.pdf. Yet even despite its apparent biases, the Cass

20  Review does not recommend banning treatment, as the Denial-of-Care Order seeks to

21  accomplish.

22          Defendants also cannot show that the Orders are substantially related to their purported

23  purposes. As this Court held "the [Denial-of-Care] Order is underinclusive in that it does not

24  encompass any similar medical treatments for *cisgender* youth . . . even where those medical

25  treatments pose the same or similar risks." Dkt. #161 p.20. It is also "overinclusive" by including

26  adults and medical procedures that have nothing to do with gender-affirming care. *Id.* pp.20-21.

PLS.' REPLY ISO MOT. FOR
PRELIM. INJ. – NO. 2:25-cv-00244-LK                    6                    ATTORNEY GENERAL OF WASHINGTON
                                                                            Complex Litigation Division
                                                                            800 Fifth Avenue, Suite 2000
                                                                            Seattle, WA  98104
                                                                            (206) 464-7744

1    Defendants paper over this obvious overinclusivness by citing an article about Canadian law as

2    to when adolescence ends. Opp. p.21 (citing Canadian Paediatric Society, *Age Limits and*

3    *Adolescents*,    PubMed    Central    (Nov.    2023),    https://pmc.ncbi.nlm.nih.gov/articles/

4    PMC2794325/). In the United States, however, the age of adulthood is clear: 18. And in any

5    event, the Canadian Paediatric Society *explicitly recommends* "an affirming approach to care for

6    all children and youth, including those who are transgender or gender-diverse," including the

7    provision of puberty blockers and hormone replacement therapy to treat gender dysphoria.

8    Ashley Vandermorris, Daniel Metzger, *Position Statement: An affirming approach to caring for*

9    *transgender and gender-diverse youth*, Canadian Paediatric Society (Jun. 20, 2023),

10    https://cps.ca/en/documents/position/an-affirming-approach-to-caring-for-transgender-and-

11    gender-diverse-youth.

12         The Gender-Ideology Order suffers from similar defects. It purports to align federal

13    policy with biological truth, but simply leaves out individuals who produce both kinds or no

14    reproductive cells, *see* Dkt. #18 ¶19, and bars federal funding for programs that accept a person's

15    gender identity might be different than the sex they were assigned at birth, regardless of whether

16    that acceptance has any policy influence at all, E.O. 14,168 §§3(e), (g).

17         **3.    Section 8(a) of the Denial-of-Care Order violates the Tenth Amendment and**
18                 **separation of powers**

19         Defendants argue that 18 U.S.C. § 116 fits squarely within the Commerce Clause

20    (Opp. pp.22-23), and Plaintiffs agree. Plaintiffs are not challenging 18 U.S.C. § 116, but

21    E.O. 14,187, which weaponizes that statute and threatens criminal investigation and prosecution

22    against providers and families of transgender and gender-diverse youths.

23         This is a Tenth Amendment and separation of powers concern. The President has no

24    Commerce Clause powers and cannot unilaterally criminalize gender-affirming care whether

    there is a nexus to interstate commerce or not. *See* U.S. Const. art. II; *Clinton v. City of New York*,

25    524 U.S. 417, 438 (1998). Because the Constitution does not give the President the power to

26

1   regulate health care, when he arrogates it to himself, he both treads on rights reserved to the

2   States and usurps Congress's exclusive authority to legislate. *Clinton*, 524 U.S. at 438; *Linder v.*

3   *United States*, 268 U.S. 5, 18 (1925).

4       Defendants do not deny that applying 18 U.S.C. § 116 to gender-affirming care would

5   violate the Tenth Amendment or separation of powers. Nor have Defendants disavowed

6   prosecution of gender-affirming care under 18 U.S.C. § 116, even when directly asked by this

7   Court whether "gender-affirming care that plaintiffs provide and intend to continue" falls "within

8   the ambit of Section 116." TRO Tr. 18:4-21; *see also* Dkt. #161 p.24 n.14 ("Nowhere in their

9   briefing or at oral argument did Defendants explicitly disclaim any intent to prosecute physicians

10  providing the Listed Services under Section 116").

11      The best Defendants can argue is that the definition of "chemical and surgical mutilation"

12  is different than the statutory definition of female genital mutilation. Opp. p.24. But Defendants

13  ignore that "female genital mutilation" applies not only to surgeries, but also to "any

14  procedure . . . that involves . . . injury to[] the external female genitalia" including "other

15  procedures that are harmful to the external female genitalia." 18 U.S.C. § 116(e). By redefining

16  gender-affirming care as "chemical and surgical mutilation" and accusing "medical

17  professionals" who provide such care of "maiming and sterilizing" children, E.O. 14,187 §1, the

18  Executive Order "suggests a clear intent to equate" gender-affirming care with female genital

19  mutilation. Dkt. #161 p.23. This Court also rightly rejected Defendants' Orwellian suggestion

20  that the Order just happens to reference "multiple topics" without any connection between the

21  two, particularly given that the Order directs agencies to "rigorously enforce all laws that prohibit

22  or limit" gender-affirming care but only references a single law—18 U.S.C. § 116. *Id.* pp.23-24.

