1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11    STATE OF WASHINGTON et al.,

12                        Plaintiffs,

          v.

13    DONALD J. TRUMP et al.,

14

15                        Defendants.

16

CASE NO. 2:25-cv-00244-LK

ORDER DENYING PLAINTIFFS'
MOTION FOR CONTEMPT AND
ATTORNEY'S FEES AND
GRANTING PLAINTIFFS'
MOTION FOR EXPEDITED
DISCOVERY

        Beginning February 14, 2025, this Court's orders enjoined all Defendants except President

Trump from enforcing or implementing a section of an executive order that directed agencies to

"immediately take appropriate steps to ensure that institutions receiving Federal research or

education grants end" four kinds of medical treatments within Washington, Oregon, or Minnesota.

Beginning on the evening of February 28, 2025, this Court's preliminary injunction additionally

prevented these Defendants from enforcing or implementing two sections of a second executive

order within Washington, Oregon, Minnesota, or Colorado "to condition or withhold federal

funding based on the fact that a health care entity or health professional provides gender-affirming care."

On February 28, 2025, the National Institutes of Health ("NIH") terminated a grant that had been awarded to Seattle Children's Hospital for a research study developing an online "health education/skills delivery tool" for transgender youth. Dkt. No. 244-1 at 2; Dkt. No. 244 at 2. On March 4, 2025, NIH sent an updated Notice of Award to Seattle Children's Hospital confirming the grant's termination and explaining that "[t]his award related to Transgender issues no longer effectuates agency priorities." Dkt. No. 244-2 at 2, 6.

On March 6, 2025, Plaintiffs filed a motion asking the Court to hold Defendants in contempt of the Court's orders or, alternatively, to permit Plaintiffs to engage in expedited discovery. Dkt. No. 243.[1] Because Plaintiffs do not establish by clear and convincing evidence that the grant termination violates the Court's orders, the Court denies Plaintiffs' motion for contempt. However, Plaintiffs do establish good cause for expedited discovery, so the Court grants their alternative request.

## I.    BACKGROUND

On February 14, 2025, this Court issued a temporary restraining order ("TRO") prohibiting, in relevant part, all Defendants other than President Trump "from enforcing or implementing Section 4 of Executive Order 14,187 within the Plaintiff States." Dkt. No. 158 at 1. The text of Section 4 of Executive Order 14,187 (the "Medical Services EO") reads as follows:

> The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

---

[1] The Court previously denied Plaintiffs' request to have their motion heard on shortened time. Dkt. No. 248.

ORDER DENYING PLAINTIFFS' MOTION FOR CONTEMPT AND ATTORNEY'S FEES AND GRANTING PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY - 2

Dkt. No. 17-1 at 3. "Chemical and surgical mutilation" is defined in Section 2(c) of the Medical

Services EO to include four kinds of medical treatments (the "Listed Services"):

- "[T]he use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex," *id.* at 2;

- "[T]he use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex," *id.*;

- "[S]urgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex," *id.*; and

- "[S]urgical procedures . . . that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions," *id.*

On February 28, while this Court's TRO was in place, Dkt. No. 158 at 2, the National

Institutes of Health ("NIH")—an agency within the Department of Health and Human Services

("HHS")—terminated "without warning" Grant No. 5R21HD107311 (the "Grant"), which had

been awarded to Seattle Children's Hospital for a project period commencing September 5, 2022

and ending on August 31, 2025, Dkt. No. 244 at 3. The Grant supported a research study titled

"An intervention to promote healthy relationships among transgender and gender expansive

youth," which was "designed to improve the delivery of healthcare, through health education and

skills training for transgender youth." *Id.* at 2. The research study is designed to develop a "health

education/skills delivery tool" to "better enable transgender and gender-expansive youth to set

healthy boundaries in relationships, thus mitigating their risks of violence, mental health disorders,

and sexually transmitted infections." *Id.* at 2–3. This tool is being developed in coordination with

"a national advisory board of transgender youth[.]" *Id.* at 2. The Grant's principal investigator

