Exhibit G








2200 Sixth Avenue, Suite 425, Seattle, WA 98121 • 206.389.9321 • Toll Free: 855.329.0919    2208 North 30th Street, Suite 202, Tacoma, WA 98403 • 253.627.6401 • Toll Fee: 800.649.2034

# ONE-WEEK TRANSCRIPT TURNAROUND
Digital Transcripts • Internet Realtime • HD Legal Video • Picture-in-Picture Depositions
Remote Depositions • Designation Editing • Nationwide Scheduling • HD Videoconferencing

In the Matter of:

State of WA, et al.

vs

Trump, et al.

_____

**MICHELLE BULLS**

*April 03, 2025*

_____

Thank you for choosing BA Litigation Services for your court reporting, legal video, and deposition technology needs. It is always our goal to provide you with exceptional service. If there is anything we can do to assist you, please don't hesitate to let us know.

*Sarah Fitzgibbon, CCR*
Vice President



The Premier Advantage™
PDF transcript bundle contains:

• Full-size and condensed transcripts
• Printable word index
• Hyperlinked selectable word index
• Embedded printable exhibit scans
• Hyperlinked selectable exhibit viewing
• Common file formats: txt, lef, mdb
  accessed via *paperclip* icon

STRATEGY    •    TECHNOLOGY    •    DESIGN    •    DEPOSITIONS

Case 2:25-cv-00244-LK    Document 276-7    Filed 04/30/25    Page 3 of 72

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1              UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF WASHINGTON

 3             WESTERN DISTRICT OF WASHINGTON

 4                      AT SEATTLE

 5    ------------------------------)

 6    STATE OF WASHINGTON, et al.,   ) NO.2:25-cv-00244-LK

 7                      Plaintiffs, )

 8              v.                   )

 9    DONALD J. TRUMP, in his        )

10    official capacity as President )

11    of the United States, et al.,  )

12                      Defendants.  )

13    ------------------------------)

14                          Washington, D.C.

15                          Thursday, April 3, 2025

16

17         Deposition of MICHELLE G. BULLS, a witness

18    herein, was called for examination by counsel for

19    Plaintiffs in the above-entitled matter, pursuant to

20    notice, the witness being first duly sworn by

21    BESS A. AVERY, a Notary Public in and for the

22    District of Columbia, taken at the offices of B&A

23    Litigation Services, 1029 Vermont Avenue, N.W.,

24    Washington, D.C., commencing at  9:06 a.m., when

25    were present on behalf of the respective parties:
```

```
 1            A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF STATE OF WASHINGTON:

 3        WILLIAM MCGINTY, ESQ.

 4        LAURYN K. FRAAS, ESQ.

 5        Assistant Attorneys General

 6        Attorney General of Washington

 7        800 Fifth Avenue, Suite 2000

 8        Seattle, Washington  98104-3188

 9        (360) 709-6027

10        william.mcginty@atg.wa.gov

11        lauryn.fraas@atg.wa.gov

12   ON BEHALF OF THE DEFENDANTS:

13        VINITA B. ANDRAPALLIYAL, ESQ., SR. COUNSEL

14        CHRISTIAN S. DANIEL, ESQ., TRIAL ATTORNEY

15        ROBERT BOMBARD, ESQUIRE

16        UNITED STATES DEPARTMENT OF JUSTICE

17        Civil Division, Federal Programs Branch

18        1100 L Street, NW

19        Washington, DC  20530

20        (202) 305-0845

21        Vinita.B.Andrapalliyal@usdoj.gov

22        Christian.S.Daniels@usdoj.gov

23

24   ALSO PRESENT:  Miranda Berge, Esq. - HHS

25                  Anna Jacobs, Esq. - HHS
```

```
 1              I N D E X
 2  Witness:                                   Page
 3      MICHELLE G. BULLS
 4          Examination by Mr. McGinty. . . . . . 6
 5          Examination by Ms. Andrapalliyal. . . 184
 6          Further Examination by Mr. McGinty. . 204
 7
 8
 9
10              - - -
11          E X H I B I T S
12
13  Bulls Deposition Exhibits                   Page
14  Exhibit 1  Subpoena Duces Tecum  . . . . . . . . . 11
15  Exhibit 2  Resume of Michelle G. Bulls . . . . . . 33
16  Exhibit 3  Presidential Documents from the . . . . 49
17          Federal Register Vol. 90, 1/20/2025
18  Exhibit 4  Termination letter, dated 2/28/25 . . . 66
19  Exhibit 5  Exhibit 5, article from journal . . . . 77
20          Nature
21  Exhibit 6  NIH Grants Management Staff . . . . . . 91
22          Guidance - Award Assessments for
23          Alignment with Agency Priorities -
24          3/2025
25
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 4

```
 1            E X H I B I T S   (Continued)

 2

 3   Exhibit 7  Memo from NIH to Institute and  . . . . 99

 4         Centers Chief Grants Management

 5         Officers, 2/13/2025

 6   Exhibit 8  Memo from NIH to Institute and  . . . .104

 7         Center Chief Grants Management Officers,

 8         2/12/2025

 9   Exhibit 9  Exhibit B - Notices of Awards . . . . .106

10   Exhibit 10 HSS Notices of Award  . . . . . . . . .112

11   Exhibit 11 NIH Office of Extramural Research . . .118

12         letter to Patrick Donnell, 3/12/2025

13   Exhibit 12 NIH Office of Extramural Research . . .122

14         letter to Julie C. Tang, 3/18/2025

15   Exhibit 13 NIH Office of Extramural Research . . .125

16         letter to  Garrett M. Steed, 3/21/2025

17   Exhibit 14 E-mail from Office of Sponsored . . . .126

18         Programs to Carol Rhodes

19   Exhibit 15 NIH letter to Carol Rhodes, . . . . . .129

20         3/18/2025

21   Exhibit 16 NIH letter to Lester Warnac . . . . . .132

22         Villaflor, 3/20/2025

23   Exhibit 17 NIH letter to Carole Rhodes,  . . . . .134

24         3/12/2025

25
```

Case 2:25-cv-00244-LK    Document 276-7    Filed 04/30/25    Page 7 of 72

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025                                    Page 5

1              E X H I B I T S   (Continued)

2

3     Exhibit 18 E-mail from UW-AOR to Carol Rhodes, . .136

4          3/21/25

5     Exhibit 19 NIH letter to Carol Rhodes, . . . . . .139

6          3/20/2025

7     Exhibit 20 NIH Grants Policy Statement . . . . . .141

8     Exhibit 21 Spreadsheet of terminations . . . . . .180

9     Exhibit 22 Revised version of Exhibit 21 . . . . .182

10

11

12 (all exhibits retained)
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    P R O C E E D I N G S

 2                      -   -   -   -   -

 3              (Bulls Deposition Exhibit 1 was

 4                premarked.)

 5    Thereupon,

 6                    MICHELLE G. BULLS,

 7    was called as a witness by counsel for Plaintiffs,

 8    and, having been duly sworn by the Notary Public,

 9    was examined and testified as follows:

10                    EXAMINATION

11    BY MR. McGINTY:

12         Q    Could you state your name and spell your

13    last name for the record, please.

14         A    Sure.  Michelle Bulls, B-U-L-L-S.

15         Q    Great.  And have you ever been deposed

16    before?

17         A    No.

18         Q    Okay.  So just in terms of ground rules,

19    we're here so that I can ask you some questions

20    about what you know about the case.  I'll ask you

21    questions and you'll answer them unless you're

22    instructed by counsel not to do so.

