1

2

3

4

5

6

The Honorable Lauren King

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

STATE OF WASHINGTON, et al.,

NO. 2:25-cv-00244-LK

10

Plaintiffs,

PLAINTIFFS' OPPOSITION TO
MOTION TO STAY PRELIMINARY
INJUNCTION PENDING APPEAL

11

v.

12

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

NOTE ON MOTION CALENDAR:
August 25, 2025

13

14

Defendants.

ORAL ARGUMENT REQUESTED

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 1

        A.      Since February, the Trump Administration Has Continued its Campaign of
                Intimidation and Threats Against Providers of Gender-Affirming Care ................. 1

III.    LEGAL STANDARD ......................................................................................... 3

IV.     ARGUMENT ...................................................................................................... 3

        A.      Likelihood of Success ................................................................................ 3

                1.      Plaintiffs' Separation-of-Powers claims are unaffected by *American
                        Federation of Government Employees v. Trump* ................................ 3

                2.      The Orders violate equal protection ................................................. 5

                3.      The Court's injunction is properly limited to provide complete relief to
                        the parties ................................................................................ 8

        B.      The Remaining Factors Strongly Weigh Against a Stay ......................................... 11

        C.      If Granted, This Court Should Dissolve the Stay of Proceedings ........................... 12

V.      CONCLUSION ................................................................................................. 13

1

## I.    INTRODUCTION

The Court should not stay the preliminary injunction. No intervening case law impairs Plaintiffs' likelihood of success. And since February, the Trump Administration has only escalated its relentless assault on transgender adolescents. This Court's preliminary injunction is one of the only bulwarks keeping the lights on for adolescent transgender healthcare in the Plaintiff States. A stay would be disastrous; Defendants' motion should be denied.

## II.    BACKGROUND

**A.    Since February, the Trump Administration Has Continued its Campaign of Intimidation and Threats Against Providers of Gender-Affirming Care**

Since this Court granted the preliminary injunction, the Trump Administration's campaign against institutions providing gender-affirming care has only escalated. As this Court previously recognized, gender-affirming care is legal under federal and the Plaintiff States' laws and the President has no authority to criminalize it. *See* Dkt. #161 pp.24-25. Yet, this Administration has engaged in a ruthless campaign of attrition to eliminate this essential and life-saving treatment.

Attorney General Bondi issued a memo on April 22 threatening investigations of various federal criminal laws against providers of gender-affirming care, promising to "bring these practices to an end." McGinty Decl., Ex. 1. Assistant Attorney General Brett Shumate followed up with his own memorandum, instructing the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with" the President's orders and the Attorney General's memo. McGinty Decl., Ex. 2. The Department of Health and Human Services and its subagency, the Centers for Medicare and Medicaid Services, issued a series of threatening letters implying that the provision of gender-affirming care could violate federal law or fall below the standard of care set by federal programs. McGinty Decl., Exs. 3, 4, 5. It further issued "guidance for whistleblowers" to "blow the whistle on medical professionals who are maiming and sterilizing a growing number of impressionable children" by providing gender-affirming care.

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1   McGinty Decl., Ex. 6. The FBI is actively soliciting tips to "hold accountable those who mutilate
2   [children] under the guise of gender-affirming care." McGinty Decl., Ex. 7. The Federal Trade
3   Commission held a daylong conference on the theory that gender-affirming care is a fraudulent
4   practice by nature. *See The Dangers of "Gender-Affirming Care" for Minors*, Federal Trade
5   Commission, (July 9, 2025), https://www.ftc.gov/news-events/events/2025/07/dangers-gender-
6   affirming-care-minors. The Department of Justice has issued "more than 20 subpoenas to doctors
7   and clinics involved in preforming transgender medical procedures on children" premised on the
8   same or similar theories. McGinty Decl., Ex. 8; *see also* McGinty Decl., Ex. 9.