23  Given the Order's redefinition of gender-affirming care, its stated purpose to "end" gender-

24  affirming care, and Defendants' continued failure to disavow prosecution of gender-affirming

25  under 18 U.S.C. § 116, this Court rightly found that Physician Plaintiffs have established "a

26

PLS.' REPLY ISO MOT. FOR
PRELIM. INJ. – NO. 2:25-cv-00244-LK

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    reasonable fear of prosecution" supporting a pre-enforcement challenge. *Id.* p.24 n.14 (citing

2    *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489–90 (9th Cir. 2024)).

3          Finally, this Court need not decide whether Congress would have power to regulate

4    gender-affirming care under the Commerce Clause because Congress has not chosen to do so.

5    *United States v. Bass*, 404 U.S. 336, 349 (1971) (courts will not construe a statute to "alter the

6    federal-state framework by permitting federal encroachment upon a traditional state power,"

7    unless "Congress conveys its purpose clearly"). The President has no delegated or enumerated

8    power to "end" gender-affirming care. By directing DOJ to prioritize prosecutions of gender-

9    affirming care to achieve this aim, the President is regulating the practice of medicine, without

10   authority, in violation of the Tenth Amendment and Congress's exclusive authority to legislate.

11   *Clinton*, 524 U.S. at 438. Indeed, the President is forcing providers to quit gender-affirming care,

12   and gloating about it, Dkt. #17-9 pp.2-3, even as Defendants claim Plaintiffs "misread[] the EO."

13   Opp. p.24.

14          **4.    The Orders are void for vagueness**

15          Defendants recycle their ripeness arguments to argue that the Orders "cannot be

16   unconstitutionally vague" because the agencies responsible for their enforcement "can provide

17   any clarification they deem appropriate if and when" they are enforced. *Id.* p.25. This ignores

18   that the Orders force the Plaintiffs into a "Sophie's choice" of violating their ethical duties by

19   refraining from providing gender-affirming care to those who need it, or risking federal funding

20   that enables them to operate at all. Dkt. #161 p.10.

21          Defendants try to save the Orders by claiming that sex is determined at conception by

22   chromosome configuration. Opp. p.26. But the Gender-Ideology Order does not define "male"

23   or "female" by chromosome configuration. E.O. 14,168 §2. And chromosome configuration

24   alone does not control whether a person creates large or small reproductive cells. Dkt. #175

25   ¶¶7-10. Defendants next point to guidance issued by the Department of Health & Human

26   Services (HHS) "expanding" on the Gender-Ideology Order's definitions. Opp. p.26. But HHS's

1    guidance does not change the Order's language requiring sex to be determined "at conception."

2    *See id.* And even if it could, the HHS guidance states "[t]he sex of a human, female or male, is

3    determined genetically at conception" but still defines each sex by the reproductive cells they

4    produce. Supp. McGinty Decl. Ex. 3. The reproductive cell a zygote may eventually produce

5    cannot be determined at conception. Dkt. #175 ¶¶7-10.

6    **C.    Irreparable Injury and the Balance of Equities Weigh in Plaintiffs' Favor, and a
        Preliminary Injunction Is in the Public Interest**

7        Defendants do not seriously contest that the Orders cause irreparable injury to Plaintiffs.

8    They have no answer to the parents who testify to the enormous benefits that gender-affirming

9    care brought to their children. *E.g.*, Dkt. #39 ¶¶6-7; Dkt. #50 ¶12; Dkt. #68 ¶7. Or the providers

10   who testify that gender-affirming care saved their patients' lives. *E.g.*, Dkt. #77 ¶¶12-13;

11   Dkt. #105 ¶8; Dkt. #109 ¶7. Or the expert testimony. Dkt. #18 ¶¶59-66; Dkt. #19 ¶¶85-102. Or

12   even the testimony of Plaintiff States that enforcement of the Orders will deprive the world of

13   critical medical breakthroughs. Dkt. #16 ¶¶5-12; Dkt. #107 ¶¶4-19.