"plan[s] to conduct a randomized study with 40 youth, 30 of whom will be given the intervention

we are developing and 10 of whom will initially be given a control (but will then be provided with

the intervention after the trial ends)." *Id.* at 3. As research and development have progressed,

1    "Seattle Children's has drawn down expenses on a reoccurring [sic] basis from the federal Payment

2    Management System portal operated by the U.S. Department of Health & Human Services" and,

3    "[a]s of February 28, 2025, the project was in good standing and there was a balance of $78,300.91

4    on the grant." *Id.*

5          In its February 28 letter terminating the program, NIH explained that "[t]his award no

6    longer effectuates agency priorities." Dkt. No. 244-1 at 2 (citing 2 C.F.R. § 200.340(a)(2)). It added

7    that "[r]esearch programs based on gender identity are often unscientific, have little identifiable

8    return on investment, and do nothing to enhance the health of many Americans. Many such studies

9    ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize

10    these research programs." *Id.*

11          On the evening of February 28, this Court issued a preliminary injunction that enjoined all

12    Defendants except President Trump from, in relevant part, "enforcing or implementing Section 4

13    of Executive Order 14,187 [(the Medical Services EO)] within the Plaintiff States," and "from

14    enforcing Sections 3(e) or 3(g) of Executive Order 14,168 to condition or withhold federal funding

15    based on the fact that a health care entity or health professional provides gender-affirming care

16    within the Plaintiff States." Dkt. No. 233 at 53. Sections 3(e) and (g) of Executive Order 14,168

17    (the "Gender Ideology EO") read in relevant part as follows:

18         • <u>Section 3(e)</u>: "Agencies shall take all necessary steps, as permitted by law, to end the
              Federal funding of gender ideology." Dkt. No. 17-2 at 2.
19

20         • <u>Section 3(g)</u>: "Federal funds shall not be used to promote gender ideology. Each agency
              shall assess grant conditions and grantee preferences and ensure grant funds do not
              promote gender ideology." *Id.*
21

22    "Gender ideology" is defined within the Gender Ideology EO as

23         replac[ing] the biological category of sex with an ever-shifting concept of self-
             assessed gender identity, permitting the false claim that males can identify as and
             thus become women and vice versa, and requiring all institutions of society to
24           regard this false claim as true. Gender ideology includes the idea that there is a vast

spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

*Id.* at 2.

On March 4, 2025, NIH sent an updated Notice of Award to Seattle Children's Hospital. Dkt. No. 244-2 at 2. The March 4 notice confirmed the Grant's termination and stated that NIH "hereby revises this award to reflect a decrease in the amount of $200,453[.]" *Id.* at 2–3. NIH noted that "[f]unds in the amount of [$40,091] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered." *Id.* at 7.

Plaintiffs filed a motion for contempt on March 6, urging the Court to hold that the Grant termination violated the TRO and preliminary injunction. Dkt. No. 243. Alternatively, Plaintiffs ask the Court to "issue an order to show cause and permit Plaintiffs expedited discovery to test Defendants' assertions concerning the grant termination." *Id.* at 12.

## II.  DISCUSSION

"The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987). Thus, "courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

The Court first addresses Defendants' unreasonable interpretation of the Court's orders. It then explains why Plaintiffs have not met their burden to establish contempt. And finally, it addresses Plaintiffs' alternative request for expedited discovery.

**A.    Defendants' Interpretation of the Court's Orders is Unreasonable**

Defendants argue that the Court "enjoined enforcement of Sections 3(e) or 3(g) of the [Gender Ideology] EO only as to 'gender-affirming care' as that term is used in the [Medical Services] EO"—i.e., only as to the four Listed Services. Dkt. No. 253 at 10–11. This interpretation borders on violating Federal Rule of Civil Procedure 11(b). Fed. R. Civ. P. 11(b) (by submitting a brief to the court, an attorney certifies that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law . . . ; (3) the factual contentions have evidentiary support . . . ; and (4) the denials of factual contentions are warranted on the evidence[.]").