23              Is that fair?

24         A    That's fair.

25         Q    Okay.  It's important we make a clear
```

1      A      The counsel.

2      Q      Oh, yeah, yeah.  What I meant is, you

3   talked to DOJ, you talked to OGC, Office of General

4   Counsel?

5      A      Yes.

6      Q      And you talked to your husband?

7      A      I talked to my husband.  And I alerted my

8   supervisor, my current supervisor, that I had to

9   come to the deposition.

10      Q      Okay.  And who is that?

11      A      Jon Lorsch.

12      Q      Jon Lorsch?  Can you spell that for me.

13      A      L-O-R-S-C-H.

14      Q      Okay.  And did you talk substantively

15   about what your testimony might be today?

16      A      No.

17      Q      Okay.  Did he ask any questions?

18      A      No.

19      Q      Okay.  Let's turn to the Subpoena that's

20   been marked as Exhibit 1.  So you got a copy of

21   this?

22      A      Yes.

23      Q      Okay.  And when did you get a copy?

24      A      I'm not sure.

25      Q      All right.  If you could turn to page 5 of

1    Exhibit 1, there's a numbered list titled, "Requests

2    for Production."  Do you see that?

3        A    Yes.

4        Q    Did you review that before today?

5        A    Yes.

6        Q    Okay.  And what efforts did you make to

7    collect the documents that were asked for here?

8        A    I went through my e-mails and tried to

9    find anything that I could provide.

10       Q    Okay.  And did you find e-mails that would

11    match the descriptions in this list?

12            MS. ANDRAPALLIYAL:  Objection, calls for a

13    legal conclusion.

14    BY MR. McGINTY:

15       Q    You can answer.

16            (Witness reviews document)

17            THE WITNESS:  Yes.

18    BY MR. McGINTY:

19       Q    Okay.  What e-mails were those?

20       A    The e-mail that I sent to -- oh.  Well,

21    the e-mails that I received related to the

22    termination.

23       Q    Mm-hmm.

24       A    The e-mails that I sent to the Chief

25    Grants Management Officers related to the

1          Did you get copies of those documents so

2   you could verify that you had -- to see if you had

3   other copies of those versions of documents?

4       A    No.

5       Q    You didn't get copies of those?

6       A    I don't recall.

7       Q    Okay.  So Number 2 asks for all drafts in

8   your possession, custody, or control of the document

9   titled "Staff Guidance - Award Assessments for

10  Alignment with Agency Priorities - March 2025."

11          Do you know what document that's talking

12  about, Staff Guidance - Award Assessments for

13  Alignment with Agency Priorities?

14      A    Yes.

15      Q    Okay.  And do you have a copy of that?

16      A    Yes.

17      Q    Okay.  And did you give that to counsel?

18      A    Yes.

19      Q    Okay.  How many versions of that exist?

20      A    At the time I gave it to counsel or today?

21      Q    Today.

22      A    Probably two or three.

23      Q    Two or three versions of that exist?

24      A    Maybe -- yeah, I'll say three.

25      Q    Three?  Three that exist.

```
 1   don't know.  And there's a final that's forthcoming?
 2        A    Yes.  It's been an evolving document.  And
 3   so, like I said, some of them were -- some of the IC
 4   staff were comfortable in using the document, some
 5   of the staff were, decided that they were going to
 6   stop and wait for the final document.  So it's been
 7   a bit of back and forth.
 8        Q    Okay.  And "IC," Institute/Centers?
 9        A    Institutes and Centers.
10        Q    Thank you.
11        A    You're welcome.
12        Q    Let's see.  And then item Number 3 asks
13   for all communications made to or by you related to
14   documents identified in Requests for Production 1
15   and 2.
16             It sounds like there was lots of
17   communications to and by you about all of these
18   documents.  Is that right?
19        A    Yes.
20        Q    Okay.  And did you collect all of those
21   communications?
22        A    I believe I did.
23        Q    Okay.  And you gave them to counsel?
24        A    I believe I did.
25        Q    Okay.  Let's see.  And then all documents
```

 1  in your possession, custody, or control, including

 2  communications made to or by you, related to

 3  termination of NIH Grant No. -- and then there's a

 4  grant number there -- 5R21HD107311.  That's the

 5  document we were just talking about with Kym Ahrens

 6  as the principal investigator.  Is that right?

 7       **A    I do recognize the grant number, yes.**

 8       Q    Okay.  And it sounds like there's all

 9  kinds of documents that would be responsive to that

10  one, too?

11       **A    Correct.**

12       Q    Okay.  And you gave those to counsel?

13       **A    I --**

14            MS. ANDRAPALLIYAL:  Objection.  Just a

15  standing objection here to the extent that we're

16  going through all these requests that are calling

17  for a legal conclusion where you're asking her

18  whether she has collected all of the documents

19  responsive to these requests.

20            MR. McGINTY:  Are you instructing the

21  witness not to answer?

22            MS. ANDRAPALLIYAL:  No.

23  BY MR. McGINTY:

24       Q    Could you repeat your last answer for me.

25       **A    Can you repeat the question.**

1      Q      Yes.  I think I just asked you if you gave

2   them to counsel.

3      A      I believe so.

4      Q      Okay.  So next one asks for all documents

5   in your possession, custody, or control related to

6   NIH's claims that research programs based on gender

7   identity are often unscientific, have little

8   identifiable return on investment, and do nothing to

9   enhance the health of many Americans.  Many such

10  studies ignore, rather than seriously examine,

11  biological realities.

12            Did you look for documents related to that

13  request?

14     A      Yes.

15     Q      Did you find any?

16     A      It was in the termination letter.  That

17  was the language in the termination letter that was

18  provided to me.

19     Q      Okay.  Anything else?

20     A      No.

21     Q      Okay.  Number 6 asks for all documents in

22  your possession, custody, or control related to

23  NIH's claim that it is the policy of NIH not to

24  prioritize these research programs.  Do you see

25  that?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025                                    Page 26

1        **A        Yes.**

2        Q        And did you search for documents like

3    that?

4        **A        I provided the documents that likely had**

5    **this in it, but I was not searching for this**

6    **specific document, if that makes sense.**

7        Q        Okay.  You were looking for documents that

8    had that quoted language?

9        **A        Not the quoted language.  I looked for**

10   **documents that surrounded the termination, and if**

11   **the termination was based on this, it had that in**

12   **it.  I wasn't looking specifically for this, if that**

13   **makes sense.  I gave what I had and what I received,**

14   **and I -- that's what I gave.**

15       Q        Okay.  I guess my question is:

16           What this is asking for is documents

17   that's related to the claim that it is the policy of

18   NIH not to prioritize these research programs, so

19   did you look for any documents about NIH policy?

20       **A        No, I looked for documents related to the**

21   **termination.**

22       Q        Okay.  Did you look for any documents

23   related to the policy that animated the termination?

24       **A        No, I looked for the documents, the letter**

25   **that terminated the grant.**

1        Q      Okay.   Thank you.

2                So moving on to Number 7.  This one asks

3    for all documents in your possession, custody, or

4    control related to NIH's claims that this award

5    related to transgender issue no longer

6    effectuates agency priorities.

7                So did you look for any documents about

8    NIH priorities in response to this question?

9        A      I looked for the termination documents

10   that may have included that language, but I did not

11   look for that language.

12       Q      Okay.  You didn't look for any documents

13   about whether or not it is the policy, or, excuse

14   me, the priority of NIH to fund studies and research

15   related to transgender issues?

16       A      No, I provided the documents that was

17   provided to me that may have included that.  I did

18   not search for that.

19       Q      Okay.  The next one asks for all documents

20   in your possession, custody, or control that include

21   descriptions of policies, procedures, or guidance

22   regarding termination of NIH grants dated between

23   January 20, 2025 and March 6, 2025.  Do you see

24   that?

25       A      Mm-hmm.

1      Q    Did you look for those kinds of documents?

2      A    **Yes, I provided all of the documents that,**

3   **regarding the termination.**

4      Q    Okay.  And would this have included the

5   document that we were just talking about a minute

6   ago, the Staff Guidance Award Assessments?  Would it

7   have included that one?

8      A    **Yes.**

9      Q    Okay.  Are there any other documents about

10  agency priorities or policies that are dated in that

11  range having to do with grant termination?

12     A    **No, not that I recall.**

13     Q    Okay.  The next one asks for all documents

14  in your possession, custody, or control including

15  communications, policy statements, or guidance

16  documents related to or referencing two Executive

17  Orders.  Do you see that there?

18     A    **Yes.**

19     Q    And did you search for those documents?

20     A    **I provided the documents that led up to**

21  **the termination.  That's all I provided.**

22     Q    Okay.  In response to this request

23  specifically?

24     A    **In response to the request for me to**

25  **provide all documentation that led up to, all the**

1    way through the termination.  That's what I

2    provided.

3         Q    Okay.  How about documents that relate to

4    or reference these two Executive Orders, did you

5    search for that?

6         A    If it was a part of the termination

7    package communication, I did provide it.  But I

8    don't know that I searched for the Executive -- like

9    I didn't provide the Executive Order, I don't

10   believe.

11        Q    Okay.  So you searched for documents that

12   would have related to the termination we've been

13   talking about, but not necessarily anything else?

14        A    Correct.

15        Q    Okay.  Did you search for any documents or

16   any communications between you and any person

17   affiliated with the Department of Government

18   Efficiency?

19        A    I provided all the e-mails, all of the

20   communications, and if that was a part of it, that

21   is part of that package.  I didn't look for any

22   communications with Department of Government

23   Efficiency.

24        Q    Okay.  Were there such communications?

25        A    There was no communication between, that I

1    can, that I know of, directly between me and anyone

2    in the Department of Government Efficiency.  They

3    may have been copied on the e-mail, but not with me.

4         Q    Okay.  Sitting here today, can you

5    recollect any e-mails that they were copied on?

6         A    Yes, one.

7         Q    Okay.  Can you describe that e-mail for

8    me?

9         A    I believe that was the e-mail that

10   included a list of grants to be terminated.

11        Q    Okay.  So you got an e-mail.  Was it from

12   someone at the Department of Government Efficiency?

13        A    No.

14        Q    No.  They were copied on one.  Who was

15   sending that e-mail?

16        A    The e-mail that I received was from,

17   between me and my supervisor, and there was a string

18   below it.  So I wasn't directly on the e-mail with

19   that individual, it was forwarded to me with a list

20   of the terminations.

21        Q    I see.  And who was your supervisor at the

22   time?

23        A    Liza Bundesen.

24        Q    That was Liza Bundesen?

25        A    Yeah.