9        And on July 25, 2025, the White House gloated that "President Trump promised to end
10  child sexual mutilation—and he delivered." McGinty Decl., Ex. 10. The press release listed 16
11  hospitals that had ceased or curtailed their provision of gender-affirming care in the United
12  States, including Denver Health and Seattle Children's Hospital. *Id.*

13       Against this campaign of intimidation, this Court's preliminary injunction has been
14  indispensable in allowing providers of gender-affirming care in the Plaintiff States to keep their
15  doors open. *See* Goepford Decl. ¶29 ("[T]he preliminary injunction has allowed Children's
16  Minnesota to focus on what we do best, which is provide outstanding medical care to kids, who
17  seek our services and expertise."); Brumbaugh Decl. ¶22 ("Without the preliminary injunction
18  having been issued, Children's Hospital [Colorado] likely would not have continued to provide
19  medical gender affirming care to these patients."); Ojemann Decl. ¶6 ("Seattle Children's
20  continues to face immense pressure from the federal government to stop providing gender-
21  affirming care."); Dellit Decl. ¶13 ("This Court's Preliminary Injunction has also enabled UW
22  to stay true to its public health mission."). And the preliminary injunction is working. Federal
23  agencies have reinstated numerous grants due to the preliminary injunction. Dkt. #275 pp.6-7.
24  The National Institutes of Health (NIH) has also recognized limitations on its ability to terminate
25  funding for providers of gender-affirming care in states where the preliminary injunction applies.
26  McGinty Decl., Ex. 11.

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK                          2                ATTORNEY GENERAL OF WASHINGTON
                                                                    Complex Litigation Division
                                                                    800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA 98104
                                                                        206-464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### III.    LEGAL STANDARD

A stay is never a matter of right, and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [judicial] discretion." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). Courts consider four factors: (1) likelihood of success; (2) irreparable injury; (3) interests of other parties; and (4) "where the public interest lies." *Id*. at 434.

### IV.    ARGUMENT

**A.    Likelihood of Success**

**1.    Plaintiffs' Separation-of-Powers claims are unaffected by *American Federation of Government Employees v. Trump***

This Court concluded correctly that the defunding provisions of the Medical Services Order and the Gender Ideology Order (collectively "Orders") conditioned congressionally appropriated funds in a manner that "usurp[s] Congress's legislative role and [amounts] to an end run around the separation of powers." Dkt. #233 p.23. Defendants barely engage with this Court's application of *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231-32 (9th Cir. 2018), and instead seek a stay based on a two-paragraph stay decision in *Trump v. American Federation of Government Employees*, 606 U.S. __, No. 24A1174, 2025 WL 1873449 (July 8, 2025) (*AFGE*)—a case involving reductions in force. *AFGE*, however, has no application here.

To start, the Supreme Court determined in *AFGE* that the Government was likely to succeed in showing that the challenged order was lawful where Congress had explicitly authorized federal agencies to conduct reductions in force. *E.g.,* 5 U.S.C. §§ 3501-3504. Here, in contrast, this Court properly determined that "none of the funds received by the Plaintiff States' medical institutions have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care." Dkt. #233 p.22. Indeed, this Court determined that the Orders here do something "not even Congress may do: 'surprise[] states with post acceptance . . . conditions' on federal funds, and 'impose conditions on federal grants that are

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

unrelated to the federal interest in particular national projects or programs.'" *Id.* (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019)). Unlike in *AFGE*, the President's authority in *this* case is at its "lowest ebb" by "purport[ing] to condition congressionally appropriated funds in a manner that effectively rewrites the law." *Id.* p.23. The Supreme Court's likelihood of success determination in *AFGE*, involving a different assertion of executive authority in connection with different federal statutes, has no application here.