14       Their *only* argument is that the Orders effects are "speculative." Opp. pp.26. This is a

15   rehash of Defendants' argument that the case is not ripe for review and should be rejected for

16   the same reasons. *See* Dkt. #161 pp.26-27. It is additionally refuted by the fact that this Court's

17   TRO has already enabled provision of gender-affirming care that would have been prevented by

18   the Orders. *E.g.*, Dkt. #179 ¶¶3-5; Supp. McGinty Decl. Ex. 1.

19       The balance of equities and public interest, which merge when the government is a party,

20   also compel an injunction. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The tremendous

21   harm the Orders have and will continue to cause Plaintiffs far outweighs Defendants' complaint

22   that enjoining the Orders would "effectively disable the President and federal agencies from

23   effectuating the President's agenda." Opp. p.27. The Ninth Circuit rejected this same argument

24   in *Doe #1 v. Trump*, holding "it cannot be so" that the government's "irreparable harm standard

25   is satisfied by the fact of executive action alone." 957 F.3d 1050,1059 (9th Cir. 2020).

26

1    **D.     Relief Should Cover All Gender-Affirming Care Provided in Plaintiff States**

2         Defendants argue that the scope of relief "should be limited to only redress each

3    Plaintiff's specifically asserted injuries." Opp. p.27. This argument fails for three reasons.

4         First, for Tenth Amendment purposes, the Plaintiff States are the "one[s] at whom the

5    constitutional protection is aimed." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Defendants

6    do not explain how relief for Plaintiff States' sovereign injury could be narrower than the

7    geographic bounds of Washington, Minnesota, Oregon, and Colorado. Instead, relief here should

8    track the boundaries of the Plaintiff States. *See City & Cnty. of San Francisco v. U.S. Citizenship

9    & Immigr. Servs.,* 981 F.3d 742, 763 (9th Cir. 2020) (affirming preliminary injunction covering

10   "the territory" of the plaintiff states and counties); *California v. Azar*, 911 F.3d 558, 584 (9th

11   Cir. 2018) (similar).[4]

12        Second, Defendants' separation-of-powers violation similarly merits complete relief

13   within the Plaintiff States. As the Supreme Court recently explained, broad relief is merited when

14   a state plaintiff demonstrates harm to itself or its instrumentality. In *Biden v. Nebraska*,

15   143 S. Ct. 2355, 2373-75 (2023), the Supreme Court left undisturbed a *nationwide* preliminary

16   injunction based on the Executive's improper incursion into Congress's "control of the purse,"

17   based on harms to a *single* Missouri instrumentality receiving federal funds. *Id*. at 2365-67. Here,

18   where the Plaintiff States stand to lose massive federal funds and Defendants concede standing,

19   an injunction covering the four Plaintiff States is both warranted and modest.[5]

---

20        [4] Defendants purport to refute *parens patriae* standing. Opp. p.29. But Plaintiff States did not invoke *parens*
21   standing. And because Defendants concede standing, *parens* is irrelevant. *See* Dkt. #161 pp.6-7.
         [5] Defendants claim Minnesota has not established standing to challenge Section 4 of the Denial-of-Care
22   Order. Opp. p.27 n.7. This is incorrect, as this Court recognized in granting Plaintiffs' TRO. Dkt. #161 p.7 n.2,
     p.11 n.3 (citing Minnesota-specific declarations regarding provision of gender-affirming care and state medical
23   programs). Multiple declarations establish the Orders' risks to care provided by the University of Minnesota,
     Dkt. #79 p.1; Dkt. #98 ¶3, and other institutions, Dkt. ##75, 88, 93, 95, 96, 100, 102, 209. The Court also has a
24   declaration from a Minnesota-based integrated health system that receives greater than $50 million in federal grants
     annually and stands to lose greater than $10 million in funding if federal research and education grants related to
25   gender-affirming care were halted. Dkt. #209 ¶¶2, 4. Defendants fail to challenge Minnesota's standing under the
     Gender-Ideology Order. In addition, Minnesota has standing to assert its sovereign and quasi-sovereign interests,
26   to maintain the exercise of its police powers, and to challenge Defendants' attempts to co-opt the regulation of the
     practice of medicine. *See supra* §B.3.

---

1    Third, the Physician Plaintiffs represent the interests of their minor patients, not just

2    themselves. Under established precedent, they may seek relief on behalf of current and future

3    patients. *See*, *e.g.*, *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 318 (2020) (plurality) ("We

4    have long permitted abortion providers to invoke the rights of their actual or potential

5    patients[.]") (citing cases); *id.* at 354 n.4 (Roberts, C.J., concurring) (agreeing with standing

6    analysis); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of HHS*, 485 F. Supp. 3d 1, 35 (D.D.C.