The preliminary injunction order makes clear that "gender-affirming care" is far broader than the Listed Services. The Court expressly stated that the prohibitions in Sections 3(e) and (g) of the Gender Ideology EO "are broader than Section 4 of the Medical Services EO" such that, for example, Minnesota's failure to establish that its medical institutions receive research or education grants or provide the Listed Services was "inconsequential with respect to the injunctive relief to which it is entitled." Dkt. No. 233 at 8 n.5. In comparison to Section 4 of the Medical Services EO, which conditions grant funding on whether grant recipients offer the Listed Services, Sections 3(e) and (g) of the Gender Ideology EO more broadly "condition[] grant funding based on whether grant recipients offer—among other things—gender-affirming services for individuals with gender dysphoria." *Id.* at 30 (emphasis omitted). Thus, while the Medical Services EO forced institutions to choose between "*halt[ing] the Listed Services*" or losing federal grant money, Dkt. No. 161 at 9, the Gender Ideology EO forced institutions to choose between "*halt[ing] any treatment or funding for gender dysphoria*" or losing federal grant money, Dkt. No. 233 at 12. A plaintiff's

1    provision of the Listed Services was therefore *sufficient* to establish its standing to challenge

2    Sections 3(e) and (g) of the Gender Ideology EO, but it was not *necessary*. Dkt. No. 233 at 8 n.5.

3    The Court went on to detail the various forms of gender-affirming care that an individual

4    with gender dysphoria might receive. *Id.* at 27–28 (listing therapy; assistance with elements of a

5    social transition (e.g., new name and pronouns, modification of attire); evaluation of persistency

6    of gender dysphoria, emotional and cognitive maturity, and coexisting psychological, medical, or

7    social problems; puberty-suppressing medications; hormone therapy; and surgery); *see also id.* at

8    51 & n.27 (noting that "a multidisciplinary approach is frequently necessary" to provide complete

9    care to transgender patients, and citing to evidence that this approach may include, among other

10   things, voice training, mental health care, hormone therapy, and surgery); *id.* at 9 n.7 ("Oregon

11   State University provides gender-affirming care to students through its Student Health Services,

12   including hormone therapy, mental health support, and surgical referrals.").[2] Despite Defendants'

13   contrived arguments to the contrary, Dkt. No. 253 at 10–12, it is clear from the Court's preliminary

14   injunction order that "gender-affirming care" includes all of these things. Indeed, if the Court

15   meant to equate "gender-affirming care" with the Listed Services, as Defendants wrongly contend,

16

17   ───────────────

[2] The care listed in the Court's order conforms with similar definitions provided by governmental and medical entities.

18   For example, as of February 27, 2025, the HHS Office of Population Affairs defined the term as "an array of services that may include medical, surgical, mental health, and non-medical services for transgender and nonbinary people." HHS Office of Population Affairs, *Gender-Affirming Care and Young People*,

19   https://web.archive.org/web/20250227041634/https://opa.hhs.gov/sites/default/files/2025-02/gender-affirming-care-young-people.pdf ("For transgender and nonbinary children and adolescents, early gender-affirming care is crucial to

20   overall health and well-being as it allows the child or adolescent to focus on social transitions and can increase their confidence while navigating the healthcare system."). According to the World Professional Association of Transgender Health ("WPATH"), gender affirming care involves "holistic inter- and multidisciplinary care between endocrinology, surgery, voice and communication, primary care, reproductive health, sexual health and mental health

21   disciplines to support gender-affirming interventions as well as preventive care and chronic disease management." *See* WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. of

22   Transgender Health 51, 57 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644. Similarly, the World Health Organization defines the term as including "any single or combination of a number of social, psychological, behavioural or medical

23   (including hormonal treatment or surgery) interventions designed to support and affirm an individual's gender identity." World Health Organization, *Gender incongruence and transgender health in the ICD*, https://www.who.int/standards/classifications/frequently-asked-questions/gender-incongruence-and-transgender-

24   health-in-the-icd.