```
 1        Q    And she was given a list of terminations?

 2        A    Correct.

 3        Q    And that list came from someone at the

 4   Department of Government Efficiency?

 5        A    That list came from Rachel Riley.

 6        Q    Okay.

 7        A    And her address was from HHS Office of the

 8   Secretary.

 9        Q    Thank you.  And the Department of

10   Government Efficiency was -- how were they involved

11   in that e-mail?

12        A    Copied.

13        Q    They were cc'd?

14        A    I believe.

15        Q    Okay.  So Rachel Riley at HHS sent it to

16   Liza Bundesen, who sent it to you.  Is that right?

17        A    Yes.

18        Q    Okay.  Can you remember anybody else who

19   was included on that e-mail?

20        A    Not that particular e-mail.  Because one

21   of the e-mails came from Dr. Memoli, so those were

22   two separate strings, but both termination e-mails.

23        Q    Oh, okay.  So there's another set of

24   terminations.  Am I understanding that right?

25        A    It was the same -- yes, yes.
```

1        Q      Okay.  And that one came from Dr. Memoli?

2        A      Yes.

3        Q      But that was -- did it come from the same

4    person at HHS?

5        A      Yes, it came from the same person at HHS

6    to Dr. Memoli that was forwarded to Liza.

7        Q      I see.  And who is the person in the

8    Department of Government Efficiency who was copied?

9        A      I believe his name was Brad.

10       Q      Brad.  Don't remember the last name?

11       A      I don't.

12       Q      Okay, fine.  Okay.

13              So it sounds like there's at least two

14   e-mails that copied someone at the Department of

15   Government Efficiency.  One was forwarded to you by

16   Dr. Bundesen, one was forwarded to you by

17   Dr. Memoli.  Are there any others?

18       A      Dr. Memoli didn't forward the e-mail

19   directly to me.

20       Q      Oh.

21       A      He forwarded it to Liza Bundesen, who

22   forwarded it to me.

23       Q      I see.  Thank you for that clarification.

24       A      You are welcome.

25       Q      Are there any others?

1    A    No.

2    Q    Okay.  Just the two?

3    A    (Nodding head)

4    Q    Okay.

5    A    Yes.

6    Q    Thank you so much.  I did not ask you to

7    verbally answer the questions, and I should have

8    done so, so thank you so much for remembering to do

9    that.

10   A    You're welcome.

11   Q    We also asked for a copy of your CV and

12   your resume.  Did you give that to counsel?

13   A    Yes.

14        MR. McGINTY:  Counsel, do you have any of

15   those documents to provide today?

16        MS. ANDRAPALLIYAL:  Yes.  I believe we've

17   provided you a copy of Ms. Bulls' CV.

18        (Document tendered to Mr. McGinty)

19        MR. McGINTY:  Thank you.  Okay.  Let's go

20   ahead and mark this Exhibit 2.

21        (Bulls Deposition Exhibit 2 was marked for

22         identification.)

23        MR. McGINTY:  Counsel, would it be

24   possible to get a second copy of this?

25        MR. BOMBARD:  For the witness?

1    2011.  Did I get that right?

2        A    2012.

3        Q    2012.  So since 2012, there's been one or

4    two noncompliance terminations until about

5    January 20th, 2025.  Is that right?

6        A    Yeah.  And it's probably more than one,

7    for sure, and less than a handful.  So I don't

8    recall, so I apologize, but I just know that that's

9    not what we normally do.  And, yes, the answer to

10   the question is whether -- actually --

11       Q    What were you going to say?

12       A    No, I need you to repeat the question

13   again, because I want to make sure I don't restate

14   it incorrectly.

15       Q    Sure.  No, that's fair, that's fair.

16            My question was just between when you were

17   appointed director in 2012 until January 20, 2025,

18   there's been, I think you clarified, more than one

19   but less than ten noncompliance terminations.  I

20   think that's what your testimony was.

21       A    My testimony was it doesn't happen often,

22   more than one and probably less than five.

23       Q    More than one, less than five.  Okay.

24            And since January 20, 2025, to the present

25   date, how many noncompliance terminations have there

1    been?

2         A    Zero.

3         Q    Oh, okay.  None at all.  Were they all the

4    bilateral terminations you were just talking about?

5         A    **We had some bilateral terminations between**

6    **January, yes.**

7         Q    Okay.

8         A    **And I don't recall the number, but not any**

9    **noncompliance.**

10        Q    So then the thread we were talking about

11   with Dr. Kym Ahrens, it's been reinstated now, but

12   when it was terminated, what kind of termination was

13   that?

14        A    **A termination that was provided to me, to**

15   **this -- yeah.**

16        Q    Okay.  It was neither noncompliant nor was

17   it bilateral?

18        A    Correct.

19        Q    Okay.  It was a different kind of

20   termination?

21        A    Correct.

22        Q    How many of that kind of termination was

23   there between when you were appointed director of

24   OPERA until January 20, 2025?

25        A    Zero.

1      Q    Zero.  That never happened before?

2      A    I'm sorry, let me restate.  There was one

3   termination that happened that way, but it was --

4   the grant was reinstated as well.  That, yes.

5      Q    Okay.  Which one was that?

6      A    That was one under the first Trump

7   Administration for the Eco Health Alliance.

8      Q    Okay.  Do you know why that one was

9   reinstated?

10     A    No.

11     Q    Okay.  Okay.  You just stated that this

12  particular kind of termination, like for a

13  Dr. Ahrens, was provided to you.  Who provided it?

14     A    Liza Bundesen, my supervisor.

15     Q    Okay.  And I think you said it was

16  provided by someone in HHS, I forget her name,

17  Rachel something?

18     A    Rachel Riley.

19     Q    Rachel Riley?

20     A    Correct.

21     Q    Okay.  And just to clarify, Rachel Riley

22  provided that list to Liza Bundesen, and that

23  included the termination to Dr. Ahrens?

24     A    Correct.

25     Q    Okay.

1    basis of agency priorities, haven't they?

2        A    Yes.

3        Q    But you don't have agency priorities that

4    are final?

5        A    I have letters that I've been asked to

6    send.

7        Q    Okay.

8            MR. McGINTY:  Can I mark this as Exhibit

9    4, please.

10           (Bulls Deposition Exhibit 4 was marked for

11            identification.)

12   BY MR. McGINTY:

13       Q    I'm passing to you what has been marked

14   Exhibit 4, and do you recognize this document?

15       A    Yes.

16       Q    And what is it?

17       A    A termination letter.

18       Q    This is one of those letters that you've

19   been asked to send that you were just talking about?

20       A    Yes.

21       Q    And you signed this letter, right?

22       A    Yes.

23       Q    Okay.  And why did you send this letter?

24       A    I was asked to send it.

25       Q    Who asked you to send it?

1        A      My supervisor.

2        Q      Okay.  And who is that?

3        A      At the time, Liza Bundesen.

4        Q      Okay.  How did she ask you to send it?

5        A      Via e-mail.

6        Q      Did she tell you why she was asking you to

7   send it?

8        A      Yes.

9        Q      Okay.  And what did she say?

10       A      That we were asked to terminate grants.

11       Q      Did she tell you why you were asked to

12   terminate grants?

13       A      She did not.

14       Q      Okay.

15       A      Can I correct the statement?

16              The e-mail that I received from

17   Liza Bundesen indicated that we needed to terminate

18   the grants, and the language in the letters were

19   provided so I didn't question, I just followed the

20   directive.

21       Q      Okay.

22       A      She didn't say:  Terminate the grant

23   because of.  She said:  The list below.  So I just

24   wanted to be clear about that.

25       Q      Okay.  And did you provide this e-mail to

```
 1   counsel?