Second, Defendants ignore that, unlike in *AFGE*, the Orders here direct immediate action and, indeed, triggered unlawful agency action before this Court issued its preliminary injunction. The order challenged in *AFGE* only required the Director of the Office of Management and Budget to "*submit a plan* to reduce the size of the Federal Government's workforce through efficiency improvements and attrition" and *initiate a rulemaking* to revise suitability criteria for federal employment in 5 C.F.R. § 731.202(b). Exec. Order No. 14,210, 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025) (emphasis added). It also direct[ed] agency heads to "promptly *undertake preparations* to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* Here, in contrast, the Medical Services Order "command[ed] 'immediate[]' action from agency heads to be detailed in a 60-day progress report, Dkt. #17-1 pp.3-4, while the Gender Ideology [Order] mandate[d] that agencies 'take all necessary steps . . . to end the Federal funding of gender ideology' and provide an 'update on implementation of this order to the President' within 120 days." Dkt. 233 p.47 (citing Dkt. #17-2 pp.3-4). Given this command to immediate action, this Court has twice rejected the Defendants' argument that the Orders were mere "sheep in wolves' clothing," finding that they had already caused two agencies to send notices to grant recipients "(1) commanding them to 'immediately' stop using federal funding for any activities that do not align with the Medical Services [Order] and the Gender Ideology [Order], and (2) pronouncing that '[a]ny vestige, remnant, or re-named piece' of any programs in conflict with the Executive Orders is

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

terminated." *Id*. (citing Dkt. #16-1 p.2 (HRSA); Dkt. #174-1 p.2 (CDC)). Although later rescinded, "the agencies' immediate implementation of the Executive Orders emphatically demonstrate[d] that 'this wolf comes as a wolf.'" *Id*. (citation omitted).

Defendants do not dispute this. They instead suggest that the Supreme Court stayed the *AFGE* preliminary injunction only because the "plans" directed by the order were not yet before the Court, relying on Justice Sotomayor's concurrence. But the concurrence is not the Court's opinion. *Accord City and Cnty. of San Francisco v. Trump*, No. 25-cv-1350-WHO, 2025 WL 2243619, at *4 (N.D. Cal. Aug. 5, 2025) ("Justice Sotomayor's concurrence applies to the Executive Order at issue in that case, which involves a different context, different directives and different language than the Executive Orders at issue here."). And here, this Court *did* have agency action before it, which only bolstered its conclusion that the Orders commanded immediate unlawful action.

As for Defendants' reliance on the Orders' savings clauses, Ninth Circuit law commands that "[s]avings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City and Cnty. of San Francico*, 897 F.3d at 1239. Boilerplate savings clauses cannot insulate the Orders from review and nothing in *AFGE* says otherwise. This Court properly determined that the Orders violated the separation of powers.

### 2. The Orders violate equal protection

Defendants next rely on *United States v. Skrmetti*, 145 S.Ct. 1816 (2025), arguing that the Orders challenged here are "materially indistinguishable" from the Tennessee law upheld by the Supreme Court, and therefore they are likely to show on appeal that the orders do not violate equal protection. Dkt. #288 pp.2-3. Defendants are wrong.

Unlike the law upheld in *Skrmetti*, which drew lines according to age and medical diagnosis, the Orders here explicitly discriminate on the basis of transgender status and sex. In *Skrmetti*, the challenged law prohibited medical treatments for individuals under 18 "for the

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

purpose of: (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103; *see also Skrmetti*, 145 S. Ct. at 1826 (citing the challenged law). The Court held that, absent evidence the "prohibitions are pretexts designed to effect invidious discrimination against transgender individuals, the law does not classify on the basis of transgender status." *Skrmetti*, 145 S. Ct. at 1833. It further held the Tennessee law did not discriminate on the basis of sex because it "prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex." *Id.* at 1829.

The Orders here, in contrast, explicitly distinguish based on transgender status. The Gender Ideology Order is most obvious. It does not deny funding for institutions that treat or study gender-dysphoria or any other *medical condition*. It instead denies funding to any person or institution that accepts "gender ideology," or the idea that people may have gender identities incongruent with the sex they were assigned at birth. *See* Exec. Order No. 14,168 §§ 2(f), 3(e), 3(g), 60 Fed. Reg. 8615; *see also American Assoc. of Phys. For Human Rights, Inc. et al. v. Nat. Inst. Health et al.*, No. 25-cv-01620-LKG, 2025 WL 2344900 (D. Md. Aug. 13, 2025) (holding withholding research grants concerning gender identity violated equal protection). It targets transness itself and thus explicitly classifies based of transgender status, unlike the law in *Skrmetti*. Under controlling Ninth Circuit precedent, discrimination based on transgender status triggers heightened scrutiny—a holding that *Skrmetti* did not disturb. Dkt. #233 p.24; *see also, e.g., Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019); *Skrmetti*, 145 S. Ct. at 1832 (declining to address whether "transgender individuals are a suspect or quasi-suspect class"). For the same reason, it discriminates based on sex. The Gender Ideology Order denies funding to institutions that recognize a person assigned male sex at birth may have a female gender identity but permits funding for institutions recognizing female identifications for people assigned female sex at birth. This is not