7    2020) ("Defendants are wrong to suggest that the health-provider Plaintiffs cannot assert the

8    rights of LGBTQ patients they might treat in the future."). Because future patients may lawfully

9    seek gender-affirming health care anywhere within the Plaintiff States, the Court should issue

10   an injunction of the same scope.[6]

11   Finally, an injunction halting the implementation, including agency preparation, of

12   unconstitutional executive orders is not overly broad. *See CASA, Inc. v. Trump*,

13   No. DLB-25-0201, 2025 WL 545840, at *2 (D. Md. Feb. 18, 2025) ("Surely, the government

14   has no valid interest in taking internal, preparatory steps to formulate policies and guidance on

15   an unconstitutional Executive Order.").

16   **E.      No Bond Requirement or Stay Should Issue**

17   The Court should reject the Defendants' bond request. This Court did not require

18   Plaintiffs to post a bond "[b]ecause Defendants have shown no evidence of a likelihood of harm,

19   monetary or otherwise, from the TRO[.]" Dkt. #161 p.28 n.15. This remains true now. *See*

20   *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

21   The Court should also deny Defendants' cursory request to stay the preliminary

22   injunction. First, the request is inadequately briefed, analyzing none of the stay factors. Second,

23   Defendants cannot meet any stay factor, let alone all of them. Their request fails at the threshold:

24   Defendants cannot meet their burden of showing that *they* will be irreparably injured absent a

25

26   _____
     [6] Defendants object to an injunction against the President. But here, Plaintiffs pursue injunctive relief against all Defendants except the President.

1    stay. *Doe #1*, 957 F.3d at 1058. Defendants also cannot make a strong showing that they are

2    likely to succeed on the merits, the stay will substantially injure Plaintiffs and other parties

3    interested in the proceeding, and the public interest lies in enjoining unconstitutional executive

4    orders and thus maintaining the status quo. *See id.* at 1061-69; *Nken v. Holder*, 556 U.S. 418,

5    434 (2009).

6                                    **III.    CONCLUSION**

7        The Court should grant Plaintiffs' motion.

8        DATED this 26th day of February 2025.

9                                                I certify that this memorandum contains 4,196
                                                 words, in compliance with the Local Civil Rules.
10
                                                 NICHOLAS W. BROWN
11                                               Washington State Attorney General

12                                               */s/ William McGinty*
                                                 WILLIAM MCGINTY, WSBA #41868
13                                               CYNTHIA ALEXANDER, WSBA #46019
                                                 TERA HEINTZ, WSBA #54921
14                                               ANDREW R.W. HUGHES, WSBA #49515
                                                 NEAL LUNA, WSBA #34085
15                                               CRISTINA SEPE, WSBA #53609
                                                 LUCY WOLF, WSBA #59028
16                                               Assistant Attorneys General
                                                 800 Fifth Avenue, Suite 2000
17                                               Seattle, WA 98104-3188
                                                 (206) 464-7744
18                                               William.McGinty@atg.wa.gov
                                                 Cynthia.Alexander@atg.wa.gov
19                                               Tera.Heintz@atg.wa.gov
                                                 Andrew.Hughes@atg.wa.gov
20                                               Neal.Luna@atg.wa.gov
                                                 Cristina.Sepe@atg.wa.gov
21                                               Lucy.Wolf@atg.wa.gov
                                                 *Attorneys for Plaintiff State of Washington*
22
                                                 */s/ Lauryn K. Fraas*
23                                               LAURYN K. FRAAS, WSBA #53238
                                                 COLLEEN MELODY, WSBA #42275
24                                               Assistant Attorneys General
                                                 800 Fifth Avenue, Suite 2000
25                                               Seattle, WA 98104-3188
                                                 (206) 464-7744
26                                               Lauryn.Fraas@atg.wa.gov

Colleen.Melody@atg.wa.gov
*Attorneys for Physician Plaintiffs 1-3*

KEITH ELLISON
State of Minnesota Attorney General

*/s/ James W. Canaday*
JAMES W. CANADAY (admitted pro hac vice)
Deputy Attorney General
445 Minnesota St., Ste. 600
St. Paul, Minnesota 55101-2130
(651) 757-1421
james.canaday@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

DAN RAYFIELD
State of Oregon Attorney General

*/s/ Allie M. Boyd*
ALLIE M. BOYD, WSBA #56444
Senior Assistant Attorney General
Trial Attorney
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700
allie.m.boyd@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

PHIL WEISER
Attorney General of Colorado

*/s/ Shannon Stevenson*
SHANNON STEVENSON (admitted pro hac vice)
Solicitor General
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov
*Attorneys for Plaintiff State of Colorado*

PLS.' REPLY ISO MOT. FOR
PRELIM. INJ. – NO. 2:25-cv-00244-LK

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744