ORDER DENYING PLAINTIFFS' MOTION FOR CONTEMPT AND ATTORNEY'S FEES AND GRANTING
PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY - 7

Dkt. No. 253 at 10, there would have been no reason to use the term "gender-affirming care" instead of "Listed Services" in paragraph 2 of the preliminary injunction. Dkt. No. 233 at 53; *see also League of California Cities v. Fed. Commc'ns Comm'n*, 118 F.4th 995, 1021 (9th Cir. 2024) (the "meaningful-variation canon" provides "that '[w]here a document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea'" (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022)). If that weren't enough, the Court also squarely rejected Defendants' contention that the Gender Ideology EO's use of the term "gender affirming care" defined the "Listed Services." Dkt. No. 233 at 37 ("That the Executive Order mentions that what it defines as 'chemical and surgical mutilation' is 'sometimes referred to as "gender affirming care"' does not change its definitional sweep[.]").

In sum, it was manifestly unreasonable for Defendants to "understand this Court's enjoinment of Section[s] 3[(e) and (g)] of the [Gender Ideology] EO . . . to exclude . . . care other than the Listed Services." Dkt. No. 253 at 12.

Defendants also adopt an unreasonably narrow and self-serving view of what constitutes "care," arguing that research studies categorically cannot include the provision of care. Dkt. No. 253 at 2, 8–10. Such an interpretation appears to be deliberately ignorant: it is common knowledge that research studies frequently involve patient care. Indeed, the NIH Grants Policy Statement includes an entire chapter dedicated to costs related to "research patient care." NIH Grants Policy Statement, Chapter 19: Research Patient Care Costs (April 2024), *available at* https://grants.nih.gov/grants/policy/nihgps/HTML5/section_19/19_research_patient_care_costs.htm. NIH states that "[r]esearch patients may receive routine services as inpatients or ancillary services as either inpatient or outpatient subjects/volunteers/donors"; "routine services" include "[r]egular room services, minor medical and surgical supplies, and the use of equipment and facilities"; "ancillary services" include "special services for which charges are customarily made

1    in addition to routine services, e.g., x-ray, operating room, laboratory, pharmacy, blood bank, and

2    pathology"; and "outpatient services" include "[s]ervices rendered to subjects/volunteers/donors

3    who are not hospitalized." *Id.* §§ 19.2–.3. Research subjects may also receive "usual patient care"

4    during the study: i.e., "[i]tems and services (routine and ancillary) ordinarily furnished in the

5    treatment of patients by providers of patient care under the supervision of the physician or other

6    responsible health professional," including "diagnostic, therapeutic, rehabilitative, medical,

7    psychiatric, or any other related professional health services." *Id.* § 19.2. That a given medical

8    intervention might ultimately not turn out to be "efficacious" for certain patients (or all patients)

9    does not mean that the intervention is not "care." Dkt. No. 253 at 9. The Court accordingly rejects

10    Defendants' frivolous argument that research studies cannot involve the provision of care. *See also*

11    Dina Berlyn, *Routine Patient Care in Clinical Trials: Whose Cost Is It Anyway?*, 16 J.L. & Health

12    77 (2002); *Piggott v. Kampgrounds of Am., Inc.*, No. CV-09-2691, 2010 WL 11679195, at *10

13    (S.D. Tex. July 19, 2010) (guidelines issued by the National Cancer Institute distinguish between

14    "two types of costs associated with a clinical trial: patient care costs and research costs"), *report*

15    *and recommendation adopted*, 2010 WL 11679199 (S.D. Tex. Sept. 23, 2010).

16            Defendants' unreasonable and self-serving interpretation of the Court's orders is certainly

17    deserving of the above reprimands, as well as a warning that the Court may impose sanctions for

18    any future violations of Rule 11, other Federal Rules, the Local Civil Rules, or its orders. The

19    Court further orders counsel for Defendants to correct their unreasonable interpretation of the

20    Court's orders, as described below. However, as explained in the following section, Plaintiffs have

21    not shown by clear and convincing evidence that the Grant cancellation at issue here rises to the

22    level of contempt.