 2       A     Yes.

 3       Q     Okay.  And "the list is below," list of

 4   what?

 5       A     Awards to be terminated.

 6       Q     Okay.  And is that the same list that you

 7   were talking about earlier that came from

 8   Rachel Riley?

 9       A     That was on the same e-mail, yes.

10       Q     Okay.  And Brad may have been copied on

11   that e-mail?

12       A     I don't know if Brad was on that e-mail

13   string.

14       Q     Okay.

15       A     I can't recall.

16       Q     Brad was on one of the e-mail strings?

17       A     Correct.

18       Q     Do you remember if it was Brad Smith?

19       A     I know for sure Brad.

20       Q     Okay.  Definitely Brad.  It might have

21   been Brad Smith, it might have been Brad someone

22   else?

23       A     Yes.

24       Q     Okay.  And you said the language was

25   provided.  What do you mean by "the language was
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 69

```
 1    provided"?
 2        A    The letter.  There were template letters.
 3        Q    So the entirety of the letter language?
 4        A    Correct.
 5        Q    Okay.  So take a look at the first
 6    paragraph here:
 7             "Funding for Project Number," and then
 8              there's a number," is hereby terminated
 9              pursuant to the 2022 National Institutes
10              of Health Grants Policy Statement," and
11              C.F.R., a CFR section.  "This letter
12              constitutes a notice of termination."
13              You did not write that language?
14        A    No.
15        Q    You didn't write any word in this letter?
16        A    Just the signature.
17        Q    Okay.  You wrote your name?
18        A    Correct.  I mean, I -- yes, I wrote my
19    name and signed it.
20        Q    Okay.  And you don't know why this letter
21    was sent?
22        A    To terminate the grant.
23        Q    Okay.  But you don't know what agency
24    priorities are intended to be served by terminating
25    this grant?
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025                                                    Page 70

```
 1        A      I didn't ask the question and I was not
 2   told, I sent the letter as it was.
 3        Q      Okay.  Did Rachel Riley provide the
 4   templates that you used?
 5        A      Yes.
 6        Q    So it says here -- actually, can you read
 7   the fourth paragraph, the one that starts with,
 8   "This award no longer effectuates."
 9        A      "This award no longer effectuates agency
10               priorities.  NIH is obligated to
11               carefully steward grant awards to ensure
12               taxpayer dollars are used in ways that
13               benefit the American people and improve
14               their quality of life.  Your project does
15               not satisfy these criteria.  Research
16               programs based on gender identity are
17               often unscientific, have little
18               identifiable return on investment, and do
19               nothing to enhance the health of many
20               Americans.  Many such studies ignore,
21               rather than seriously examine, biological
22               realities.  It is the policy of NIH not
23               to prioritize these research programs."
24        Q    Okay.  And this was part of the template
25   letter that Rachel Riley provided?
```

 1        A      Yes.
 2        Q      Are you aware of -- let me strike that.
 3               Did NIH have any ability to alter this
 4    language in any way?
 5        A      **Did we have the ability?**
 6               MS. ANDRAPALLIYAL:   Objection, assumes
 7    facts not in evidence.
 8    BY MR. McGINTY:
 9        Q      Was this edited in any way from the
10    template letter that Rachel Riley provided?
11        A      **No.**
12        Q      Okay.  It says, "Your project does not
13    satisfy these criteria."  Do you see that there?
14        A      **Yeah.**
15        Q      Are you aware of any assessment of
16    Dr. Ahrens' grant in particular that was made to see
17    if her grant satisfied the criteria?
18        A      **No.**
19        Q      Would you have been aware of such
20    assessment if one had been made?
21        A      **I don't know.**
22        Q      Okay.  Would you have been aware of such
23    an assessment if one had been made by NIH?
24        A      **Yes.**
25        Q      And it says, "Research programs based on

```
 1    gender identity are often unscientific with little

 2    identifiable return on investment, and do nothing to

 3    enhance the health of many Americans."

 4            Did NIH do any assessment of this

 5    particular grant to see if it was unscientific?

 6        A    I don't know.  The letter was provided and

 7    it was sent.  I don't know what happened before

 8    that.

 9        Q    Well, did NIH do any assessment?

10        A    I don't know.

11        Q    You don't know if NIH did an assessment to

12    see if Dr. Ahrens' grant was scientific or not?

13        A    Are you talking about -- I don't

14    understand your question, sorry.

15        Q    Well, it says in this letter, and I

16    understand you didn't write it, but you signed it,

17    "Research programs based on gender identity are

18    often unscientific."  And that was the reason this

19    particular grant was terminated.

20            Is that right?

21        A    That's what the letter says.

22        Q    That's what the letter says.  So I'm

23    trying to figure out whether or not there was any

24    basis to think that Dr. Ahrens' grant was

25    unscientific.
```

1      A    I don't know.

2      Q    Okay.  And do you know if there was any

3  assessment to see if it had an identifiable return

4  on investment?

5      A    No, I don't know.

6      Q    Do you know if NIH did one?

7      A    I don't know.

8      Q    Okay.  Would you have been aware if NIH

9  did one?

10     A    I'm not sure.

11     Q    Okay.  And it also says, "and do nothing

12  to enhance the health of many Americans."

13         Do you know if NIH did any assessment to

14  see if Dr. Ahrens' grant would enhance the health of

15  many Americans?

16     A    I don't know.

17     Q    Okay.  Was this the only template language

18  that Rachel Riley provided?

19         MS. ANDRAPALLIYAL:  Objection.  To the

20  extent that you're calling for draft language that

21  wasn't finalized, that's privileged, and I instruct

22  the witness not to answer.

23  BY MR. McGINTY:

24     Q    I'll clarify.

25         Did Rachel Riley provide any other

1    template letters that were sent?

2        A    Yes.

3        Q    Okay.  What were those template letters

4    about?

5        A    In that list, I don't recall.

6        Q    How about any list for letters that had

7    been sent?

8        A    DEI activities, this language.  I think

9    one on China.  I don't know.  That's it that I can

10   recall, and I'm sure I'm blanking right now.

11       Q    So what you remember is the gender

12   identity language, the DEI language, and the China

13   language.

14            Was there language on vaccine hesitancy

15   that was used?

16       A    In that batch, no.

17       Q    Any batch that's been sent?

18       A    Yes.

19       Q    And that was provided by Rachel Riley,

20   too?

21       A    Yes.  Well, actually, that was provided by

22   Dr. Memoli.  I don't know if Rachel Riley provided

23   that to him, I apologize.

24       Q    Okay.  So Dr. Memoli wrote the one on --

25   or provided you with the one on vaccine hesitancy?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 90

```
 1        Q    And it says:

 2             "China:  Bolstering Chinese universities

 3              does not enhance the American people's

 4              quality of life or improve America's

 5              position in the world.  On the contrary,

 6              funding research in China contravenes

 7              American national security interests  and

 8              hinders America's foreign-policy

 9              objectives."

10             Do you see that?

11        A    Yes.

12        Q    This language was provided by

13   Rachel Riley?

14        A    Yes.

15        Q    And then it says:

16             "DEI:  Research programs based primarily

17              on artificial and non-scientific

18              categories, including amorphous equity

19              objectives, are antithetical to

20              scientific inquiry, do nothing to expand

21              our knowledge of living systems, provide

22              low returns on investment, and ultimately

23              do not enhance health, lengthen life, or

24              reduce illness.  Worse, so called

25              diversity, equity, and inclusion (DEI)
```

```
 1              studies are often used to support

 2              unlawful discrimination on the basis of

 3              race and other protected characteristics,

 4              which harms the health of Americans.

 5              Therefore, it is the policy of NIH not to

 6              prioritize such research programs."

 7         That language also was provided by

 8    Rachel Riley?

 9       A    Yes.

10       Q    And, finally, the transgender language

11    that we looked at before which was also provided by

12    Rachel Riley?

13       A    Yes.

14       Q    And it was provided by her in the form of

15    template letters to terminate grants?

16       A    Yes.

17              MR. McGINTY:  Mark this as Exhibit 6,

18    please.

19              (Bulls Deposition Exhibit 6 was marked for

20               identification.)