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

discrimination based on a medical purpose or age as in *Skrmetti*; it is enforcement of a sex stereotype. *See* 145 S.Ct. at 1832 (holding sex-based stereotypes subject to heightened scrutiny).

The Medical Services Order is no different. As this Court previously held, the order prohibits medical services for proscribed *people,* not just for proscribed purposes. Dkt. #233 p.29 (holding that under the Medical Services Order "federally funded institutions can offer puberty blockers to delay the onset of normally timed puberty to *anyone except* 'an individual who does not identify as his or her sex.'" (quoting Dkt. #17-1 § 2(c)); *see also Skrmetti*, 145 S.Ct. at 1834 n. 3 (distinguishing a law that "regulates a class of *persons* identified on the basis of a specified characteristic"). Even the second and third listed services, which reference medical purpose, must be understood from their context to apply only to transgender and gender-diverse people. Otherwise, as this Court previously recognized, a voluntary vasectomy for an 18-year-old man who wished to avoid procreation would be prohibited, because it would likewise "'minimize or destroy [his] natural biological functions.'" Dkt. #161 p.21 (quoting Dkt. #17-1). Defendants themselves admit that this is not the Order's intent. *See* Dkt. #223 pp.21-22.

The law at issue in *Skrmetti* also included carveouts to treat medical conditions *except* gender-dysphoria, making it clear that the law discriminated based on medical purpose, not transgender status. Tenn. Code. Ann. § 68-33-103(b). Such carveouts are conspicuously absent in the Medical Services Order. Read as a whole, and in context of the Gender Ideology Order that governs its critical definitions, it singles out transgender and gender-diverse people for discriminatory treatment. This Court correctly applied heightened scrutiny under undisturbed Ninth Circuit precedent.

Finally, *Skrmetti* reaffirmed that if a regulation "is a mere pretext for invidious sex discrimination" it is subject to heightened judicial scrutiny. *See* 145 S. Ct. at 1833. That's exactly the case here: this Court already found that the Gender Ideology Order "is motivated by purposeful discrimination [and] violates the Fifth Amendment's equal protection guarantee." Dkt. #233 p.45. The Gender Ideology Order establishes critical definitions such as "sex," "male,"

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1  and "female," without which the Medical Services Order is incomprehensible. *See* Dkt. 17-2 §
2  2. This set of definitions, as the Court already held, "denies and denigrates the very existence of
3  transgender people." Dkt. #233 p.45. The Medical Services Order is governed by these same
4  definitions and is infected by the same animus. And, if more were needed, the Orders' animus is
5  amply confirmed by the ongoing campaign of hostility waged against transgender kids by the
6  Trump Administration. *See* Dkt. #164 pp.40-41; *see also generally* McGinty Decl. Both Orders
7  were motivated by a "desire to harm a politically unpopular group" and violate the Fifth
8  Amendment. *See U.S. Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973).

9      **3.     The Court's injunction is properly limited to provide complete relief to the parties**

10     The Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), confirms
11 that this Court did not abuse its discretion in reaching the factual conclusion that a Plaintiff State-
12 wide injunction was necessary to protect the Plaintiff States from irreparable harm. *CASA*
13 confirmed that this Court got it exactly right in carefully limiting its injunction to no further than
14 necessary to provide the Plaintiffs complete relief. Defendants' bid to narrow the Court's
15 injunction fails.