23

24

ORDER DENYING PLAINTIFFS' MOTION FOR CONTEMPT AND ATTORNEY'S FEES AND GRANTING
PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY - 9

1
**B.      Plaintiffs Have Not Met Their Burden to Show Contempt**

2          "Civil contempt . . . consists of a party's disobedience to a specific and definite court order

3  by failure to take all reasonable steps within the party's power to comply." *In re Dual–Deck Video*

4  *Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695 (9th Cir. 1993). "The party alleging civil

5  contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and

6  convincing evidence,' not merely a preponderance of the evidence." *Id.* "The contempt need not

7  be willful, and there is no good faith exception to the requirement of obedience to a court order";

8  however, "a person should not be held in contempt if his action appears to be based on a good faith

9  and reasonable interpretation of the court's order." *Id.* (cleaned up). "Substantial compliance with

10 the court's injunction is a defense to civil contempt." *Nat'l Advert. Co. v. City of Orange*, 861 F.2d

11 246, 250 (9th Cir. 1988).

12         Again, on February 28, 2025, while this Court's TRO was in place, NIH terminated the

13 Grant, explaining that it "no longer effectuates agency priorities." Dkt. No. 244-1 at 2. The record

14 before the Court does not indicate that the Grant was terminated based on the fact that Seattle

15 Children's provides the Listed Services. In fact, NIH continued to otherwise provide grant funding

16 to Seattle Children's, including a $415,863 continuation award issued on March 5, 2025. *See* NIH,

17 RePORTER   Search   Results   for   Active   Projects   at   Seattle   Children's   Hospital,

18 https://reporter.nih.gov/search/lFzuWhiOWUie121QPESo-

19 g/projects?org=SEATTLE%20CHILDREN%27S%20HOSPITAL&agencies=NIH&projects=Ac

20 tive (listing currently active projects); NIH, RePORTER Information on Project Number

21 5R01MH108519-11,         https://reporter.nih.gov/search/QKTSKN7vhUaAaj-bfO_SNg/project-

22 details/11077352. Plaintiffs have not established by clear and convincing evidence that NIH's

23 February 28, 2025 action violated the Court's TRO.

24

1    However, a broader injunction went into effect as of the evening of February 28, 2025,

2    preventing Defendants from enforcing Sections 3(e) and (g) of the Gender Ideology EO by

3    "condition[ing] or withhold[ing] federal funding based on the fact that a health care entity or health

4    professional provides gender-affirming care[.]" Dkt. No. 233 at 53. NIH's March 4, 2025 notice

5    confirmed the Grant's termination, explaining that

6        [t]his award related to Transgender issues no longer effectuates agency priorities.
         It is the policy of NIH not to further prioritize these research programs. Therefore,
7        the award is terminated.

8    Dkt. No. 244-2 at 6. Echoing the February 28 letter, the March 4 notice added that "[r]esearch

9    programs based on gender identity are often unscientific, have little identifiable return on

10   investment, and do nothing to enhance the health of many Americans. Many such studies ignore,

11   rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these

12   research programs." *Id.* Notably, the March 4 letter not only confirmed termination of the Grant,

13   but also stated that NIH "hereby revises this award to reflect a decrease in the amount of

14   $200,453," *id.* at 2–3, although "[f]unds in the amount of [$40,091] may be used to support patient

15   safety and orderly closeout of the project," *id.* at 7. Because the grant had a funds balance of

16   $78,300.91, the March 4 notice appeared to withhold more funds than those remaining on the

17   Grant, thereby effecting more than a simple termination of the Grant. Dkt. No. 244 at 3–4.

18       Again, Sections 3(e) and (g) of the Gender Ideology EO require agencies to "end the

19   Federal funding of gender ideology" and "ensure grant funds do not promote gender ideology,"

20   respectively. Dkt. No. 17-2 at 3. The EO explains that "gender ideology" "replaces the biological

21   category of sex with an ever-shifting concept of self-assessed gender identity"; "[g]ender identity,"

22   in turn, "reflects a . . . subjective sense of self, disconnected from biological reality and sex[.]" *Id.*

23   at 2–3. The March 4 NIH notice uses strikingly similar language to that in the January 20 Gender