21    BY MR. McGINTY:

22       Q    I'm handing you what's been marked

23    Exhibit 6, and I'll represent to you that this was

24    also published in the Nature journal, and I've

25    printed it off of their website.
```

1      A      To help the Institutes and Centers with

2    trying to figure out how to make awards, give them

3    guidance.

4      Q      Okay.  Give them guidance on making awards

5    and also terminating awards, right?

6      A      Making awards and making assessments on

7    which categories they need to use to make those

8    assessments.

9      Q      Okay.  So this says, under Category 1,

10   "Add the action to the master spreadsheet"?

11     A      Yes.

12     Q      What's the master spreadsheet?

13            MS. ANDRAPALLIYAL:  Objection.  To the

14   extent the question calls for information that's

15   deliberative, I'm instructing the witness not to

16   answer.

17   BY MR. McGINTY:

18     Q      How does NIH keep track of the grants it

19   has terminated?

20     A      We do track it in a spreadsheet.

21     Q      Okay.  And what's on that spreadsheet?

22            MS. ANDRAPALLIYAL:  Objection.  To the

23   extent that the question is calling for information

24   that's deliberative and not final, I'm instructing

25   the witness not to answer.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 94

1    BY MR. McGINTY:

2        Q    Okay.  Does the spreadsheet contain

3    information about grants that have been terminated?

4        A    Yes.

5        Q    Okay.  And do you use a spreadsheet to

6    keep track of that?

7        A    Yes.

8        Q    Okay.  Does the spreadsheet indicate the

9    reason that the grants were terminated?

10       A    Based on the categories, yes.

11       Q    Okay.  And that's the Category 1, 2, 3,

12   4 you have here?

13       A    No.  The categories that were provided in

14   the termination letters.

15       Q    Okay.  And which categories are those?

16       A    The categories of the DEI --

17       Q    Okay.  So going --

18       A    -- China.

19       Q    -- back to --

20       A    Yeah.

21       Q    -- what I think had been marked Exhibit 5,

22   page 5 of Exhibit 5?

23       A    Yes.

24       Q    So you're looking at China, DEI, and

25   transgender issues?

1        A      Yes.

2        Q      Are there any other categories that

3    designate the reason that a grant was terminated?

4        A      Vaccine hesitancy is the one additional

5    one.

6        Q      Any others?

7        A      No.

8        Q      Okay.  And how do you know which of those

9    categories to terminate a grant under?

10       A      Based on the letters that are provided

11   to -- you know, the list.  We receive a list.

12       Q      That's the list you get from Rachel Riley?

13       A      That's the list that I get from my

14   supervisor or, yeah, it's forwarded.

15       Q      Okay.  And does that list show which

16   category reason to terminate the grant for?

17       A      Yes.

18       Q      Okay.  How does it do that?

19       A      It has a category section.

20       Q      What's the form of this list?

21       A      It's a spreadsheet.

22       Q      It's a spreadsheet.  Okay.

23       A      So our spreadsheet matches that

24   spreadsheet.

25       Q      Did you, like, copy and paste into it?

```
 1              MS. ANDRAPALLIYAL:  Objection.  To the
 2    extent the information sought is deliberative and
 3    not final in nature, I'm instructing the witness not
 4    to answer.
 5    BY MR. McGINTY:
 6         Q    Okay.  So you get a spreadsheet that tells
 7    you which grants to terminate and the reasons why?
 8         A    Yes.
 9         Q    And what are those reasons?
10         A    Based on the categories.
11         Q    Is it verbatim what I'm seeing her, China,
12    DEI --
13              MS. ANDRAPALLIYAL:  Objection.  To the
14    extent that this is calling for deliberative
15    information that has not been finalized, I'm
16    instructing the witness not to answer.
17    BY MR. McGINTY:
18         Q    Speaking only about grants that have
19    actually been terminated, the spreadsheet that you
20    get, what does it say for the reason that the grants
21    have been terminated?
22         A    The categories, you know, DEI,
23    transgender, you know.
24         Q    Is that verbatim?
25         A    I don't -- I can't tell you verbatim, but
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 97

1   it doesn't include all of this detail that was

2   provided in the termination letter.  It just gives

3   the title, the category.

4        Q    So it says China, DEI, or transgender?

5        A    Yes, and vaccine --

6        Q    And vaccine?

7        A    -- hesitancy.

8        Q    Okay.  When you get that list and you get

9   the template letters, do you get a letter for each

10  grant that you're going to terminate, or do you have

11  to do some kind of, like, word merge?

12            MS. ANDRAPALLIYAL:  Objection.  The

13  question is calling for provision of deliberative

14  information which is privileged.  I'm instructing

15  the witness not to answer.

16  BY MR. McGINTY:

17       Q    Okay.  But it's your testimony that the

18  reason that the grant is going to be terminated is

19  provided to you.  Is that right?

20       A    That's right.

21       Q    And you don't have any input into that?

22       A    I don't.

23       Q    Okay.  And you're testifying that the

24  template letter for each reason is provided to you.

25  Is that right?

1       A       Yes.

2       Q       And you don't have any input into that

3    either?

4       A       I don't.

5       Q       Okay.  And how many of these lists have

6    you gotten to terminate grants?

7               MS. ANDRAPALLIYAL:  Objection.  To the

8    extent this information is deliberative and

9    nonfinal, I'm instructing the witness not to answer.

10   BY MR. McGINTY:

11      Q       How many lists have you gotten for grants

12   that have been terminated?

13      A       More than five.

14      Q       And how many grants have you terminated on

15   the basis of these lists?

16      A       Lots of grants.  I don't know the number.

17      Q       More than a hundred?

18      A       More than a hundred.

19      Q       More than a thousand?

20      A       No.

21      Q       Somewhere between a hundred and a

22   thousand?

23      A       Somewhere between five hundred and a

24   thousand.

25      Q       Somewhere between five hundred and a

1    thousand.

2        A      Mm-hmm.

3            MR. McGINTY:   This is Exhibit 7, I think

4    we are on.

5            (Bulls Deposition Exhibit 7 was marked for

6             identification.)

7    BY MR. McGINTY:

8        Q    Do you recognize this document?

9        A    Yes.

10       Q    And you wrote this document, right?

11       A    I wrote it with Dr. Lauer, yes.

12       Q    Okay.  And what is it?

13       A    It's the supplemental -- it's the

14   beginning of the guidance providing agency -- I mean

15   ICs with guidance on how to unpause funding.

16       Q    And it does say that there is a

17   restriction.  What's the restriction that it gives

18   guidance about?

19       A    On spending funding related to DEI

20   activities on grants.

21       Q    Was there a definition of DEI activities

22   provided with this memo?

23           MS. ANDRAPALLIYAL:  Objection.  To the

24   extent the information sought is deliberative and

25   not final, I'm instructing the witness not to

1      A      No.

2      Q      You wrote that?

3      A      I wrote it.

4             MR. McGINTY:  We can go off the record.

5       (Luncheon recess taken -- 12:03 to 1:08 p.m.)

6             MR. McGINTY:  Back on the record.  Go

7      ahead and mark this, please.

8                  (Bulls Deposition Exhibit 11 was marked

9                   for identification.)

10     BY MR. McGINTY:

11     Q      I'm handing you what's been marked

12     Exhibit 11.  Do you recognize this document?

13     A      Yes.

14     Q      And what is it?

15     A      A termination letter.

16     Q      And this is another one that you wrote,

17     right?

18     A      This is another one that I issued that was

19     written.

20     Q      I'll clarify.  You signed this, right?

21     A      Correct.

22     Q      Okay.  And you signed this on behalf of

23     Margaret Young?

24     A      Yes.

25     Q      And that's the same Margaret Young that we

1  were talking about earlier, the Chief Grants

2  Management Officer at NICHD?

3      A    Yes.

4      Q    Why did you issue this on behalf of

5  Margaret Young?

6      A    I believe at that time because the letters

7  were coming out quickly that I just issued them on

8  behalf of the IC Chief GMO, and then they would

9  handle the Notice of Reward.

10     Q    Did you talk to Margaret Young, before you

11  issued it, about issuing this letter?

12     A    No.

13     Q    Is this another one of the letters that

14  you got in a list?

15     A    Yes.

16     Q    And that list was sent to you by your

17  supervisor?

18     A    Yes.

19     Q    Who at the time was?

20     A    March 12th?  I can't recall.

21     Q    Okay.  And do you recall whether or not

22  Rachel Riley was cc'd on the e-mail you got that

23  terminated this grant as well?

24     A    I don't recall --

25     Q    Okay.

1        A       -- Rachel being on there.

2        Q       You'd have to look at the e-mail to know?

3        A       Yes.

4        Q       And you did get this in an e-mail from

5    your supervisor?