16     *CASA* addressed preliminary injunctions against President Trump's Citizenship-
17 Stripping Order awarded to three types of plaintiffs—individuals, organizations, and states. The
18 federal government sought to partially stay the injunctions "and limit them to the parties." *Id.* at
19 2549. In setting forth the type of injunctions it considered to be unauthorized, the Court
20 distinguished between "universal" injunctions, designed primarily to protect non-parties, and
21 "traditional, parties-only injunction[s]," which, while more limited, "can apply beyond the
22 jurisdiction of the issuing court." *Id.* at 2548 n.1 (citing *Steele v. Bulova Watch Co.*, 344 U.S.
23 280, 289 (1952)). As the Supreme Court explained, "[t]he difference between a traditional
24 injunction and a universal injunction is not so much *where* it applies, but *whom* it protects[.]" *Id.*
25
26

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

The Court concluded that courts likely do not have the authority to issue so-called "universal" injunctions designed to protect "anyone, anywhere." *Id.* at 2560. But in so doing, the Court reiterated that injunctions that incidentally benefit non-parties are permissible. The Court reaffirmed the "complete-relief principle" that "has deep roots in equity[,]" explaining that "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at 2556 (citing *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). And importantly, courts may do so where, as a practical matter, the relief may "advantag[e] nonparties," since "they do so only incidentally." *Id.* at 2557 (citing *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). Thus, while complete relief "is the maximum a court can provide[,]" the Court confirmed that "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Id*. at 2558 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

This Court carefully applied these principles in this case. It acknowledged "the general rule . . . that injunctions must 'be limited . . . only to named plaintiffs where there is no class certification,'" but noted that broader equitable relief affecting non-parties "'is acceptable where it is necessary to give prevailing parties the relief to which they are entitled.'" Dkt. #233 p.50 (quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996), and *Hecox v. Little*, 104 F.4th 1061, 1090 (9th Cir. 2024)). This is the same complete-relief principle the Supreme Court re-affirmed in *CASA*.

Because this Court's analysis hews closely to the Supreme Court's reasoning in *CASA*, Defendants do not (and cannot) contend this Court misapplied the law. Instead, they are left to quibble with this Court's factual conclusions that statewide relief was necessary to provide the Plaintiffs complete relief. Dkt. #288 pp.8-9. But they come nowhere near showing that this Court abused its discretion in determining that a statewide injunction was necessary to provide complete relief. *See California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018) ("The scope of the preliminary injunction . . . is . . . reviewed for abuse of discretion.").

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

"Having closely examined the record, . . . statewide relief is not only appropriate, but essential to provide complete relief to Plaintiffs." Dkt. #233 p.51. This is because the "voluminous record"—which Defendants still make no effort to rebut—shows that the Orders restrict Plaintiff State providers' ability to provide care for their patients. *Id.* As the Court found, based on undisputed evidence, "a multidisciplinary approach is frequently necessary to address patients' medical needs[.]" *Id.* That remains so. *See* Brumbaugh Decl. ¶¶14-15; Ojemann Decl. ¶5; Goepford Decl. ¶¶26-31; Dellit Decl. ¶14. Thus, state-wide injunctions are necessary to provide complete relief for the states' proprietary harms.

Defendants attempt to sidestep the Court's factual conclusions by contending that the Plaintiff States should be required to identify every possible specialist whom this injunction should be extended and pooh-poohing the obvious administrability concerns as irrelevant. Dkt. #288 pp.8-9. This is wrong for four reasons.

First, administrability is undoubtedly an important concern for district courts exercising equitable jurisdiction. *See North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (holding that "what is workable" matters when selecting an equitable remedy) (quotations omitted); *New Jersey. v. Trump*, No. 25-10139-LTS, Dkt. #203 pp.17-21 (D. Mass. July 25, 2025) (applying *CASA* to reject Defendants' arguments for a narrowed infeasible injunction). Defendants' blasé suggestion that this Court cannot take into account whether a narrower injunction would even be feasible—an argument which rests entirely on a concurring opinion that only two Justices joined—is obviously wrong. Dkt. #288 p.9 (citing *CASA*, 145 S. Ct. at 2565 (Thomas, J., concurring, joined only by Gorsuch, J.)).