24   Ideology EO. For example, the notice explains that the Grant—which is "related to Transgender

issues"—"no longer effectuates agency priorities" because "[m]any" studies "based on gender identity are often unscientific" and "ignore, rather than seriously examine, biological realities." Dkt. No. 244-2 at 6. Furthermore, Defendants do not contest that the March 4 notice "de-obligated $200,453 for the grant at issue here," Dkt. No. 253 at 8, nor do they dispute Plaintiffs' evidence that "this means Seattle Children's could be asked to pay back money for expenses that were already incurred for study costs and salaries," Dkt. No. 244 at 4. And although Defendants now deny that this Grant involved patient care, NIH provided over $40,000 to support "patient safety" and orderly closeout of the project. Dkt. No. 244-2 at 7. In other words, while NIH was enjoined from enforcing the Gender Ideology EO by "condition[ing] or withhold[ing] federal funding based on the fact that a health care entity or health professional provides gender-affirming care," Dkt. No. 233 at 53, NIH retracted federal funding for a grant with potential "patient safety" needs because the grant involved "Transgender issues" and was "based on gender identity," Dkt. No. 244-2 at 6–7.

The February 28 letter[3] and March 4 notice also conform substantially to an NIH decision chart received by Plaintiff Physician 1 that Physician 1 understands to be "a tool NIH may be using to determine whether it will continue to fund grants in light of the Gender Ideology Order[.]" Dkt. No. 245 at 2. The decision chart indicates that any grant with "Sex" or "Gender" in the "title, abstract, or specific aims of [the] grant" will be reviewed by a program officer "to determine whether a negotiation is needed to revise title, aims, and/or budget[.]" Dkt. No. 245-6 at 2. If such a revision is possible, the program officer will "negotiate[] with [the] awardee" "to bring the work into alignment with EO 14168 [(the Gender Ideology EO)] and HHS guidance." *Id.* If this is not possible, and the funds are "used for gender-affirming care" or "[g]ender identity development,"

---

[3] Although the February 28 letter did not violate the Court's TRO or preliminary injunction, its rationale informs NIH's later action in its March 4 notice.

the program officer should "[c]onsider suspension or withholding future funding." *Id.* Consistent with the directives in the chart, the February 28 letter terminated the Grant because it is a "[r]esearch program[] based on gender identity" and "no modification of the project could align the project with agency priorities." Dkt. No. 244-1 at 2. Presumably on the same bases, the March 4 notice confirmed the termination and purported to claw back more grant funding than a termination of only prospective funding would appear to permit.

This evidence raises the possibility that the March 4 revocation of grant funding was effected pursuant to Sections 3(e) or (g) of the Gender Ideology EO for an enjoined purpose. But a mere possibility that an action violates a court order is not enough to establish contempt; Plaintiffs must instead provide clear and convincing evidence. Here, they have not done so. The record leaves unclear (1) whether NIH actually did revoke Grant funding on March 4 pursuant to the Gender Ideology EO; and (2) if so, whether the Grant involved "gender-affirming care." Plaintiffs' motion for contempt is therefore denied.[4] However, Plaintiffs have established good cause for expedited discovery, as explained below.

---

[4] On March 5, 2025, the Centers for Medicare and Medicaid Services ("CMS") sent a "Quality and Safety Special Alert Memo" ("QSSAM") to "[h]ospital [p]roviders and other [c]overed [e]ntities" stating that "CMS is alerting providers to the dangerous chemical and surgical mutilation of children, including interventions that cause sterilization." CMS QSSAM, https://www.cms.gov/files/document/qssam-25-02-hospitals.pdf (March 5, 2025). On March 6, 2025, the Health Resources and Services Administration ("HRSA") and the Substance Abuse and Mental Health Services Administration ("SAMHSA")—also within HHS—distributed letters to hospitals and grant recipients informing them that each respective agency "will review its policies, grants, and programs in light of the concerns discussed in the QSSAM and may begin taking steps in the future to appropriately update its policies to protect children from chemical and surgical mutilation." Dkt. No. 245-8 at 2 (HRSA letter); Dkt. No. 245-9 at 2 (SAMHSA letter). The HRSA letter also noted that it "will examine the $367.2 million that was awarded in fiscal year 2024 to 59 free-standing children's hospitals nationwide in light of the concerns" relating to the "dangerous chemical and surgical mutilation of children." Dkt. No. 245-8 at 2.