6        A       An e-mail from my supervisor, a forwarded,

7    probably.

8        Q       A forwarded e-mail from your supervisor

9    that had the spreadsheet that you were talking about

10   earlier?

11       A       All of them have spreadsheets.

12       Q       And that spreadsheet has the list of

13   grants to terminate?

14       A       Yes.  And a point of clarification, if I

15   may?

16               MS. ANDRAPALLIYAL:  Sure.

17               THE WITNESS:  Because the process was just

18   continuing to be a lot, we actually -- I did say to

19   the -- I asked the Chief Grants Management Officers

20   if they were okay with me just issuing the letter

21   and them issuing the Notice of Awards.  And they did

22   say that they were okay with that.  And I do have

23   some of that in writing.

24   BY MR. McGINTY:

25       Q       Great.  Thank you for that clarification.

1      A      Yeah.

2      Q      By way of further clarification, did you

3  have any input in saying whether or not this

4  particular grant was going to be terminated?

5      A      No.

6      Q      And did you have any input in the language

7  on this letter?

8      A      No.

9      Q      To your knowledge, did anyone at NIH have

10  input?

11            MS. ANDRAPALLIYAL:  Objection.  It calls

12  for the provision of deliberative information.  I'm

13  instructing the witness not to answer.

14            MR. McGINTY:  Counsel, deliberative

15  process exemption only applies where an action has

16  not been taken.  I'm talking about terminating a

17  grant.

18            MS. ANDRAPALLIYAL:  No, that's not true.

19  The deliberative process privilege applies to

20  pre-decisional communications that precede a final

21  action, so it does apply to actions that have

22  already been taken.

23  BY MR. McGINTY:

24      Q      Is there anything other than this letter

25  that explains why the grant was being terminated?

1      A      **The spreadsheet.**

2      Q      The spreadsheet explains why?

3      A      **It doesn't explain, it just lists the**

4  **category.**

5      Q      Okay.  Is there anything other than this

6  letter and the spreadsheet?

7      A      **An e-mail.**

8      Q      An e-mail?

9      A      **Yes.**

10     Q      An e-mail you got from your supervisor?

11     A      **Yes.**

12     Q      Anything other than this letter, that

13 spreadsheet, and the e-mail?

14     A      **No.**

15     Q      Okay.  Were either the spreadsheet or the

16 e-mail shared with the grant recipient?

17     A      **No, not that I'm aware of.**

18            MR. McGINTY:  Mark this, please.

19            (Bulls Deposition Exhibit 12 was marked

20             for identification.)

21 BY MR. McGINTY:

22     Q      I'm handing you what's been marked

23 Exhibit 12.  And do you recognize this document?

24     A      **Yes.**

25     Q      And what is it?

1        A     **Termination letter.**

2        Q     And this is another termination letter

3    that you signed?

4        A     **Yes.**

5        Q     And this one is to the Regents of the

6    University of California, San Francisco.  And it's

7    Project No. 1R01 AI186641-01 --

8              (Reporter requests clarification)

9              MR. McGINTY:  I'm sorry.  1R01 AI186641-0.

10   BY MR. McGINTY:

11       Q     Is that correct?

12       A     **Dash 01.**

13       Q     And is this another one of the

14   terminations that you got in a list?

15       A     **Yes.**

16       Q     From your supervisor?

17       A     **Yes.**

18       Q     And this letter is dated March 18?

19       A     **Yes.**

20       Q     And who was your supervisor at that time?

21       A     **I believe it was Jon Lorsch at that time,**

22   **for sure.**

23       Q     Jon Lorsch?

24       A     **Dr. Lorsch.**

25       Q     Dr. Lorsch?

1        A       Yeah.

2        Q       And, to your knowledge, did anyone at NIH

3    have any input in whether or not this grant was

4    going to be terminated?

5        A       I don't know.

6        Q       Would you know?

7        A       I don't know.

8                MS. ANDRAPALLIYAL:  Objection, calls for

9    speculation.

10   BY MR. McGINTY:

11       Q       You can answer.

12       A       I wouldn't know.

13       Q       And is there anything, other than this

14   letter, that explains why this grant was terminated?

15       A       The spreadsheet, the e-mail.

16       Q       Anything else?

17       A       No.

18       Q       Okay.  Did you ever talk to Dr. Lorsch

19   about this termination?

20               MS. ANDRAPALLIYAL:  Go ahead.

21               THE WITNESS:  No.

22   BY MR. McGINTY:

23       Q       Did he tell you why this grant was being

24   terminated?

25               MS. ANDRAPALLIYAL:  Objection.  Because

1  the question is seeking deliberative information, I

2  instruct the witness not to answer.

3  BY MR. McGINTY:

4       Q    Let's go back very quickly to Exhibit 11.

5  I just want to make sure that the grant project

6  number is on the record.

7            Could you read that for me.

8       **A    Can I read -- I'm sorry?**

9       Q    The project number that was being

10 terminated.

11      **A    Oh.  5 U01 HD108779-04.**

12      Q    Great.  And to whom -- what was the

13 institution this was issued to?

14      **A    Regents of the University of Minnesota.**

15      Q    Thank you.

16           MR. McGINTY:  Mark that one, please.

17           (Bulls Deposition Exhibit 13 was marked

18             for identification.)

19 BY MR. McGINTY:

20      Q    I hand you what's been marked Exhibit 13.

21 Do you recognize this document?

22      **A    Yes.**

23      Q    And what is it?

24      **A    A termination letter.**

25      Q    Okay.  And this one is a grant to the

```
 1   Regents of the University of Colorado.  Is that
 2   right?
 3         A    That is correct.
 4         Q    And could you read the project number for
 5   me, please.
 6         A    Sure.  1R21 HD115838-01.
 7         Q    And this is another one that was provided
 8   to you in a list from your supervisor?
 9         A    Yes.
10         Q    And the only thing to explain why that
11   grant was terminated is this letter, the spreadsheet
12   that was attached to that e-mail, and the e-mail
13   itself?
14         A    The e-mail itself doesn't explain it, it
15   just asks me to terminate it.  The spreadsheet
16   attached gives the category and the grant number.
17         Q    Okay.  And, to your knowledge, NIH didn't
18   do any assessment of this particular grant before it
19   was terminated?
20         A    I don't know.
21              MR. McGINTY:  Mark that, please.
22              (Bulls Deposition Exhibit 14 was marked
23               for identification.)
24   BY MR. McGINTY:
25         Q    I hand you what's been marked Exhibit 14.
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025                                                        Page 127

```
 1    Now, starting about halfway down the page, this
 2    appears to be an e-mail from you.  Is that right?
 3        A    Yes.
 4        Q    And what is this e-mail from you?
 5        A    A termination letter.
 6        Q    And did you start sending these in the
 7    form of an e-mail at some point?
 8        A    Yes.
 9        Q    When was that?
10        A    Likely around the same date of this
11    letter.
12        Q    Which is March 21, 2025?
13        A    Yeah, around that time.
14        Q    And why did you do that?
15        A    To be efficient.
16        Q    Why did you need to be efficient?
17        A    The letters were -- the spreadsheet had
18    many terminations on the list, so I did it to be
19    efficient.
20        Q    It was easier to send it in e-mail form
21    because there were so many to do?
22        A    Yeah.
23        Q    And who is the institution that this grant
24    was issued to?
25        A    University of Washington.
```

```
 1        Q    And what's the project number?
 2        A    5R01MD017573-03.
 3        Q    Okay.  And this one, I think you alluded
    to it already, but this one is also on the basis of
    the spreadsheet that you got?
 6        A    Yes.
 7        Q    And who sent you that spreadsheet?
 8        A    Probably it was forwarded to me by my
 9   supervisor.
10        Q    Forwarded from whom?
11        A    From Dr. Memoli.
12        Q    Dr. Memoli?
13        A    Yeah, at this point.  That's correct.
14        Q    And do you know if it was forwarded to
15   Dr. Memoli from anybody?
16             MS. ANDRAPALLIYAL:  Objection, calls for
17   speculation, calls for a provision of deliberative
18   information.
19   BY MR. McGINTY:
20        Q    You can answer.
21             MS. ANDRAPALLIYAL:  Objection.  To the
22   extent that it calls for the provision of
23   deliberative information, I would instruct the
24   witness not to answer.
25             MR. McGINTY:  Can you explain the
```

 1    privilege attaching to an e-mail that the person

 2    forwarded an e-mail.

 3            MS. ANDRAPALLIYAL:  To the extent that the

 4    answer is -- that the answer would provide

 5    information that is deliberative, I would instruct

 6    the witness not to answer.

 7    BY MR. McGINTY:

 8        Q    Did any of the to or from or cc fields on

 9    that e-mail, or on the e-mails that were attached to

10    it, contain back-and-forth deliberative discussions?

11        A    Not that I'm aware of.

12        Q    Okay.  Do you recall if the e-mail that

13    Dr. Memoli -- was forwarded from Dr. Memoli, was

14    forwarded from anybody else?

15        A    I don't recall.

16        Q    Okay.  The only way to know that would be

17    from the e-mail?

18        A    Yes.

19        Q    Okay.

20            MR. McGINTY:  Mark that.

21            (Bulls Deposition Exhibit 15 was marked

22             for identification.)

23    BY MR. McGINTY:

24        Q    I pass you what has been marked

25    Exhibit 15.  Do you recognize this document?