Second, the workability concerns of Defendants' hypothetical but undefined narrowed injunction are not merely challenging—they are impossible to square with Federal Rule of Civil Procedure 65. The Rule requires that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). Defendants' insistence that this Court's injunction be limited to "specific providers" who are "members of

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

patients' care teams" ignores the obvious problem that this is not a static or discrete group. Care teams may shift for any number of reasons, new patients will seek care every day, providers will move in and out of states, and so on. There is no reasonable way for this Court to determine, *ex ante*, the universe of providers against whom Defendants cannot enforce their unlawful orders except on a statewide basis.

Third, the harm of the Orders is not limited to current care teams or providers. Rather, the Orders thwart the development of provider networks in the Plaintiff States. If this Court's injunction were restricted to current members of patients' care teams, new providers would still effectively be blocked from entering the field, even as existing providers are reducing services for transgender kids. *See, e.g.*, Dkt. #13 ¶29; Dkt. #87 ¶15.

Fourth, the Physician Plaintiffs represent the interests of their minor patients, not just themselves, and properly seek relief on behalf of current and future patients. *See, e.g.*, *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 318 (2020) (plurality) ("We have long permitted abortion providers to invoke the rights of their actual or potential patients[.]") (citing cases); *id.* at 354 n.4 (Roberts, C.J., concurring) (agreeing with standing analysis); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of HHS*, 485 F. Supp. 3d 1, 35 (D.D.C. 2020). Because future patients may lawfully seek gender-affirming health care anywhere within the Plaintiff States, this Court correctly issued an injunction of the same scope.

**B.     The Remaining Factors Strongly Weigh Against a Stay**

As this Court previously held, "[a]ny hardship suffered by Defendants pales in comparison to the irreparable harms likely to befall Plaintiffs." Dkt. #233 p.49. And this is even more true now, as the Trump Administration's campaign of intimidation against providers of gender-affirming care has escalated since February. *See supra* § II.A. Providers cite the preliminary injunction as a crucial factor enabling them to continue providing needed healthcare. Brumbaugh Decl. ¶¶22, 25; Ojemann Decl. ¶¶7-8; Goepford Decl. ¶¶26-31; Dellit Decl. ¶¶4,13. But without that protection, "[s]uch threats to our mission would likely force us to cease

11

1    providing gender-affirming care services." Ojemann Decl. ¶8; *see also* Brumbaugh Decl. ¶25

2    ("If the preliminary injunction is not continued, Children's Hospital [Colorado]is less likely to

3    be able to provide medical gender affirming care"); Goepford Decl. ¶29 ("To remove this

4    protection is to strike at the core of what makes Children's Minnesota who we are, which is

5    every family's essential partner in raising healthier children."); Dellit Decl. ¶18 ("The alternative

6    is to stop providing gender-affirming care to treat gender-dysphoria in our adolescent patients in

7    response to the EOs.").

8         Defendants cannot show irreparable injury, especially since they only move for a stay of

9    the preliminary injunction now, almost six months after it was issued. And this is after they

10    moved to stay proceedings in this Court, explicitly *consenting* to the preliminary injunction while

11    they appealed the Court's order. *See* Dkt. #263 pp.7-8 (arguing that staying proceedings would

12    not prejudice Plaintiffs because the preliminary injunction would remain in effect). Defendants

13    "delay in . . . filing the present motion cuts against their claim of irreparable harm." *See Wise v.*

14    *Inslee*, No. 2:21-cv-0288-TOR, 2021 WL 4951571, at *6 (W.D. Wash. Oct. 25, 2021).

15         Preserving the constitutional rights of Plaintiffs and their patients is in the public interest.

16    *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). And since gender-affirming care

17    has been provided safely for many years, consistently with the applicable standards of care, a

18    preliminary injunction merely maintains the status quo. Defendants' argument that the injunction

19    hampers the administration's ability to "implement [its] policy objectives" cannot be accepted

20    because that would mean that "no act of the executive branch asserted to be inconsistent with a

21    legislative enactment could be the subject of a preliminary injunction." Dkt. #233 p.49 (quoting

22    *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020)).