   In the "background" section of Plaintiffs' motion, they state that the HRSA and SAMHSA letters were submitted to "at least two hospitals in the Plaintiff States" in "flagrant violation of this Court's order." Dkt. No. 243 at 5. But Plaintiffs do not advance this argument in the "argument" section of their motion. *Id.* at 6–14. Nor do they include proposed findings regarding these letters in their proposed order, instead dedicating their proposed findings solely to the Grant termination. *See generally* Dkt. No. 243-1. Where a movant seeks a "severe remedy" such as contempt, *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019), it must at least provide adequate notice to the opposing party before contempt can properly be entered against it. *Cf. Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981); *Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 660214,

**C.  Plaintiffs Have Established that Expedited Discovery is Warranted**

A party "may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by [the Federal Rules of Civil Procedure], by stipulation, or by court order." Fed. R. Civ. P. 26(d)(1). To deviate from the standard pretrial schedule, including by seeking expedited discovery before a Rule 26(f) conference, the moving party must demonstrate good cause. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *see also, e.g.*, *MACOM Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, No. 216CV02859CASPLAX, 2017 WL 1371247, at *5 (C.D. Cal. Mar. 17, 2017) (finding good cause for expedited discovery when defendants' communications created substantial questions about whether they were complying with the court's preliminary injunction). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Amazon.com, Inc. v. Autospeedstore*, No. C22-1183 MJP, 2023 WL 1869300, at *1 (W.D. Wash. Jan. 11, 2023) (quoting *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002)). Courts commonly consider the following non-exclusive factors in determining the reasonableness of expedited discovery: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the

---

at *1 (N.D. Cal. Feb. 12, 2015) ("As the party moving for summary judgment, Plaintiff was required to frame the relief sought by his motion clearly, in order to provide adequate notice to the opposing party and to the Court."). Because Plaintiffs' "ambiguous motion denied [Defendants] adequate notice," *Wichansky v. Zoel Holding Co., Inc.*, 702 F. App'x 559, 561 (9th Cir. 2017), the Court does not entertain Plaintiffs' request relating to the HRSA and SAMHSA letters. *See Wagafe v. Biden*, No. 2:17-CV-00094-LK, 2025 WL 241744, at *9 (W.D. Wash. Jan. 17, 2025).

The Court also notes that, contrary to Plaintiffs' representations, these letters do not "explicitly threaten" institutions with loss of funding "if they do not abide by the Orders this Court has enjoined." Dkt. No. 254 at 7. However, Defendants are certainly on notice that they may not "enforc[e] or implement[] Section 4 of Executive Order 14,187 within the Plaintiff States" or "enforc[e] Sections 3(e) or 3(g) of Executive Order 14,168 to condition or withhold federal funding based on the fact that a health care entity or health professional provides gender-affirming care within the Plaintiff States." Dkt. No. 233 at 53. And taking action in "violation of the spirit of the injunction, even though its strict letter may not have been disregarded," can suffice to meet the standard for civil contempt. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014).

ORDER DENYING PLAINTIFFS' MOTION FOR CONTEMPT AND ATTORNEY'S FEES AND GRANTING PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY - 14

1  defendants to comply with the requests; and (5) how far in advance of the typical discovery process

2  the request was made. *Id.*

3      Here, the discovery Plaintiffs seek prior to the Rule 26(f) conference is limited to the

4  circumstances surrounding the Grant termination. Dkt. No. 243 at 12.[5] Defendants do not identify

5  any prejudice they would suffer from this expedited discovery, *see generally* Dkt. No. 253; and

6  indeed, the Court expects the typical discovery process to begin soon, *see* Dkt. No. 241 (ordering

7  the parties to submit a joint status report proposing next steps in the case). And as explained above,

8  NIH's communications have raised substantial questions regarding whether the March 4, 2025

9  federal funding revocation occurred as part of enforcement of the Gender Ideology EO in

10  contravention of the Court's preliminary injunction.