```
 1         A     Yes.

 2         Q     What is it?

 3         A     It is a termination letter.

 4         Q     And this is two-sided.  I'm sorry, I

 5    printed this double sided.

 6         A     That's okay.

 7         Q     And that's your signature at the end,

 8    right?

 9         A     Yes.

10         Q     Okay.  And this is another one of the

11    terminations on the basis -- that was sent to you on

12    a spreadsheet?

13         A     Yes.

14         Q     And what's the institution that received

15    this grant?

16         A     University of Washington.

17         Q     And what's the project number?

18         A     1F31 AI181431-01A1.

19         Q     Okay.  And the only thing that would

20    explain why this grant was terminated is this letter

21    and the spreadsheet?

22         A     Yes.

23               MS. ANDRAPALLIYAL:  Sorry.  Objection,

24    assumes facts not in evidence.

25    BY MR. McGINTY:
```

```
 1        Q     What are the documents that would explain
 2   why this grant was terminated?
 3        A     The letter, the e-mail that was forwarded
 4   with the spreadsheet.
 5        Q     And that spreadsheet was forwarded to you
 6   from your supervisor?
 7        A     Yes.
 8        Q     And who is your supervisor at the time?
 9        A     I believe it was Dr. Lorsch.  There was a
10   transition period so.
11        Q     So either Dr. Lorsch or?
12        A     Dr. Bundesen.
13        Q     Okay.  Either Dr. Lorsch or Dr. Bundesen.
14              And would Rachel Riley have been on any of
15   the to or from fields of that e-mail?
16        A     Not at that time, not during this time
17   period.
18        Q     Anyone else from HHS?
19        A     No.
20        Q     So did -- so that stopped at some point?
21        A     Yes.  I didn't see the to, where it
22   originated.  It was just coming from Dr. Memoli to
23   either Liza or Dr. Lorsch.
24        Q     And when did you stop being able to see
25   where it originated?
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 132

```
 1        A    I don't even recall because I stopped
 2   looking down on the e-mails at that point.  It
 3   was -- yeah.
 4        Q    Before or after March 10?
 5        A    Probably after.
 6        Q    Sometime after March 10?
 7        A    Yes.
 8             (Bulls Deposition Exhibit 16 was marked
 9              for identification.)
10   BY MR. McGINTY:
11        Q    I'm showing you what's been marked
12   Exhibit 16.  Do you recognize this?
13        A    Yes.
14        Q    And what is it?
15        A    A termination letter.
16        Q    And this is another one that you signed?
17        A    Yes.
18        Q    And who is the recipient of this grant?
19        A    University of Washington.
20        Q    And what's that project number?
21        A    5R01LM013301-05.
22        Q    And this is another one that came to you
23   in the form of a spreadsheet listing the grants to
24   terminate?
25        A    Yes.
```

1      Q     And that was sent to you by your

2   supervisor?

3      A     Yes.

4      Q     Which was who at this point?

5      A     Dr. Lorsch.

6      Q     That was Dr. Lorsch.

7            And you wouldn't have known who sent

8   Dr. Lorsch this spreadsheet?

9      A     Typically, like I said, I started seeing

10  just the e-mail forwarded from -- sent to Dr. Lorsch

11  from Dr. Memoli.

12     Q     Got it.

13     A     Yeah.

14     Q     So Dr. Memoli sent it to Dr. Lorsch.  Is

15  that right?

16     A     That is correct.

17     Q     Okay.  And do you know who sent it to

18  Dr. Memoli?

19     A     No.

20     Q     Okay.  Because that information was cut

21  off of the e-mail?

22     A     I don't know if it was cut off, it just

23  wasn't there.

24     Q     It wasn't on the e-mail?

25     A     No, it wasn't on the e-mail.

```
 1          Q      Okay.

 2                 (Bulls Deposition Exhibit 17 was marked

 3                  for identification.)

 4   BY MR. McGINTY:

 5          Q      I'm handing what's been marked Exhibit 17.

 6   Do you recognize this?

 7          A      Yes.

 8          Q      And what is this?

 9          A      A termination letter.

10          Q      And who is the institution it was issued

11   to?

12          A      University of Washington.

13          Q      And what's the project number?

14          A      1G13LM014426-01.

15          Q      And this is another one that you got in a

16   spreadsheet?

17          A      Yes.

18          Q      And it was sent to you by your supervisor?

19          A      Yes.

20          Q      And do you know who sent the spreadsheet

21   to your supervisor?

22          A      During this period it was from Dr. Memoli

23   to -- I -- this is the foggy period, sorry.

24          Q      Okay.  You're not sure who your supervisor

25   was?
```

1        A    I'm sure who my supervisor was.  I'm just

2   not sure of the period when it was, the different

3   time frames.

4        Q    That's fine.  It was either Bundesen or

5   Lorsch?

6        A    Right.

7        Q    And do you know who sent it to Dr. Memoli?

8        A    I don't recall during this time.  Yeah,

9   I'm not sure if it was just forwarded from

10  Dr. Memoli to Liza or Jon to me.  Because, remember,

11  during a period of time, it was on the from with --

12  how do I say?  The person that it was sent from at

13  the department was on there, and at a point that

14  stopped.

15       Q    But when it was from someone from the

16  department, that was Rachel Riley?

17       A    The two times, yes.

18       Q    Okay.  Was there anyone else from HHS it

19  was sent from?

20       A    Not that I'm aware of.

21       Q    Okay.  So either it was Rachel Riley or

22  you didn't have the information?

23       A    Correct.

24       Q    Okay.  And this letter and the other

25  letters we've been looking at, this is still the

1    same template letter that was provided to you?

2         A    Yes.

3         Q    You didn't write one word in this letter?

4         A    No, just signed it.

5         Q    Okay.  And the only thing that would

6    explain why this grant was terminated is this letter

7    and the spreadsheet and the e-mail?

8         A    Yeah, the spreadsheet that was attached to

9    the e-mail.

10             (Bulls Deposition Exhibit 18 was marked

11               for identification.)

12   BY MR. McGINTY:

13        Q    I'm handing you what's been marked

14   Exhibit 18.  Do you recognize this?

15        A    Yes.

16        Q    And what is it?

17        A    A termination letter.

18        Q    And this is another one that looks like it

19   was in e-mail form.  Is that right?

20        A    Yes, that's correct.

21        Q    And who is the institution it was issued

22   to?

23        A    University of Washington.

24        Q    And what's the project number?

25        A    1R21AI183907-01A1.

1              (Reporter requests clarification)

2         THE WITNESS:  "A" as in apple.

3    BY MR. McGINTY:

4         Q     And this is another termination that you

5    issued on the basis of a spreadsheet that was sent

6    to you?

7         A     Yes.

8         Q     And that was sent to you -- who sent you

9    that spreadsheet?

10        A     Dr. Lorsch.

11        Q     Dr. Lorsch sent it to you.  And Dr. Memoli

12   sent it to Dr. Lorsch?

13        A     Correct.

14        Q     And the only thing that would explain why

15   this grant was terminated is this letter and the

16   e-mail and the spreadsheet?

17             MS. ANDRAPALLIYAL:  Objection, assumes

18   facts not in evidence.

19   BY MR. McGINTY:

20        Q     What are the documents that would explain

21   why this grant was terminated?

22        A     The letter, the forwarded spreadsheet that

23   had the categories in there.

24        Q     Okay.  Anything else?

25        A     No.

1        A      Yes.

2        Q      Okay.

3                MR. McGINTY:  Can I ask the court reporter

4    how much time we've been on the record.