**C.    If Granted, This Court Should Dissolve the Stay of Proceedings**

23         This Court should not stay the preliminary injunction. But, if it does, then it should

24    dissolve the stay of proceedings. The Court held Plaintiffs were not prejudiced by the stay

25

26

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY
NO. 2:25-cv-00244-LK

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1    because the preliminary injunction would remain in place. Dkt. #273 p.5.[1]  Absent the

2    preliminary injunction, Plaintiffs will be prejudiced by the stay of proceedings.

3                              **V.    CONCLUSION**

4        The Court should not stay the preliminary injunction.

5        DATED this 18th day of August 2025.

6                                   I certify that this memorandum contains 4,183
                                   words, in compliance with the Local Civil Rules.
7

8                                   NICHOLAS W. BROWN
                                   Attorney General of Washington
9
                                   */s/ William McGinty*
10                                  WILLIAM MCGINTY, WSBA #41868
                                   CYNTHIA ALEXANDER, WSBA #46019
11                                  TERA HEINTZ, WSBA #54921
                                   ANDREW R.W. HUGHES, WSBA #49515
12                                  NEAL LUNA, WSBA #34085
                                   CRISTINA SEPE, WSBA #53609
13                                  LUCY WOLF, WSBA #59028
                                   Assistant Attorneys General
14                                  800 Fifth Avenue, Suite 2000
                                   Seattle, WA 98104-3188
15                                  360-709-6470
                                   William.McGinty@atg.wa.gov
16                                  Cynthia.Alexander@atg.wa.gov
                                   Tera.Heintz@atg.wa.gov
17                                  Andrew.Hughes@atg.wa.gov
                                   Neal.Luna@atg.wa.gov
18                                  Cristina.Sepe@atg.wa.gov
                                   Lucy.Wolf@atg.wa.gov
19                                  *Attorneys for Plaintiff State of Washington*

20                                  */s/ Colleen Melody*
                                   LAURYN K. FRAAS, WSBA #53238
21                                  COLLEEN MELODY, WSBA #42275
                                   Assistant Attorneys General
22                                  800 Fifth Avenue, Suite 2000
                                   Seattle, WA 98104-3188
23                                  360-709-6470
                                   Lauryn.Fraas@atg.wa.gov
24                                  Colleen.Melody@atg.wa.gov
                                   *Attorneys for Physician Plaintiffs 1-3*
25

26        [1] The Court also noted the injunction entered by the District of Maryland. Dkt. #273 p.5. Defendants have
     also requested a stay of that injunction. *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337-BAH, Dkt. #151 (July 28, 2025).

1

2    KEITH ELLISON
     Attorney General of Minnesota
3
     */s/ James W. Canaday*
4    JAMES W. CANADAY (admitted pro hac vice)
     Deputy Attorney General
5    445 Minnesota St., Ste. 600
     St. Paul, Minnesota 55101-2130
6    651-757-1421
     james.canaday@ag.state.mn.us
7    *Attorneys for Plaintiff State of Minnesota*

8

9    DAN RAYFIELD
     Attorney General of Oregon
10
     */s/ Allie M. Boyd*
11   ALLIE M. BOYD, WSBA #56444
     Senior Assistant Attorney General
12   Trial Attorney
     1162 Court Street NE
13   Salem, OR 97301-4096
     503-947-4700
14   allie.m.boyd@doj.oregon.gov
     *Attorneys for Plaintiff State of Oregon*

15

16   PHIL WEISER
     Attorney General of Colorado
17
     */s/ Shannon Stevenson*
18   SHANNON STEVENSON (admitted pro hac vice)
     Solicitor General
19   LAUREN PEACH (admitted pro hac vice)
     First Assistant Attorney General
20   Office of the Colorado Attorney General
     1300 Broadway, 10th Floor
21   Denver, CO 80203
     720-508-6000
22   shannon.stevenson@coag.gov
     lauren.peach@coag.gov
23   *Attorneys for Plaintiff State of Colorado*

24

25

26