11      Accordingly, Plaintiffs' request for expedited discovery is granted as to the narrow issue

12  of whether the March 4 funding revocation was carried out on the basis of the enjoined provisions

13  in the Gender Ideology EO "based on the fact that" either Seattle Children's Hospital or the study

14  at issue "provides gender-affirming care[.]" Dkt. No. 233 at 53.

### III.   CONCLUSION

16      For these reasons, the Court DENIES Plaintiffs' Motion for Contempt and GRANTS their

17  alternative request for expedited discovery. Dkt. No. 243. Because the Court declines to hold

18  Defendants in contempt, it denies as moot Plaintiffs' request for fees.

19      The Court ORDERS counsel for Defendants to correct their unreasonable interpretation of

20  the Court's preliminary injunction by notifying all Defendants and agencies and their employees,

21  contractors, and grantees of the following by no later than March 20, 2025:

22

23  _____
[5] In their reply brief, Plaintiffs expand this request to encompass "discovery about what steps Defendants are taking
24  to terminate grants that fund research and health care for transgender people, and why they are taking those steps."
Dkt. No. 254 at 8. It is procedurally improper to introduce new arguments in a reply brief, and the Court declines to
entertain Plaintiffs' expanded request. *Thompson v. Comm'r*, 631 F.2d 642, 649 (9th Cir. 1980).

1.  This Court's February 28, 2025 preliminary injunction enjoined all Defendants (except President Trump) and all their respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who received actual notice of the order "from enforcing Sections 3(e) or 3(g) of Executive Order 14,168 to condition or withhold federal funding based on the fact that a health care entity or health professional provides gender-affirming care within the Plaintiff States" of Washington, Oregon, Minnesota, and Colorado. Dkt. No. 233 at 53.

2.  Defendants unreasonably interpreted "gender-affirming care" in paragraph 2 of the preliminary injunction to include only the four medical treatments listed in Executive Order 14,187, i.e., (1) "the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; (2) "the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex"; (3) "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex"; and (4) "surgical procedures . . . that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." Executive Order 14,187 § 2(c); *see also* Dkt. No. 253 at 10–11.

3.  Contrary to Defendants' unreasonable interpretation, "gender-affirming care" as used in paragraph 2 of the Court's preliminary injunction includes all gender-affirming services for individuals with gender dysphoria. Dkt. No. 233 at 30. In other words, consistent with the HHS Office of Population Affairs' definition of the term—i.e., "an array of services that may include medical, surgical, mental health, and non-medical services for transgender and nonbinary people," HHS Office of Population Affairs,

*Gender-Affirming      Care      and      Young      People*, https://web.archive.org/web/20250227041634/https://opa.hhs.gov/sites/default/files/2025-02/gender-affirming-care-young-people.pdf—"gender-affirming care" as set forth in paragraph 2 of the preliminary injunction includes, but is not limited to, therapy; mental health care; assistance with elements of a social transition (e.g., new name and pronouns, modification of clothing, voice training); evaluation of persistency of gender dysphoria, emotional and cognitive maturity, and coexisting psychological, medical, or social problems; puberty-suppressing medications; hormone therapy; and surgery. Dkt. No. 233 at 27–28, 51 & n.27.

4.  Defendants also unreasonably interpreted "care" to exclude patient care provided during research studies. Dkt. No. 253 at 2, 8–10. By way of clarification and not limitation, "gender-affirming care" as used in paragraph 2 of the Court's preliminary injunction includes patient care provided as part of research or education grants, including but not limited to routine services, ancillary services, outpatient services, inpatient services, and usual patient care received during the study. *See* NIH Grants Policy Statement, Chapter 19 (April 2024), *available at* https://grants.nih.gov/grants/policy/nihgps/HTML5/section_19/19_research_patient_care_costs.htm.

Defendants shall file a copy of the notice on the docket at the same time.


Dated this 17th day of March, 2025.


Lauren King
United States District Judge

ORDER DENYING PLAINTIFFS' MOTION FOR CONTEMPT AND ATTORNEY'S FEES AND GRANTING PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY - 17