5                (Whereupon, the reporter discloses time

6                 spent on the record)

7                MR. McGINTY:  A little less than four

8    hours?

9                MADAM COURT REPORTER:  Yes.

10               MR. McGINTY:  I'll also note for the

11   record that we've been on the record for a little

12   less than four hours.

13               (Bulls Deposition Exhibit 19 was marked

14                for identification.)

15   BY MR. McGINTY:

16       Q      I'm handing you what's been marked

17   Exhibit 19.

18               MR. McGINTY:  Counsel.

19               (Document tendered to Ms. Andrapalliyal)

20   BY MR. McGINTY:

21       Q      Do you recognize this document?

22       A      Yes.

23       Q      And what is it?

24       A      A termination letter.

25       Q      Okay.  And this is another one that you

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 140

1    signed, right?

2        A    Yes.

3        Q    Okay.  And who is the issuing

4    institution -- or the institution that received the

5    termination letter?

6        A    University of Washington.

7        Q    And what's that project number?

8        A    1R01 TW012904-01.

9        Q    And this is another one that you got in a

10   spreadsheet from your supervisor?

11       A    Yes.

12       Q    Okay.  And where are the documents that

13   explain why the grant was terminated?

14       A    The spreadsheet and the request for me to

15   terminate.  And this letter right here, sorry.

16       Q    No, that's fine, that's fine.

17            And, again, this was language -- the

18   language in this letter was provided to you?

19       A    Yes.

20       Q    And you didn't write one word in this

21   letter?

22       A    (Nodding head)

23       Q    Sorry, I didn't hear your answer.

24       A    No.  Sorry, no.

25            (Bulls Deposition Exhibit 20 was marked

 1   available?

 2              MS. ANDRAPALLIYAL:  Objection, asked and

 3   answered.

 4              **THE WITNESS:  No.**

 5              MR. McGINTY:  Okay.  I think we're about

 6   to move into a new area.  It might be time to take a

 7   quick five or ten-minute break.  Can we go off the

 8   record.

 9              (Recess taken - 2:29 to 2:50 p.m.)

10              MR. McGINTY:  We can go back on the

11   record.

12   BY MR. McGINTY:

13        Q     Now, I know you have a big stack of

14   exhibits right in front of you.  And I'm going to

15   ask you to find Exhibit 3 which is the February 28th

16   letter to Dr. Tham.

17        **A     Exhibit 3, you said?**

18        Q     Oh, did I get the number wrong?

19              No, not that one.  Maybe it's 4.

20        **A     Okay.**

21        Q     Yeah, 4.  Sorry.

22        **A     Yeah.**

23        Q     Okay.  So about a little more than halfway

24   down the page it says here in this letter:

25              "It is the policy of NIH not to prioritize

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 174

1              these research programs."

2              Do you see that?

3        A    Yes.

4        Q    Okay.  And "these research programs,"

5   meaning research programs based on gender identity,

6   right?

7        A    Yes.

8        Q    Now, I just asked you to go through a lot

9   of NIH policies, and your testimony was there is no

10  written final policy of NIH not to prioritize

11  research programs based on gender identity.

12             That was your testimony, right?

13       A    Yes.

14       Q    So when this letter says it is the policy

15  of NIH not to prioritize these research programs,

16  that's not referring to any written policy, is it?

17             MS. ANDRAPALLIYAL:  Objection, assumes

18  facts not in evidence.

19             THE WITNESS:  I don't know what it was

20  intended to mean because I didn't write it.

21  BY MR. McGINTY:

22       Q    There is no effective and final NIH policy

23  that you are aware of not to prioritize research

24  programs based on gender identity.  Is that right?

25       A    That I know of, no.

 1        Q    And in your role as Director of OPERA,

 2   would you expect to know about such a policy?

 3             (Reporter requests clarification)

 4             MR. McGINTY:  Director of OPERA.

 5             MS. ANDRAPALLIYAL:  Objection, calls for

 6   speculation.

 7             **THE WITNESS:  I don't -- not necessarily.**

 8   BY MR. McGINTY:

 9        Q    In your role as Director of OPERA, what

10   kind of policies do you oversee?

11        **A    Grants administration policies and**

12   **grants -- internal policies for our grants managers,**

13   **which are called the NIH Grants Administration**

14   **Manuals, which is an internal document that supports**

15   **the external document which is the NIH Grants Policy**

16   **Statement.**

17        Q    So those are all policies that apply to

18   NIH as a whole?

19        **A    Yes.**

20        Q    So the policies that you might not be

21   aware of would be policies that would apply to one

22   IC, for example?

23             MS. ANDRAPALLIYAL:  Objection, calls for

24   speculation.

25             **THE WITNESS:  I don't know.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

Page 176

```
 1    BY MR. McGINTY:
 2        Q     Do you know of policies within the ICs
 3    that you do not oversee?
 4        A     I don't know.
 5        Q     Okay.  And just to be clear, there is no
 6    NIH policy not to prioritize research programs based
 7    on gender identity that you are aware of?
 8        A     That -- that is clear.  No, not that I am
 9    aware of.
10        Q     Okay.
11        A     Can I ask a point of clarification?
12        Q     Please.
13        A     You are saying NIH policies, and I don't
14    see priorities as something that I would oversee.
15        Q     Sure.
16        A     You know?
17        Q     I understand.  I guess my question comes
18    from the part of the sentence where it says, "It is
19    the policy of NIH not to prioritize these research
20    programs."  So that's why I'm asking you about the
21    policies of NIH.
22        A     Okay.
23        Q     And you're not aware of any policy of NIH
24    not to prioritize those research programs?
25        A     No, I don't have any (indiscernible).
```

```
 1                  (Reporter requests clarification)

 2                  THE WITNESS:  I don't have any insight on

 3       it.

 4       BY MR. McGINTY:

 5            Q    Okay.  So now let's go back to Exhibit 3.

 6            A    I don't know if I'll be able to find it

 7       now.

 8                  (Witness reviews documents)

 9                  THE WITNESS:  I just saw it.  Where did it

10       go?  It's running from me.  Maybe I'll look closer.

11       I have to re-order.

12                  (Witness reviews documents)

13       BY MR. McGINTY:

14            Q    I understand the papers get shuffled.

15                  Okay.  And we are looking at page 8616 on

16       Exhibit 3, and looking at Section 3(e).  The last

17       sentence there, it says:

18                  "Agencies shall take all necessary steps,

19                   as permitted by law, to end the Federal

20                   funding of gender ideology."

21                  Do you see that?

22            A    Yes.

23            Q    Has NIH, to your knowledge, terminated any

24       grants implementing that sentence?

25                  MS. ANDRAPALLIYAL:  Objection, calls for a
```

1    legal conclusion, calls for speculation.

2            THE WITNESS:  We terminated it based on

3    the language in the letter.

4    BY MR. McGINTY:

5        Q    Is it your testimony that the language in

6    the letter had no connection to the sentence that I

7    just read?

8            MS. ANDRAPALLIYAL:  Objection, calls for

9    speculation, calls for a legal conclusion, assumes

10   facts not in evidence.

11           THE WITNESS:  I don't know what the

12   intention was for the two.  I don't know.

13   BY MR. McGINTY:

14       Q    The language in the letter was given to

15   you.  Is that right?

16       A    Yes.

17       Q    And you don't know why it was written.  Is

18   that right?

19       A    I don't know.

20       Q    Okay.  Let's go to Section 3(g) of this

21   same Executive Order.

22       A    Okay.

23       Q    It says:

24           "Federal funds shall not be used to

25            promote gender ideology.  Each agency

```
 1                   shall assess grant conditions and grantee

 2                   preferences to ensure grants funds do not

 3                   promote gender ideology."

 4                   See that?

 5         A     Yes.

 6         Q     To your knowledge, has NIH terminated any

 7    grants in implementing this section of this

 8    Executive Order?

 9                   MS. ANDRAPALLIYAL:  Objection, calls for a

10    legal conclusion, calls for speculation.

11                   THE WITNESS:  To my knowledge, the letter

12    terminates the grant and the language is in the

13    termination letter.

14    BY MR. McGINTY:

15         Q     Okay.  And the reason that the grants were

16    terminated, if I understand your prior testimony

17    correctly, is stated in the letter and it's stated

18    in the spreadsheet that states which grants you are

19    going to terminate.  Is that right?

20         A     Yeah, the spreadsheet, remember, I was

21    telling you, it has the categories, like, Y, you

22    know, D, I, that kind of thing.

23         Q     Okay.  Are you familiar with the START

24    platform?

25         A     No.
```